**KAPLAN FOX & KILSHEIMER LLP**
Justin B. Farar (SBN 211556)
*jfarar@kaplanfox.com*
12400 Wilshire Boulevard, Suite 460
Los Angeles, CA 90025
Telephone: (310) 614-7260
Facsimile: (310) 575.8697

*Liaison Counsel for Lead Plaintiff and the
Proposed Class*

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY TRAN, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> BEYOND MEAT, INC., ETHAN BROWN, and MARK J. NELSON, <br><br> Defendants. | Case No. 2:20-cv-00963-MWF <br><br> <u>CLASS ACTION</u> <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ........................................................... 1

II.  JURISDICTION AND VENUE ..................................................... 7

III.  PARTIES ...................................................................................... 8

    A.  Plaintiffs ............................................................................. 8

    B.  Defendants ........................................................................... 9

    C.  Significant Non-Parties .................................................... 11

IV.  SUBSTANTIVE ALLEGATIONS ............................................. 12

    A.  Beyond Meat and Its Business ......................................... 12

    B.  DLF Contracts With Beyond Meat to Be its Exclusive Co-Manufacturer ................................................................... 13

    C.  The 2016 Safety Audit and Expansion of the Exclusive Supply Agreement .............................................................. 15

    D.  Beyond Meat Executes a Scheme to Replace DLF as Co-Manufacturer ................................................................... 17

        1.  Beyond Meat Covertly Negotiates with CLW to Replace DLF as the Company's Co-Manufacturer ............................... 17

        2.  Beyond Meat Executes a Scheme to Justify Terminating the Amended ESA .......................................................... 20

    E.  DLF Sues Beyond Meat For the Company's Actions Surrounding the Termination of the ESA ......................... 21

    F.  Beyond Meat Conceals the Risks of the DLF Litigation to Avoid Compromising its IPO and "Unicorn" Status ........ 22

    G.  The Market Learns of Beyond Meat's Real Risk of Liability in the DLF Litigation .......................................................... 24

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ......................................... 25

    A.  The May 2, 2019 False and Misleading Statements .......... 26

    B.  The June 12, 2019 False and Misleading Statements ........ 28

    C.  The July 29, 2019 False and Misleading Statements ........ 30

    D.  The November 12, 2019 False and Misleading Statements ............... 32

    E.  The Truth is Revealed ....................................................... 34

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS (cont. d)**

**Page**

VI.     ADDITIONAL SCIENTER ALLEGATIONS ............................................. 35

      A.      The Fraud Impacted Beyond Meat's Core Operations ...................... 36

      B.      The Individual Defendants Controlled the Contents of the Company's Public Statements during the Class Period ...................... 37

VII.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ............... 38

VIII.   LOSS CAUSATION ........................................................................... 39

      A.      Corrective Disclosure ........................................................ 40

      B.      Materialization of the Risk ................................................. 40

IX.     CLASS ACTION ALLEGATIONS ................................................... 42

X.      CLAIMS FOR RELIEF ................................................................... 44

XI.     PRAYER FOR RELIEF ................................................................... 48

XII.    JURY TRIAL DEMANDED ............................................................ 48

1.     Lead Plaintiff Block Investments Corporation ("Block") and named plaintiffs Jie Ling Guo and Neeraj Tulsian (together, "Plaintiffs") together and on behalf of all others similarly situated, by and through their attorneys, bring this securities class action under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder on behalf of all other persons and entities that purchased or otherwise acquired the securities of Defendant Beyond Meat, Inc. ("Beyond Meat" or the "Company"), between May 2, 2019 and January 27, 2020, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.     Plaintiffs allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), all public court filings regarding the litigation between Savage River Inc., d/b/a Beyond Meat and Don Lee Farms, press releases, news articles, analyst reports, and information readily available on the Internet. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

3.     From the moment Beyond Meat went public in May 2019, Defendants materially misrepresented to investors that a pending lawsuit against the Company brought by its former co-manufacturer, Don Lee Farms ("DLF"), lacked validity, and that its risks from the lawsuit were not extraordinary.[1] In reality, however,

---

[1] The lawsuit referred to is the matter filed in the California Superior Court, County of Los Angeles, *Don Lee Farms v. Savage River, Inc. d/b/a Beyond Meat*, Case No. BC662838 (the "DLF Litigation"). All individual pleadings cited herein are from the DLF Litigation, unless otherwise specified.

Defendants knew or recklessly disregarded that their risk of liability was a near-certainty.  Defendants' fraudulent actions ensured that Beyond Meat's May 2019 Initial Public Offering ("IPO") went off without a hitch, becoming the largest-popping U.S. IPO in nearly two decades, and artificially inflated Beyond Meat's stock price throughout the Class Period.

4.     Unbeknownst to investors, however, years before the IPO, Defendants executed a scheme to get out of an exclusive supply agreement it had with DLF before the end of the contract term – a scheme that would ultimately form the basis of DLF's legal claims against the Company.

5.     Beyond Meat is a food company that manufactures and sells plant-based meat products using protein from peas referred to as "extrudate."  Beyond Meat does not perform all of the steps in the manufacturing process for its products.  Rather, the Company produces the extrudate and other pea protein-based raw ingredients and contracts with a co-manufacturer who processes the ingredients into finished products and packages them for distribution and sale by the Company.

6.     In 2014, Beyond Meat and DLF entered into a contract whereby, DLF became Beyond Meat's exclusive co-manufacturer.  In its role as exclusive co-manufacturer, DLF significantly contributed to Beyond Meat's rise.  Prior to entering its relationship with DLF, Beyond Meat did not know how to mass-produce its product and had essentially been making the products by hand.  DLF was responsible for engineering the process to scale production of Beyond Meat's plant-based meat products, allowing the Company to grow.

7.     DLF also developed the "Batch Making Protocols" for producing several of the Company's products, including the "Beyond Burger" – Beyond Meat's most popular product.  DLF's Batch Making Protocols detailed the method

1   and process for mass-producing the Beyond Burger, including critical components
2   like ingredient amounts, mixing times, and equipment layouts.

3       8.      However, in late January 2016, prior to DLF completing development
4   of the Beyond Burger, Beyond Meat's relationship with DLF was deteriorating, in
5   part, because DLF had lost confidence in Beyond Meat's food safety protocols
6   after discovering foreign objects in the raw materials provided by Beyond Meat on
7   multiple occasions.

8       9.      At that time, maintaining the Company's relationship with DLF was
9   critical, as DLF was still perfecting the Beyond Burger.  Accordingly, Beyond
10  Meat conducted an independent food safety audit of the Company's facility in an
11  attempt to address DLF's concerns.

12      10.     Thereafter, Beyond Meat provided DLF with an independent safety
13  audit report that identified no food safety concerns.  DLF has since alleged that
14  Beyond Meat executives deleted significant portions of the safety audit report,
15  concealing the consultant's findings of contamination.

16      11.     Satisfied by the purported clean audit, on April 11, 2016, DLF agreed
17  to amend the exclusive supply agreement, extending the contract with Beyond
18  Meat through April 11, 2019.  The amendment also more than doubled Beyond
19  Meat's minimum required purchases under the agreement to 4,000,000 pounds of
20  product in the first year, escalating to 6,000,000 pounds in the third year.

21      12.      One month later, in May 2016, Beyond Meat launched the Beyond
22  Burger, which sold out almost immediately and became the Company's flagship
23  product.  Since its launch, the Beyond Burger has continued to be the Company's
24  most successful product, accounting for approximately 60% of the Company's
25  revenue leading up to its IPO.[2]

26

27  _____
28  [2] Beyond Meat, Inc. Annual Report (Form 10-K) (Mar. 19, 2020) at 2.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

13.    With the Beyond Burger launched and DLF's Batch Making Protocol for its new core product in hand, Defendants no longer had to rely on DLF and began to shop for a less costly replacement co-manufacturer.

14.    To that end, Defendants secretly arranged a test with CLW Food to potentially replace DLF as the Company's co-manufacturer.   The test was scheduled for February 3, 2017.   However, before the test could take place, DLF was alerted to Defendants' plans when a Beyond Meat employee accidently copied DLF on an email chain discussing CLW.

15.    Defendant Brown mitigated the error by representing to DLF that the Company would pull the test at CLW in the hope that the two companies could put the matter behind them.   However, despite Brown's assurances to the contrary, Beyond Meat continued to covertly negotiate with CLW.

16.    Beyond Meat's former Vice President of Operations and Supply Chain testified that by late March 2017, he had been negotiating with CLW for a while, including discussing price, capabilities and quantities, and had taken a tour of CLW's facility.

