# EXHIBIT 3

ORIGINAL

MITCHELL A. KAMIN (Bar No. 202788)
NEEMA T. SAHNI (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: mkamin@cov.com
Email: nsahni@cov.com

**FILED**
Superior Court Of California
County Of Los Angeles

JUL 27 2017

herri R. Carter  **Executive Officer/Clerk**

By _____ Deputy
Glorietta Robinson

*Attorneys for Cross-Complainant Savage River, Inc.*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

**BY FAX**

|  |  |
|---|---|
| DON LEE FARMS, a division of GOODMAN FOOD PRODUCTS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>SAVAGE RIVER, INC. d/b/a BEYOND MEAT, and DOES 1 through 10, inclusive,<br><br>    Defendants. | Civil Case No.:  BC662838<br><br>[Assigned to the Hon. Malcolm H. Mackey, Dept. 55]<br><br>**SAVAGE RIVER, INC.'S CROSS-COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT;**<br>**(2) UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *ET. SEQ.*;**<br>**(3) CONVERSION** |
| SAVAGE RIVER, INC.,<br><br>    Cross-Complainant,<br><br>    v.<br><br>DON LEE FARMS, a division of GOODMAN FOOD PRODUCTS, INC.,<br><br>    Cross-Defendant. |  |

Cross-Complainant Savage River Inc. ("Savage River" or "Cross-Complainant") alleges causes of action against Cross-Defendant Don Lee Farms, a division of Goodman Food Products, Inc. ("DLF" or "Cross-Defendant"), as follows:

## NATURE OF ACTION

1.     This is a cross-complaint for damages arising from a now-terminated exclusive contractual relationship between Savage River and DLF, under which DLF represented, warranted and agreed that it would manufacture, process and package Savage River's plant-based food products safely and in compliance with applicable law.  DLF consistently breached these representations, warranties and agreements, operating in a way that resulted in serious production problems — problems which DLF refused to acknowledge or correct — including, most significantly, the detection of *Salmonella* both in the facility where DLF makes Savage River products, and in Savage River products manufactured at that facility (which, fortunately, were not released by Savage River).  That discovery created an untenable and unacceptable health risk to Savage River's customers in connection with any future product manufactured by DLF, and thus prompted Savage River to terminate its contract with DLF.

2.     In response to Savage River's notice of termination, instead of compensating Savage River for the unsaleable product it had manufactured, DLF filed a baseless complaint against Savage River for wrongful termination and misappropriation of trade secrets.  That pleading is remarkable not only for its threadbare and legally insufficient allegations — which Savage River addresses by demurrer filed concurrently herewith — but even more striking, for its glaring omission of the *Salmonella* contamination and other health and safety concerns which prompted Savage River to terminate its contract with DLF in the first place.  Savage River now files this cross-complaint to recover damages and other relief owed to it based on DLF's multiple breaches of the parties' agreement.

3.     Savage River and DLF entered into an Exclusive Supply Agreement in December 2014 (as amended, the "Supply Agreement") whereby Savage River would provide raw materials to DLF, and DLF would in turn use those raw materials to manufacture, process, package and deliver finished products to Savage River for distribution and sale.  Under the Supply Agreement, DLF was designated the exclusive co-manufacturer for all of Savage River's product needs at the time.

2

SAVAGE RIVER, INC.'S CROSS-COMPLAINT

EXHIBIT 3
Page 2 of 20

4.    At all times prior to and during the course of the parties' exclusive business relationship, DLF represented to Savage River that it had adequate facilities and appropriate controls in place to safely manufacture Savage River products. Indeed, that expectation was the fundamental premise on which the parties' entire relationship was based. But as Savage River learned over time, DLF's manufacturing and processing facility in Mansfield, Texas, and the procedures and controls it had in place at that facility, were far from adequate, requiring Savage River to invest millions of dollars in facility upgrades and equipment purchases so that DLF could fulfill its production obligations under the Supply Agreement.

5.    Since earlier this year, Savage River received multiple reports of foreign objects — including a temperature stick and glove, wood fragments, and parchment paper — found in finished food products manufactured, processed and packaged at DLF's Mansfield facility. Savage River alerted DLF to these reports, expressing significant concerns about potential deficiencies in DLF's manufacturing processes and practices and requesting DLF propose a corrective action plan to cure each such deficiency. DLF, however, did nothing, instead refusing to take responsibility and brushing aside Savage River's very real health and safety concerns as isolated incidents. Savage River nonetheless remained concerned that the foreign object reports reflected a broader pattern of inappropriate controls and inadequate sanitation at DLF's facility and asked that DLF communicate a plan to remedy these ongoing production problems. DLF did not respond to Savage River's request and did nothing to change or improve its practices.

