# EXHIBIT 4

Electronically FILED by Superior Court of California, County of Los Angeles on 03/11/2019 01:01 PM Sherri R. Carter, Executive Officer/Clerk of Court, by Y. Tarasyuk,Deputy Clerk

LOEB & LOEB LLP
DANIEL A. PLATT (SBN 132665)
dplatt@loeb.com
ROBERT J. CATALANO (SBN 240654)
rcatalano@loeb.com
EDWARD K. LEE (SBN 294954)
elee@loeb.com
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067
Telephone: 310.282.2000
Facsimile: 310.282.2200

Attorneys for Plaintiff and Cross-Defendant
DON LEE FARMS, a division of
GOODMAN FOOD PRODUCTS, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| DON LEE FARMS, a division of GOODMAN FOOD PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BEYOND MEAT, INC.; PROPORTION FOODS, LLC; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: BC662838 <br><br> Assigned to Hon. Malcolm H. Mackey <br> Dept.: 55 <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> **(1) BREACH OF CONTRACT;** <br> **(2) DECLARATORY RELIEF;** <br> **(3) MISAPPROPRIATION OF TRADE SECRETS;** <br> **(4) MONEY OWED AND DUE;** <br> **(5) UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *ET. SEQ.*;** |
| BEYOND MEAT, INC.; <br><br> Cross-Complainant, <br> v. <br><br> DON LEE FARMS, a division of GOODMAN FOOD PRODUCTS, INC.; <br><br> Cross-Defendant. | |
| PROPORTION FOODS, LLC, a California limited liability company; <br><br> Cross-Complainant, <br> v. <br><br> BEYOND MEAT, INC., a Delaware corporation; and ROES 1 through 10 <br><br> Cross-Defendants | **(6) TORTIOUS INTERFERENCE WITH CONTRACT;** <br> **(7) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(9) FRAUD; AND** <br> **(10) NEGLIGENT MISREPRESENTATION** <br><br> Complaint Filed: May 25, 2017 |

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

17203901

221655-10004                                          SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 1 of 67

Plaintiff Don Lee Farms, a division of Goodman Food Products, Inc. ("DLF" or "Plaintiff"), for its second amended complaint ("SAC") against defendants Savage River, Inc. d/b/a Beyond Meat n/k/a Beyond Meat, Inc. ("Beyond Meat") and ProPortion Foods, LLC ("ProPortion" and, together with Beyond Meat, "Defendants"), alleges as follows:

## THE PARTIES

1.      DLF is a corporation organized and existing under the laws of California, and is headquartered in Inglewood, California.

2.      Plaintiff is informed and believes, and based thereon alleges, that Beyond Meat is a Delaware corporation and is headquartered in El Segundo, California.

3.      Plaintiff is informed and believes, and based thereon alleges, that ProPortion is a California corporation and is headquartered in Los Angeles, California.

4.      Plaintiff is currently unaware of the true names and capacities of the defendants sued herein by the fictitious names Does 1 through 10, inclusive ("Does"), and therefore sues those defendants by such fictitious names.  Plaintiff is informed and believes, and based thereon alleges, that each of the Doe defendants is responsible or liable in some manner to Plaintiff for the conduct alleged herein, and that Plaintiff's damages as herein alleged were proximately caused by such Does.  This complaint will be amended to allege the true names and capacities of such fictitiously named Does once the same are ascertained.

5.      Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned, each defendant and Doe was the agent, servant and/or employee of each other defendant and Doe, and in connection with the conduct herein alleged, was acting within the course and scope of such agency, and that each defendant and Doe ratified each and every act, omission and thing done by each and every other defendant and Doe.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this case pursuant to California Code of Civil Procedure ("C.C.P.") section 410.10.  Venue is proper in this Court pursuant to C.C.P. section 395.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

2

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 2 of 67

**FACTS**

7.      DLF is an industry-leading producer and processor of meat and organic vegetable-based substitute-meat products.  ProPortion is one of DLF's competitors. Beyond Meat is a producer of pea protein-based raw ingredients, referred to as "extrudate."  Plaintiff is informed and believes that Beyond Meat does not produce any of its own products.  Instead, Beyond Meat ships its extrudate to a co-manufacturer who then processes and packages the finished products for distribution and sale.

8.      Beyond Meat approached DLF in 2014 to become such a co-manufacturer. On December 2, 2014, DLF and Beyond Meat entered into a written exclusive supply agreement (collectively, as amended, the "Exclusive Supply Agreement"), with DLF, as supplier of the finished products, and Beyond Meat, as buyer.  A true and correct copy of the Exclusive Supply Agreement, inclusive of amendments, is attached hereto as Exhibit "A" and is incorporated by reference.[1]

9.      By early 2016, DLF expressed to Beyond Meat that it had significant concerns regarding Beyond Meat's food safety protocols, arising from Beyond Meat's provision of ingredients to DLF.

10.      Beyond Meat's CEO, Ethan Brown, had actual knowledge of DLF's concerns about Beyond Meat's food safety protocols and affirmatively represented to DLF that he would work towards resolving those issues.

11.      Beyond Meat thereafter retained a third-party food safety consultant to perform an audit of Beyond Meat's manufacturing facility.  Upon the third-party's completion of its inspection, it issued a report to Beyond Meat citing various concerns.

12.      Beyond Meat altered the report by, among other things, deleting significant provisions of it.  The altered report was ultimately delivered to DLF to assuage its food safety concerns.  Based on the altered report, DLF agreed to enter into the First

---

[1] For the Court's convenience, and because of the poor quality of the original version appended hereto, a transcribed version of the Second Amendment to the Exclusive Supply Agreement is attached hereto as Exhibit B.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

3

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 3 of 67

Amendment to the Exclusive Supply Agreement, which significantly increased the scope of operations under the agreement and DLF's commitment to Beyond Meat.

13.     Section 6.13 of the Exclusive Supply Agreement provides that the prevailing party in any suit for the interpretation or enforcement of the agreement "shall be entitled to obtain reimbursement from the non-prevailing party for all costs and expenses, including, without limitation, attorneys' fees and disbursements, incurred by the prevailing party."

14.     On May 23, 2017, Beyond Meat purported to serve a notice of termination (the "Termination Notice") of the Exclusive Supply Agreement with DLF, asserting that because DLF had failed to cure certain alleged breaches within thirty days, as required by the parties' agreement, that Beyond Meat was entitled to terminate the Exclusive Supply Agreement pursuant to its section 3.3.

15.     Beyond Meat's Termination Notice was invalid.

16.     As consideration for entering into the Exclusive Supply Agreement, DLF developed proprietary processes solely dedicated to processing and transforming Beyond Meat's extrudate into the Beyond Meat plant-based, substitute-meat products that consumers know and purchase, including, among other things, burgers, chicken strips and beef crumbles.

17.     Given the nature of the exclusive supplier-buyer relationship, Beyond Meat received access to highly confidential and trade secret information regarding DLF's processes and technology developed specifically for processing and transforming Beyond Meat's extrudate into consumer-ready products.  This information is not known to DLF's competitors (which include ProPortion), the general public, or other DLF customers.  This information constitutes trade secrets protectable under applicable laws (the "Trade Secrets").  DLF has taken steps to protect such information from disclosure, including requiring employees and contractors to sign non-disclosure agreements.  In fact, DLF required Beyond Meat to execute a Non-Disclosure Agreement ("NDA") when the parties first entered into discussions with respect to the Exclusive Supply Agreement.  Exhibit D

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

4

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 4 of 67

to the Exclusive Supply Agreement specifically amended the NDA to extend the protections of the NDA through the term of the Exclusive Supply Agreement.

18.     Section 3.3 of the NDA was amended to reflect the parties' agreement that Beyond Meat can use DLF's Trade Secrets "solely … for any purpose consistent with the goals and provisions of" the business relationship between Beyond Meat and DLF, and that any Trade Secrets developed by DLF during the term of the NDA and during the term of the Exclusive Supply Agreement "shall be solely owned and may be used only by [DLF] for its own purposes or for its financial or other gain or advantage."

19.     Section 14 of the NDA was amended to reflect the parties' agreement that the NDA "shall continue in full force and effect" until the termination of the Exclusive Supply Agreement, and that in the event of any such termination, "[t]he restrictions and obligations contained in [the NDA]" shall survive termination of the NDA with respect to Trade Secrets, for as long as they remain trade secrets.

20.     Despite having agreed to the terms of the NDA and Exclusive Supply Agreement, Plaintiff is informed and believes that Beyond Meat has obtained DLF's Trade Secrets, and plans to and/or has been using and disclosing such Trade Secrets in violation of the NDA and Exclusive Supply Agreement so that Beyond Meat may exploit DLF's Trade Secrets without using DLF as its exclusive supplier.  Beyond Meat has done so knowing that such Trade Secrets are commercially sensitive, highly valuable, were developed by DLF at its expense over a substantial period of time, and are owned exclusively by DLF.

21.     Plaintiff is informed and believes that Beyond Meat plans to and/or has been using and disclosing such Trade Secrets to actively solicit DLF's competitors to replace DLF as Beyond Meat's exclusive supplier at prices more favorable to Beyond Meat than those contained in the Exclusive Supply Agreement.

22.     Moreover, upon information and belief, Beyond Meat did use and disclose such Trade Secrets to ProPortion, in their combined efforts to successfully, but unlawfully, replace DLF as Beyond Meat's exclusive supplier.

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

5
SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 5 of 67

23.     None of the information accessed and/or used by Beyond Meat and ProPortion is known to DLF's competitors or publicly available, and all of it was subject to efforts by DLF to maintain its secrecy.

24.     Beyond Meat and ProPortion cannot be permitted to use, in any matter, the Trade Secrets developed by DLF, and reap and/or allow DLF's competitors (including ProPortion) to reap an unfair and unlawful competitive advantage over DLF.

25.     Beyond Meat has also breached the Exclusive Supply Agreement by, among other things, (i) providing unusable, unsafe and/or inferior raw product to DLF and thus inhibiting DLF's ability to produce salable product; (ii) failing to compensate DLF for delivered product; (iii) failing to furnish equipment, parts and labor at its sole cost and expense; (iv) failing to service and repair such equipment; (v) furnishing defective and/or inadequate equipment; and (vi) failing to furnish personnel required in connection with various certifying agency requirements as set forth in the Exclusive Supply Agreement.

**<u>FIRST CAUSE OF ACTION</u>**

**Breach of Contract**

**Count One: Invalid Termination**

**(Against Beyond Meat)**

26.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

27.     <u>Fully Enforceable Contract</u>.  The Exclusive Supply Agreement and its amendments constitutes a fully enforceable contract, supported by mutual consideration.

28.     <u>Plaintiff's Performance</u>.  Plaintiff has performed all of its obligations under the Exclusive Supply Agreement, except to the extent such obligations have been excused under the Exclusive Supply Agreement and/or by Beyond Meat's breach.

29.     <u>Beyond Meat's Breaches</u>.  Beyond Meat breached its promises to Plaintiff by among other things, improperly terminating the Exclusive Supply Agreement, failing to pay for certain equipment and parts, failing to pay invoices, providing inferior raw product to DLF.

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

6

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 6 of 67

30.  Causation and Damages.  As a direct and proximate result of Beyond Meat's breach, Plaintiff has been damaged in an amount to be determined at trial plus attorneys' fees and interest.

## Count Two: Breach of the NDA

### (Against Beyond Meat)

31.  Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

32.  Fully Enforceable Contract.  The Exclusive Supply Agreement and its amendments constitutes a fully enforceable contract, supported by mutual consideration. The NDA and its amendment constitutes a fully enforceable contract, supported by mutual consideration.

33.  Plaintiff's Performance.  Plaintiff has performed all of its obligations under the Exclusive Supply Agreement and the NDA, except to the extent such obligations have been excused under the Exclusive Supply Agreement and NDA, and/or by Beyond Meat's breach.

34.  Beyond Meat's Breach.  Beyond Meat breached its promises to Plaintiff by improperly, and without authorizing, using and disclosing Plaintiff's Trade Secrets.

35.  Causation and Damages.  As a direct and proximate result of Beyond Meat's breach, Plaintiff has lost its valuable Trade Secrets and other confidential information, and suffered damages that were foreseeable by Beyond Meat in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Declaratory Relief – Termination Rights

### (Against Beyond Meat)

36.  Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

37.  An actual controversy has arisen now and exists between Plaintiff and Beyond Meat concerning Beyond Meat's rights and duties under the Exclusive Supply

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

7

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 7 of 67

Agreement. On the one hand, Plaintiff contends that Beyond Meat has no right under the Exclusive Supplier Agreement to terminate the Exclusive Supplier Agreement for alleged breaches of section 2.1 of the Exclusive Supplier Agreement. On the other hand, Beyond Meat has a contrary understanding of its rights and obligations under the Exclusive Supply Agreement.

38.     A judicial declaration is necessary and appropriate at this time and under these circumstances in order that the parties may ascertain their rights and duties with respect to the Exclusive Supply Agreement.

## THIRD CAUSE OF ACTION

### Misappropriation of Trade Secrets – C.C.P. § 3426, *et seq.*

### (Against Beyond Meat and ProPortion)

39.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

40.     DLF is informed and believes and thereon alleges that Beyond Meat is improperly using and/or disclosing Plaintiff's Trade Secrets, including to and with ProPortion to create extrudate-based products. Creation and development of these Trade Secrets was the result of a substantial amount of time, effort, and money on the part of DLF in the operation of its business.

41.     DLF's Trade Secrets had, and continue to have, economic value by virtue of the fact that they constitute and/or contain information not generally known within the industry or to the general public, represent substantial research and confidential information between DLF and its potential and existing partners, and would be of great value to its competitors.