17.    Beyond Meat was looking for an alternative to DLF in part, because of the excessive minimum purchases required under the parties' agreement, which Beyond Meat executives believed were too costly.   Rather than attempt to renegotiate the terms with DLF, Beyond Meat decided to find a way out of the contract.

18.    After ensuring that CLW was ready to take over as co-manufacturer – Beyond Meat set in motion its plan to change its co-manufacturer, in violation of the Company's exclusive supply agreement with DLF.  On April 12, 2017, Beyond Meat sent DLF a Notice of Breach alleging multiple material breaches of the exclusive supply agreement related to purported food safety concerns, including

discovering Salmonella at DLF's facility, allegations DLF claims were just a pretext to end the relationship.

19.     On May 23, 2017, Beyond Meat sent a Notice of Termination to DLF stating that, due to DLF's failure to cure the alleged breaches, the Company was terminating the exclusive supply agreement.

20.     On May 25, 2017, DLF filed a lawsuit against the Company alleging breach of contract, misappropriation of trade secrets, and fraud, among other claims.

21.     In November 2018, Beyond Meat announced that the Company planned to go public.  In the weeks leading up to the Company's May 2, 2019 IPO, there was significant excitement about the Company.  Despite never having turned a profit, Beyond Meat was dubbed a "unicorn" startup, as a private company with a valuation of over $1 billion.[3]

22.     Not wanting to damage the positivity in the market surrounding the Company heading into the IPO, Beyond Meat concealed the truth about the DLF Litigation from investors in the Registration Statement dated May 1, 2019, filed with the SEC in connection with the Company's IPO (the "Registration Statement").  In the Registration Statement, Beyond Meat affirmatively denied each of the claims made against the Company by DLF and provided only general risk disclosures related to the DLF Litigation.  These representations served to assuage investors' concerns that DLF was likely to be awarded damages in the DLF Litigation or be able to lay claim to any portion of Beyond Meat's intellectual property, including the Beyond Burger.

---

[3] Edward Helmore, *Beyond Meat Preps for IPO as Rivals Take Bite Out of Food Industry*, THE GUARDIAN (April 28, 2019), https://www.theguardian.com/business/2019/apr/28/beyond-meat-wall-street-debut-public.

23.     On May 2, 2019, the Company completed its Initial Public Offering, issuing 11,068,750 shares of common stock at an offering price of $25.00 per share generating approximately $276,718,750 in gross proceeds.  By the close of the market, Beyond Meat shares had soared to $65.75, for a gain of 163%, and it had become the biggest-popping U.S. IPO in nearly two decades.[4]

24.     Throughout the Class Period, Defendants continued to deny the merits of DLF's claims and conceal from investors that Beyond Meat's risk of being held liable in the DLF Litigation was closer to a near certainty rather than the mere possibility represented by the Company.  Because of the Company's forceful denials of liability, the market was unable to decipher the Company's true risks of liability.  Nevertheless, it was only a matter of time before the market discovered DLF's claims were valid and the risks materialized.

25.     On January 27, 2020, after the close of the markets, DLF issued a press release announcing that the judge in the DLF Litigation issued a Right to Attach Order, and by doing so, ruled that DLF "proved the probable validity of its claim that Beyond Meat breached its manufacturing agreement with Don Lee Farms."[5]

26.     DLF's press release also revealed that based on discovery produced in the DLF Litigation, the court granted its motion to amend its complaint to name

---

[4] Mike Murphy, *Beyond Meat Soars 163% in Biggest-Popping U.S. IPO Since 2000*, MarketWatch (May 5, 2019), https://www.marketwatch.com/story/beyond-meat-soars-163-in-biggest-popping-us-ipo-since-2000-2019-05-02#:~:text=Beyond%20Meat's%20BYND%2C%20%2D2.52%25,raise%20at%20least%20%24240%20million.

[5] Press Release, Don Lee Farms, *Judge Rules Don Lee Farms Likely to Obtain Judgment.  Beyond Meat's CFO and Others Named Individually for Fraud*, Business Wire (Jan. 27, 2020), https://www.businesswire.com/news/home/20200127005705/en/Judge-Rules-Don-Lee-Farms-Obtain-Judgment.#:~:text=Judge%20Rules%20Don%20Lee%20Farms%20Likely%20to%20Obtain%20a%20Judgment,Others%20Named%20Individually%20for%20Fraud.&text=LOS%20ANGELES%2D%2D(BUSINESS%20WIRE,agreement%20with%20Don%20Lee%20Farms.

Defendant Nelson and Beyond Meat's Senior Quality Assurance Manager Jessica Quetsch and Director of Operations Anthony Miller in connection with its fraud claim, alleging that these individuals coordinated to intentionally doctor and omit material information from the 2016 safety audit report that Beyond Meat provided to DLF – the very report that induced DLF to extend its contract with Beyond Meat.[6]

27.    Following these revelations, for the first time, the market appreciated that DLF's claims were legitimate and that Defendants had no basis for their blanket denial of culpability for the actions alleged in the DLF Litigation.  The market also appreciated that Beyond Meat's warnings did not reflect the true level of risk the Company faced with respect to the DLF Litigation and it was likely to be subjected to significant penalties.  Indeed, even analysts at J.P. Morgan noted that this news "surely is an additional risk to the stock price."[7]

28.    On this news, Beyond Meat's stock price dropped $4.63, or over 3.7%, to close at $120.12 per share on January 28, 2020.

29.    As a direct and proximate result of Defendants' fraud, Beyond Meat investors lost hundreds of millions of dollars.

## II.    JURISDICTION AND VENUE

30.    The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

31.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

---

[6] *Id.*

[7] Ken Goldman, "Beyond Meat: Downgrading to Neutral as 65% Stock Appreciation this Month Renders Risk/Reward More Balanced", J.P. Morgan, Jan. 28, 2020 at p. 1, available from Investext, accessed June 30, 2020.

32.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Many of the acts and transactions, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District. Additionally, Beyond Meat's headquarters is located in this District.

33.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate communications, and the facilities of a national securities exchange.

## III.     PARTIES

### A.     Plaintiffs

34.     Lead Plaintiff Block Investment Corporation, as set forth in the certification submitted with its motion for appointment as lead plaintiff, incorporated by reference herein, purchased Beyond Meat securities during the Class Period and suffered damages as a result of the federal securities law violations and false or misleading statements or material omissions alleged herein.

35.     Named Plaintiff Jie Ling Guo, as set forth in her Private Securities Litigation Reform Act ("PSLRA") certification attached hereto as Exhibit A, purchased Beyond Meat securities during the Class Period and suffered damages as a result of the federal securities law violations and false or misleading statements or material omissions alleged herein.

36.     Named Plaintiff Neeraj Tulsian, as set forth in his PSLRA certification attached hereto as Exhibit B, purchased Beyond Meat securities during the Class Period and suffered damages as a result of the federal securities law violations and false or misleading statements or material omissions alleged herein.

**B.    Defendants**

37.    Defendant Beyond Meat is food company that produces and sells a range of plant-based meat products.  Beyond Meat is a Delaware corporation with its principal executive offices located at 119 Standard Street, El Segundo, CA 90245.  Beyond Meat's common stock trades in an efficient market on the NASDAQ under the ticker symbol "BYND."

38.    Defendant Ethan Brown ("Brown") served as Beyond Meat's Chief Executive Officer and President during the Class Period, and also served on the Company's Board of Directors.

39.    Defendant Mark J. Nelson ("Nelson") served as Beyond Meat's Chief Financial Officer, Treasurer, and Secretary during the Class Period.

40.    Defendants Brown and Nelson are sometimes referred to herein as the "Individual Defendants."  Each of the Individual Defendants:

(a)    had intimate knowledge of every aspect of Beyond Meat's business, including its relationships with its co-manufacturers;

(b)    directly participated in the management of the Company, including being involved in negotiating and terminating the Company's contracts with its co-manufacturers;

(c)    were directly involved in the day-to-day operations of the Company at the highest levels;

(d)    were privy to confidential proprietary information concerning the Company and its business and operations, including trade secrets used for the production of its plant-based meat products;

(e)    were directly or indirectly involved in drafting, producing, reviewing and disseminating the false and misleading statements and information alleged herein;

(f)     were aware of or recklessly disregarded that Beyond Meat had wrongfully terminated its exclusive supply agreement with DLF and was likely to be held liable for breach of contract in the DLF Litigation;

(g)     were aware of or recklessly disregarded that Beyond Meat had misappropriated DLF's trade secrets in violation of the non-disclosure agreement contained in the exclusive supply agreement, and thus, was likely to be held liable for such conduct in the DLF Litigation;

(h)     were aware of or recklessly disregarded that Beyond Meat altered the 2016 safety audit report to remove negative information before providing it to DLF, that DLF relied on the report in its decision to enter into the amendment to the Exclusive Supply Agreement, and thus, was likely to be held liable for fraud or negligent misrepresentation in the DLF Litigation;

(i)     were aware of or recklessly disregarded the fact that false or misleading statements were being issued concerning the Company; and

(j)     approved or ratified these statements in violation of the federal securities laws.