6.    Savage River's concern came to fruition on May 3, 2017, when Savage River learned through its routine testing that one lot of its finished (but yet to be released) products manufactured at the Mansfield facility on April 24, 2017 tested positive for *Salmonella*.[1] Combined with a report of pathogenic *Listeria monocytogenes* detected at the facility — identified in samples collected from a

_____

[1] Upon learning of these facts, Savage River immediately quarantined the affected products and other Savage River finished products manufactured at the DLF facility from around that time, withholding them from distribution. Because it holds consumer safety as paramount, Savage River routinely conducts safety testing on its products before releasing them into the market; it has continued to do so to ensure no contaminated product is released, including by performing enhanced safety testing on lots of finished product manufactured by DLF from that time period.

partial inspection the week before, in which DLF denied Savage River and its third party consultant access to portions of the facility in which Savage River products were made — this finding prompted Savage River to immediate action. First, Savage River halted all shipping and distribution of products manufactured at the DLF facility. Then, pursuant to a contractual inspection right, and given the serious health and safety risks associated with a possible *Salmonella* contamination, Savage River requested that its third party consultant be granted access to DLF's facility as soon as possible, on Friday, May 5, to inspect the premises and conduct comprehensive environmental sampling. DLF denied the request, insisting that the inspection could not occur until the following Monday, without providing any reason for the two-day delay.

7. But DLF's reason became clear, as DLF then spent the weekend subjecting its facility to a deep clean, above and beyond any routine cleaning that Savage River's employees had observed on any prior occasion. In pushing off the inspection so that it could undergo this deep clean, DLF demonstrated that it was less concerned with swiftly identifying and remedying a potential *Salmonella* contamination at its facility — a facility in which it also processes raw chicken and beef — than with protecting itself from possible liability for that contamination.

8. DLF's extensive weekend cleaning efforts ultimately proved insufficient. Savage River's independent third party consultant inspected the Mansfield facility on May 8 and collected samples from all rooms of the facility in which Savage River products were manufactured, processed or packaged. Despite DLF's "deep cleaning" efforts, pathogenic strains of *Salmonella* were identified in two locations of the facility where they could risk contaminating Savage River products, which explains how Savage River's finished products manufactured at the facility became contaminated with *Salmonella*. Again demonstrating a dangerously cavalier attitude toward public safety and its own legal obligations, after Savage River shared the testing results, DLF responded by suggesting, without any factual support, that the *Salmonella* may have originated in the raw ingredients used to make Savage River products. In fact, the *Salmonella* contamination at DLF's facility is the *only* plausible explanation for how *Salmonella* wound up in any finished products, as Savage River also conducted comprehensive testing of its own facility and raw materials, and those results — consistent with the results of Savage River's regular and routine raw material testing and environmental sampling — did not identify the presence of *Salmonella*.

4

EXHIBIT 3
Page 4 of 20

9.      The discovery of *Salmonella* at DLF's facility and in finished product manufactured at that facility, coupled with earlier pathogen findings and foreign object reports, confirmed that DLF was simply incapable of maintaining a clean and safe environment for the production of Savage River's food products. The insanitary conditions at DLF's Mansfield facility, and the inadequate controls and procedures maintained by DLF, violate the law and constitute material breaches of the parties' Supply Agreement for which Savage River seeks redress in this action.

## THE PARTIES

10.     Cross-Complainant Savage River is a Delaware corporation with its principal place of business in El Segundo, California.

11.     Cross-Defendant DLF is a California corporation with its principal place of business in Inglewood, California.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action, and venue is proper in this Court, because: (1) the contract at issue contains a forum selection clause designating courts in the County of Los Angeles as having exclusive jurisdiction over disputes under the contract, (2) the parties have waived objections to jurisdiction of and venue in this Court, (3) Cross-Defendant resides in and does business in the County of Los Angeles, and (4) the contract at issue was entered into, and the obligations thereunder were to be performed, at least in part, in this County.

## FACTS

### A.      The Parties Enter Into the December 2014 Supply Agreement

13.     Savage River d/b/a Beyond Meat launched in 2009 as an entrepreneurial food start-up, offering a line of plant-based meatless products, including the "Beyond Burger," "Beast Burgers," "Beyond Chicken Strips," and "Beyond Beef Crumbles." The company developed an innovative and proprietary manufacturing process by which it produces pea protein-based raw ingredients in-house at its facility in Columbia, Missouri, and then ships those raw ingredients to a co-manufacturer to further cook, process and package as finished product for distribution and sale.