42.     Plaintiff has taken reasonable measures to ensure that the Trade Secrets remain the confidential property of Plaintiff. Plaintiff has had a long standing policy that all information relating to its operations and information related to its proprietary processes must be kept confidential by all of Plaintiff's employees, contractors, and customers, both

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

8

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 8 of 67

during and after their engagement and / or business relationship. Such policy is reflected in the NDA and Exclusive Supply Agreement executed by Beyond Meat.

43.     Plaintiff is informed and believes and thereon alleges that Beyond Meat has misappropriated the Trade Secrets for its own benefit, and to the detriment of Plaintiff, by using and/or disclosing, through improper means and without authorization, the Trade Secrets, and sharing said Trade Secrets with third parties, in an effort to secure relationship(s) with DLF's competitor(s).

44.     Plaintiff is informed and believes and thereon alleges that ProPortion has misappropriated the Trade Secrets for its own benefit, and to the detriment of Plaintiff, by using, through improper means and without authorization, the Trade Secrets, to replace DLF as Beyond Meat's co-manufacturer.

45.     As a direct and proximate result of Beyond Meat and ProPortion's misappropriation of Plaintiff's Trade Secrets, Plaintiff has suffered and continues to suffer damages, and Beyond Meat and ProPortion have been unjustly enriched in an amount to be proven at trial as a direct result of their misappropriation.

46.     The aforementioned acts of Beyond Meat and ProPortion were willful and malicious in that Beyond Meat and ProPortion misappropriated Plaintiff's Trade Secrets with the deliberate intent to injure Plaintiff's business and for their own personal gain. Plaintiff is therefore entitled to punitive damages pursuant to C.C.P. § 3426.3 of twice the general damages awarded.

47.     Beyond Meat and ProPortion's wrongful conduct in misappropriating Plaintiff's Trade Secrets, unless enjoined by this Court, will cause great and irreparable injury to Plaintiff's business.

48.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as Beyond Meat and ProPortion will continue to improperly utilize and disclose the Trade Secrets and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests each time the Trade Secrets were improperly used.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

9

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 9 of 67

## FOURTH CAUSE OF ACTION

### Money Owed and Due – Common Count

### (Against Beyond Meat)

49.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

50.     Beyond Meat has become indebted to DLF for various goods and services provided as described above.

51.     Beyond Meat has failed to make such payments.

52.     Accordingly, DLF has suffered damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Violation of Business & Professions Code § 17200, *et seq.*

### (Against Beyond Meat and ProPortion)

53.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

54.     The conduct of Beyond Meat and ProPortion, described herein, constitutes common law unfair competition and unlawful, unfair and deceptive business practices under California Business and Professions Code, section 17200.  Beyond Meat and ProPortion's conduct have harmed Plaintiff and have deprived Plaintiff of certain business. As a direct and proximate result, Plaintiff has suffered and continues to suffer actual damages in the nature of past and future lost profits according to proof.

55.     Beyond Meat and ProPortion have been unjustly enriched by virtue of their unfair competition.  Plaintiff requests that the Court order Beyond Meat and ProPortion to restore to Plaintiff all money and/or property improperly obtained.

56.     Pursuant to California Business and Professions Code, section 17203, which authorizes injunctive and restitutionary relief against any person who has engaged in or proposes to engage in unfair competition, Plaintiff requests that the Court order Beyond Meat and ProPortion to be enjoined from engaging in further unfair competition.

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

10
SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 10 of 67

## SIXTH CAUSE OF ACTION

### Tortious Interference with Contract

### Count One: The Exclusive Supply Agreement

### (Against ProPortion)

57.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

58.     Plaintiff and Beyond Meat had a valid existing contract, namely the Exclusive Supply Agreement.

59.     Upon information and belief, ProPortion was aware of the existence of the Exclusive Supply Agreement at the time that ProPortion interfered with it.

60.     ProPortion intended to induce Beyond Meat to breach the Exclusive Supply Agreement.

61.     By, among other things, misappropriating Plaintiff's Trade Secrets and replacing Plaintiff as Beyond Meat's co-manufacturer, ProPortion's conduct, in part, caused Beyond Meat to breach the Exclusive Supply Agreement.

62.     As a direct and proximate result of ProPortion's interference with the Exclusive Supply Agreement, Plaintiff has suffered and continues to suffer damages, and ProPortion has been unjustly enriched in an amount to be proven at trial as a direct result of its interference.

63.     ProPortion carried out the aforementioned acts with oppression, fraud, or malice, for its own personal gain with the deliberate intent to injure Plaintiff's business. Plaintiff is therefore entitled to punitive damages pursuant to C.C.P. § 3294 to punish ProPortion for the acts complained of herein and to deter such future conduct.

64.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as Beyond Meat and ProPortion will continue to improperly utilize and disclose the Trade Secrets and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests each time the Trade Secrets were improperly used.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

11
SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 11 of 67

**Count Two: The NDA**

**(Against ProPortion)**

65.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

66.     Plaintiff and Beyond Meat had a valid existing contract, namely the NDA.

67.     Upon information and belief, ProPortion was aware of the existence of the NDA at the time that ProPortion interfered with it.

68.     ProPortion intended to induce Beyond Meat to breach the NDA.

69.     By, among other things, misappropriating Plaintiff's Trade Secrets and replacing Plaintiff as Beyond Meat's co-manufacturer, ProPortion's conduct, in part, caused Beyond Meat to breach the NDA with Plaintiff.

70.     As a direct and proximate result of ProPortion's interference with the NDA, Plaintiff has suffered and continues to suffer damages, and ProPortion has been unjustly enriched in an amount to be proven at trial as a direct result of its interference.

71.     ProPortion carried out the aforementioned acts with oppression, fraud, or malice, for its own personal gain with the deliberate intent to injure Plaintiff's business. Plaintiff is therefore entitled to punitive damages pursuant to C.C.P. § 3294 to punish ProPortion for the acts complained of herein and to deter such future conduct.

72.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as Beyond Meat and ProPortion will continue to improperly utilize and disclose the Trade Secrets and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests each time the Trade Secrets were improperly used.

**SEVENTH CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Advantage**

**(Against ProPortion)**

73.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

12

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 12 of 67

74.     Plaintiff and Beyond Meat had an existing business relationship, as defined by the Exclusive Supply Agreement and the NDA, from which Plaintiff would have derived significant future economic benefit.

75.     ProPortion, by unlawfully misappropriating Plaintiff's Trade Secrets and replacing Plaintiff as Beyond Meat's exclusive co-manufacturer, intentionally interfered with Plaintiff's business relationship with Beyond Meat.

76.     As a direct and proximate result of ProPortion's interference, Plaintiff has suffered and continues to suffer damages, and ProPortion has been unjustly enriched in an amount to be proven at trial as a direct result of its interference.

77.     ProPortion carried out the aforementioned acts with oppression, fraud, or malice, for its own personal gain with the deliberate intent to injure Plaintiff's business. Plaintiff is therefore entitled to punitive damages pursuant to C.C.P. § 3294 to punish ProPortion for the acts complained of herein and to deter such future conduct.

78.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as Beyond Meat and ProPortion will continue to improperly utilize and disclose the Trade Secrets and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests each time the Trade Secrets were improperly used.

## EIGHTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

### (Against ProPortion)

79.     Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

80.     Plaintiff and Beyond Meat had an existing business relationship, as defined by the Exclusive Supply Agreement and the NDA, from which Plaintiff would have derived significant future economic benefit.

81.     ProPortion owed a duty of care to Plaintiff, including at least because ProPortion's unlawful misappropriation of Plaintiff's Trade Secrets could not be performed without a direct and plainly foreseeable adverse effect on Plaintiff's business,

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

13

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 13 of 67

and because Plaintiff's business suffered injury directly caused by ProPortion's actions. Stated another way, Plaintiff's interests are entitled to legal protection against ProPortion's conduct.

82. ProPortion, by unlawfully misappropriating Plaintiff's Trade Secrets and replacing Plaintiff as Beyond Meat's exclusive co-manufacturer, unreasonably and wrongfully interfered with and disrupted Plaintiff's business relationship with Beyond Meat.

83. As a direct and proximate result of ProPortion's interference, Plaintiff has suffered and continues to suffer damages, and ProPortion has been unjustly enriched in an amount to be proven at trial as a direct result of its interference.

84. Plaintiff has no adequate remedy at law for the injuries currently being suffered as Beyond Meat and ProPortion will continue to improperly utilize and disclose the Trade Secrets and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests each time the Trade Secrets were improperly used.

## NINTH CAUSE OF ACTION

### Fraud

### (Against Beyond Meat)

85. Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

86. In altering the food safety consultant's report, and then delivering that altered report to DLF, Beyond Meat made misrepresentations of several material facts regarding their manufacturing processes. These misrepresentations include, but are not limited to, omission of material information from that consultant's report, and affirmatively representing to DLF that the report was the complete opinion of the consultant and that no other food safety issues had been discovered or discussed as part of the consultant's work at Beyond Meat's facility.

87. When the altered report was delivered to DLF, Beyond Meat knew (a) that the report was falsified, (b) that material facts regarding food safety were being concealed

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

14

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 14 of 67

from DLF, (c) that DLF would have no reason to suspect that the report was altered and therefore incomplete, and (d) the effect that such concealment and deception would have on DLF.

88.    In delivering the altered report to DLF, Beyond Meat intended to induce DLF's reliance on that report.  Specifically, Beyond Meat intended that DLF would rely on the report and decide to continue to serve as Beyond Meat's co-manufacturer, having had its growing concerns regarding Beyond Meat's food safety practices assuaged.

89.    DLF reasonably relied on the altered report, as DLF could not have reasonably anticipated or known that the report, ostensibly created by a neutral third-party, was altered by Beyond Meat.  Among other things, DLF relied on the report in deciding to continue to serve as Beyond Meat's co-manufacturer, which included entering into the First Amendment to the Exclusive Supply Agreement in order to expand its relationship with Beyond Meat.

90.    As a direct and proximate result of Beyond Meat's fraud, DLF has suffered and continues to suffer damages, and Beyond Meat has been unjustly enriched in an amount to be proven at trial as a direct result of its interference.

## TENTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against Beyond Meat)

91.    Plaintiff hereby incorporates by reference each and every allegation of the foregoing paragraphs of this SAC, inclusive, as though fully set forth therein.

92.    In altering the food safety consultant's report, and then delivering that altered report to DLF, Beyond Meat made misrepresentations of several material facts regarding their manufacturing processes.  These misrepresentations include, but are not limited to, omission of material information from that consultant's report, and affirmatively representing to DLF that the report was the complete opinion of the consultant and that no other food safety issues had been discovered or discussed as part of the consultant's work at Beyond Meat's facility.

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

15

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 15 of 67

93.    When the altered report was delivered to DLF, Beyond Meat had no reasonable grounds for believing (a) that the report was not falsified, (b) that material facts regarding food safety were not being concealed from DLF, and (c) that DLF would have any reason to suspect that the report was altered and therefore incomplete.

94.    In delivering the altered report to DLF, Beyond Meat intended to induce DLF's reliance on that report.  Specifically, Beyond Meat intended that DLF would rely on the report and decide to continue to serve as Beyond Meat's co-manufacturer, having had its growing concerns regarding Beyond Meat's food safety practices assuaged.

95.    DLF reasonably relied on the altered report, as DLF could not have reasonably anticipated or known that the report, ostensibly created by a neutral third-party, was altered by Beyond Meat.  Among other things, DLF relied on the report in deciding to continue to serve as Beyond Meat's co-manufacturer, which included entering into the First Amendment to the Exclusive Supply Agreement in order to expand its relationship with Beyond Meat.

96.    As a direct and proximate result of Beyond Meat's fraud, DLF has suffered and continues to suffer damages, and Beyond Meat has been unjustly enriched in an amount to be proven at trial as a direct result of its interference.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment against Beyond Meat and ProPortion as follows:

1.    For compensatory damages, including interest at the maximum statutory rate, according to proof, in an amount to be proven at trial;

2.    For punitive and exemplary damages;

3.    For cost of suit incurred herein, including an award of those reasonable attorneys' fees and costs;

4.    For a declaration that Beyond Meat is not entitled to terminate the Exclusive Supply Agreement for the breaches alleged in the Breach Notice, and that its sole and

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

16

SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 16 of 67

exclusive remedy for those alleged breaches are contained in Section 2.2 of the Exclusive Supply Agreement;

5.  For injunctive relief (a) prohibiting use or disclosure of the Trade Secrets, and (b) enjoining other acts of unfair competition; and

6.  For such other and further relief as the Court deems proper.

Dated:  March 11, 2019

LOEB & LOEB LLP
DANIEL A. PLATT
ROBERT J. CATALANO
EDWARD K. LEE

By: _____
Daniel A. Platt
Robert J. Catalano
Edward K. Lee
Attorneys for Plaintiff
DON LEE FARMS, a division of
GOODMAN FOOD PRODUCTS, INC.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

17
SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 17 of 67

DocuSign Envelope ID: 70974874-5384-4D4B-AF4C-ED83FFBA942C

## VERIFICATION

I, Donald Goodman, declare as follows:

I am President of Plaintiff Don Lee Farms, a division of Goodman Food Products, Inc. I have read the foregoing Second Amended Complaint and know its contents. With respect to any factual portion of the Second Amended Complaint that is within my personal knowledge, I state that such portion is true. All other facts in the Second Amended Complaint are the product of information gathered by others acting on my behalf, including my attorneys; and, on that basis, I am informed, believe and thereon state that all such other matters are true.