41.     As a result, the Individual Defendants are liable for the false or misleading statements and omissions pleaded herein.

42.     In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause, and did cause, directly or indirectly, the Company to engage in the unlawful conduct complained of herein.

43.     Defendant Beyond Meat and the Individual Defendants are collectively referred to as "Defendants."

## C.    Significant Non-Parties

44.    Non-party Don Lee Farms is the trade name of Goodman Food Products, Inc., a California corporation, headquartered in Inglewood, California. DLF is a producer of fresh and frozen foods and has been making plant-based proteins since 2005.  DLF's products are sold at major retailers including Costco Wholesale, Whole Foods Markets, Trader Joe's, Kroeger, Publix, and Albertsons. DLF was Beyond Meat's exclusive co-manufacturer of its plant-based meats from December 2014 to May 2017.

45.    Non-party Don Ephgrave ("Ephgrave") was Beyond Meat's Vice President of Operations and Supply Chain from 2016 to 2017.  Ephgrave was responsible for managing Beyond Meats relationships with its co-manufacturers. Ephgrave also negotiated Beyond Meat's agreements with ProPortion Foods, LLC/ CLW Foods, LLC to provide co-manufacturing services for Beyond Meat.

46.    Non-party ProPortion Foods, LLC ("ProPortion") is a California corporation, headquartered in Round Rock, Texas.  ProPortion served as one of Beyond Meat's co-manufacturers after the Company terminated its exclusive supply agreement with DLF.

47.    Non-party CLW Foods, LLC ("CLW") is a California corporation, headquartered in Hanford, California.[8]  CLW served as one of Beyond Meat's co-manufacturers after the Company terminated the exclusive supply agreement with DLF.

---

[8] Though they are incorporated as separate entities, Ephgrave testified that ProPortion and CLW are alter egos of each other and have the same owner.  *See* Compendium of Evidence in Support of Don Lee Farms' Opposition to ProPortion Foods, LLC's Motion for Summary Judgment or, In the Alternative for Summary Adjudication dated May 3, 2019 (the "Compendium of Evidence") at COE0091 (Excerpts from the Deposition Testimony of Don Ephgrave, Mar. 12, 2018).

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Beyond Meat and Its Business

48.   Beyond Meat is a food company that manufactures and sells plant-based meat products.  It has products in three core plant-based platforms that align with the largest meat categories globally: beef, pork, and poultry.

49.   Instead of animal protein, the Company's products are produced using protein from peas, referred to by the Company as "extrudate."  Beyond Meat produces the extrudate and other pea protein-based raw ingredients at the Company's facility in Columbia, Missouri.  The Company then delivers the raw ingredients to a co-manufacturer, who processes them into finished products and packages them for distribution and sale by the Company.

50.   As of December 31, 2019, Beyond Meat's products were available in approximately 77,000 retail stores, restaurants and foodservice outlets in more than 65 countries, including major retailers such as Whole Foods Market and Costco Wholesale.  Beyond Meat's products are also included on the menu of several fast-casual restaurants, including KFC, Dunkin, Subway, Carl's Jr. and Del Taco. Additionally, the Company announced that McDonalds would be testing a Beyond Meat product in selected restaurants.

51.   Launched in May 2016, Beyond Meat's flagship product is the Beyond Burger, which the Company claims to be the "world's first 100% plant-based burger" and is "designed to look, cook and taste like a traditional beef burger."[9]

52.   Since its launch, the Beyond Burger has been critical to Beyond Meat's growth and success.   From 2017 through 2019, the Beyond Burger accounted for over 60% of the Company's gross revenues.[10]

---

[9] Beyond Meat, Inc. Annual Report (Form 10-K) (Mar. 19, 2020) at 2.
[10] *Id.*

**B.    DLF Contracts With Beyond Meat to Be its Exclusive Co-Manufacturer**

53.    On September 12, 2014, Beyond Meat and DLF entered into a Mutual Confidentiality Agreement (the "NDA") while exploring a potential business relationship.  Per the terms of the NDA, Beyond Meat could not disclose any confidential information that it received from DLF without prior written consent. The NDA was executed by Defendant Brown on behalf of Beyond Meat.[11]

54.    On December 2, 2014, Beyond Meat entered into the Exclusive Supply Agreement ("ESA") with DLF, through which DLF became the Company's exclusive co-manufacturer through December 2, 2017.[12]

55.    Under the terms of the ESA, Beyond Meat agreed to supply extrudate to DLF and DLF agreed to process the extrudate into finished food products. Beyond Meat agreed to "purchase one hundred percent (100%) of its Products needs" from DLF.[13]

56.    The ESA required Beyond Meat to purchase a minimum amount of finished product from DLF in each order throughout the course of each year of the contract term.   Specifically, Beyond Meat was required to purchase at least 400,000 pounds of products during the first year of the agreement and at least 2,000,000 pounds of products during the second and third years, with no individual order less than 40,000 pounds.[14]

57.    The NDA was incorporated into the ESA and amended to extend its protections through the terms of the ESA.   Section 3.3 of the NDA was also

---

[11]   *See* Compendium of Evidence at COE0052-61 (Mutual Confidentiality Agreement between Beyond Meat and DLF, Sept. 12, 2014).

[12] Compendium of Evidence at COE0016, COE0022 (Exclusive Supply Agreement between Beyond Meat and DLF, Dec. 2, 2014).

[13] *Id.* at COE0013.

[14] *Id.* at COE0026.

amended to ensure that Beyond Meat could only use DLF's confidential information "for any purpose consistent with the goals and provisions of" the business relationship between Beyond Meat and DLF, and that any intellectual property developed by DLF during the term of the ESA "shall be solely owned and may be used only by [DLF] for its own purposes or for its financial gain or other advantage."[15]

58.    The ESA was executed by Defendant Brown on behalf of Beyond Meat.

59.    In its role as co-manufacturer, DLF was responsible for scaling up Beyond Meat's operations.  Beyond Meat's Vice President of Operations and Supply Chain, Don Ephgrave ("Ephgrave") testified that prior to entering into the ESA with DLF, Beyond Meat did not know how to mass-produce its product.[16]

60.    Ephgrave further testified that the process DLF created was "totally different" from what the Company was doing before, which Ephgrave stated was "making 50-pound batches in the mom-and-pop facility in California or the facility in Columbia" by hand.[17]

61.    According to DLF, it spent months developing and refining the processes for turning the raw ingredients provided by Beyond Meat into finished products that could be produced in large volumes.  These processes for creating Beyond Meat's products were documented in what were called "Batch Making Protocols."[18]

---

[15] *Id.* at COE0012, COE0027.

[16] Compendium of Evidence at COE0096-98 (Excerpts from the Deposition Testimony of Don Ephgrave, Mar. 12, 2018).

[17] *Id.* at COE0101-102.

[18] Don Lee Farm's Opposition to ProPortion Foods, LLC's Motion for Summary Judgment (the "DLF Opposition"), May 3, 2019 at 8.

62.     The Batch Making Protocols described how much of each ingredient would be used during each step of the manufacturing process and how to manipulate each ingredient during the process, including mixing times.[19]

63.     According to DLF, it also engineered the process for manufacturing the Company's products at scale by selecting the layout, product flow, room design, and equipment selection for implementing its Batch Making Protocols.[20]

64.     During the ESA, DLF created Batching Making Protocols for producing Beyond Meat's flagship Beyond Burger, a raw plant-based burger patty, as well as for the Company's Beast Burger, a pre-cooked, plant-based burger patty, among others.

## C.     The 2016 Safety Audit and Expansion of the Exclusive Supply Agreement

65.     DLF claims that in 2016, Beyond Meat and DLF were considering expanding their relationship to include additional products and extending the ESA, but DLF raised concerns about Beyond Meat's food safety protocols.[21]

66.     Specifically, on January 27, 2016, DLF's Quality Assurance Manager, Gerber Alvarado ("Alvarado") emailed Beyond Meat's Senior Quality Assurance Manager Jessica Quetsch ("Quetsch"), notifying her that DLF discovered a foreign object (a blue plastic scoop) in Beyond Meat's shipments of raw materials.[22]

67.     This was not the first time DLF received tainted ingredients from Beyond Meat.  DLF CEO Donald Goodman forwarded the email to Defendant Brown stating: "Are you aware of how many foreign objects we have found?  We need to halt operations until satisfactory corrective action has been put in place."