14.     In late 2014, Savage River entered into the Supply Agreement with DLF, designating DLF as its exclusive co-manufacturer. Under that contract, DLF was required to "use reasonable efforts,

5

EXHIBIT 3
Page 5 of 20

consistent with such efforts it uses with respect to other preferred customers, to fill all orders for Products submitted by" Savage River. Supply Agreement, § 1.1. This obligation was at the very heart of the contractual relationship between DLF and Savage River.

15. Pursuant to Section 2.1 of the Supply Agreement, the "Product Warranty" provision, DLF further agreed that it would "comply with all applicable federal, state, and local laws, regulations, ordinances, and rules, including . . . those promulgated by the [FDA]." It also warranted, represented and guaranteed that all products it manufactured and delivered to Savage River would not be "adulterated or misbranded within the Federal Food, Drug, and Cosmetic Act (FDCA)," and would not be an article "which may not be introduced into interstate commerce under such Act."[2] This warranty — and DLF's verbal guarantees that it would manufacture Savage River products in accordance with applicable law and quality standards — was a fundamental promise made by DLF to Savage River. The safety of its food products are of paramount concern to Savage River, and without the Product Warranty, Savage River would never have agreed to do business with DLF.

16. The Supply Agreement also grants to Savage River the right to enter DLF's facility upon notice to "inspect the manufacturing and packaging of all Products to determine if manufacturing and packaging are being performed" in compliance with the agreement and Savage River's quality standards. *Id.* § 1.14 (as amended). Finally, the agreement contains an attorneys' fees provision, permitting the prevailing party in a lawsuit arising under the agreement to obtain reimbursement of its attorneys' fees and costs. *Id.* § 6.13.

**B.    DLF Moves Manufacturing Operations to Its Mansfield, Texas Facility**

17. After the parties executed the Supply Agreement, DLF initially manufactured Savage River finished product in a facility in Inglewood, California. In 2016, however, DLF informed Savage River it would be transferring its manufacturing and processing operations for Savage River products to a facility in Mansfield, Texas, representing to Savage River that that facility was adequately set up to

---

[2] A food is deemed "adulterated," in part, if it "bears or contains any poisonous or deleterious substance which may render it injurious to health," "consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food," or if it has been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a).

support higher volume production demands. DLF repeatedly assured Savage River that it would be able to manufacture Savage River finished product safely at the Mansfield facility, and in accordance with the Supply Agreement.

18.     Around the same time, and in contemplation of the move to Mansfield, in April of 2016, the parties executed an amendment to the Supply Agreement ("April 2016 Amendment"). Although DLF told Savage River that its Mansfield facility was set up to handle Savage River's production needs, Savage River quickly learned that was not the case. Instead, DLF required Savage River to purchase, deliver and install several pieces of expensive equipment that would be used to make Savage River products. The April 2016 Amendment contained a list of the parties' expected equipment requirements in Exhibit E, with an estimated budget of $1,122,900 for such purchases. Exhibit E contains a footnote stating that Savage River acknowledges that, from time to time, DLF will require "additional equipment that it *reasonably deems necessary in order to fulfill its obligations under this Agreement*. [Savage River] agrees to deliver and install such equipment at its sole cost and expense." April 2016 Amendment to the Supply Agreement, Ex. E, n. 2 (emphasis added).

19.     Invoking Savage River's purported obligations under Exhibit E to cover all equipment costs, DLF made several additional equipment demands over the following year. In fact, although the parties originally contemplated an equipment budget of roughly $1.12 million, in actuality, Savage River spent nearly $3.8 million on installed equipment purchases and leases for the DLF facility — far beyond the parties' initial estimates. Although it is far from clear that all of those purchases were "reasonably necessary in order [for DLF] to fulfill its obligations under" the Supply Agreement, Savage River was willing to bear the expense because, per the contract, it would retain ownership of that equipment even after it was installed at the Mansfield facility, giving it the right to remove and retain that equipment for its own purposes once the parties' relationship terminated.

20.     Indeed, Section 5 of the April 2016 Amendment assigns to Savage River ownership of any equipment "specifically purchased" by Savage River pursuant to Exhibit E, "as amended from time to time." In other words, all of the equipment listed in Exhibit E, and all of the equipment subsequently demanded by DLF or otherwise purchased pursuant to Exhibit E, belongs to Savage River, *not* to DLF.