Executed on ____March 8, 2019____, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DocuSigned by:

Donald Goodman

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17203901
221655-10004

18
SECOND AMENDED COMPLAINT

EXHIBIT 4
Page 18 of 67

# EXHIBIT A

EXHIBIT 4
Page 19 of 67



## EXCLUSIVE SUPPLY AGREEMENT

THIS EXCLUSIVE SUPPLY AGREEMENT (this "Agreement") is made and entered into as of December 2, 2014 ("Effective Date"), by and between Don Lee Farms, a division of Goodman Food Products, Inc., a California corporation ("Supplier") located at 200 East Beach Ave, Inglewood, CA, 90302, and Savage River, Inc., a Delaware corporation ("Buyer") located at 111 Main Street, El Segundo, CA 90245.

## RECITALS

A. The parties are mutually interested in entering into a business relationship with each other, after having previously entered into a Mutual Confidentiality Agreement (the "NDA"), which contained certain definitions which were incorporated therein and are incorporated herein as though fully set forth in this Agreement.

B. Supplier is in the business of researching, designing, creating, developing, testing, manufacturing, selling and distributing various food products. Buyer has developed certain food products as identified on **Exhibit A** to this Agreement (collectively, the "Beyond Meat Products").

C. Supplier and Buyer now wish to enter into this Agreement under which Supplier will design, test, manufacture and ship to Buyer on an exclusive requirements basis, the Beyond Meat Products and such other products as agreed to by the parties (each, a "Product" and collectively, the "Products").

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

## SECTION 1.        OBLIGATIONS OF SUPPLIER AND BUYER

1.1     **Supplier Obligations Generally.** Supplier will sell to Buyer the Products defined in Recital C above according to the terms set forth in this Agreement and will use reasonable efforts, consistent with such efforts it uses with respect to other preferred customers, to fill all orders for Products submitted by Buyer. Supplier shall manufacture the Products in accordance with written specifications provided by Buyer as set forth on **Exhibit B**, which may be changed only by an amendment in writing signed by both Supplier and Buyer. Supplier's agreement to such amendment shall not be unreasonably withheld.

© Proprietary to Goodman Food Products, Inc.

1

EXHIBIT 4
Page 20 of 67



**1.2.    Buyer Obligations Generally.** Buyer shall purchase the Products from Supplier at the prices identified in **Exhibit C**, which prices are firm for the term of this Agreement, subject to freight and storage charges also identified in **Exhibit C**. During the term of this Agreement, Buyer shall purchase the minimum quantities of Products set forth on **Exhibit C** ("Minimum Required Purchases").

**1.3    Exclusive Contract.** Except as set forth below, Buyer shall purchase one hundred percent (100%) of its Products needs (otherwise referred to as all of Buyer's requirements therefor) from Supplier during the term of this Agreement, as renewed or extended from time to time in accordance with Section 3 below. Subject to the provisions of this Agreement, Buyer may not have the Products supplied by a supplier other than Supplier during the term of this Agreement, as renewed or extended. It is understood and agreed that this Agreement applies to all of the Products; unless (a) Buyer receives from Supplier written notice that Supplier is not able to supply such Products according to the specified delivery date, which written notice by Supplier shall be delivered to Buyer within ninety (90) days' of Supplier's receipt of written notice from Buyer of such order, specifying the quantity and date for delivery of such Products or (b) Supplier is unable to supply Product which meets the quality control standards set forth in the written specifications for that specific Product as set forth in Exhibit B. Notwithstanding anything set forth above, and provided Buyer has satisfied the Minimum Required Purchases set forth in **Exhibit B** of this Agreement, Buyer reserves the right to produce Products internally. Finally, since Buyer is agreeing to use Supplier as its exclusive external source of supply for the products, Supplier agrees that, Supplier will not manufacture or sell any vegan or vegetarian food products for any third party or under its own brand that contain the same list of ingredients and proportions of such ingredients as set forth on **Exhibit C** during the term of this Agreement, as renewed or extended, or any time thereafter.

**1.4    Ordering Products.** Buyer will submit orders to purchase Products to Supplier by the issuance of a written purchase order or similar document specifying the quantity, the model number (if available) of the Products to be purchased and the requested delivery date (the "Purchase Order"). Each order will be promptly accepted or rejected by Supplier. Buyer shall be required to order items as set forth on **Exhibit C**. Minimum quantity of each item is forty thousand (40,000) pounds per production run maximum 2 items, reference <u>Minimum Required Purchases</u> page.

EXHIBIT 4
Page 21 of 67



**1.5    Terms of Order.** When a Purchase Order has been received by Supplier, it will constitute a firm and binding contract together with the terms of this Agreement. In the event of any inconsistency between the terms of any Purchase Order and this Agreement, the terms of this Agreement shall control such inconsistent terms.

**1.6    Cancellation.** Purchase Orders received by Supplier under Paragraph 1.4 that have been accepted by Supplier cannot be cancelled except by written mutual consent of Supplier and Buyer; and Buyer shall be responsible for Supplier's cancellation changes.

**1.7    Prices.** The prices for all Products sold by Supplier to Buyer hereunder will be F.O.B. Supplier's facility, and will include manufacturing, labor, overhead and thirty (30) days' storage charges. Prices will be at the prices set forth in this Agreement, which may be modified as also set forth below.

**1.8    Payment Terms.** Payment of each invoice for Products ordered by Buyer will be made net thirty (30) days after shipment. If sales are made on "Open Account" by Supplier and Buyer does not pay in collectible funds according to payment terms, a late charge of 1 ½% of the unpaid amount will be added by Supplier for each 30 day period or any increment thereof that Buyer fails to pay the balance due according to terms.

**1.9    Shipments/Pickups.** It is contemplated that Buyer will make their own arrangements for the pickup of all Products from Supplier's location. Supplier will promptly notify Buyer of any changes to shipment schedules that have previously been agreed to by Supplier and Buyer.

**1.10    Method of Shipment.** Any special shipping instructions will be provided to Supplier by Buyer not later than the time that the related order is placed by Buyer; and any additional costs associated therewith shall be paid by Buyer. All Products shall be packed, marked, loaded and shipped in accordance with any specifications (if any) provided by Buyer, and the requirements of common carriers. Damage to any Product must be clearly noted on the Product's bill of lading at time of receipt of shipment of such damaged Product.



**1.11    Title and Risk of Loss.** Title to, and possession of, the Products will pass to Buyer at the time that Supplier delivers the Products to the carrier for shipment. Buyer assumes and will bear the entire risk of loss and damage to the Products from any cause whatsoever while in transit and at all times thereafter, and no such loss or damage will relieve Buyer from its obligations under this Agreement. Buyer will notify Supplier and the insurance carrier of any such loss or damage.

EXHIBIT 4
Page 22 of 67



**1.12    Defective Product.** Buyer shall be entitled to inspection of Product at time of a pre-shipment batch of Products manufactured. Supplier shall be responsible for the full cost of any finished goods inventory that is not salable because such finished goods inventory falls to meet the written Product specifications set forth in Exhibit B, or is (a) rejected by Buyer or its customers due to any failure to meet the written Product specifications set forth in Exhibit B, (b) is in breach of the Product Warranty set forth in Section 2.1, below or (c) is withheld or recalled due to food safety or mis-marking considerations which were caused solely as the result of any actions or failure to take any actions by Supplier.



**1.13    Trademarks.** Supplier acknowledges Buyer's ownership of the trademarks, distinctive markings and/or designs (hereinafter called "Trademarks"), which appear on the packaging materials and/or shipping containers for the Products and agrees not to use the Trademarks except as provided for in this Agreement. Supplier also agrees that its placing of the Trademarks on the packaging materials and/or shipping containers for the Products on behalf of Buyer does not constitute use of those Trademarks by Supplier. Supplier agrees to remove Buyer's Trademarks from any of the packaging materials and/or shipping containers that are unacceptable to Buyer or that remain in Supplier's possession or under its control upon termination of this Agreement so that such Product and/or packaging materials and/or shipping containers will not indicate in any way any association with Buyer when sold or otherwise disposed of by Supplier. Upon termination of this Agreement, Supplier also agrees that it will immediately discontinue all use of the Trademarks.

**1.14    Inspection.** Buyer shall have at all times during regular business hours when its Product is being manufactured and packaged, the right to enter Supplier's plant, upon notification to the manager of such plant, and inspect the manufacturing and packaging of all Products to determine if manufacturing and packaging are being performed in compliance with this Agreement and Buyer's quality standards.



**SECTION 2.          PRODUCT WARRANTY**

**2.1    Product Warranty.** Supplier agrees to comply with all applicable federal, state, and local laws, regulations, ordinances and rules, including, without limitation, those promulgated by the U.S. Food and Drug Administration, the U.S. Department of Agriculture, the U.S. Federal Trade Commission and the Environmental Protection Agency. Supplier warrants, represents and guarantees that all Products contained in each shipment or other delivery are: (a) not adulterated or misbranded within the Federal Food, Drug and Cosmetic Act, and not an article which may not be introduced into interstate commerce under such Act; (b) not adulterated or misbranded within

A Confidential Supplier Manufacturing Agreement                                    4

EXHIBIT 4
Page 23 of 67



the terms of any state Pure Food or Net Weight Acts, or any other applicable federal, state, or local law, and not an article which cannot be legally transported or sold under the provisions of any federal, state, or local law; and (c) manufactured in accordance with the written product, packaging, labeling, quality and food safety specifications set forth in **Exhibit B** (collectively, the "Product Warranty"). In the event the Products are subjected to misuse, negligence, alteration, accident or repair by unauthorized personnel, or are otherwise tampered with after title pursuant to Section 1.11 above has passed to Buyer, Supplier's obligations under the foregoing warranty shall cease.

**2.2    Sole Remedy.** Subject to the conditions set forth in Section 2.1 above, with the exception of product liability claims brought by either Buyer's customers or customers of Buyer's customers, the sole and exclusive remedy for breach of any Product Warranty for any Product shall be the return of any nonconforming Product and either repayment of the purchase price thereof or replacement at the option of Supplier. All Products returned in connection with the Product Warranty may only be made with the prior authorization of Supplier, not to be unreasonably withheld.

**2.3    Disclaimer.** The warranties set forth above in this Section 2 are exclusive and in lieu of all other warranties. No other warranty, whether written or oral, is expressed or implied. Supplier expressly disclaims any warranties or merchantability or fitness for a particular purpose. In no event shall Supplier be liable for incidental, consequential, or special damages of any kind and however caused, including without limitation, loss of revenue or profit, loss of use of equipment or software, loss or interruption of business, loss of goodwill, cost of substitute equipment, facilities or services, or any claim of any customer for any such damages, even if Supplier has been advised of the possibility of such damages. The limitation of Supplier's liability provided for in the preceding sentence shall apply under all circumstances.

**SECTION 3.         TERM AND TERMINATION**

**3.1    Initial Term and Extensions.** This Agreement will become effective on the Effective Date set forth in the first paragraph and will, unless sooner terminated, (a) continue for an initial term of three (3) years, and thereafter (b) be automatically extended for one (1) additional periods of one (1) year each on the anniversary of the date of this Agreement unless written notice of termination is provided by one party to the other at least ninety (90) days prior to such anniversary date (with termination then being effective on such anniversary date).

EXHIBIT 4
Page 24 of 67



**3.2** ·Further Events of Termination· Either party may immediately terminate this Agreement by giving written notice to the other party if any of the following should occur:  (a) bankruptcy, insolvency, or reorganization proceedings, or any other proceedings analogous in nature and effect, are instituted by or against the other party; (b) the other party is liquidated, whether voluntarily or involuntarily; (c) a receiver or trustee is appointed for all or substantially all of the property of the other party and not removed within thirty (30) days thereafter; or (d) the other party makes an assignment for the benefit of creditors.

**3.3**     Breach of Obligations.  If either party commits a material breach of any of its obligations under this Agreement and fails to cure said breach within thirty (30) days after receipt of written notice to do so by the other party, the other party may immediately terminate this Agreement by giving written notice thereof.

**3.4**     **Consequences of Expiration or Termination.**  Expiration or termination of this Agreement will have the following effects upon the rights and obligations of the parties hereunder:

        3.4.1    Except as expressly provided in this Section 3.4, all remaining obligations of Supplier to make deliveries of Products will cease upon the effective date of such expiration or termination.

        3.4.2    In the event of expiration pursuant to Section 3.1 or termination pursuant to Section 3.2 hereof orders accepted by Supplier during the term hereof will be completed as though expiration or termination had not occurred.

        3.4.3 . In the event that Supplier terminates this Agreement prior to expiration of the term of this Agreement, including without limitation, due to Buyer's failure to meet the Minimum Purchases Required set forth in this Agreement or Buyer's breach of its obligations to purchase all of its Products requirements from Supplier and such termination is not for reason of material breach of this Agreement by Supplier, Buyer agrees as follows to:  (a) pay Supplier a termination fee (the "Termination Fee"), which Buyer hereby acknowledges is not a penalty, rather it is an alternative means for Buyer to perform its obligations under the Agreement that partially compensates Supplier for the fact that Supplier has agreed to honor Buyer's purchase orders for Products, which has caused Supplier to not accept orders for other product manufacturing and upon which the prices charged Buyer hereunder is based in part.  In the event Buyer fails to meet the Minimum Required Purchases as set forth in **Exhibit B** for any year, Buyer shall be responsible for paying a Termination Fee in the amount of twenty-five percent (25%) of the Processing Fee on

EXHIBIT 4
Page 25 of 67



the unfulfilled portion of the Minimum Required Purchases as also set forth in **Exhibit B** based on that year's average Processing Fee for all Products shipped. For example, if the Minimum Required Purchases is 5,000,000 pounds of all Products in year 1, and Buyer only orders and has shipped 4,000,000 pounds of all Products in year 1, and the average Processing Fee for that year 1 is eighty cents ($.80), then the Termination Fee shall be computed by multiplying 1,000,000 pounds by 25% by $.80 for a resulting amount of $1,000,000 x .25 x .80 = $200,000.00.