---

[19] *Id.*

[20] *Id.* at 4, 8.

[21] *Id.* at 7.

[22] Compendium of Evidence at COE0062-63 (Email from Gerber Alvarado to Jessica Quetsch, Fwd: QC 01-27-16 beyond meat blue scoop, Jan. 27, 2016).

Defendant Brown assured Goodman that Beyond Meat would try to resolve this issue.[23]

68.     Maintaining the relationship with DLF was critical to Beyond Meat because at the time, DLF was still perfecting the Beyond Burger.  Therefore, in an effort to assuage DLF's concerns, Beyond Meat hired a third-party food safety consultant to conduct an inspection of the Company's production facility in Columbia, Missouri (the "2016 Safety Audit").[24]

69.     Upon completion of the 2016 Safety Audit (and prior to DLF agreeing to amend the ESA on April 11, 2016), Beyond Meat delivered a report with the consultant's findings to DLF (the "Safety Audit Report") that reported no safety violations at Beyond Meat's facility.[25]

70.     Satisfied with the purported results of the 2016 Safety Audit, DLF agreed to amend the ESA to extend and expand DLF's and Beyond Meat's relationship.  In furtherance of this expanded relationship, DLF planned to move its production from its California facility to a facility in Mansfield, Texas to support the higher production volume required by the amendment.

71.     Among other things, the amended ESA: (i) extended the term of the parties' relationship until at least April 2019; (ii) increased the minimum required to be purchased by Beyond Meat to four million, five million, and six million pounds of product, respectively, during the first three years; and (iii) removed Beyond Meat's right to produce any products internally, except for pilot productions, and gave DLF the right of first refusal to expand its operations in the

---

[23] Compendium of Evidence at COE0062 (Email from Donald Goodman to Ethan Brown, Re: QC 01-27-16 beyond meat blue scoop, Jan. 27, 2016).

[24] DLF Opposition at 7.

[25] *Id.*

event the Company's production requirements exceeded the capabilities of DLF's new Texas facility.[26]

72.     DLF alleges that it relied on the Safety Audit Report's conclusion that there were no food-safety concerns present at Beyond Meat's facility when it agreed to the amended ESA.[27]

73.     Following the parties' agreement to the amended ESA, DLF continued to develop methods and processes for creating Beyond Meat's products, including the Beyond Burger – a process that DLF alleges took several months to finalize, with "numerous changes being discussed on a near-daily basis."[28]

74.     Beyond Meat officially launched the Beyond Burger in May 2016. The Beyond Burger was an instant success, in some cases, selling out within an hour of hitting the shelves.

**D.     Beyond Meat Executes a Scheme to Replace DLF as Co-Manufacturer**

**1.     Beyond Meat Covertly Negotiates with CLW to Replace DLF as the Company's Co-Manufacturer**

75.     In or around January 2017, after the launch of the Beyond Burger and more than two years before the amended ESA was set to expire, Beyond Meat executives, who believed the ESA with DLF was too costly, covertly scheduled a test with CLW[29] to see if it was capable of replacing DLF as the Company's co-manufacturer.[30]

---

[26] Compendium of Evidence at COE0029-45 (Amendment to Exclusive Supply Agreement).

[27] Second Amended Complaint, March 11, 2019 at 15.

[28] DLF's Opposition at 7-8.

[29] As discussed *supra* at FN7, Ephgrave testified that CLW and ProPortion are in effect the same company.

[30] Compendium of Evidence at COE0068 (Email from Ephgrave to Brown, cc'ing Goodman, Re: Hockey All Star Game, Feb. 1, 2017).

76.     Brian Levy, a Partner at ProPortion, who is also connected to CLW,[31] submitted a sworn declaration in the DLF Litigation admitting that ProPortion's relationship with Beyond Meat began no later than January 2017.[32]

77.     On February 1, 2017, the Company's plan to replace DLF was exposed when Ephgrave accidently included Goodman on an email discussing the Company's scheduled test with CLW.  Ephgrave's email stated: "We are testing this Friday at CLW.  If all goes wetland [sic], it meets everyone's expectations, I don't see why we could not be up and running within two to three weeks."[33]

78.     Within hours, Goodman notified Defendant Brown that DLF's lawyers believed Beyond Meat's test violated the amended ESA and to cease sharing information with other suppliers.[34]

79.     The next day, on February 2, 2017, Defendant Brown attempted to mitigate Ephgrave's mistake by alleging that while DLF and Beyond Meat have "different views of the contract," including "whether or not [Beyond Meat] can produce our core product (fresh beef) elsewhere until [DLF is] ready," Brown would be pulling the test at CLW for "the health of our relationship."  Brown further offered to meet with Goodman personally to put this matter behind them, characterizing his offer as "very sincere and a reflection on what [he] hope[s] is a mutual respect for one another."[35]

---

[31] Compendium of Evidence at COE0182-183 (California Secretary of State Corporate Filing for CLW Foods.).

[32] DLF's Opposition at 19-20 (citing Levy Declaration in Support of ProPortion's MSJ at ¶ 4).

[33] Compendium of Evidence at COE0068 (Email from Ephgrave to Brown, cc'ing Goodman, Re: Hockey All Star Game, Feb. 1, 2017).

[34] Compendium of Evidence at COE0071 (Email from Brown to Goodman, Re: Beyond Meat, Feb. 2, 2017).

[35] *Id.*

80.     Despite Brown's assurances to DLF, the Company continued to move forward with CLW and began surreptitiously negotiating an agreement to replace DLF as its co-manufacturer.

81.     Ephgrave testified that by late March 2017, he had "already been talking to [CLW] for a while," had engaged in negotiations, including discussing price capabilities and quantities, and had taken a tour of CLW's facility.[36] Ephgrave further testified that, on or around April 12, 2017, he directed Sergio Jimenez-Marquez, Beyond Meat's Senior Director of Process Engineering, to send CLW design drawings for how to set up their facility to produce the Company's products.[37]

82.     Ephgrave also testified that (like Beyond Meat before it contracted with DLF), CLW had no prior experience mass-producing plant-based meat products and that CLW would need Beyond Meat's know-how to "jump start" them.[38]

83.     According to Ephgrave, one of the reasons Beyond Meat was exploring new co-manufacturers was because the Company considered the required minimum purchases under the amended ESA excessive.   Ephgrave testified that after Defendant Nelson briefly left the Company in March 2017, "that's when a few things started bubbling up in terms of like the minimums."[39] Ephgrave alerted Defendant Brown that the Company's inventory of product on hand had ballooned to an estimated 1.2 million pounds because, under the ESA,

---

[36] Compendium of Evidence at COE0105-106 (Excerpts from the Deposition Testimony of Don Ephgrave, Mar. 12, 2018).

[37] *Id.* at COE0095.

[38] *Id.* at COE0094-95.

[39] *Id.* at COE0106-107.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Beyond Meat was required to accept whatever DLF produced and he "just kept applying pressure to Ethan [Brown]" with respect to the minimums.[40]

### 2.  Beyond Meat Executes a Scheme to Justify Terminating the Amended ESA

84.  After discovering that Beyond Meat had approached CLW and ProPortion about becoming co-manufacturers for the Company, DLF alleges that Beyond Meat invented false food safety concerns at DLF's new Texas facility as a pretext for terminating the amended ESA.[41]

85.  On April 12, 2017, Beyond Meat sent DLF a Notice of Breach alleging multiple material breaches of the amended ESA related to food safety concerns, including: (i) wood fragments in the raw ingredients and finished product at DLF's Mansfield facility, (ii) unsanitary conditions at DLF's Mansfield facility, including insects and the presence of Listeria and Salmonella bacteria, and (iii) complaints of other foreign objects appearing in finished product.[42]  Per the terms of the amended ESA, DLF was given 30 days to cure the breaches.

86.  Beyond Meat alleges that on May 3, 2017, it discovered that another lot of finished product produced at DLF's Mansfield facility had tested positive for Salmonella.  Beyond Meat further alleges that on May 8, 2017, an inspection of DLF's Mansfield facility by a third-party consultant conduct revealed that the facility was contaminated with Salmonella.[43]

---

[40] *Id.*

[41] DLF's Opposition at 4-5.

[42] Beyond Meat's Cross Complaint, July 27, 2017 at 8-11.

[43] *Id.* at 11.