SAVAGE RIVER, INC.'S CROSS-COMPLAINT

EXHIBIT 3
Page 7 of 20

21.    On top of the millions of extra dollars in equipment purchases demanded by DLF, over the next year, DLF made additional unreasonable demands on Savage River. For instance, Savage River initially agreed to pay $1,089,600 to fund infrastructure "improvements and additions" at the Mansfield facility — upgrades that would be permanently affixed at the facility and thus inure solely to the benefit of DLF following termination. Under Section 5 of the April 2016 Amendment, DLF could make further upgrades only with Savage River's prior approval, and Savage River was only obligated to cover "necessary" improvements to the facility. Notwithstanding these limitations, DLF required Savage River to pay for a total of $2.1 million to cover infrastructure expenditures (i.e., another million over budget), and demanded Savage River pay for even more unnecessary upgrades. In total, Savage River has invested $5.9 million in equipment and infrastructure for the Mansfield facility, an amount that exceeds the parties' original budget by over $3.8 million.

C.    **DLF Materially Breaches the Product Warranty Provision By Violating the FDCA**

22.    Since February 2017, Savage River has received multiple customer reports of foreign objects found in finished Savage River products that DLF manufactured, processed and/or packed in its Mansfield, Texas facility. Specifically, Savage River received the following reports that can be definitively linked to acts or omissions by DLF or its employees:

- On February 1, 2017, Whole Foods Market reported finding a temperature stick, wrapped in a glove, inside a retail package of Beyond Burgers produced at the Mansfield facility.

- On February 21, 2017, Savage River identified wood inside a bulk case of Beast Burgers, and on April 28, 2017, Savage River received a report that a customer found a piece of wood in a package of Beefy Crumbles that was manufactured and packaged by DLF.

- On April 12, 2017, Savage River received a report from a customer who found a piece of parchment embedded in a Beyond Burger manufactured by DLF.

- On May 5, 2017, Savage River received a report that a customer found chunks of blue plastic in a package of Beefy Crumbles that was manufactured and packaged by DLF.

- On May 8, 2017, Savage River received a report from a food service customer that they found blue plastic embedded in Beyond Burger patties. This blue plastic was identical to the blue plastic sheets that DLF uses in its Mansfield facility.

23.    These foreign objects — a temperature stick wrapped in a glove, wood fragments, parchment paper, blue plastic chunks — constitute "filthy, putrid, or decomposed substances" or

substances that are otherwise "unfit for food." DLF's manufacturing, processing and/or packing practices thus caused the finished products in which these items were found to be "adulterated," in violation of both the FDCA and the Product Warranty.

24.     In addition, DLF failed to maintain appropriate controls to ensure that food products from its Mansfield, Texas facility were manufactured, processed, packed, and/or held under conditions that do not render them injurious to health. Most notably, as discussed above, independent environmental sampling and testing (on May 8, 2017) identified the presence of *Salmonella* in two locations in the facility where Savage River's products were prepared, packed or held. Astonishingly, the pathogen was identified even after DLF undertook a significant cleaning effort in anticipation of the inspection, scrubbing the facility from top to bottom over a weekend and even on the morning of the inspection. This suggests the extent of the contamination may have been even greater prior to the "deep clean," which Savage River would have been able to ascertain had DLF not refused to allow a full inspection only a few days earlier. Coupled with Savage River's detection of *Salmonella* in lots of finished product manufactured at the Mansfield facility — which also renders such product "adulterated" under the FDCA in that it contains a "poisonous or deleterious substance which may render it injurious to health" — the inspection results reflect and illustrate the insanitary conditions at that facility. Indeed, as further proof of a broader contamination issue, in addition to the initial lot of finished product manufactured by DLF on April 24 that tested positive for *Salmonella*, Savage River has identified, through its ongoing testing, the presence of *Salmonella* in two more samples of finished product manufactured by DLF from around that time.[3]

25.     While particularly troubling, the *Salmonella* contamination was by no means an isolated occurrence. On more than one prior occasion this year, DLF's own environmental monitoring program identified the presence of *Listeria* spp. at various locations throughout the Mansfield facility, including in rooms where Savage River products were processed or held. According to the FDA, the presence of

_____

[3] As with the April 24 lot of finished product, these finished product lots were quarantined and withheld from distribution.

*Listeria* spp. can be an indicator for the probable presence of the dangerous pathogen, *Listeria monocytogenes*, in a processing environment.

26. Based on these *Listeria* spp. findings, Savage River requested access to the Mansfield facility to conduct broader environmental sampling in late April. Although DLF denied Savage River and its third party consultant access to a number of areas where Savage River products were manufactured, processed, packed or held, the limited sampling they *were* able to conduct confirmed serious deficiencies related to pathogen control. One sample identified the presence of pathogenic *Listeria monocytogenes*, and four additional samples identified the presence of *Listeria* spp. on surfaces throughout the facility. These pathogen findings only heightened Savage River's concerns, leading it to request access to the facility in order to conduct comprehensive sampling and a thorough inspection.