Buy also shall either use up or repurchase at Supplier's cost any authorized and unused raw materials used specifically by Supplier in the manufacture of the Products, as well as any packaging materials (in usable condition) that Supplier has in stock and that prior to such termination have been identified as being set aside for Products to be purchased by Buyer.

3.4.4   In the event that Buyer terminates this Agreement prior to expiration of the term of this Agreement, including without limitation, due to Supplier's failure to honor its exclusive supply commitment pursuant to the provisions of Section 1.3, above, and such termination is not for reason of material breach of this Agreement by Buyer, Supplier agrees to pay Buyer a termination fee (the "Buyer Termination Fee"), which Supplier hereby acknowledges is not a penalty, rather it is an alternative means for Supplier to perform its obligations under the Agreement that partially compensates Buyer for the fact that Buyer has agreed to purchase Products exclusively from Supplier, which has caused Buyer to not pursue other sources of Product manufacturing. The Termination Fee shall be in the amount of twenty-five percent (25%) of the Processing Fee on the unfulfilled portion of the Minimum Required Purchases as also set forth in **Exhibit B** based on that year's average Processing Fee for all Products shipped. For example, if the Minimum Required Purchases is 5,000,000 pounds of all Products in year 1, and Buyer only orders and has shipped 4,000,000 pounds of all Products in year 1 before termination, and the average Processing Fee for that year 1 is eighty cents ($.80), then the Termination Fee shall be computed by multiplying 1,000,000 pounds by 25% by $.80 for a resulting amount of $1,000,000 x .25 x .80 = $200,000.00.

**SECTION 4.**          **FORCE MAJEURE**

No party will be liable in any manner, including without limitation any incidental, consequential or special damages of any kind, for failure to fulfill or delay in fulfilling all or any part of this Agreement which is due to any cause or circumstance beyond the control of such party, including without limitation acts of God, governmental orders, regulations or restrictions, war (whether declared or not), threat of war, warlike conditions, hostilities, sanctions, mobilization, blockage, embargo, detention, revolution, riot, looting, strike, lockout, plague or other epidemics, fire or flood.

A provision of Goodness Fong Products Inc.                                     7

EXHIBIT 4
Page 26 of 67



## SECTION 5.    ADDITIONAL EQUIPMENT

Should additional equipment be required for processing any of the Products to be manufactured by Supplier for Buyer, Supplier will identify the equipment needed as set forth on Exhibit D and Buyer shall pay for (including but not limited to acquisition, installation, insurance, servicing and parts for continuous operation) and own all such equipment. Supplier will maintain the equipment with exception to parts and outside labor and have access to use the equipment for other production needs when the equipment is not in use. In the event the acquisition and use of any of the equipment to be purchased by Buyer hereunder in addition to and following the acquisition of any of the equipment identified on Exhibit D as of the Effective Date (the "Future Equipment") results in cost savings of the labor component of the pricing per pound of any Products manufactured and purchased hereunder, Supplier agrees to reduce the price per pound of such Products purchased hereunder in an amount equal to the amount of the actual cost savings realized from the Future Equipment purchased.

## SECTION 6.    MISCELLANEOUS

6.1    Nature of Relationship. Supplier and Buyer are and will remain independent business entities, not joint venture or partners. Nothing contained in this Agreement will be deemed or construed as constituting either party as an agent or legal representative of the other party for any purpose whatsoever, nor is either party granted any right or authority to assume or create any obligation or responsibility, express or implied, orally or in writing, on behalf of or in the name of the other party, or to bind the other party in any manner whatsoever.

6.2    Entire Agreement. This Agreement as well as the NDA constitute the entire agreement between the parties and wholly cancels, terminates and supersedes all previous negotiations, agreements and commitments, whether formal or informal, oral or written, with respect to the subject matter. The terms of the NDA, with the exceptions of Sections 3.3 and 14 which shall be modified as set forth in Exhibit D, shall remain in full force and effect as otherwise provided therein. In the event of any inconsistency between the terms of the NDA and this Agreement, the terms of this Agreement shall control such inconsistent terms.

6.3    Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of California without regard to conflict of laws principles. Any action which is brought to enforce, interpret or to remedy any alleged breach of this Agreement shall be filed .

EXHIBIT 4
Page 27 of 67



exclusively in any state of federal court located in Los Angeles county, California, and neither party shall object to the exercise of such court on any grounds, including without limitation, jurisdictional whether subject matter or personal.

**6.4** Waiver. The failure or delay by a party in exercising any right, power or privilege under this Agreement shall not be deemed a waiver of such right power or privilege, nor shall any single or partial exercise thereof preclude any other further exercise of any right, power or privilege under this Agreement. No waiver of any term of this Agreement shall be binding unless made by means of a written instrument signed by a duly authorized representative of the party against whom enforcement of such waiver is sought.

**6.5** Amendment; Binding Effect; Entire Agreement. This Agreement may not be amended, supplemented or otherwise modified except by a written instrument signed by a duly authorized representative of each party. The rights and obligations under this Agreement shall accrue to and be binding upon the successors and permitted assigns of the parties. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. No promises or understandings, either expressed or implied, exist between the parties with respect to the subject matter hereof unless contained in this Agreement.

**6.6** Notices. Any notice, consent, authorization or other communication required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, or be sent by facsimile or overnight express carrier with a confirmable means of delivery, or by certified mail, return receipt requested, postage prepaid, addressed in the case of each party to a duly authorized representative of such party at the address set forth at the beginning of this Agreement.

**6.7** Severability. Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**6.8** Assignment. This Agreement may not be assigned by either party without the prior written consent of the other party, except that Supplier may assign this Agreement to any subsidiary or affiliate of Supplier without Savage River's consent.

**6.9** Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be original and all of which shall constitute one and the same instrument.

9

EXHIBIT 4
Page 28 of 67

**6.10     Time.** Time is of the essence of this Agreement with respect to each and every provision of this Agreement in which time is a factor.

**6.11     Further Assurances.** Each of the parties agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Agreement.

**6.12     No Liability.** Supplier shall not be liable by reason of the termination or expiration of this Agreement to Buyer for compensation, reimbursement or damages on account of any loss of prospective profits on anticipated sales or on account of expenditures, investment, leases, or other commitments relating to the business or goodwill of Buyer. Buyer agrees to indemnify Supplier from all claims of its employees or representatives for similar compensation, reimbursement or damages.

**6.13     Attorney's Fees.** In the event that any party brings a suit against any other party for the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to obtain reimbursement from the non-prevailing party for all costs and expenses, including, without limitation, attorneys' fees and disbursements, incurred by the prevailing party.

*Signatures on following page:*

Advertising of Grand Napa Food Products Inc.                                      10

EXHIBIT 4
Page 29 of 67



IN WITNESS WHEREOF, the parties have executed this Agreement to as of the day and year first above written.

SUPPLIER:

Don Lee Farms, a division of
Goodman Food Products,
a California corporation

By: _____
        Donald Goodman

Title:    President

Date: _____12 | 2 |14_____

BUYER:

Savage River, Inc.,
a Delaware corporation

By: _____
              Ethan Brown

Title: [President]

Date: ____11/26/2014____

11

EXHIBIT 4
Page 30 of 67



**EXHIBIT A**

List of Beyond Meat Products:

Vegan Vegetable Protein Based Meat Analog Products consisting of:

Patties

Sliders

Meatballs

Chicken Poppers

Chicken Tenders

Other (as agreed to by both Buyer and Supplier)

12

EXHIBIT 4
Page 31 of 67



**EXHIBIT B**

## PRODUCT SPECIFICATIONS

### TO BE PROVIDED AND AGREED UPON BETWEEN BUYER AND SUPPLIER NO LATER THAN DECEMBER 9, 2014

### TO BE PROVIDED BY BUYER

13

EXHIBIT 4
Page 32 of 67



## EXHIBIT C

### PRICING AND PRODUCT PURCHASE MINIMUMS

Processing fee ("Processing Fee") for the Agreement

$.79 per pound for patties, sliders and meatballs

$.795 per pound for tenders and poppers (pre-marinated by Buyer)

The above Processing Fee prices do not include the following:

(1) The price per pound for any liquid nitrogen used and
(2) The cost of materials used, unless otherwise noted above.
(3) Other than bulk pack

14

EXHIBIT 4
Page 33 of 67

## MINIMUM REQUIRED PURCHASES

First year of Agreement – Four hundred Thousand (400,000) pounds of all Products shipped within first year.

Second and third years of Agreement – two million (2,000,000) pounds of all Products shipped per year.

For any year after the third full year of the Agreement, as mutually agreed in writing by the Parties, but in no event shall such year's Minimum Required Purchases be an amount less than 100% of the previous year's Minimum Required Purchases.

For purposes of calculating the aggregate pounds shipped during any year, that year shall run from the Effective Date, or the subsequent anniversary of the Effective Date through the 364th day thereafter. Each 365 day period shall constitute one year, and no overage or shortage of Products shipped within any one year shall be counted towards the Minimum Required Purchases for any other year.

Minimum orders shall be:

40,000 lb. for meatball items (spices pre-blended by Buyer by batch size) – 2 flavors total

40,000 lb. for patty/slider items (spices pre-blended by Buyer by batch size) – 2 flavors total

40,000 lb. for chicken tenders/poppers items (pre-marinated by Buyer) – 2 flavors total

15

EXHIBIT 4
Page 34 of 67



## EXHIBIT D

### Revisions to Sections 3.3 and 14 of the NDA

Sections 3.3 and 14 of the NDA shall be revised to read as follows:

3.3 Restrictions on Use. Company shall use Savage River Confidential Information and Know-How received from Savage River or Savage River Intellectual Property solely for the purpose of evaluating the possibility of entering into a business relationship with Savage River, as well for any purpose consistent with the goals and provisions of any resultant business relationship. Likewise, Savage River shall use Company Confidential Information and Know How received from Company or Company Intellectual Property solely for the purpose of evaluating the possibility of entering into a business relationship with Company, as well for any purpose consistent with the goals and provisions of any resultant business relationship. With respect to any New Company Intellectual Property developed solely by Company during the term of this Agreement or the subsequent Exclusive Supply Agreement dated as of October 31, 2014 ("Exclusive Supply Agreement"), such New Company Intellectual Property shall be solely owned and may be used only by Company for its own purposes or for its financial or other gain or advantage. With respect to any New Savage River Intellectual Property developed solely by Savage River during the term of this Agreement or the subsequent Exclusive Supply Agreement, such New Savage River Intellectual Property shall be solely owned and may be used only by Savage River for its own purposes or for its financial or other gain or advantage.

14.    Term. This Agreement shall continue in full force and effect until the parties conclude the evaluation contemplated hereunder by either entering into a business relationship or determining that such a relationship is inappropriate. In the event the parties enter into a business relationship, this term of this Agreement shall terminate at the same time as the term of that Exclusive Supply Agreement between the parties which sets forth the parameters of their new business relationship. The restrictions and obligations contained in this Agreement shall survive the termination of this Agreement for a period of three (3) years from the date of such termination unless the Confidential Information remains a trade secret under applicable law. For such trade secrets, the Recipient's obligations shall survive termination for as long as the Confidential Information remains a trade secret. For purposes of this Agreement, and without limitation to the foregoing, all (i) recipes, product specifications and formulations as provided and/or disclosed by Savage River; (ii) manufacturing processes and techniques as provided and/or disclosed by Company and (iii) marketing and distribution strategies of each Disclosing Party, are considered trade secrets.

16

EXHIBIT 4
Page 35 of 67



**EXHIBIT E**

## ADDITIONAL EQUIPMENT NEEDED

| PRODUCT | EQUIPMENT NEEDED | BUDGET COSTS |
|---------|------------------|--------------|
| Meatballs | Meatball forming head | $26,000 |
| Meatballs | Shuttle conveyor | $28,000 |

17

EXHIBIT 4
Page 36 of 67

cuSign Envelope ID: 8FD8060B-B649-465B-974B-A2054782F457

## AMENDMENT TO
## EXCLUSIVE SUPPLY AGREEMENT

THIS AMENDMENT TO EXCLUSIVE SUPPLY AGREEMENT (this "Amendment") is made and entered into as of April 11, 2016, by and between Don Lee Farms, a division of Goodman Food Products, Inc., a California corporation ("Supplier"), located at 200 East Beach Ave., Inglewood, CA 90302, and Savage River, Inc., a Delaware corporation ("Buyer"), located at 111 Main Street, El Segundo, CA 90245.

### RECITALS

A. The parties hereto have entered into a certain Exclusive Supply Agreement as of December 2, 2014 (the "Agreement").

B. The parties now wish to amend the Agreement as set forth below.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1. For purposes of the Agreement, the term "Start Date" shall mean the date that (a) all of the Additional Equipment set forth in Exhibit E is installed and operating and (b) the improvements set forth in Exhibit F are completed.

2. Exhibits A, B, C and E to the Agreement are hereby amended in their entirety and replaced by Exhibits A, B, C and E to this Amendment, with the addition of new Exhibit F (Improvements and Additions), new Exhibit G (Pre-shipment Testing Requirements and Quality Standards) and new Exhibit H (External Agency Certifications).