Case No. 2:20-cv-00963-MWF

87.    On May 23, 2017, Beyond Meat sent a Notice of Termination to DLF stating that, due to DLF's failure to cure the alleged breaches, the Company was terminating the amended ESA.[44]

88.    DLF alleges that Beyond Meat shared DLF's trade secrets (i.e. its Batch Making Protocols) with CLW and ProPortion in violation of the NDA.[45] Indeed, just weeks after Beyond Meat terminated the ESA, CLW and ProPortion were producing Beyond Meat's products, including the Beyond Burger, despite having no experience mass-producing plant-based protein products.

89.    In fact, DLF discovered its Batch Making Protocol for the Beyond Burger in the ProPortion files that were produced in discovery, buried in over 2,000 pages of what ProPortion represented were "Invoices and Purchase Orders" and that ProPortion's protocol for the Beyond Burger was nearly identical to its own.[46]

### E.    DLF Sues Beyond Meat For the Company's Actions Surrounding the Termination of the ESA

90.    On May 25, 2017, DLF commenced the DLF Litigation, filing a complaint against Beyond Meat in the Superior Court of the State of California for the County of Los Angles, asserting claims for, *inter alia*, breach of contract, misappropriation of trade secrets, and unfair competition, seeking monetary damages and injunctive relief.

91.    The DLF Litigation stemmed from Beyond Meat's termination of the ESA and DLF's belief that the Company had shared DLF's methods and processes

---

[44] *See* Compendium of Evidence at COE0077-81 (Letter from Mitchell A. Kamin, Counsel for Beyond Meat, to Gerald M. Chizever, Counsel for DLF, Re: Notice of Termination, May 23, 2017).

[45] *Id.* at 10.

[46] *Id.*

to create Beyond Meat's products with its replacement co-manufacturers (e.g. CLW and ProPortion) in violation of the NDA.

92.    On July 27, 2017, Beyond Meat filed a cross-complaint against DLF alleging, *inter alia*, that DLF had breached the amended ESA by failing to produce a saleable product stemming from customer complaints regarding foreign objects found in products and the presence of Salmonella at DLF's Texas facility.

93.    In October 2018, DLF filed an amended complaint adding ProPortion as a defendant asserting, *inter alia*, claims arising from ProPortion's alleged use of DLF's trade secrets to produce Beyond Meat's products.

94.    On February 25, 2019, ProPortion moved for summary judgment against DLF, claiming there was no genuine issue of material fact because there is no evidence that ProPortion received DLF's trade secrets and there no evidence that ProPortion was aware of the ESA.  This motion was denied.

95.    On March 11, 2019, DLF filed a second amended complaint, adding claims of fraud and negligent misrepresentation against Beyond Meat.  DLF's new claims alleged that the Safety Audit Report identified various food safety concerns at Beyond Meat's facility, but that prior to providing the Safety Audit Report to DLF, the Company deleted significant portions of it to conceal these findings.[47]

**F.    Beyond Meat Conceals the Risks of the DLF Litigation to Avoid Compromising its IPO and "Unicorn" Status**

96.    Throughout the Class Period, and beginning with the Company's Registration Statement, Beyond Meat concealed the risks presented by the DLF Litigation.

97.    Leading up to the IPO, Beyond Meat was dubbed a "unicorn" - a private company with a valuation of over $1 billion.[48]

---

[47] DLF Opposition at 7.

[48] Edward Helmore, *Beyond Meat Preps For IPO as Rivals Take Bite Out of Food Industry*, THE GUARDIAN (April 28, 2019),

98.   Indeed, investor excitement surrounding the IPO reached a fever pitch.  As a result, the Company steadily increased that number of shares it planned to sell and the initial offering price.  By the time of the IPO, Beyond Meat had raised its offering price over 25% from initial projected offering price and increased the offering by over 1 million shares.

99.   Disclosing the true facts surrounding the Company's decision to terminate the ESA with DLF and its continued use of DLF's Batch Making Protocols with a cheaper co-manufacturer in violation of the NDA, would have quelled investor demand and market positivity surrounding the IPO because the probable risk of liability in the DLF Litigation would have been acutely apparent.

100.   Instead, in the Registration Statement, Beyond Meat affirmatively proclaimed the Company's innocence with respect to each of the claims alleged in the DLF Litigation and provided only boilerplate risk disclosures that merely warned investors that the Company "could" be required to pay DLF damages. These disclosures were inadequate to warn investors of Beyond Meat's actual risk of liability and did not reflect Defendants' knowledge of the events related to the DLF Litigation.

101.   On May 2, 2019, Beyond Meat conducted its IPO, issuing 11,068,750 shares of common stock at an offering price of $25.00 per share, generating approximately $276,718,750 in gross proceeds.

102.   By the close of the market on May 2, 2019, Beyond Meat shares had soared to $65.75, for a gain of 163% and it became the biggest-popping U.S. IPO in nearly two decades.

103.   Defendants' forceful rejection of the claims alleged in the DLF Litigation and tepid warnings had their intended effect – investors and analysts

---

https://www.theguardian.com/business/2019/apr/28/beyond-meat-wall-street-debut-public.

bought into the hype surrounding the Company's IPO, unencumbered by the ongoing DLF Litigation and unable to decipher its true risk to the Company.

104.   Following the IPO, Beyond Meat continued to keep investors in the dark by consistently denying the merits of the claims alleged in the DLF Litigation and by providing the same general risk disclosures to investors in all of the Company's Class Period Form 10-Q filings with the SEC.

**G.    The Market Learns of Beyond Meat's Real Risk of Liability in the DLF Litigation**

105.   On January 24, 2020, the court in the DLF Litigation granted DLF's application for a Writ of Attachment, finding that it was more likely than not that DLF would prevail on a portion of its breach of contract claim against Beyond Meat.  Specifically, the court issued a Right to Attach Order with respect to DLF's claims that Beyond Meat failed to pay money owed under the ESA for product produced and delivered pursuant to the ESA.

106.   On January 27, 2020, after the close of the markets, DLF issued a press release announcing the judge's decision and explaining to the market that, by granting DLF's motion, the judge ruled that DLF had "proved the probable validity of its claim that Beyond Meat breached its manufacturing agreement with Don Lee Farms."[49]

107.   DLF also disclosed that the court granted its motion to name Defendant Nelson, Senior Quality Assurance Manager Jessica Quetsch and Director of Operations Anthony Miller in its fraud claim related to the 2016 Safety

---

[49] Press Release, Don Lee Farms, *Judge Rules Don Lee Farms Likely to Obtain Judgment.  Beyond Meat's CFO and Others Named Individually for Fraud*, Business Wire (Jan. 27, 2020),
https://www.businesswire.com/news/home/20200127005705/en/Judge-Rules-Don-Lee-Farms-Obtain-
Judgment.#:~:text=Judge%20Rules%20Don%20Lee%20Farms%20Likely%20to%20Obtain%20a%20Judgment,Others%20Named%20Individually%20for%20Fraud.&text=LOS%20ANGELES%2D%2D(BUSINESS%20WIRE,agreement%20with%20Don%20Lee%20Farms.

Audit Report.[50]  As a result of discovery produced in the DLF Litigation, including the deposition of Quetsch, DLF claimed it has reason to believe that Defendant Nelson, Quetsch, and Miller "coordinated to modify the [Safety Audit] report by, among other things, deleting significant provisions of it to conceal certain findings about Beyond Meat's manufacturing facility from Don Lee Farms."[51]  The court agreed, allowing the amendment.

108.   Because of Beyond Meat's blanket and repeated denials of DLF's claims, this was the first time the market could appreciate the validity and risks posed by the DLF Litigation.

109.   On January 28, 2020, an analyst from J.P. Morgan admitted that "[t]he press release reads poorly for BYND" and that this news about the litigation is "surely is an additional risk to the stock price," while declining to handicap the ultimate outcome of the DLF Litigation.[52]

110.   As a result, on January 28, 2020, Beyond Meat's stock price fell $4.63 per share, or 3.71%, to close at $120.12 per share.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

111.   Throughout the Class Period, Defendants issued false and misleading statements concerning the Company's risk of liability from the DLF Litigation by failing to disclose that the Company knew liability was a near-certainty because it had manufactured a reason to terminate the ESA with DLF, shared DLF's trade secrets with its replacement co-manufacturers in violation of the NDA, and had altered the 2016 Safety Audit Report to induce DLF into entering into the amended

---

[50] Id.

[51] Motion to Amend at 6-7.

[52] Ken Goldman, "Beyond Meat: Downgrading to Neutral as 65% Stock Appreciation this Month Renders Risk/Reward More Balanced", J.P. Morgan, Jan. 28, 2020 at p. 1, available from Investext, accessed June 30, 2020.

ESA to ensure that the process for manufacturing the Beyond Burger was perfected before the relationship was terminated.