27. Finally, during visits to DLF, Savage River employees observed extremely troubling practices and conditions that confirmed that the facility was unsuitable for food production. For instance, on April 10, 2017, Savage River employees observed live insects on food contact surfaces in a room in which Savage River's fresh products were manufactured, immediately before production was to begin. The next day, Savage River employees observed wood fragments of the same composition as those identified above on the surface of bags of finished Savage River product that were in process at the Mansfield facility.

28. DLF thus caused Savage River's finished products to be "adulterated" within the meaning of the FDCA by preparing, packing and/or holding such products under "insanitary conditions" whereby they "may have become contaminated with filth," or "may have been rendered injurious to health." This adulteration violates the FDCA and the Product Warranty provision of the Supply Agreement.

29. Together, the inadequate control exercised by DLF over the manufacturing and processing operations at its facility, the presence of *Salmonella* and *Listeria* in that facility, the poor sanitation and careless processing practices observed in and around Savage River's products, and the detection of foreign objects and *Salmonella* in products made and packaged by DLF made abundantly clear that DLF was unable to ensure a safe environment for the production of Savage River products.

Nor was it able to perform its fundamental obligation under Section 1.1 of the Supply Agreement to fill all orders submitted by Savage River.

> **D.      DLF Fails to Take Seriously Savage River's Serious Health and Safety Concerns**

30.      On April 12, 2017, Savage River sent DLF a breach notice ("Breach Notice"), identifying the multiple material breaches described above as a basis for terminating the Supply Agreement following a 30-day cure period.  In that Breach Notice, Savage River expressed deep concerns about DLF's ability to manufacture its products safely, and requested that DLF promptly implement a comprehensive and meaningful corrective action plan to remedy its material breaches.

31.      Rather than taking any corrective measures to address the deficiencies identified in the Breach Notice, DLF sent back a response that demonstrated its utter disregard for the serious health and safety concerns raised by Savage River.  DLF brushed aside the many foreign object reports cited in the Breach Notice as "isolated incidents" or "one-offs" that did not result in any physical harm to any person, and it attempted — without basis — to pass the blame for those incidents onto Savage River.

32.      Similarly, when Savage River learned on Wednesday, May 3 that a finished product lot manufactured at the DLF facility tested positive for *Salmonella*, it immediately notified DLF, and requested prompt access to inspect the facility and conduct environmental sampling in order to determine the likely source of the contamination.  In light of the heightened urgency surrounding a potential *Salmonella* contamination, Savage River enlisted its third party consultant to inspect the facility as early as Friday morning, less than 48 hours later.  Although Savage River expected DLF to be equally concerned about the possibility of pathogenic contamination at its facility, and just as invested in obtaining prompt inspection and sampling results, DLF stalled.  Without explanation, DLF said Friday would not work and insisted the inspection take place on Monday morning instead.  As Savage River later learned, DLF delayed so that it could spend the weekend deep-cleaning its facility, in the hope that the inspection would not detect the presence of *Salmonella*.  But the inspection and sampling results nonetheless showed the facility *was* in fact contaminated with *Salmonella*.[4]

---

[4] Since receiving the inspection and finished product testing results, Savage River has not, and absent further safety testing for pathogenic contamination, will not, ship any finished product manufactured at

33.     Even after these remarkable findings, DLF *still* refused to meaningfully address, or even acknowledge, Savage River's legitimate health and safety concerns. Despite receiving Savage River's Breach Notice on April 12, DLF *never* proposed a comprehensive corrective action plan to remedy its material breaches. In fact, the first time DLF even acknowledged the need for corrective action was moments before Savage River sent its termination notice to DLF, after counsel for Savage River had already notified counsel for DLF of Savage River's intent to terminate. At that point, DLF sent a hastily-compiled document titled "Corrective Action Plan." The belated "plan" was woefully inadequate and a far cry from the sort of meaningful corrective action plan one would expect from a food manufacturer following a *Salmonella* contamination at its facility. For instance, it lacked industry-standard corrective measures, like the retention of a third-party expert to evaluate potential deficiencies and recommend process and procedure modifications to avoid future contamination events.

34.     Rather than offering a comprehensive solution to the problems identified by Savage River, DLF used its delayed missive to try once again to shift blame from itself, claiming the *Salmonella* originated from ingredients that Savage River provided to DLF from its Missouri facility. But as Savage River explained to DLF, that is not plausible for a number of reasons.