3. Section 1.2 of the Agreement is hereby amended in its entirety to read as follows:

1.2. Buyer Obligations Generally. Buyer shall purchase the Products from Supplier identified in Exhibit C; provided, however, until the Start Date, the actual Products and the prices thereof shall be those presently being supplied and paid under the Agreement. From and after the Start Date, the Products and the prices thereof shall be as set forth in Exhibit C, which prices are firm for the term of this Agreement. From and after the Start Date and during the term of this Agreement, Buyer shall purchase the minimum quantities of Products set forth on Exhibit C ("Minimum Required Purchases"). Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed by the parties that Supplier has no obligation to furnish or supply any of the ingredients or packaging materials for the Products, all of which are to be furnished, supplied and delivered by Buyer at its sole cost and expense. Supplier's sole obligation is to process and package the Products solely with the ingredients and materials furnished, supplied and delivered by Buyer.

LA2480114.7
221655-10001

EXHIBIT 4
Page 37 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9?4B-A2054782F457

4.      Section 1.3 of the Agreement is hereby amended to remove Buyer's right to produce Products internally except for pilot production activities. In the event that Buyer's production requirements exceed the physical footprint of Supplier's Mansfield, TX facility, Buyer shall give Supplier right of first refusal to expand the physical footprint of its facility at its own cost, in order to provide space to meet Buyer's production requirements.     Buyer and Supplier shall mutually agree to additional facility improvements and equipment requirements prior to commencement of facility expansion, Buyer would then be responsible for the purchase of any required equipment and reimbursement of facility infrastructure improvements in accordance with Section 5 of this agreement. In the event that supplier is unable or unwilling to increase or expand its factory footprint, then Buyer shall retain the right to produce such excess Products internally or with another external third-party manufacturer.

5.      Section 1.4 of the Agreement is hereby amended in its entirety to read as follows:

1.4     Ordering Products. Buyer will submit orders to purchase Products to Supplier by the issuance of a written purchase order or similar documents specifying the specific Product(s), the quantity, and the model number (if available) of the Product(s) to be purchased and the requested delivery date (the "Purchase Order"). Each order will be accepted or rejected by Supplier within three (3) business days of its receipt of the Purchase Order.   Buyer shall order all Products in accordance with Exhibit C.

6.      Section 1.5 of the Agreement is hereby amended to provide that the Purchase Order constitutes a firm and binding contract when it has been accepted by Supplier.

7.      Section 1.8 of the Agreement is hereby amended in its entirety to read as follows:

1.8     Payment Terms. Payment of each invoice for Products ordered by Buyer shall be made the earlier of (a) net fourteen (14) days after shipment or (b) thirty (30) days after supplier notifies Buyer that the Products are ready for shipment, whichever occurs sooner. If sales are made on "Open Account" by Supplier and Buyer does not pay in collectible funds according to payment terms, a late charge of 1 ½% of the unpaid amount will be added by Supplier for each 30-day period or any increment thereof that Buyer fails to pay the balance due according to terms.

8.      Section 1.9 of the Agreement is hereby amended in its entirety to read as follows:

1.9     Shipments/Pickups.  Buyer will make its own arrangements for the pickup of all Products from Supplier's location, at Buyer's sole cost and expense.

9.      Section 1.10 of the Agreement is hereby amended in its entirety to read as follows:

LA2480114.7
221655-10001

2

EXHIBIT 4
Page 38 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-974B-A2054782F457

1.10   Storage. For any Product that is stored by Supplier for more than thirty (30) days, Buyer shall pay to Supplier an amount equal to $0.03 per pound for each thirty (30) days or portion thereof. Payments shall be made within ten (10) days after each thirty (30) day period. In addition to the foregoing, if any Product(s) are not picked up within six (6) months from the first day of storage, Supplier may dispose of such Product(s) without any obligation to liability to Buyer. Buyer shall reimburse Supplier for the costs of disposition.

10.   Section 1.12 of the Agreement is hereby amended to include the language as follows:

1.12 Defective Product. Buyer shall be entitled to inspection of Product at time of a pre-shipment batch of Products manufactured. Supplier shall be required to hold Product until Product has passed Buyer's Pre-shipment Testing Requirements and Quality Standards set forth in Exhibit G. Buyer will bear the cost and fees of all quality, certifications and other testing, including but not limited to costs incurred by Supplier in connection therewith (including but not limited to additional labor). Supplier shall be responsible for the full cost of any finished goods inventory that is not salable because such finished goods inventory fails to meet the written Product specifications set forth in Exhibit B, or is (a) rejected by Buyer or its customers due to any failure to meet written product specifications set forth in Exhibit B, (b) is in breach of the Product Warranty set forth in Section 2.1, below or (c) is withheld or recalled due to food safety or mis-marking considerations which were caused solely as the result of any actions or failure to take any actions by the Supplier.

11.   Section 1.14 Inspection of the Agreement is hereby amended to include the language as follows:

1.14 Inspection.   Buyer should have at all times during production or sanitation hours when its Product is being manufactured and packaged, the right to enter Supplier's plant, upon notification to the manager of such plant, and inspect the manufacturing and packaging of all Products to determine if manufacturing and packaging are being performed in compliance with this agreement and Buyers quality standards as specified in product specifications provided in Exhibit B and quality standards in Exhibit G.

12.   Section 1.15 External Agency Certifications is hereby added to the Agreement to include the language as follows:

1.15 External Agency Certifications. In as much as Buyer wishes to obtain various External Agency Certifications as described in Exhibit H (External Agency Certifications) for several of its Products, Buyer will bear all costs associated with Supplier preparing for, complying with and maintaining systems associated with the various certifying agency requirements. To this effect, Buyer agrees to reimburse Supplier for the addition of one or more Quality Assurance personnel hired by and compensated directly by Supplier at an annual cost of approximately $90,000 per year, charged back to Buyer for the specific purpose of administering the Buyer's quality

LA2480114.7
221655-10001

3

EXHIBIT 4
Page 39 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9⬤⬤-A2054782F457

assurance, product traceability and inventory management programs at Supplier's premises. Buyer shall have the right to interface with and request information from said Quality Assurance personnel as required in order to conduct Buyer's aforementioned quality, product traceability and inventory management programs. Concurrent with the execution of this Agreement, Buyer shall pay to Supplier an advance of $90,000. It shall be Buyer's obligation to obtain the various External Agency Certifications. Buyer understands that Supplier makes no guarantee that any or all of the External Agency Certifications will or may be achievable and agrees that in the event that any or all of the External Agency Certifications are not achieved, that Buyer is still bound under the Minimum Required Purchases as outlined in Exhibit C of this contract. In the event that an External Agency Certification is deemed unachievable by Supplier (at its sole discretion) for a Product, due to complexity, business interference or for any other reason, Supplier agrees that Buyer may seek to manufacture that individual Product offering with an external third party, thus waiving its exclusive supply arrangement for that sole Product. Buyer understands that if such exclusivity is waived by Supplier for any single or combination of Products, that this in no way reduces the Buyer's Minimum Required Purchase commitment as outlined in Exhibit C.

13.    Section 2.1 of the Agreement is hereby amended to provide that, with respect to all raw materials and other items furnished by Buyer, Buyer shall have the same obligations and responsibilities that Supplier has under this Section 2.1.

14.    Section 3.1 of the Agreement is hereby amended in its entirety to read as follows:

3.1    Initial Term and Extensions. The term of the Agreement is hereby extended to end three (3) years after the Start Date, and thereafter be automatically extended for additional periods of one (1) year, with each year commencing on the anniversary of the Start Date unless written notice of termination is provided by one party to the other at least ninety (90) days prior to such anniversary date (with termination then being effective on such anniversary date).

15.    Section 3.3 of the Agreement is hereby amended to provide that a material breach by Buyer shall include, but not be limited to, the failure to pay any or all monies due to Supplier under this Agreement and the failure to furnish, supply and deliver all ingredients and materials provided for in Section 1.2.

16.    Section 3.4 of the Agreement is hereby amended in its entirety to read as follows:

3.4.    Consequences of Expiration or Termination.    Expiration or termination of this Agreement will have the following effects upon the rights and obligations of the parties hereunder:

3.4.1    Except as expressly provided in Section 3.4.2, all remaining obligations of Supplier to make deliveries of Products will cease upon the effective date of such expiration or termination.

LA2480114.7
221655-10001

4

EXHIBIT 4
Page 40 of 67

OccuSign Envelope ID: 8FD8060B-B649-465B-97*B-A2054782F457

3.4.2  In the event of expiration pursuant to Section 3.1, orders accepted by Supplier during the term hereof will be completed as though expiration had not occurred.

3.4.3  In the event that Supplier terminates this Agreement prior to expiration of the term of this Agreement pursuant to Section 3.3, in addition to any other rights and remedies to which Supplier is entitled, Buyer agrees to pay Supplier a termination fee (the "Termination Fee"), which Buyer hereby acknowledges is not a penalty but rather an alternative means for Buyer to perform its obligations under the Agreement, that partially compensates Supplier for the fact that Supplier has agreed to honor Buyer's purchase orders for Products, which has caused Supplier to not accept orders for other product manufacturing, and upon which the prices charged Buyer hereunder is based in part. The Termination Fee shall be an amount equal to twenty-five percent (25%) of the Processing Fee on the unfulfilled portion of the Minimum Required Purchases for each of the remaining years of the term of the Agreement (or portion thereof) based on the weighted average Processing Fee for all Products purchased during the previous twelve (12) months. For example, if the Agreement is terminated in the second year and the Products purchased was 4,000,000 pounds during that year, and the weighted average Processing Fee for the twelve (12) months prior thereto was eighty cents ($.80), then the Termination Fee shall be computed by multiplying 7,000,000 pounds by 25% by $.80 for a resulting amount of $1,400,000 (7,000,000 x .25 x .80 = $1,400,000).

17.    Section 5 of the Agreement is hereby amended in its entirety to read as follows:

Section 5.    Equipment and Improvements to Infrastructure. The parties acknowledge that certain equipment has been installed, at Buyer's cost and expense, in Supplier's premises for the purpose of processing certain of the Products ("Original Equipment"). The parties agree that on or before May 15, 2016, Buyer shall, at its sole cost and expense, deliver to and install in Supplier's premises all of the equipment set forth in Exhibit E ("Additional Equipment"). For purposes of the Agreement, the Original Equipment and the Additional Equipment shall be referred to as the "Equipment". In addition to paying for the Equipment and the installation thereof, Buyer shall also pay for insuring it at replacement cost. Buyer shall also be responsible for any and all parts and outside labor that Supplier reasonably deems are required in order for the Equipment to function properly. Supplier may, but shall not be obligated to, use its own employees to perform service on the Equipment. Supplier has the authority to retain outside labor and purchase parts for the Equipment as it reasonably deems fit. Buyer shall reimburse supplier for the cost thereof within ten (10) days after presented with a bill.

In connection with the installation of the Additional Equipment, Supplier may retain one or more consultants to assist in such installation. Buyer shall reimburse Supplier for the cost of such consultants up to $500.00 per day (for a maximum of sixty (60) consulting days) plus travel expenses. Such reimbursement shall be made within ten (10) days after Buyer receives a statement from Supplier.

LA2480114.7
221655-10001

5

EXHIBIT 4
Page 41 of 67

· DocuSign Envelope ID: 8FD80608-B649-465B-974B-A2054782F457

Upon delivery of the Equipment, all of the Equipment (except for those items specifically purchased by Buyer as provided for in Exhibit E, as amended from time to time) shall belong to and be owned by Supplier without any obligation to compensate Buyer. Supplier shall allow for buyer to file a UCC in the Supplier's domiciled state, identifying the Equipment located in Supplier's facility, which was purchased by and is reserved to Buyer. Any and all of the Equipment reserved to Buyer must be picked up by Buyer, at its sole cost and expense, within thirty (30) days of the termination; if not picked up within such thirty (30) day period, then Buyer shall immediately pay to Supplier the sum of $10,000.00, and if any of such Equipment is not picked up by Buyer within six (6) months of the termination, then such Equipment shall belong to and be owned by Supplier without any obligation to compensate Buyer; if Supplier elects to dispose of any such Equipment, the cost thereof shall be paid by Buyer. Upon the removal of Equipment by Buyer and/or the disposition of Equipment by Supplier, Buyer shall at its sole cost and expense restore Supplier's premises to the same condition as it was immediately prior to the installation of the Equipment. If Buyer does not so restore the premises within ten (10) days after removal or disposition, then Supplier may elect to restore the premises, in which event Buyer shall immediately reimburse Supplier for all costs and expenses associated therewith.

In order for Supplier to fulfill its obligations under this Agreement, it is necessary for Supplier to make certain improvements and additions to its premises. A description of such improvements and additions is set forth in Exhibit F attached hereto. As work progresses, and with Buyer's approval (which shall not unreasonably be withheld), Supplier may make changes that it deems reasonable. Although the parties estimate that the total cost thereof will be $1,089,600, the parties understand that such amount may differ. If the cost exceeds $1,089,600, Buyer shall pay the difference; if it is less than $1,089,600, Supplier shall reimburse such difference to Buyer. Supplier agrees to complete such improvements and additions within ninety (90) days after installation of the equipment provided for in Exhibit E. Concurrent with the execution of this Agreement, Buyer shall pay to Supplier the amount of $907,600, which covers the estimated cost of Phases 1 and 2 of Exhibit F. Prior to commencement of the Phase 3 work, Buyer shall pay to Supplier the amount of $182,000, which may be adjusted by Supplier.

[Signature Page Follows]

LA2480114.7
221655-10001

6

EXHIBIT 4
Page 42 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9?1B-A2054782F457

IN WITNESS WHEREOF, the parties have executed this Amendment to as of the day and year first above written.