112.   Defendants falsely assured the market that Beyond Meat was innocent of *all* of the allegations asserted in the DLF Litigation and affirmatively denied culpability for all of the claims.   Additionally, Defendants understated the Company's true risks from the DLF Litigation by merely stating that the Company "could" face liability, when Defendants knew that at least some of DLF's claims were meritorious.

113.   As a result of the foregoing, Defendants' statements about Beyond Meat's business, operations, and prospects were false and misleading, or lacked a reasonable basis.   These material misstatements had the cause and effect of creating an unrealistically positive assessment of Beyond Meat's likelihood of success in the DLF Litigation in the market.

**A.   The May 2, 2019 False and Misleading Statements**

114.    On or about May 2, 2019, Beyond Meat conducted the IPO.   The Registration Statement filed with the SEC in connection with IPO was signed by the Individual Defendants.

115.   The Company's Registration Statement contained the following statement regarding the DLF Litigation:

> [O]n May 25, 2017, following our termination of our supply agreement with Don Lee Farms, a co-manufacturer, Don Lee Farms filed a lawsuit against us in California state court claiming that we wrongfully terminated the parties' contract and that we misappropriated their trade secrets by sharing with subsequent co-manufacturers the process for manufacturing our products – processes which they claim to have developed…On March 11, 2019, Don Lee Farms filed a second amended complaint to add claims for fraud and

negligent misrepresentations against us…***We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, [and] that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint…*** (emphasis added).

116.   The Company's Offering Documents also provided the following risk language with respect to the DLF Litigation:

> [W]e cannot assure you that Don Lee Farms or ProPortion[53] will not prevail in all or some of their claims…For example, if Don Lee Farms succeeds in the lawsuit we could be required to pay damages, including but not limited to contract damages reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms.

117.   The statements in ¶¶ 114-116 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that Beyond Meat had deliberately manufactured circumstances that would allow the Company to wrongfully terminate the ESA in order to contract with less expensive co-manufacturers; (ii) Defendants failed to disclose that they shared DLF's trade secrets with ProPortion and/or CLW in violation of the NDA; (iii) Defendants failed to disclose that they were continuing to use DLF's trade secrets in the

---

[53] On January 3, 2019, ProPortion filed a cross-complaint against Beyond Meat asserting claims of total and partial equitable indemnity, contribution and repayment.

production of the Company's products after the termination of the ESA; (iv) Defendants failed to disclose that they had altered the 2016 Safety Audit Report provided to DLF in order to induce DLF to enter into the amended ESA; (v) Defendants concealed the actual known risks that the Company would likely be subject to liability in the DLF Litigation; and (iv) as a result the Company's public statements were materially false and misleading at all relevant times.

**B.    The June 12, 2019 False and Misleading Statements**

118.    On June 12, 2019, Beyond Meat filed its quarterly report on Form 10-Q with the SEC for the quarter ended March 30, 2019 (the "Q1 2019 10-Q").  The Q1 2019 10-Q contained Sarbanes-Oxley ("SOX") certification signed by the Individual Defendants attesting that "the information contained in the [Q1 2019 10-Q] fairly presents, in all material respects the financial condition and results of operations of the Company for the periods presented therein."

119.    The Q1 2019 10-Q reiterated Beyond Meat's position contained in the Offering Documents with respect to the DLF Litigation, stating:

> On May 25, 2017, Don Lee Farms, a division of Goodman Food Products, Inc., filed a complaint against us in the Superior Court of the State of California for the County of Los Angeles asserting claims for breach of contract, misappropriation of trade secrets, unfair competition under the California Business and Professions Code, money owed and due, declaratory relief and injunctive relief, each arising out of our decision to terminate an exclusive supply agreement between us and Don Lee Farms. ***We deny all of these claims***…On March 11, 2019, Don Lee Farms filed a second amended complaint to add claims for fraud and negligent misrepresentation against us.  On May 30, 2019, the judge denied our motion to dismiss the fraud a negligent misrepresentation claims, allowing the claims to

proceed…***We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, [and] that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint…*** (emphasis added).

120.   The Q1 2019 10-Q also reiterated the generic risk disclosures contained in the Offering Documents, which framed Beyond Meat's risk of liability in the DLF Litigation as merely a possibility.  Specifically, the Q1 2019 10-Q once again stated:

[W]e cannot assure you that Don Lee Farms or ProPortion will not prevail in all or some of their claims…For example, if Don Lee Farms succeeds in the lawsuit we could be required to pay damages, including but not limited to contract damages reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms.

121.   The statements in ¶¶ 118-120 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that Beyond Meat had deliberately manufactured circumstances that would allow the Company to wrongfully terminate the ESA in order to contract with less expensive co-manufacturers; (ii) Defendants failed to disclose that they shared DLF's trade secrets with ProPortion and/or CLW in violation of the NDA; (iii) Defendants failed to disclose that they were continuing to use DLF's trade secrets in the

production of the Company's products after the termination of the ESA; (iv) Defendants failed to disclose that they had altered the 2016 Safety Audit Report provided to DLF in order to induce DLF to enter into the amended ESA; (v) Defendants concealed the actual known risks that the Company would likely be subject to liability in the DLF Litigation; and (iv) as a result the Company's public statements were materially false and misleading at all relevant times.

### C.   The July 29, 2019 False and Misleading Statements

122.   On July 29, 2019, Beyond Meat filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 29, 2019 (the "Q2 2019 10-Q").  The Q2 2019 10-Q contained Sarbanes-Oxley ("SOX") certification signed by the Individual Defendants attesting that "the information contained in the [Q2 2019 10-Q] fairly presents, in all material respects the financial condition and results of operations of the Company for the periods presented therein."

123.   The Q2 2019 10-Q once again proclaimed the Company's innocence with respect the DLF Litigation and stated the following:

> On May 25, 2017, Don Lee Farms, a division of Goodman Food Products, Inc., filed a complaint against us in the Superior Court of the State of California for the County of Los Angeles asserting claims for breach of contract, misappropriation of trade secrets, unfair competition under the California Business and Professions Code, money owed and due, declaratory relief and injunctive relief, each arising out of our decision to terminate an exclusive supply agreement between us and Don Lee Farms. ***We deny all of these claims***…On March 11, 2019, Don Lee Farms filed a second amended complaint to add claims for fraud and negligent misrepresentation against us.  On May 30, 2019, the judge denied our motion to dismiss the fraud a negligent misrepresentation claims, allowing the claims to proceed.

*On June 19, 2019, we filed an answer denying Don Lee Farms'
claims…We believe we were justified in terminating the supply
agreement with Don Lee Farms, that we did not misappropriate
their alleged trade secrets, [and] that we are not liable for the fraud
or negligent misrepresentation alleged in the proposed second
amended complaint…* (emphasis added).

124.   The Q2 2019 10-Q repeated the same generic risk disclosures that only informed investors of the mere possibility that the Company could face liability in the DLF Litigation.  These disclosures were not tailored to Beyond Meat's actual known risks with respect to the DLF Litigation, given the Company's knowledge of its own conduct.

125.   The Q2 2019 10-Q contained the following risk disclosures with respect to the DLF Litigation:

[W]e cannot assure you that Don Lee Farms or ProPortion will not
prevail in all or some of their claims…For example, if Don Lee Farms
succeeds in the lawsuit we could be required to pay damages,
including but not limited to contract damages reasonably calculated at
what we would have paid Don Lee Farms to produce our products
through 2019, the end of the contract term, and Don Lee Farms could
also claim some ownership in the intellectual property associated with
the production of certain of our products or in the products
themselves, and thus claim a stake in the value we have derived and
will derive from the use of that intellectual property after we
terminated our supply agreement with Don Lee Farms.

126.   The statements in ¶¶ 122-125 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that Beyond Meat had deliberately manufactured circumstances that would allow the Company

to wrongfully terminate the ESA in order to contract with less expensive co-manufacturers; (ii) Defendants failed to disclose that they shared DLF's trade secrets with ProPortion and/or CLW in violation of the NDA; (iii) Defendants failed to disclose that they were continuing to use DLF's trade secrets in the production of the Company's products after the termination of the ESA; (iv) Defendants failed to disclose that they had altered the 2016 Safety Audit Report provided to DLF in order to induce DLF to enter into the amended ESA; (v) Defendants concealed the actual known risks that the Company would likely be subject to liability in the DLF Litigation; and (iv) as a result the Company's public statements were materially false and misleading at all relevant times.