35.     *First*, Savage River's manufacturing process for such ingredients includes a "kill step" that controls for any potential presence of pathogens in its raw materials (*i.e.*, a processing step at high temperatures intended to kill any pathogenic growth), and Savage River also has certificates of analysis for each raw material used in the relevant lots attesting to an absence of pathogens. *Second*, after learning of the *Salmonella* contamination in finished product lots manufactured at the DLF facility, Savage River conducted comprehensive environmental testing at its Missouri facility and did not identify the presence of *Salmonella*, nor has Savage River *ever* identified pathogens within that facility

the DLF facility due to the public health risks associated with a possible *Salmonella* contamination. It has also withheld from distribution any lots of finished product manufactured at the Mansfield facility that tested positive for *Salmonella* and lots produced after such time.

More broadly, Savage River conducted routine safety testing on every batch of finished product manufactured by DLF before releasing such product into the market. Since that routine testing identified the presence of *Salmonella* in certain lots manufactured by DLF, Savage River conducted enhanced testing on all lots manufactured at the facility — above and beyond what is required by law or best practices — to ensure no contaminated product would be released.

12

SAVAGE RIVER, INC.'S CROSS-COMPLAINT

EXHIBIT 3
Page 12 of 20

or in ingredients manufactured at that facility. *Third,* the manufacturing process in the DLF facility for one of the finished products that tested positive for *Salmonella* also included a "kill step" that should have controlled for any presence of pathogens in finished product. *Fourth,* DLF processes raw chicken, a known source of *Salmonella,* in the same facility. *Finally,* environmental monitoring *did* identify *Salmonella* in DLF's Mansfield facility. All of this indicates that the only plausible explanation for the contamination of Savage River finished product is that it occurred post-processing at DLF's facility and is attributable solely to the fundamental lack of required food safety controls in that facility.

### E.    DLF Refuses to Fully Cooperate With Savage River's Extraction Efforts, Fails to Compensate Savage River for Unsaleable Product, and Instead Files a Frivolous Lawsuit

36.    Based on DLF's failure to cure the repeated material breaches identified by Savage River in its Breach Notice, Savage River sent DLF a termination notice on May 23, 2017. In that notice, Savage River requested DLF's "full cooperation to ensure an orderly transition of all manufacturing processes out of the Mansfield facility." Savage River also specifically demanded access to the facility at specified dates and times so that it could remove its highly-specialized and valuable equipment, raw materials and other tangible personal property as soon as possible.

37.    DLF acceded to this demand on May 24, seemingly accepting Savage River's notice of termination. Over the next few weeks, the parties even conferred on dates and times when Savage River could enter the DLF facility to extract its property.

38.    But while DLF initially suggested it would cooperate with Savage River's transition efforts, the very next day, unbeknownst to Savage River, DLF filed a complaint initiating this action. The complaint alleges that Savage River's termination notice was invalid and therefore a breach of the Supply Agreement. Astonishingly, however, *the complaint makes no mention of the serious Salmonella contamination and other health and safety issues that prompted Savage River to terminate the parties' agreement.* Instead, as with its earlier communications, the complaint seeks to deflect blame, asserting that Savage River provided "unusable, unsafe and/or inferior raw product" — which is simply not the case, as explained above.

39.    After filing its complaint — which was not served until several weeks later — DLF continued providing Savage River access to the Mansfield facility for a period of time to remove its raw material and equipment inventory.  In this period, DLF also sent Savage River several invoices demanding payment for finished product it had manufactured, including for lots manufactured after *Salmonella* was detected in its facility.  Savage River explained to DLF that DLF owed money to Savage River — not the other way around — for the defective and unsaleable product it had made.

40.    In early June, while Savage River was still working diligently to retrieve its property, DLF abruptly denied Savage River further access to its facility, turning away trucks dispatched by Savage River to remove additional inventory.  As a result, some of Savage River's equipment remains at the DLF facility.  This includes a large "octofrost" freezer that cost several hundreds of thousands of dollars to purchase and install and that would require significant expense and effort on the part of Savage River to remove from the facility.  DLF thus continues to enjoy the many benefits of Savage River's investments in its facility — including over $2 million in infrastructure investments paid for by Savage River — notwithstanding its material breaches of the Supply Agreement.

41.    Because Savage River has been unable to recover some of its property, it had to expend additional capital to procure replacement equipment in order to resume manufacturing operations.  Because the equipment at issue is highly-specialized, it has taken substantial time to secure replacement items and get them operational.  More broadly, DLF's production failures have caused a temporary drop in Savage River's saleable finished product inventory — at least until Savage River can fully transition manufacturing operations to a new co-manufacturer.