SUPPLIER:                                              BUYER:

Don Lee Farms, a division of                           Savage River, Inc.,
Goodman Food Products,                                 a Delaware corporation
a California corporation

By: _____                          By: _____
        Donald Goodman                                         Ethan Brown
Title: President                                       Title: President

LA2480114.7
221655-10001

EXHIBIT 4
Page 43 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-BB-A2054782F457

## EXHIBIT A

### List of Beyond Meat Products:

Vegan Vegetable Protein Based Meat Analog Products consisting of:

**SINGLE PROCESS ITEMS:**

"Chicken" Strips

"Beef" Crumbles

Raw ground "beef" loaf

Raw ground "beef" patties

Raw ground "beef" chub-packed

**DOUBLE PROCESS-STEP ITEMS:**

Beast Burgers

Beast Sliders

Meatballs

LA2480114.7
221655-10001

EXHIBIT 4
Page 44 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9?-B-A2054782F457

## EXHIBIT B

## PRODUCT SPECIFICATIONS

[TO BE FINALIZED AND MUTUALLY APPROVED BY BOTH BUYER AND SUPPLIER WITHIN 30 DAYS FOLLOWING COMMENCEMENT OF PRODUCTION OF THE PRODUCTS AT SUPPLIERS FACILITY]

LA2480114.7
221655-10001

EXHIBIT 4
Page 45 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-___B-A2054782F457

## EXHIBIT C

PRICING

The prices paid by Buyer to Supplier for all Products ("Processing Fee") shall be as follows:

1. $0.79 per pound for single-step processing of raw materials, freezing and bulk packaging items of twenty (20) pounds or more. For example, "Chicken" strips, "Beef" crumble, and Raw ground "beef" patties.

2. $0.98 per pound for single-step processing of raw materials, freezing and retail packaging items that are less than twenty (20) pounds. For example, "Chicken" strips, "Beef" crumbles, Raw ground "beef" patties and Raw ground "beef" loaf.

3. $1.14 per pound when Buyer supplies hydrated raw material and Supplier cooks, freezes and retail packages into finished product that are less than thirty (30) pounds. For example, Cooked Beast Burger & Sliders, Meatballs and Breaded Chicken Tenders.

4. $1.49 per pound for processing raw materials, freezing and packaging into finished product on double process-step items. For example, Cooked Beast Burger & Sliders, Meatballs, Breaded Chicken Tenders.

5. There may not be more than two (2) processes in any one (1) package, in addition to freezing work-steps.

6. Each order must be for a minimum of 40,000 pounds.

7. Prices for Raw ground "Beef" chub-packed items shall be determined by Buyer and Supplier within thirty (30) days after the equipment is specified.

MINIMUM REQUIRED PURCHASES

First year of Agreement – four million (4,000,000) pounds of all Products purchased within first year.

Second year of Agreement – five million (5,000,000) pounds of all Products purchased within second year.

Third year of Agreement – six million (6,000,000) pounds of all Products purchased within third year.

For any year after the third full year of the Agreement, as mutually agreed in writing by the parties, but in no event shall such year's Minimum Required Purchases be an amount less than 100% of the previous year's Minimum Required Purchases.

LA2480114.7
221655-10001

EXHIBIT 4
Page 46 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9▮▮8-A2054782F457

For purposes of calculating the aggregate pounds purchased during any year, that year shall run from the Start Date, or the subsequent anniversary of the Start Date through the 364th day thereafter. Each 365-day period shall constitute one year, and no overage of Products shipped within any one year shall be counted towards the Minimum Required Purchases for any other year. In the event that Buyer does not purchase the Minimum Required Purchases for any year then, within ten (10) days after such year, Buyer shall pay to Supplier an amount equal to twenty-five percent (25%) of the Processing Fee of the unfilled portion of the Minimum Required Purchases for that year based upon the weighted average for all Products shipped during such year. For example, if the Minimum Required Purchases for that year is 5,000,000 pounds and Buyer purchased only 4,000,000 pounds at a weighted average of $0.80, then Buyer must pay to Supplier the sum of $200,000 (1,000,000 pounds multiplied by $0.80 by 25% = $200,000).

Each order must be for a minimum of 40,000 pounds.

LA2480114.7
221655-10001

11

EXHIBIT 4
Page 47 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9__B-A2054782F457

## EXHIBIT E

## EQUIPMENT

| PRODUCT | ESTIMATED INSTANTANEOUS LINE RATE (lbs/hr) | EXISTING AND PROPERTY OF DON LEE FARMS | EQUIPMENT | PURCHASE ($) | RENTAL ($/Mo.) | COMMENTS |
|---|---|---|---|---|---|---|
| **FROZEN (Phase 2)** | | | | | | |
| Beef Crumble | 3,900 | | | | | |
| Chicken Strips | 2,900 | | | | | |
| | | | Gaylord Tote Dumper (Combo Bin Dumper) | 20,000 | | Estimate to verify |
| | | | Lightning Mixer & Vessel for Marinade/Spices | 5,000 | | |
| | | | Cooking Steam Jacketed/Injected Paddle/Ribbon Mixer | | 3,280 | 72 mo lease to own purchase |
| | | YES | Floor Scale | | | |
| | | | Buggie Dumper | 14,000 | | Estimate to verify |
| | | | Vibratory Dewatering Screen/Conveyor | 25,000 | | Estimate to verify |
| | | | Incline Belt Feeder (to Feed Freezer) | 25,000 | | Estimate to verify |
| | | | Storeveyor/Delivery Conveyor to Octofrost | 25,000 | | Estimate to verify |
| | | | IQF Freezer (Octofrox) | 450,000 | | |
| | | | Incline Conveyor to Scale | 50,000 | | Estimate to verify |
| | | | Stand-Up (Gussetted) Resealable Pouching Machine | | 9,000 | Rental estimate to verify. Need 95 bags/min (to deliver 3900 lbs/hr @1loz, and 86 bags/min to deliver 2900 lbs/hr @9oz |
| | | | Washdown Scale (To supply Pouching Machine) | | 6,000 | New $240k, Rental estimate to verify |
| | | | CEIA Metal Detector | 26,000 | | As currently used by DLF |
| | | | Top and Bottom Case Sealer SS InterTape | 18,000 | | As currently used by DLF |
| | | | **TOTALS EQUIPMENT FROZEN PRODUCTS** | 658,000 | 18,280 | |
| **FRESH BEEF (Phase 3)** | | | | | | |
| Patty | 2,000 | | | | | |
| | | | Gaylord Tote Dumper (Combo Bin Dumper) | 20,000 | | Estimate to verify. Format of crumble extrudate to verify. |
| | | | In-line Water Filter For Microbial Filtration | 1,000 | | 20gpm |
| | | | Water Chiller | 15,000 | | Installed cost Batch Water Chiller, look into to Combine with Freon Cooling |
| | | | Mixer for Paste | 25,000 | | Estimate to verify |
| | | | Mixer Buggie Dumper | 14,000 | | Estimate to verify |
| | | | Floor Scale | 10,000 | | Estimate to verify |
| | | | Load Cells for Mixer | 12,000 | | Including display |
| | | | Paddle/Ribbon Mixer | 20,000 | | DLF Estimate |
| | | | Vemag HP 20E | 148,600 | | From former Reiser Quote |
| | | | Inline Grinder | 31,700 | | From former Reiser Quote |
| | | YES | FM250 | | | Patty & Slider Maker |
| | | | MMP 220 | | | 78000 Loaf maker - For later |
| | | | Interleaver | 54,100 | | From former Reiser Quote |
| | | | Tray Depositor/Patty Stacker | 24,500 | | From former Reiser Quote |
| | | | Tray Sealer | | 15,000 | Estimate, we need 40-50 trays/min (preferably in one machine) for 2000 lbs/hr |
| | | YES | Compressor - for Tray Sealer | | | |
| | | | Water Chiller - for Tray Sealer | 15,000 | | Installed Cost Batch Water Chiller, look into to Combine with Freon Cooling |
| | | | "Mini-Bulk" Gas Tank System | | 1,400 | N2 & CO2 $700 each |
| | | YES | Gas Mixer | | | |
| | | | Inkjet Printer to mount on Conveyor | 30,000 | | As currently used by DLF |
| | | | CEIA Metal Detector | 26,000 | | As currently used by DLF |
| | | | Top and Bottom Case Sealer SS InterTape | 18,000 | | As currently used by DLF |
| | | | **TOTALS EQUIPMENT FRESH BEEF** | 444,900 | 16,400 | |
| **FURTHER PROCESSING PRODUCTS (Phase 1)** | | | | | | HYDRATION AND COOLING ASSETS SAME AS FOR BEEF CRUMBLE |
| Beast Burger & Sliders | 3,000 | | | | | |
| | | YES | Mixing, Patty Making, Cooking, Grilling, IQF | | | As currently done at DLF Inglewood factory |
| | | | Beast Burger Forming Plates Inventory 810315141 | | | Property of Beyond Meat currently at DLF Inglewood Factory |
| | | | Flow Wrapper | | 4,000 | |
| | | | Cartoner | | 7,950 | |
| Chicken Tenders/Poppers | TBD | | | | | |
| | | | Breader | 20,000 | | Used - Estimate |
| | | YES | Batterer | | | |
| | | YES | Pre-dust Drum (Needs Repair) | | | |
| | | YES | Fryer | | | |
| | | YES | Scale & Bag Sealer | | | |
| Meatballs | TBD | | | | | |
| | | YES | Meatball Extrusion Equipment | | | |
| | | YES | Scale & Bag Sealer | | | |
| | | | Shuttle Conveyor | | | Property of Beyond Meat currently at DLF Inglewood Factory |
| | | | **TOTALS EQUIPMENT FURTHER PROCESSING PRODUCTS** | 20,000 | 11,950 | |
| | | | **TOTALS OF 3 CATEGORIES OF PRODUCT** | 1,122,900 | 46,630 | |

( 1 ) All equipment must withstand high pressure washing on a daily basis.
( 2 ) Buyer acknowledges that, from time to time, Supplier will require additional equipment that it reasonably deems necessary in order to fulfill its obligations under this Agreement. Buyer agrees to deliver and install such equipment at its sole cost and expense.

LA2480114.7
221655-10001

EXHIBIT 4
Page 48 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-9?4B-A2054782F457

## EXHIBIT F

## IMPROVEMENTS AND ADDITIONS

| PRODUCT | ITEM | COST ($) | COMMENTS |
|---|---|---|---|
| **FROZEN (Phase 2)** | | | |
| Beef Crumble | | | |
| Chicken Strips | | | |
| | Ammonia Recirculator | 101,200 | |
| | Inner Cooler | 26,400 | |
| | Evapco PMC-889E Condenser | 132,000 | |
| | 3 Quantum HD Panels | 35,000 | |
| | Control | 28,000 | |
| | Ammonia Refrigeration System Install | 400,000 | |
| | Install - OctaFrost Mechanical, Moving Kettles, Blentech Mechanical & Electrical, Wall | 100,000 | |
| | Blentech Steam Install & Electrical OctoFrost | 25,000 | |
| | Upgrade/expansion to Fire Panel | 50,000 | |
| | Electrical Drops | 10,000 | |
| | TOTALS INFRASTRUCTURE/INSTALL FROZEN PRODUCTS | 907,600 | |
| **FRESH BEEF (Phase 3)** | | | |
| Patty | | | |
| | Blast Freezer Modifications | 80,000 | |
| | Room Refrigeration Package | 50,000 | |
| | Flooring Frozen & Fresh Area 2000 ft2@ $10/ft2 | 10,000 | |
| | Freezer Door Repair/Replacement | 26,000 | |
| | Curtins & Wall Perforations | 5,000 | |
| | Various Electrical Installs & Lights | 5,000 | |
| | 1" Gas Flush Line to Fresh Beef Area | 6,000 | |
| | TOTALS INFRASTRUCTURE/INSTALL FRESH BEEF | 182,000 | |
| **FURTHER PROCESSING PRODUCTS (Phase 1)** | | | |
| Beast Burger & Sliders | N/A | | |
| Chicken Tenders/Poppers | Repair of Pre-dust Drum | | Discontinued |
| Meatballs | N/A | | |
| | TOTALS INFRASTRUCTURE/INSTALL FURTHER PROCESSING PRODUCTS | | |
| | **TOTALS OF 3 CATEGORIES OF PRODUCT** | **1,089,600** | |

\*   This is an estimate.  As per Section 5 of the Agreement, Buyer shall pay to Supplier an initial payment of $907,600 for the commencement of Phases 1 & 2.

LA2480114.7
221665-10001

EXHIBIT 4
Page 49 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-___B-A2054782F457

## EXHIBIT G

### Pre-shipment Testing Requirements and Quality Standards

**Allergen/Sensitivities Information**

**Chicken-Free Strips (Breaded)**

| Allergen | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Soy | Present | Present | | |
| Wheat | Present | Present | | |
| Peanut | Absent | Undetectable | ELISA | * |
| Tree nut | Absent | Undetectable | ELISA | * |
| Fish | Absent | Undetectable | ELISA | * |
| Shellfish | Absent | Undetectable | ELISA | * |
| Milk | Absent | Undetectable | ELISA | * |
| Egg | Absent | Undetectable | ELISA | * |

**Chicken-Free Strips (Non-Breaded)**

| Allergen | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Soy | Present | Present | | |
| Wheat | Absent | Undetectable | ELISA | * |
| Peanut | Absent | Undetectable | ELISA | * |
| Tree nut | Absent | Undetectable | ELISA | * |
| Fish | Absent | Undetectable | ELISA | * |
| Shellfish | Absent | Undetectable | ELISA | * |
| Milk | Absent | Undetectable | ELISA | * |
| Egg | Absent | Undetectable | ELISA | * |
| Gluten | Absent | < 10 ppm | ELISA | * |

**Beef-free Crumbles, Burgers, Meatballs**

| Allergen | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Soy | Absent | Undetectable | ELISA | * |
| Wheat | Absent | Undetectable | ELISA | * |
| Peanut | Absent | Undetectable | ELISA | * |
| Tree nut | Absent | Undetectable | ELISA | * |
| Fish | Absent | Undetectable | ELISA | * |
| Shellfish | Absent | Undetectable | ELISA | * |
| Milk | Absent | Undetectable | ELISA | * |
| Egg | Absent | Undetectable | ELISA | * |
| Gluten | Absent | < 10 ppm | ELISA | * |

*For allergens run on the same line, allergen testing will be required for each production run; provided however, no testing is required when washdown occurs.