### D. The November 12, 2019 False and Misleading Statements

127. On November 12, 2019, Beyond Meat filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 28, 2019 (the "Q3 2019 10-Q"). The Q3 2019 10-Q contained Sarbanes-Oxley ("SOX") certification signed by the Individual Defendants attesting that "the information contained in the [Q3 2019 10-Q] fairly presents, in all material respects the financial condition and results of operations of the Company for the periods presented therein."

128. The Q3 2019 10-Q contained the following statement, echoing the Company's prior statements specifically denying culpability for each claim alleged in the DLF Litigation:

> On May 25, 2017, Don Lee Farms, a division of Goodman Food Products, Inc., filed a complaint against us in the Superior Court of the State of California for the County of Los Angeles asserting claims for breach of contract, misappropriation of trade secrets, unfair competition under the California Business and Professions Code, money owed and due, declaratory relief and injunctive relief, each arising out of our decision to terminate an exclusive supply agreement

between us and Don Lee Farms. ***We deny all of these claims***…On March 11, 2019, Don Lee Farms filed a second amended complaint to add claims for fraud and negligent misrepresentation against us.  On May 30, 2019, the judge denied our motion to dismiss the fraud a negligent misrepresentation claims, allowing the claims to proceed. ***On June 19, 2019, we filed an answer denying Don Lee Farms' claims***…***We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, [and] that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint…*** (emphasis added).

129.   The Q3 2019 10-Q also contained the following generic risk disclosures, which were similarly provided in the Company's previous quarterly filings:

[W]e cannot assure you that Don Lee Farms or ProPortion will not prevail in all or some of their claims…For example, if Don Lee Farms succeeds in the lawsuit we could be required to pay damages, including but not limited to contract damages reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms.

130.   The statements in ¶¶ 127-129 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that Beyond

Meat had deliberately manufactured circumstances that would allow the Company to wrongfully terminate the ESA in order to contract with less expensive co-manufacturers; (ii) Defendants failed to disclose that they shared DLF's trade secrets with ProPortion and/or CLW in violation of the NDA; (iii) Defendants failed to disclose that they were continuing to use DLF's trade secrets in the production of the Company's products after the termination of the ESA; (iv) Defendants failed to disclose that they had altered the 2016 Safety Audit Report provided to DLF in order to induce DLF to enter into the amended ESA; (v) Defendants concealed the actual known risks that the Company would likely be subject to liability in the DLF Litigation; and (iv) as a result the Company's public statements were materially false and misleading at all relevant times.

### E.     The Truth is Revealed

131.   On January 27, 2020, after the close of the markets, DLF issued a press release announcing that the judge in the DLF Litigation issued a Right to Attach Order, and by doing so, ruled that DLF "proved the probable validity of its claim that Beyond Meat breached its manufacturing agreement with Don Lee Farms."[54]

132.   DLF also revealed that based on discovery produced in the DLF Litigation, the court granted its request to name Defendant Nelson, Senior Quality Assurance Manager Jessica Quetsch and Director of Operations Anthony Miller in its fraud claim, alleging that these executives coordinated to intentionally doctor and omit material information from the 2016 Safety Audit Report.

---

[54] Press Release, Don Lee Farms, *Judge Rules Don Lee Farms Likely to Obtain Judgment. Beyond Meat's CFO and Others Named Individually for Fraud*, Business Wire (Jan. 27, 2020), https://www.businesswire.com/news/home/20200127005705/en/Judge-Rules-Don-Lee-Farms-Obtain-Judgment.#:~:text=Judge%20Rules%20Don%20Lee%20Farms%20Likely%20to%20Obtain%20a%20Judgment,Others%20Named%20Individually%20for%20Fraud.&text=LOS%20ANGELES%2D%2D(BUSINESS%20WIRE,agreement%20with%20Don%20Lee%20Farms.

133.   On January 28, 2020, following the revelations that Beyond Meat was likely to face liability in the DLF Litigation and that Defendant Nelson and other Beyond Meat executives were added as defendants in connection with DLF's fraud claims related to the 2016 Safety Audit Report, Beyond Meat's stock price fell $4.63 per share, or 3.71%, to close at $120.12 per share.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

134.   As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.

135.   Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding the circumstances of the termination of the ESA, the dissemination and use of DLF's trade secrets in the production of Beyond Meat's products, and the doctoring of the Safety Audit Report in order to conceal identified food safety issues at Beyond Meat's facilities prior to providing the 2016 Safety Audit Report to DLF, were active and culpable participants in the fraudulent scheme alleged herein.

136.   Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

137.   Defendants, because of their positions with Beyond Meat, made or controlled the contents of the Company's public statements during the Class

Period.   The Individual Defendants were provided with or had access to the information alleged herein to be false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not be disclosed to or were being concealed from the public and that the positive representations that were being made were materially false and misleading.   As a result, the Individual Defendants are responsible for the accuracy of Beyond Meat's corporate statements and are therefore responsible for the representations contained therein.

## A.   The Fraud Impacted Beyond Meat's Core Operations

138.   Defendants' false and misleading statements and omissions concern Beyond Meat's core operations.  All of Beyond Meat's revenue is derived from the manufacture and sale of its plant-based meat products.

139.   From 2014 until the termination of the ESA in May 2017, DLF was Beyond Meat's exclusive co-manufacturer.   As the Company's exclusive co-manufacturer, DLF was responsible for producing all of Beyond Meat's products, including being involved in the development and launch of the Beyond Burger in 2016.

140.   The Beyond Burger is Beyond Meat's flagship product.  It accounted for approximately 48%, 70%, and 64% of the Company's gross revenues in 2017, 2018, and 2019, respectively.[55]   In March 2020, Beyond Meat acknowledged the importance of the Beyond Burger to its revenues, stating:  "[w]e believe that sales of the Beyond Burger will continue constitute a significant portion of our revenues, income and cash flow for the foreseeable future."[56]

---

[55] Beyond Meat, Inc. Annual Report (Form 10-K) (Mar. 19, 2020) at 2.

[56] Id.

141.   Defendants also represented that "[r]esearch, development, and innovation are core elements of our business strategy, and we believe they represent a critical competitive advantage for us."[57]

142.   Additionally, in a February 2, 2017 email exchange with Goodman, Defendant Brown characterized fresh beef, *i.e.* the Beyond Burger, as the Company's "core product."[58]

143.   Accordingly, the importance and exclusive nature of DLF's role in producing Beyond Meat's plant-based meat products, as well as its role in the development of new products, including the flagship Beyond Burger, raises a strong inference of scienter that the Individual Defendants knew or recklessly disregarded that their statements affirmatively proclaiming the Company's innocence in the DLF Litigation and their associated general risk disclosures, were materially false and misleading or omitted material facts.

## B.   The Individual Defendants Controlled the Contents of the Company's Public Statements during the Class Period

144.   Because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their position and access to both public and non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors about the conduct alleged in the DLF Litigation and the Company's risk of liability, were false, misleading, or omitted material facts.

[57] *Id.*

[58] Compendium of Evidence at COE0071 (Email from Brown to Goodman, Re: Beyond Meat, Feb. 2, 2017).

145.   The Individual Defendants were responsible for the accuracy of Beyond Meat's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.   Beyond Meat knowingly or recklessly made the materially false and misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants knew or recklessly disregarded that the Company's statements were materially false or misleading or omitted material facts at the time such statements were made.   Each of the Individual Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

146.   Statements made by Beyond Meat and the Individual Defendants during the Class Period suggest that they had access to the disputed information. All of the Defendants' material misrepresentations or omissions alleged herein explicitly pertain to the likelihood the Company would be subject to liability for the conduct alleged in the DLF Litigation, and could not have been made with any reasonable basis in fact, as the Individual Defendants either personally signed the Company's co-manufacturing agreements and was involved in the selection of the Company's co-manufacturer, in the case of Brown, or had access to facts demonstrating that Beyond Meat engaged in conduct that increased the Company's risk of liability in the DLF Litigation beyond what it had been telling the market.

## VII.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

147.   At all relevant times, the market for Beyond Meat securities was an efficient market for the following reasons among others:   (1) the securities were listed and actively traded on the NASDAQ, a highly efficient market; (2) as an issuer of securities, Beyond Meat filed periodic public reports on Forms 10-K and 10-Q with the SEC; (3) Beyond Meat regularly issued press releases that were

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

carried on national news wires, were publicly available and entered the public marketplace.

148.   As a result, the market for the securities promptly digested current info regarding Beyond Meat from all publicly available sources and reflected such information in Beyond Meat's stock price.

149.   Under these circumstances, all purchasers of Beyond Meat securities during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

150.   Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153 (1972).