42.    With less inventory, Savage River has been unable to fulfill customer orders and meet expected delivery deadlines, damaging its reputation and harming its established business relationships with contractual partners and important customers, some of whom have complained about the production lags and even canceled their orders.  These partners rely on Savage River to deliver finished products on time, and Savage River's inability to do so costs it substantial goodwill and harms the good reputation it has worked so hard to build as a new entrant in the marketplace.  Indeed, as an emerging start-up company, Savage River's brand is greatly impacted by its ability to meet customer service demands and delivery expectations.  Moreover, without adequate inventory, Savage River could lose

many of its existing and newly-acquired customers, representing a substantial loss of business. This, in turn, significantly impedes the company's ability to attract new investors to support its expanding business.

### FIRST CAUSE OF ACTION

### (Breach of Contract - Supply Agreement)

43.     Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 42 above.

44.     In or about December 2014, Savage River and DLF entered into the Supply Agreement, under which DLF agreed to manufacture, process and package Savage River's food products, and agreed that it would do so in compliance with applicable laws and regulations, including state and federal laws intended to ensure food products introduced into commerce are safe for consumption.

45.     Under the Product Warranty provision of the Supply Agreement, DLF also warranted, represented and guaranteed to Savage River that any products it manufactured would not be "adulterated or misbranded within the Federal Food, Drug, and Cosmetic Act [FDCA]."

46.     DLF materially breached the Product Warranty provision of the Supply Agreement by its repeated failures to comply with applicable law, including the FDCA. Specifically, DLF has, on more than one occasion, manufactured products for Savage River that are "adulterated" as set forth in Section 402(a)(3) of the FDCA, in that they consist "in whole or in part of any filthy, putrid, or decomposed substance," or are otherwise "unfit for food." DLF has also manufactured, processed, packed and/or held Savage River products under conditions that rendered them injurious to health, in violation of Sections 402(a)(1) and 402(a)(4) of the FDCA, as evidenced most clearly by the recent detection of *Salmonella* at DLF's Mansfield, Texas facility, coupled with the presence of *Salmonella* in finished product made by DLF, and an earlier finding of *Listeria monocytogenes* at the Mansfield facility.

47.     The positive testing for *Salmonella* at the Mansfield facility presented an immediate and material health and safety risk, requiring Savage River to terminate the Supply Agreement and stop any further production or distribution of products from that facility. As such, DLF's lack of appropriate controls, insanitary conditions, and confirmed pathogenic contamination at its facility prevented it from performing its fundamental obligation under Section 1.1 of the Supply Agreement to fill all orders

submitted by Savage River. This is a separate, independent material breach by DLF of its contractual obligations.

48.    Savage River has performed all of its obligations, covenants and conditions under the Supply Agreement, except to the extent any such obligations, covenants or conditions have been excused, prevented or waived by DLF's acts or omissions.

49.    Savage River has been damaged as a direct and proximate result of DLF's material breaches of the Supply Agreement as set forth above, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Unfair Competition Under California Business & Professions Code §§ 17200 *et seq.*)

50.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 49 above.

51.    California's Unfair Competition Law (UCL) defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200. A business act or practice is "unlawful" within the meaning of the UCL if it violates any other law or regulation.

52.    DLF has engaged in business practices that violate the Federal Food, Drug, and Cosmetic Act. The FDCA prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated or misbranded," and "adulteration or misbranding of any food . . . in interstate commerce." 21 U.S.C. §§ 331(a)-(b). A food is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health," "consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food," or if it has been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." *Id.* § 342(a).

53.    DLF repeatedly manufactured food products for Savage River that would be deemed "adulterated" within the meaning of the FDCA. Savage River has received multiple reports of foreign objects contained in finished product that DLF manufactured, processed and/or packed, including, for instance, a temperature stick wrapped in a glove inside a retail package of Beyond Burgers, wood fragments in a bulk case of Beast Burgers and a piece of wood in a package of Beefy Crumbles, a piece

16

of parchment paper embedded in a Beyond Burger, and blue plastic pieces in a package of Beefy Crumbles and embedded in Beyond Burger patties. These items qualify as "filthy, putrid, or decomposed substance[s]" or substances that are "otherwise unfit for food," so their presence in Savage River products causes such products to be adulterated in violation of the FDCA.

54.    Likewise, *Salmonella* is a dangerous pathogen that qualifies as a "poisonous or deleterious substance which may render [food product] injurious to health" under the FDCA. Accordingly, the presence of that pathogen in lots of finished product manufactured, processed and packaged at the Mansfield facility causes such product to be "adulterated" in violation of the FDCA.