LA2480114.7
221655-10001

EXHIBIT 4
Page 50 of 67

DocuSign Envelope ID: 8FD8060B-B649-485B-B-A2054782F457



## EXHIBIT G

### Pre-shipment Testing Requirements and Quality Standards (Continued)

**Finished Product Microbiological Standards (ONLY FOR COOKED ITEMS).**

| Microorganism | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Aerobic Plate Count | <10,000 cfu/g | <50,000 cfu/g | AOAC 990.12* | Every Lot** |
| Coliforms | <10 cfu/g | <100 cfu/g | AOAC 991.14* | Every Lot** |
| Salmonella | Negative | Negative/375 g | AOAC 2003.09* | Every Lot** |
| Listeria | Negative | Negative/25 g | AOAC RI #050903* | Every Lot** |
| E. coli O157:H7 | Negative | Negative/25 g | AOAC RI #031002* | Every Lot** |

\* Alternative method may be used with the prior approval of Beyond Meat

\*\* From washdown to washdown

**Finished Product Organoleptic Standards**

| Attribute | Target | Test Method | Test Frequency |
|---|---|---|---|
| Appearance | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |
| Texture | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |
| Flavor | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |
| Aroma | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |

EXHIBIT 4
Page 51 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B-▪▪▪B-A2054782F457

## EXHIBIT H
## External Agency Certifications

| Non-GMO (Non-GMO Project/Food Chain Advisors) | | |
|---|---|---|
| **Beyond Meat Responsibilities** | **DLF Responsibilities** | **Audit Frequency & Certification Process** |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved<br>• Ensure all high-risk ingredients have non-GMO analysis documented and are using an approved lab.<br>• Perform internal audits and be able to show documented results and corrective actions.<br>• Have a traceability program and be able to demonstrate effectiveness.<br>• Ensure BYMT employees are properly trained.<br>• Document raw materials received at BYMT facility with supplier and lot code; show evidence that BYMT verifies incoming materials are not contaminated. | • Treat BYMT raw materials as you would an allergen program – keep segregated, don't store non-verified ingredients over BYMT ingredients<br>• Allow an annual audit of DLF facility<br>• Ensure BYMT products are properly labeled throughout the production process, including lot code<br>• Document raw materials (BYMT) received at DLF facility with supplier and lot code; show evidence that DLF verifies incoming materials are not contaminated<br>• Have a traceability program and be able to demonstrate effectiveness.<br>• Stated DLF monitoring, sampling, and testing procedures for BYMT products are actually being carried out.<br>• Ensure DLF employees are properly trained.<br>• Perform internal audits and be able to show documented results and corrective actions. | • Annual audit of BYMT Facility<br>• Annual Audit of DLF facility<br>• BYMT is in charge of certification process with the help of DLF cooperating with Non-GMO requirements and audits. |

| Kosher (Star-K) | | |
|---|---|---|
| **Beyond Meat Responsibilities** | **DLF Responsibilities** | **Audit Frequency & Certification Process** |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved<br>• Get all new equipment approved (new/used)<br>• Ensure all incoming raw materials are from approved suppliers and have Kosher symbol/Rabbi signature when necessary<br>• Keep Kosher certificates from suppliers up-to-date | • Notify BYMT of any new equipment to the production line (whether equip. is new or used)<br>• Allow Rabbi to watch production of BYMT products including an inspection of raw materials<br>• Allow Rabbi to review sanitation records<br>• Allow Rabbi to "Kosherize" equipment | • Rabbi will be present every production run<br>• Assist Rabbi while he is at DLF facility for production runs |

LA2480114.7
221655-10001

16

EXHIBIT 4
Page 52 of 67

DocuSign Envelope ID: 8FD8060B-B649-465B  B-A2054782F457



## EXHIBIT H
## External Agency Certifications (Continued)

| Gluten-Free (Gluten Free Certification Organization) | | |
|---|---|---|
| **Beyond Meat Responsibilities** | **DLF Responsibilities** | **Audit Frequency & Certification Process** |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved<br>• Get all new equipment approved (new/used)<br>• Test four lots of finished product/week for gluten<br>• All ingredients must be < 10 ppm gluten<br>• All finished product must be < 10 ppm gluten | • Notify BYMT of any new equipment to the production line (whether equip. is new or used)<br>• Swab any new equipment for gluten<br>• Maintain current allergen program to prevent contamination of non-allergen products with allergenic material.<br>• Any testing of ingredients and/or products must use an approved test method according to GFCO requirements.<br>• Only use GF symbol on certified products. | • Annual audit of BYMT Facility<br>• Annual Audit of DLF facility<br>• BYMT is in charge of certification process with the help of DLF cooperating with GFCO requirements and audits. |

| Vegan (Vegan Action) | | |
|---|---|---|
| **Beyond Meat Responsibilities** | **DLF Responsibilities** | **Audit Frequency & Certification Process** |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved | • Maintain current sanitation program and GMP's to ensure no contamination of Non-Vegan products with BYMT products and raw materials. | • BYMT is in charge of certification process with the help of DLF cooperating with Vegan Action requirements and audits (if applicable). |

*These requirements are based on the most up-to-date information provided to us by our certification groups and our current programs in place. These may be updated as each certification group requires.

LA2480114,7
221655-10001

17

EXHIBIT 4
Page 53 of 67

## SECOND AMENDMENT TO
## EXCLUSIVE SUPPLY AGREEMENT

THIS SECOND AMENDMENT TO EXCLUSIVE SUPPLY AGREEMENT (this "Amendment") is made and entered into as of February __, 2017 by and between Don Lee Farms, a division of Goodman Food Products, Inc., a California corporation ("Supplier"), located at 730 East Beach Ave, Inglewood CA 90302, and Savage River, Inc., a Delaware corporation ("Buyer"), located at 111 Main Street, El Segundo, CA 90245.

## RECITALS

A. The parties hereto have entered into a certain Exclusive Supply Agreement as of December 2, 2014 (the "Supply Agreement") and a certain Amendment To Exclusive Supply Agreement as of April 11, 2016 ("First Amendment").

B. For purposes of this Amendment, the Supply Agreement and First Amendment shall collectively be referred to as "Agreement".

C. The parties acknowledge and agree that the Start Date is August 8, 2016, and the initial term of the Agreement ends on August __, __ ("Initial End Date"), as extended or otherwise pursuant to Section 3.1 remain unchanged.

D. The parties have now agreed to amend the Agreement as set forth below.

NOW, THEREFORE, for valuable consideration the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1. Exhibit A is hereby amended to include fresh food service patties ("F2 Burger") and cooked frozen Retail Packages items and "Cookout Classic Burger" as a Product under the Product Specifications.

2. The Product specifications for the F2 Burger and the Cookout Classic Burger shall be mutually and reasonably agreed upon both Buyer and Supplier within 10 days following the execution of this Amendment.

3. The amount of F2 Burgers and Cookout Classic burgers purchased by Buyer shall be included for purposes of determining Minimum Required Purchases. Each order for Burgers and Cookout Classic Burgers must be for a minimum of 40,000 pounds.

4. In order for Supplier to commence the processing of F2 Burgers (i) it is necessary for Supplier to make certain equipment and related improvements to its premises, and (ii) it is necessary for certain equipment to be installed in Supplier's Texas premises, the description of which is set forth in Exhibit L.2 attached hereto ("Initial F2 Equipment"). With respect to the equipment and related improvements, Buyer agrees to reimburse Supplier for the cost thereof up to $175,000, within 10 days after presented with a bill. With respect to the Initial F2 Equipment, Supplier shall use its best efforts to procure and install the equipment and all of it on or before March 1, 20__.

5. During the term of the Agreement, Buyer orders or intends to order more than 500,000 pounds of F2 Burgers in any 30 day calendar day period, then Buyer must give written notice to

EXHIBIT 4
Page 54 of 67

to Supplier of Buyer's intention to do so ("F2 Notice") which notice must be given no later than [illegible] and Buyer shall, at its sole cost and expense, and no later than June 7, 2019 [illegible] months of giving "F2 Notice" (whichever is sooner), deliver to and install in Supplier's [illegible] all of the equipment set forth in Exhibit E-3 ("F2 Equipment"). In addition to [illegible] the F2 Equipment and of the installation thereof, Buyer shall also pay for insuring the equipment at cost. Buyer shall also be responsible for any and all parts and outside labor that [illegible] required in order for the F2 Equipment to function properly. Buyer may, but shall not be obligated to, use its own employees to perform service on the F2 Equipment. Supplier has the authority to retain outside labor and purchase parts for the F2 Equipment as it reasonably deems fit. Buyer shall reimburse supplier for the cost thereof within thirty (30) days after presented with a bill.

Upon delivery of the F2 Equipment, all of the F2 Equipment (except for those items specifically required by Buyer as provided for in Exhibits E-2 and E-3, as may be amended [illegible], take, bearing to, and be owned by Supplier without any obligation to [illegible] Buyer. Buyer may file a UCC in the Supplier's domicile state, identifying the F2 Equipment located in Supplier's facility, which was purchased by and is owned by Buyer. Any [illegible] the F2 Equipment owned by Buyer must be picked up by Buyer, at its sole cost and expense, within thirty (30) days of the termination of the Agreement. If not picked up within said thirty (30) day period then Buyer shall immediately pay to Supplier the sum of $10,000.00, and if any of such F2 Equipment is not picked up by Buyer within six (6) months of the termination of the Agreement, then such F2 Equipment shall belong to and be owned by Supplier without any obligation to compensate Buyer. If Supplier elects to dispose of any such F2 Equipment, the reasonable cost thereof shall be paid by Buyer. Upon the removal of F2 Equipment by Buyer and or the disposition of F2 Equipment by Supplier, Buyer shall at its sole cost and expense restore Supplier's premises to the same condition as it was immediately prior to the installation of the F2 Equipment. If Buyer does not so restore the premises within ten (10) days after removal or disposition, then Supplier may elect to restore the premises, in which event Buyer shall immediately reimburse Supplier for all reasonable costs and expenses incurred in connection therewith.

[illegible] agrees to install the F2 Equipment on or before June 7, 2018, and in sufficient time in order for Supplier to process, package and deliver the F2 Burgers in accordance with this Agreement. If Supplier is unable to process, package and deliver the F2 Burgers in accordance with the Agreement because Buyer does not timely install the F2 Equipment, then Supplier shall not be in breach of the Agreement and furthermore, Supplier may not produce, or contract with any third party to produce, F2 Burgers during the term of this Agreement.

[illegible]  In the event that Buyer orders or intends to order more than 500,000 pounds of F2 Burgers in any 365 consecutive day period, as provided for in Section 4 above, and Buyer timely gives the F2 Notice to Supplier, and timely installs the F2 Equipment provided herein, then Supplier shall, at its sole cost and expense, install a spiral freezer (the "Spiral Freezer") in the Topco premises at a location to be determined by Supplier within a 4 month period from [illegible] when Buyer gives the F2 Notice. Such Spiral Freezer shall belong to and be the property of Supplier during and after the term of the Agreement, but Buyer shall be given first priority to the use of its capacity on the Spiral Freezer throughout the term of the Supply Agreement, or any of its extensions (per Exhibit A).

EXHIBIT 4
Page 55 of 67

As an inducement to Supplier to purchase the Spiral Freezer, Buyer and Supplier [...] Product [...] as set forth in Exhibit C [...] as well as any other products [...] agreed upon by Buyer and Supplier [...] shall be increased by an additional ten cents ($.10) per pound up to the first ten million (10,000,000) pounds of all Products delivered (the "Freezer Fee") after the F2 Notice is given by Buyer to Supplier. If for any reason, other than Supplier's breach of this Agreement or its inability timely to deliver adequate supplies of F2 [...] which satisfy the F2 Burger product specifications, Buyer does not order at least 10,000,000 pounds of all products after the giving of the F2 Notice (including but not limited to because of termination of the Agreement), then in addition to any Termination Fee to which Supplier [...] entitled under Section 3.4.3 of the Agreement, Buyer shall also pay to Supplier an amount equal to $0.10 per pound for each pound ordered under 10,000,000 pounds (the "Freezer Termination Fee"). Said amount, if owed, shall be paid within ten (10) days after the termination of the Agreement. As set forth above, the total of the Freezer Fee and the Freezer Termination Fee, if any, will be $1,000,000. Notwithstanding the foregoing, the parties agree [...] of the Freezer Fee and the Freezer Termination Fee, if any, actually paid by Buyer [...] the actual cost of the Spiral Freezer and all related components required to make the Spiral Freezer [...] $1,000,000, whichever is less.

In the event that the Supplier does not or cannot process, package and deliver the [...] Buyer [...] product specifications and this Agreement (except as due to Buyer's breach of this Agreement or [...] failure to provide F2 Equipment, in which case per [...], Buyer shall have the right to contract with a third party in order [...] Buyer's demand until such time as Supplier can provide for and fill Buyer's [...] requirement in accordance with the F2 Burger product specifications and this Agreement.

Except as specifically set forth in this Amendment, all of the terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment to as of the day and year first above written.