## VIII.  LOSS CAUSATION

151.   During the Class Period, Beyond Meat securities were artificially inflated due to Defendants' misleading public statements and omissions.  Because investors were unaware that Defendants' representations identified herein were false and misleading (and that Defendants failed to disclose the Company's conduct elevated the Company's risk of liability in the DLF Litigation beyond a mere possibility), they paid an artificially inflated price for their purchase of Beyond Meat securities.

152.   When the false and misleading nature of Defendants' misrepresentations were disclosed and became apparent to the market, the price of Beyond Meat common stock fell as the prior artificial inflation came out.

153.   As a result of their purchases of Beyond Meat securities during the Class Period, Plaintiffs and other Class members suffered economic loss, i.e., damages under the federal securities laws.

### A.   Corrective Disclosure

154.   The truth behind Defendants' various false statements and material omissions was revealed to the market on January 27, 2020, causing Plaintiffs and the Class to suffer significant losses.   The DLF Press Release revealed new material information showing it is likely that Beyond Meat breached the ESA with DLF, that Defendant Nelson and other Beyond Meat executives may be liable for fraud for altering the 2016 Safety Audit Report, and that Beyond Meat will likely face liability in the DLF Litigation.   This revelation also called into question the Company's risk of liability arising from all DLF's claims, as the Company's blanket denial of culpability was discredited.

155.   The decline in the price of Beyond Meat securities and the resulting losses are directly attributable to the disclosure of information and materialization of the risks that were misrepresented or concealed by Defendants.   Had investors known of the material adverse information concealed by Defendants, or been aware of the truth behind their material misstatements, they would not have purchased Beyond Meat securities at artificially inflated prices.

156.   The decline in the price of Beyond Meat stock after the facts contained in the DLF Press Release were disclosed were a direct result of the nature and extend of Defendants' fraudulent misrepresentations being revealed to investors.

### B.   Materialization of the Risk

157.   Alternatively, loss causation (i.e. a causal connection between Defendants' misrepresentation and the loss) can be demonstrated by showing the market's reaction to the materialization of risks that were concealed by Defendants' fraudulent statements.

158.   Investors were misled by Defendants' false statements that Beyond Meat did not wrongfully terminate the ESA, did not misappropriate DLF's trade

secrets and did not purposefully or negligently alter the 2016 Safety Audit Report. Defendants' false statements served to conceal the true level of risk that Beyond Meat related to the DLF Litigation.

159.   It was foreseeable that Beyond Meat's scheme to create a pretext to terminate the ESA with DLF in order to contract with a less costly co-manufacturer, while continuing to utilize DLF's proprietary processes and methods of production in violation of the NDA, would likely lead to negative financial consequences for Beyond Meat, including civil liability and the possible loss of claim to intellectual property going forward.   Nevertheless, Defendants concealed the true likelihood of these consequences from investors through their explicit denials and boilerplate warnings.

160.   The value of Plaintiffs' and the Class's investments in Beyond Meat were negatively impacted when the concealed risks materialized when the court in the DLF Litigation found that DLF was likely to obtain a judgment with respect to its breach of contract claims and it was revealed that discovery produced in the DLF Litigation implicated Defendant Nelson and other Beyond Meat executives in a coordinated effort to doctor the 2016 Safety Audit Report.

161.   After the January 27, 2020 post-market disclosures, Beyond Meat's common stock fell $4.63 per share, or more than 3.7% to close at $120.12 on January 28, 2020.

162.   Defendants' repeated denials of culpability made throughout the Class Period related to the DLF Litigation combined with Defendants' efforts to conceal all evidence submitted in the DLF Litigation from the public, clouded investors' ability to independently evaluate the Company's true risk of liability.   After the January 27, 2020 disclosure, for the first time, the market appreciated that DLF's claims were legitimate and that the risks presented by the DLF Litigation were far more significant than the Company had represented.

163.   The timing and the significance of the price decline in Beyond Meat securities on January 27, 2020 negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' misstatements.  The economic loss, *i.e.* damages suffered by Plaintiffs and other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in value of Beyond Meat's securities when the truth about Defendants' misrepresentations was revealed.

## IX.    CLASS ACTION ALLEGATIONS

164.   This is a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class of all persons who purchased Beyond Meat securities on the open market on a U.S. stock exchange during the Class Period and were damaged thereby.

165.   Excluded from the Class are: (1) Beyond Meat, and its officers, directors, employees, affiliates, legal representative, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (2) Defendants, their immediate families, employees, affiliates, legal representative, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

166.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Beyond Meat common stock traded on the NASDAY under the ticker symbol "BYND."  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of Class members located throughout the United States.  Record owners and other members of the Class may be identified from records maintained by Beyond Meat or its transfer agent and may be notified of this action by mail or other appropriate

means, using a form of notice similar to that customarily used in securities class actions.

167.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual members of the Class.   The questions of law and fact common to the Class include:   (1) whether Defendants violated the Exchange Act; (2) whether Defendants issued false or misleading statements; and (3) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

168.   Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as complained of herein.

169.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class and securities litigation.   Plaintiffs have no interest that is in conflict with, or otherwise antagonistic to the interests of other Class members.

170.   As class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

171.   There will be no difficulty in management of this action as a class action.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## X.   CLAIMS FOR RELIEF

### CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

172.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or disregarded with deliberate recklessness, misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

174.   During the Class Period, Defendants carried out a plan, scheme or course of conduct which intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) caused Plaintiffs and other Class members to purchase Beyond Meat common stock at artificially inflated prices.

175.   In furtherance of this unlawful plan, scheme or course of conduct, Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Beyond Meat securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

176.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts practices and a course of conduct as alleged herein, which included the making of,

or participation in the making of, untrue statements of material facts or omitting to state material facts necessary in order to make the statements about Beyond Meat and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

177. Each of the Individual Defendants' primary liability and control person liability arises from the following facts: (i) the Individual Defendants were high-level executives or directors at the Company during the Class period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities as a senior officer or director of the Company, were privy to and participated in the creation, development, and reporting of the Company's periodic disclosures to investors; (iii) the Individual Defendants were advised of and had access to other members of the Company's management team and internal information about Beyond Meat, including financial information and information about the Company's contractual relationships and manufacturing process; (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false or misleading.

178. Defendants had actual knowledge of the misrepresentations or omissions of material facts as set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with Beyond Meat's business from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the allegations above, Defendants, if they did not have actual

knowledge of the misrepresentations or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

179. As a result of the dissemination of the materially false or misleading information or failure to disclose material facts, as set forth above, the market price of Beyond Meat's securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired Beyond Meat securities at artificially high prices and were damaged thereby.

180. At the time of Defendants' misrepresentations or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and other members of the Class and the marketplace known the truth regarding Beyond Meat, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased Beyond Meat securities, or, would not have done do at the artificially inflated prices which they paid.

181. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of Beyond Meat securities during the Class Period.

182. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

183.   Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

184.   The Individual Defendants acted as controlling persons of Beyond Meat within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to, and did, directly or indirectly, influence or control the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of these statements or cause the statements to be corrected.

185.   Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein, and exercised the same.

186.   As set forth above, Defendants violated Sections 10(b) and Rule 10b-5 by their acts or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

187. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of securities during the Class Period.

188. By virtue of the forgoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

A.   Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding damages in favor of Plaintiffs and other Class Members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action including counsel fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

DATED: July 1, 2020          **KAPLAN FOX & KILSHEIMER LLP**

By:  /s/ *Justin B. Farar*
          Justin B. Farar

Justin B. Farar (SBN 211556)
Email: *jfarar@kaplanfox.com*
12400 Wilshire Boulevard, Suite 460
Los Angeles, CA 90025
Telephone: 310.614.7260
Facsimile: 310.575.8697

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Email: *lking@kaplanfox.com*
Mario M. Choi (SBN 243409)
Email: *mchoi@kaplanfox.com*
1999 Harrison Street, Suite 1560
Oakland, California 94612
Telephone: 415.772.4700
Facsimile: 415.772.4707

2

3

4

5

*Counsel for Block Investments Corporation and
Liaison Counsel for the Proposed Class*

6

7

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein (*pro hac vice* to be filed)
Email:  bernstein@bernlieb.com
Stephanie M. Beige (*pro hac vice* to be filed)
Email:  beige@bernlieb.com
Peter J. Harrington (*pro hac vice* to be filed)
Email:  pharrington@bernlieb.com
10 East 40th Street
New York, NY 10016
Tel: (212) 779-1414
Fax: (212) 779-3218

8

9

10

11

12

13

*Counsel for Plaintiffs and the Proposed Class*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO
CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES
AND ECF GENERAL ORDER NO. 10-07**

I HEREBY CERTIFY that, on July 1, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 1, 2020.

/s/ *Justin B. Farar*
Justin B. Farar