55.    DLF has also prepared, packed or held Savage River's products under insanitary conditions whereby such products may have become contaminated with filth and/or been rendered injurious to health. This is most clearly evidenced by the presence of *Salmonella* in rooms of DLF's Mansfield facility in which Savage River products were prepared, packed or held, and an earlier finding of pathogenic *Listeria monocytogenes* in a sample collected from the facility. Savage River also observed other insanitary conditions at the facility, including live insects on food contact surfaces in the room in which Savage River's fresh products were manufactured and wood fragments on the surface of bags of finished Savage River product. These conditions render the Savage River food products prepared, packed or held thereunder to be adulterated, also in violation of the FDCA.

56.    DLF has thus engaged in business acts and practices that are unlawful within the meaning of Cal. Bus. & Prof. Code § 17200. Through its unlawful business acts and practices, DLF has improperly obtained monies from Savage River, in the form of payments for fulfilled orders, infrastructure and equipment spend, and other start-up costs. Savage River requests this Court cause DLF to restore this money to Savage River since it was paid in reliance on DLF's representations that it would comply with applicable law — representations that have now proven to be untrue.

## THIRD CAUSE OF ACTION

### (Conversion)

57.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 56 above.

58. Pursuant to Section 5 of the Supply Agreement, as amended, Savage River owns certain tangible personal property that it has been unable to recover from the DLF Mansfield facility, including certain pieces of equipment purchased or leased and delivered to DLF by Savage River.

59. DLF has improperly asserted dominion and control over that property and has interfered with Savage River's rights to recover the same. Specifically, in its May 23, 2017 termination notice, Savage River requested access to the Mansfield facility so that it could remove its raw material and equipment inventory, evidencing its clear intent to recover its property and its lack of consent to DLF's assertion of control over that property. Although DLF initially agreed, it later reversed course before Savage River could complete the extraction effort. Since, DLF has retained possession of certain property belonging to Savage River — including certain bulky equipment that would be unreasonably expensive for Savage River to remove — and continues to reap benefits from the use of such property.

60. DLF's unlawful conversion of certain Savage River property that remains at its Mansfield facility, and its continued exercise of dominion and control over that property, has directly and proximately caused, and continues to so cause, Savage River to suffer damages in an amount to be determined at trial.

61. Specifically, Savage River needed to procure new equipment in order to meet remaining production demands (albeit on a delayed timetable). Many of these costs would not have been incurred had Savage River been allowed full, complete and prompt access to the Mansfield facility to recover its remaining equipment for use in any ongoing manufacturing efforts. In the meantime, Savage River has been unable to fulfill orders for its finished product, resulting in canceled orders, lost revenue in an amount to be determined at trial, and reputational harm and loss of goodwill with respect to its customers.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Complainant Savage River prays for judgment as follows:

1. On the First Cause of Action, for damages against Cross-Defendant in an amount to be determined at trial and sufficient to make Savage River whole with respect to Cross-Defendant's breaches of the Supply Agreement;

SAVAGE RIVER, INC.'S CROSS-COMPLAINT

EXHIBIT 3
Page 18 of 20

2.      On the Second Cause of Action, for such relief as may be permitted by law, including but not limited to restitution of monies paid to Cross-Defendant by Savage River;

3.      On the Third Cause of Action, for damages against Cross-Defendant, in an amount to be determined at trial, equal to the value of the Savage River property unlawfully converted, or sufficient to make Savage River whole with respect to Cross-Defendant's unlawful conversion of such property;

4.      For costs of suit and attorneys' fees, as provided in the Supply Agreement and permitted by law;

5.      For prejudgment and post-judgment interest in the maximum amount provided by law; and

6.      For such other and further relief as the Court deems appropriate.

Dated:  July 27, 2017

Respectfully submitted,
**COVINGTON & BURLING LLP**

By:  _____

Mitchell A. Kamin
Neema T. Sahni
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: mkamin@cov.com
Email: nsahni@cov.com

*Attorneys for Cross-Complainant Savage River, Inc. d/b/a Beyond Meat*

## JURY DEMAND

Cross-Complainant Savage River, Inc. hereby demands a trial by jury on all issues so triable.

Dated: July 27, 2017

Respectfully submitted,
**COVINGTON & BURLING LLP**

By: _____
Mitchell A. Kamin
Neema T. Sahni
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: mkamin@cov.com
Email: nsahni@cov.com

*Attorneys for Cross-Complainant Savage River, Inc. d/b/a Beyond Meat*