SUPPLIER:

Perdue Farms, a division of
Quantum Food Products, Inc.
a Delaware corporation

By _____
Dennis Goodman
Title President

BUYER:

Savage River, Inc.
a Delaware corporation

By _____
Ethan Brown
Title President

EXHIBIT 4
Page 56 of 67

## EXHIBIT A

### PRODUCTS

Lÿst of Beyond Meat Products:

Vegan Vegetable Protein Based Meat Analog Products consisting of:

SINGLE PROCESS ITEMS:

"Chicken" Strips

"Beef" Crumbles

Raw ground "beef" loaf

Raw ground "beef" patties

Raw ground "beef" chub-packed

DOUBLE PROCESS-STEP ITEMS:

Beast Burgers

Beast Sliders

Meatballs

Cookout Classics Burgers

EXHIBIT 4
Page 57 of 67

## EXHIBIT E-2

## INITIAL F2 EQUIPMENT

TO BE INSTALLED BY BUYER (...)

RECOMMENDATION TO ALLOW PORTABILITY

... ... FIVE YEAR (APPROX MATE COST ...)

EXHIBIT 4
Page 58 of 67

## EXHIBIT E-3

## F2 EQUIPMENT

**BUYER'S EXISTING** PORTABLE KEISER PATTY FORMING EQUIPMENT (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

PARTITION WALL TO SEPARATE PRODUCT IF OUTSIDE OF EXISTING FRESH AREA IS NOT TO EXCEED $40,000

MISC CONVEYORS

ELECTRICAL AND RELATED IMPROVEMENTS AND ADDITIONS TO INSTALL AND OPERATE EQUIPMENT IN THIS EXHIBIT E-3

EXISTING METAL DETECTION EQUIPMENT (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

EXISTING APF MACHINE EQUIPMENT (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

FORMING ROOM REFRIGERATION (IF ADDITIONALLY NEEDED NOT TO EXCEED $75,000)

**BUYER'S EXISTING FPEC** MIXING EQUIPMENT (IN EXISTING FRESH AREA OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

EXHIBIT 4
Page 59 of 67

# EXHIBIT B

EXHIBIT 4
Page 60 of 67

## SECOND AMENDMENT TO
## EXCLUSIVE SUPPLY AGREEMENT

THIS SECOND AMENDMENT TO EXCLUSIVE SUPPLY AGREEMENT (this "Amendment") is made and entered into as of February __, 2017, by and between Don Lee Farms, a division of Goodman Food Products, Inc., a California corporation ("Supplier"), located at 200 East Beach Ave., Inglewood, CA 90302, and Savage River, Inc., a Delaware corporation ("Buyer"), located at 111 Main Street, El Segundo, CA 90245.

### RECITALS

A.    The parties hereto have entered into a certain Exclusive Supply Agreement as of December 2, 2014 (the "Supply Agreement") and a certain Amendment to Exclusive Supply Agreement as of April 11, 2016 ("First Amendment").

B.    For purposes of this Amendment, the Supply Agreement and First Amendment shall collectively be referred to as "Agreement."

C.    The parties acknowledge and agree that the State Date is August 8, 2016, and the initial term of the Agreement ends on August 7, 2019 ("Initial End Date"). The automatic extension provisions in Section 3.1 remain unchanged.

D.    The parties now wish to amend the Agreement as set forth below.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.    Exhibit A is hereby amended to include fresh food service patties ("F2Burger") as a Product under Single Process items and "Cookout Classic Burger" as a Product under Double Process Step terms.

2.    The product specifications for the F2Burger and the Cookout Classic Burger shall be finalized and mutually approved by both Buyer and Supplier within 10 days following the execution of this Amendment.

3.    The amount of F2 Burgers and Cookout Classic burgers purchased by Buyer shall be included for purposes of determining Minimum Required Purchases. Each order for F2 Burgers and Cookout Classic Burgers must be for a minimum of 40,000 pounds.

4.    In order for Supplier to commence the processing of F2 Burgers: (i) it is necessary for Supplier to make certain electrical and related improvements to its premises, and (ii) it is necessary for certain equipment to be installed in Supplier's Texas premises, the description of which is set forth in Exhibit E-2 attached hereto ("Initial F2 Equipment"). With respect to the electrical and related improvements, Buyer agrees to reimburse Supplier for the cost thereof up to $8,000, within 10 days after presented with a bill. With respect to the Initial F2 Equipment, Buyer shall at its sole cost and expense deliver and install all of it on or before March 10, 2017.

13464956.1
221655-10001

EXHIBIT 4
Page 61 of 67

If during the term of the Agreement Buyer orders or intends to order more than 500,000 pounds of F2 Burgers in any 365 consecutive day period, then Buyer must give written notice to Supplier of Buyer's intention to do so ("F2 Notice") which notice must be given no later than February 7, 2018, and Buyer shall at its sole cost and expense and no later than June 7, 2018 or within 4 months of giving "F2 Notice"( whichever is sooner) deliver to and install in Supplier's Texas business all of the equipment set forth in Exhibit E-3 ("F2 Equipment"). In addition to paying for the F2 Equipment and the installation thereof, Buyer shall also pay for insuring it at replacement cost. Buyer shall also be responsible for any and all parts and outside labor that Supplier reasonably deems are required in order for the F2 Equipment to function properly. Supplier may, but shall not be obligated to, use its own employees to perform service on the F2 Equipment. Supplier has the authority to retain outside labor and purchase parts for the F2 Equipment as it reasonably deems fit. Buyer shall reimburse Supplier for the cost thereof within ten (10) days after presented with a bill.

Upon delivery of the F2 Equipment, all of the F2 Equipment (except for those items specifically purchased by Buyer as provided for in Exhibits E-2 and E-3 as may be amended from time to time) shall belong to and be owned by Supplier without any obligation to compensate Buyer. Buyer shall file a UCC in the Supplier's domicile state, identifying the F2 Equipment located in Supplier's facility, which was purchased by and is owned by Buyer. Any and all of the F2 Equipment owned by Buyer must be picked up by Buyer, at its sole cost and expense, within thirty (30) days of the termination of the Agreement; if not picked up within the thirty (30) day period, then Buyer shall immediately pay to Supplier the sum of $10,000.00, and if any of such E2 Equipment is not picked up by Buyer within six (6) months of the termination of the Agreement, then such F2 Equipment shall belong to and be owned by Supplier without any obligation to compensate Buyer. If Supplier elects to dispose of any such F2 Equipment, the reasonable cost thereof shall be paid by Buyer. Upon the removal of F2 Equipment by Buyer and/or the disposition of F2 Equipment by Supplier, Buyer shall at its sole cost and expense restore Supplier's premises to the same condition as it was immediately prior to the installation of the F2 Equipment. If Buyer does not so restore the premises within ten (10) days after removal or disposition, then Supplier may elect to restore the premises, in which event Buyer shall immediately reimburse Supplier for all reasonable costs and expenses associated therewith.

Buyer agrees to install the F2 Equipment on or before June 7, 2018, and in sufficient time in order for Supplier to process, package and deliver the F2 Burgers in accordance with the Agreement. If Supplier is unable to process, package and deliver the F2 Burgers in accordance with the Agreement because Buyer does not timely install the F2 Equipment, then Supplier shall not be in breach of the Agreement and furthermore, Supplier may not produce or contract with any third party to produce F2 Burgers during the term of this Agreement.

5.     In the event that Buyer orders or intends to order more than 500,000 pounds of F2 Burgers in any 365 consecutive day period, as provided for in Section 4 above, and Buyer timely gives the F2 Notice to Supplier, and timely installs the F2 Equipment provided herein, then Supplier shall at its sole cost and expense, install a spiral freezer (the "Spiral Freezer") in its Texas premises in a location to be determined by Supplier within a 4-month period from such time as when Buyer gives the F2 Notice. Such Spiral Freezer shall belong to and be the property of Supplier during and after the term of the Agreement, but Buyer shall be given first

13464956.1
221655-10001

2

EXHIBIT 4
Page 62 of 67

priority to schedule its production on the Spiral Freezer throughout the term of the Supply Agreement for any of its Products (per Exhibit A).

As an inducement to Supplier to purchase the Spiral Freezer, Buyer and Supplier agree that the prices for each Product, as set forth in Exhibit C (as well as any other products mutually agreed upon by Buyer and Supplier), shall be increased by an additional ten cents ($0.10) per pound up to the first ten million (10,000,000) pounds of all Products delivered (the "Freezer Fee") after the F2 Notice is given by Buyer to Supplier. If for any reason, other than Supplier's breach of this Agreement or its inability timely to deliver adequate supplies of F2 Burgers which satisfy the F2 Burger product specifications, Buyer does not order at least 10,000,000 pounds of all products after the giving of the F2 Notice (including but not limited to because of a termination of the Agreement), then in addition to any Termination Fee to which Supplier is entitled under Section 3.4.3 of the Agreement, Buyer shall also pay to Supplier an amount equal to $0.10 per pound for each pound ordered under 10,000,000 pounds (the "Freezer Termination Fee"). Said amount, if owed, shall be paid within ten (10) days after the termination of the Agreement. As set forth above, the total of the Freezer Fee and the Freezer Termination Fee, if any, will be $1,000,000. Notwithstanding the foregoing, the parties agree that the total of the Freezer Fee and the Freezer Termination Fee, if any, actually paid by Buyer shall equal the actual cost of the Spiral Freezer and all related components required to make the Spiral Freezer operational or $1,000,000, whichever is less.

In the event that the Supplier does not or cannot process, package and deliver the F2 Burgers in accordance with the product specifications and this Agreement (except as due to Buyer's breach of the Agreement or failure to provide F2 Equipment as described per item 1), then after thirty (30) days Buyer will have the right to contract with a third party in order to meet the F2 Burger order demand until such time as Supplier can provide for and fill Buyer's F2 Burger order requirements in accordance with the F2 Burger product specifications and this Agreement.

6. Except as specifically set forth in this Agreement, all of the terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed the Amendment to as of the day and year first above written.

SUPPLIER:                                    BUYER:

Don Lee Farms, a division of                 Savage River, Inc.,
Goodman Food Products, Inc.,                 a Delaware corporation
a California corporation
                                             By_____
By_____                        Ethan Brown
     Donald Goodman                          Title:  President
Title:  President

13464956.1                          3
221655-10001

EXHIBIT 4
Page 63 of 67

## EXHIBIT A

## PRODUCTS

<u>List of Beyond Meat Products:</u>

Vegan Vegetable Protein Based Meat Analog Products consisting of:

SINGLE PROCESS ITEMS:

"Chicken" Strips

"Beef" Crumbles

Raw ground "beef" loaf

Raw ground "beef" patties

Raw ground "beef" chub-packed

DOUBLE PROCESS-STEP ITEMS:

Beast Burgers

Beast Sliders

Meatballs

Cookout Classics Burgers

13464956.1
221655-10001

4

EXHIBIT 4
Page 64 of 67

EXHIBIT E-2

INITIAL F2 EQUIPMENT

TO BE INSTALLED BY BUYER ON OR BEFORE MARCH 10, 2017

1.    REISER MODIFICATION TO ALLOW PORTABILITY

2.    PACKAGING CONVEYOR (APPROXIMATE COST $14,500)

13464956.1
221655-10001

5

EXHIBIT 4
Page 65 of 67

## EXHIBIT E-3

## F2 EQUIPMENT

### TO BE INSTALLED BY BUYER FOR MORE THAN 500,000 POUNDS

1.  BUYER'S EXISTING PORTABLE REISER PATTY FORMING EQUIPMENT (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

2.  PARTITION WALL TO SEPARATE PRODUCT IF OUTSIDE OF EXISTING FRESH ROOM (NOT TO EXCEED $40,000)

3.  MISC. CONVEYORS

4.  ELECTRICAL AND RELATED IMPROVEMENTS AND ADDITIONS TO INSTALL AND OPERATE EQUIPMENT IN THIS EXHIBIT E-3

5.  EXISTING METAL DETECTION EQUIPMENT (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

6.  EXISTING TAPE MACHINE EQUIPMENT (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED)

7.  FORMING ROOM REFRIGERATION (IF ADDITIONALLY NEEDED NOT TO EXCEED $35,000)

8.  BUYER'S EXISTING FPEC MIXING EQUIPMENT IN EXISTING FRESH ROOM (OR NEW EQUIPMENT IF ADDITIONALLY NEEDED

13464956.1
221655-10001

6

EXHIBIT 4
Page 66 of 67

## PROOF OF SERVICE

I, Valent Manssourian, the undersigned, declare that:

I am employed in the County of Los Angeles, State of California, over the age of 18, and not a party to this cause. My business address is 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, CA 90067.

On March 11, 2019, I caused a true copy of the foregoing **SECND AMENDED COMPLAINT** to be served on the parties in this cause as follows:

☑    (*VIA ELECTRONIC TRANSMISSION*) by electronic transmission from an approved Electronic Filing Service Provider, as part of the Los Angeles Superior Court e-filing system, to the email addresses set forth below, or on the attached service list.

**Mitchell A. Kamin**          Mkamin@cov.com
**Neema Sahni**                nsahni@cov.com
**Keandra Z. Barlow**          kbarlow@cov.com
**Covington & Burling LLP**    cyeung@cov.com
**1999 Avenue of the Stars, Suite 3500**
**Los Angeles, CA 90067-6045**


**Daniel C. Lapidus**          dan@lapiduslaw.com
**Jim D. Bauch**               jim@lapiduslaw.com
**Marc Worden**                marc@lapiduslaw.com
**Lapidus & Lapidus, ALC**
**177 South Beverly Drive**
**Beverly Hills, CA 90212**

I certify that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 11, 2019, at Los Angeles, California.

*Valent Manssu——*
Valent Manssourian

17287878.1
221655-10004                        PROOF OF SERVICE

EXHIBIT 4
Page 67 of 67