**KAPLAN FOX & KILSHEIMER LLP**
Justin B. Farar (211556)
12400 Wilshire Boulevard, Suite 460
Los Angeles, CA 90025
Telephone: 310.614.7260
Facsimile: 310.575.8697
E-mail: *jfarar@kaplanfox.com*

[Additional Counsel Appear on Signature Page]

*Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY TRAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BEYOND MEAT, INC., ETHAN BROWN, and MARK J. NELSON,<br><br>Defendants. | Case No. 2:20-cv-00963-MWF<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge:  Hon. Michael W. Fitzgerald<br>Courtroom:  5A<br>Date:  October 5, 2020<br>Time:  10:00 a.m. |

Case No. 2:20-cv-00963-MWF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS .................................................................. 3

    A.    Safety Issues at Beyond Meat.......................................... 4

    B.    Beyond Meat Negotiates with CLW Despite the ESA ............. 4

    C.    Beyond Meat Terminates the ESA and DLF Sues .................... 5

    D.    Defendants' Misleading Statements About the DLF Litigation............................................................................ 6

    E.    The Market Learns the True Risk of the DLF Litigation.......... 6

    I.    LEGAL STANDARD......................................................... 7

    II.    ARGUMENT ................................................................... 7

    A.    Defendants Had A Duty To Disclose Conflicting Facts About the DLF Litigation ............................................... 7

    B.    Defendants Made Misleading Statements through Omissions ................................................................... 11

        1.    Defendants' Denials Were Misleading ......................... 11

        2.    Defendants' "Justification" Statements Were Misleading.................................................................. 13

        3.    Defendants' Risk Disclosures Were Misleading .......... 14

            a.    Defendants' Risk Warnings Were Inadequate.... 15

    C.    Plaintiffs Allege a Strong Inference of Scienter...................... 16

        1.    The FAC Adequately Alleges Actual Knowledge or Recklessness............................................................. 17

        2.    Plaintiffs Have Alleged Scienter through Core Operations ................................................................. 20

    D.    The Complaint Adequately Pleads Loss Causation ................ 21

        1.    The DLF Press Release Is a Corrective Disclosure ....... 22

    III.    THE COMPLAINT STATES AN EXCHANGE ACT SECTION 20(a) CLAIM ................................................... 25

CONCLUSION ............................................................................... 25

Case No. 2:20-cv-00963-MWF

PLTFS' MEMO. OF LAW. IN OPPO. TO DEF'S MOTION TO DISMISS

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002)............................................................................12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)..............................................................12, 13, 14

*City of Philadelphia v. Fleming Co., Inc.*,
   264 F.3d 1245 (10th Cir. 2001).........................................................16, 19, 20

*Connecticut Retirement Plans & Tr. Funds v. Amgen Inc.*,
   660 F.3d 1170 (9th Cir. 2011)..........................................................................23

*Curry v. Yelp, Inc.*,
   875 F.3d 1219 (9th Cir. 2017)..........................................................................24

*Curry v. Yelp, Inc.*,
   No. 14-cv-03547-JST, WL 7454137 (N.D. Cal. Nov. 24, 2015).......................12

*Erickson v. Corinthian Colleges, Inc.*,
   No. CV137466GHKPJWX,2015 WL 12732435 (C.D. Cal. Apr. 22, 2015)......22

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995)............................................................................15

*Gebhart v. S.E.C.*,
   595 F.3d 1034 (9th Cir. 2010)..........................................................................17

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002)......................................................................14, 19

*Hoffman v. Avant! Corp.*,
   No. C-97-20698-RMW, 1997 U.S. Dist. LEXIS 21823 (N.D. Cal.
   Dec. 18, 1997) ...............................................................................................16

*In re Amgen Inc. Sec. Litig.*,
   No. CV072536PSGPLAX, 2014 WL 12585809 (C.D. Cal Aug. 4, 2014).........17

*In re Amylin Pharm. Inc., Sec. Litig.*,
   No. 01CV1455BTM(NLS), 2002 WL 31520051
   (S.D. Cal. Oct. 10, 2002)..........................................................................15, 20

*In re Apollo Grp., Inc. Sec. Litig.*,
   395 F. Supp. 2d 906 (D. Ariz. 2005)................................................................12

*In re Apollo Grp., Inc. Sec. Litig.*,
   No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) .............................24

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989)..........................................................................24

*In re Atossa Genetics Inc. Sec. Litig.*,
   2017 WL 3568088 (9th Cir. Aug. 18, 2017)......................................................12

PLTFS' MEMO. OF LAW. IN OPPO. TO DEF'S MOTION TO DISMISS

**TABLE OF AUTHORITIES (cont'd.)**

**Page(s)**

*In re BofI Holding, Inc. Sec. Litig.*,
  302 F.Supp. 3d 1128 (S.D. Cal. 2018) ..............................................12, 24

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) .............................................................12

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ...............................................15

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...........................................................20

*In re Finisar Corp. Sec. Litig.*,
  No. 5:11-CV-01252-EJD, 2017 WL 1549485 (N.D. Cal. May 1, 2017)...........22

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ...............................................7, 22, 24

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ..........................................13, 15

*In re Network Assocs., Inc., Sec. Litig.*,
  No. C 99-01729WHA, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000)..............16

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011) ...............................................22

*In re Obalon Therapeutics, Inc. Sec. Action*,
  No. 3:18-cv-0352-AJB-WVG, 2019 WL 4729461 (S.D. Cal. Sept 25, 2019) ...14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .............................................................21

*Kauffman v. Nat. Health Trends Corp.*,
  No. CV 19-163-MWF (JPRX), 2019 WL 7165921 (C.D. Cal. 2019) ...............11

*Kovtun v. VIVUS, Inc.*,
  No. C 10-4957 PJH, 2012 WL 4477647 (N.D. Cal. Sept. 27, 2012)..................12

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)........................................8, 10, 11, 12

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) .............................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .............................................................................7

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008)......................................................22, 25

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) .............................................................21

*Nguyen v. Radient Pharmaceuticals Corp.*,
  No. SA CV 11-0406 DOC, 2011 WL 5041959 (C.D. Cal. Oct. 20, 2011)........23

PLTFS' MEMO. OF LAW. IN OPPO. TO DEF'S MOTION TO DISMISS

**TABLE OF AUTHORITIES (cont'd.)**

**Page(s)**

*Norfolk City Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ............................................................... 23

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ........................................................ 18, 21

*Nuveen Mun. High Income Opp. Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .............................................................. 25

*Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ....................................................................... 12, 13

*Oregon. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ................................................................ 21

*Public Employees' Ret. Sys. of Mississippi, Puerto Rico Teachers Ret.
Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ................................................................ 23

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................ 17, 20

*Roberti v. OSI Sys., Inc.*,
No. CV 13-9174-MWF VBKX, 2015 WL 1985562 (C.D. Cal.
Feb. 27, 2015) ....................................................................... 19, 20, 21

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ................................................................ 17

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................ 19

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ............................................................ 7, 8

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) .............................................................. 15

*Sudunagunta v. NantKwest, Inc.*,
No. CV1601947MWFJEMX, 2017 WL 8811116 (C.D. Cal.
May 16, 2017) ................................................................................ 10, 17

*Tellabs, Inc. v.. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................... 7, 16

*Todd v. STARR Surgical Co.*,
No. CV-14-05263-MWF-RZ, 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .... 17

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
No. CV1602942SJOKSX, 2017 WL 2378369 (C.D. Cal. May 31, 2017) ......... 22

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ................................................................ 13

*Westley v. Oclaro, Inc.*,
897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................. 16

TABLE OF AUTHORITIES (cont'd.)

**Page(s)**

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).................................................................................16, 21

**Statutes**

15 U.S.C.
  §§ 78a, *et seq.* ...........................................................................................................7, 25
  § 78t.............................................................................................................................25
  § 78u-4(b)(2)(a) ...........................................................................................................16

**Rules**

Federal Rules of Civil Procedure
  Rule 12(b)(6) ...............................................................................................................7

Lead Plaintiff Block Investments Corporation and named plaintiffs Jie Ling Guo and Neeraj Tulsian (collectively, "Plaintiffs") submit this memorandum of law in opposition to Defendants' motion to dismiss the FAC.[1]

## INTRODUCTION

This securities fraud class action is about how Defendants purposely misled investors as to the risk the Company faced with respect to its ongoing litigation with its former co-manufacturer, Don Lee Farms ("DLF"). Instead of simply disclosing the DLF Litigation, as the Company was obligated to do, Defendants went further: denying all claims and proclaiming the Company's innocence of the allegations, without acknowledging the existence of facts showing that DLF's claims had merit. Defendants' representations created the false impression that the DLF Litigation was without merit and that the risk of liability was minimal, when in fact, as investors learned on January 27, 2020, the risk was far greater than Defendants represented because DLF was likely to prevail on, at least, some of its claims. Despite Defendants' intentional misdirection, this case is not about whether Defendants knew for certain that DLF would prevail on its claims. Plaintiffs never alleged that, nor is that required to find liability here.

Statements that create an impression of a state of affairs that differs in a material way from what actually exists are actionable. Here, numerous facts show that, counter to Defendants' portrayal, DLF's claims have merit. For example, while representing that Beyond Meat was not liable for the misappropriation of DLF's trade secrets, Defendants knew that Beyond Meat was using a proprietary DLF process to produce its products, that Beyond Meat shared design drawings with CLW (DLF's ultimate replacement), and that DLF's Batch Making Protocol for the Company's

---

[1] "FAC" refers to the First Amended Complaint (cited herein as "¶_"). "MTD" refers to Defendants' memorandum of law in support of their motion to dismiss. "Defendants" are Beyond Meat, Inc., ("Beyond Meat" or the "Company"), Ethan Brown, and Mark J. Nelson.

flagship product was found in the files of ProPortion (CLW's "alter ego"). Similarly, Defendants denied all of DLF's allegations, while knowing that Beyond Meat failed to pay for product that was produced during the ESA, that the Company secretly negotiated with CLW to replace DLF years before the ESA was set to expire, that Beyond Meat was warned that such negotiations were in breach of the ESA, and that Defendant Brown lied to DLF's CEO about the Company's continued negotiations with CLW. These facts show that DLF's claims are not baseless. Had investors known these facts, they would have viewed the DLF Litigation with more skepticism and valued the Company's shares lower.

Defendants made these voluntary representations to create the impression that the DLF Litigation was meritless. Their statements signaled to investors—ahead of the Company's May 2019 IPO—that there was no reason to be concerned despite the fact that DLF's claims involve, among other things, ownership claims to intellectual property pertaining to the Company's core products. It is indisputable that, in light of Defendants' denials and proclamations of innocence, investors would have found information showing that DLF's claims are not meritless material in assessing the risk. While Defendants were not required to confess liability, once they decided to speak to the merits of DLF's claims, they were required to speak fully and truthfully and provide all material information, including negative information.

The market first learned of the true risk of the DLF Litigation on January 27, 2020, when DLF issued a press release announcing: (1) that the judge in the DLF Litigation issued a decision finding that DLF had proved the "probable validity" of its claim that Beyond Meat breached the contract by failing to pay for products produced during the ESA; and (2) that DLF had alleged sufficient facts to add Defendant Nelson and others to is claims for fraud and negligent misrepresentation with respect to a safety audit that DLF claims Beyond Meat altered in order to induce DLF to amend the ESA. This was the first time investors were able to appreciate the real risks associated with the DLF Litigation. As a result, the Company's stock price

declined $4.63 per share as a J.P. Morgan analyst noted that the press release "reads poorly for BYND" and that the news about the litigation "surely is an additional risk to the stock price."

Plaintiffs' allegations are accepted as true on a motion to dismiss: Plaintiffs meticulously allege that Defendants were in possession of facts undermining their voluntary proclamations of innocence. Accordingly, Defendants' motion should be denied.

## STATEMENT OF FACTS

Beyond Meat manufactures and sells plant-based meat products that are created using protein from peas referred to as "extrudate." ¶ 4. Beyond Meat supplies the extrudate to a co-manufacturer to processes it into finished products for distribution and sale by the Company. *Id.* In December 2014, Beyond Meat entered into an exclusive supply agreement with DLF, (the "ESA"). ¶ 54. Under the ESA, Beyond Meat agreed to "purchase one hundred percent (100%) of its Products needs" from DLF. ¶ 55. The ESA also prohibited Beyond Meat from disclosing confidential information it learned from DLF. ¶ 53. The ESA was executed by Defendant Brown on behalf of Beyond Meat. ¶ 58.

Prior to entering into the ESA, Beyond Meat could not mass-produce its products.¶ 6. DLF spent months developing the proprietary processes for turning the raw ingredients into finished products that could be mass-produced. ¶ 61. These processes were documented by DLF in "Batch Making Protocols." *Id.*

Among others, DLF created Batch Making Protocols for producing Beyond Meat's flagship Beyond Meat Burger, which included critical components such as ingredient amounts, mixing times, and equipment layouts. ¶ 7. According to DLF, the Beyond Meat Burger Batch Making Protocol took several months to finalize. ¶ 73. The Beyond Meat Burger was launched in May 2016 and accounted for approximately 60% of the Company's revenue leading up to its May 2019 IPO. ¶ 12.

### A.    Safety Issues at Beyond Meat

On January 27, 2016, DLF notified Beyond Meat that it had discovered a foreign object in Beyond Meat's shipment of raw materials. ¶ 66. DLF notified Defendant Brown that DLF had previously received tainted ingredients from Beyond Meat and threatened to shut down operations. ¶ 67. At the time, it was critical that Beyond Meat maintain its relationship with DLF because DLF was still perfecting the Beyond Burger. ¶ 68. To calm DLF's concerns, the Company ordered a food safety audit of its facility and provided its findings, which reported no violations (the "Safety Audit Report") to DLF. ¶¶ 68, 69.  In reliance on the Safety Audit Report, DLF amended the ESA, extending the term of the agreement and increasing the minimum production volume. ¶¶ 69-70. DLF has since alleged that Defendant Nelson and others altered the Safety Audit Report to remove findings critical of Beyond Meat.  ¶¶ 95, 107.

### B.    Beyond Meat Negotiates with CLW Despite the ESA

After the Beyond Burger was launched, Beyond Meat began negotiating with CLW Foods ("CLW") to replace DLF.  In January 2017, Beyond Meat scheduled a test with CLW to evaluate its capability to produce Beyond Meat's products—more than two years before the ESA with DLF was set to expire. ¶ 75. Beyond Meat's former Vice President of Operations and Supply Chain, Don Ephgrave ("Ephgrave") was involved in the negotiations with CLW and testified that CLW had no experience mass-producing plant-based meat products and that CLW would need instruction from Beyond Meat to "jump start" the process. ¶ 82. On February 1, 2017, Ephgrave accidently copied DLF on an email to Defendant Brown and others discussing the upcoming test with CLW stating that, despite CLW's lack of experience, "I don't see why we could not be up and running within two to three weeks." ¶¶ 77, 82. DLF notified Defendant Brown that it believed the test with CLW violated the ESA and directed Defendant Brown to cease sharing information with other suppliers. ¶ 78.

PLTFS' MEMO. OF LAW. IN OPPO. TO DEF'S MOTION TO DISMISS

In an email the next day, Defendant Brown assured DLF that the Company would be canceling the test for "the health of our relationship." ¶ 79. However, Beyond Meat continued negotiating an agreement to replace DLF. ¶ 80. Ephgrave testified that by late March 2017, he had already negotiated prices and quantities with CLW and that the Company had sent CLW designs for the facility to produce Beyond Meat's products. ¶ 81. DLF has alleged that the designs Beyond Meat shared with CLW, were confidential and sharing them breached the ESA. Ephgrave further testified that the minimum purchase requirement under the ESA were excessive and were an issue for the Company. ¶ 83. Ephgrave discussed the issue with Defendant Brown and "just kept applying pressure" with respect to the minimums. *Id*.

### C.    Beyond Meat Terminates the ESA and DLF Sues

After getting CLW up and running, on April 12, 2017, Beyond Meat sent DLF a Notice of Breach alleging breaches of the ESA related to food safety issues, giving DLF 30 days to cure. ¶ 85. Beyond Meat later sent a Notice of Termination due to DLF's alleged failure to cure the alleged breaches. ¶ 87.

On May 25, 2017, DLF filed a complaint against Beyond Meat in California Superior Court, alleging, *inter alia*, breach of contract, misappropriation of trade secrets, and unfair competition, seeing monetary damages and injunctive relief (the "DLF Litigation"). ¶ 90. The DLF Litigation alleges, among other things, that Beyond Meat failed to pay for products manufactured and delivered during the ESA and that Beyond Meat shared confidential information, including DLF's Batch Making Protocols with CLW and ProPortion, in violation of the NDA. ¶¶ 88, 91, 103. DLF's Batch Making Protocol for the Beyond Burger has since been found in ProPortion's files produced in discovery. ¶ 89.

On March 11, 2018, DLF filed a second amended complaint, adding claims for fraud and negligent misrepresentation against Beyond Meat, claiming significant portions of the Safety Audit Report that induced DLF to amend the ESA in 2016 were altered or deleted. ¶ 95.

### D.     Defendants' Misleading Statements About the DLF Litigation

Leading up to Beyond Meat's initial public offering ("IPO") in May 2019, the Company was dubbed a "unicorn" with a valuation over $1 billion. ¶ 97. Investor excitement around the IPO was so high that Beyond Meat raised its offering price by 25% over its initial projected offering price and increased the offering by over 1 million shares. ¶ 98.

Defendants disclosed the DLF Litigation in the Company's Registration Statement filed in connection with the IPO. However, in order to minimize investor concern, Defendants assured the market that DLF's claims had no merit by affirmatively stating that they believed they were justified in terminating the ESA, that they did not misappropriate DLF's trade secrets and that they were not liable for the fraud and misrepresentation claims alleged by DLF. ¶¶ 115.

The Company conducted its IPO on May 2, 2019 and by the close of the market, Beyond Meat's shares had increased 163%. ¶¶ 101, 102. Following the IPO, Beyond Meat continued to misrepresent the risks of the DLF Litigation in each of the Company's Class Period Form 10-Q filings. ¶ 104.

### E.     The Market Learns the True Risk of the DLF Litigation

On January 27, 2020, investors learned that the Company's risk in the DLF Litigation was real and far greater than what Defendants had portrayed. On that day, DLF issued a press release (the "DLF Press Release") announcing that the court in the DLF Litigation issued a Right to Attach Order with respect to DLF's claims that Beyond Meat breached the ESA by failing to pay for products produced and delivered pursuant to the ESA. ¶ 105. The DLF Press Release stated that the court ruled that DLF had "proved the probable validity of its claim that Beyond Meat breached its manufacturing agreement with Don Lee Farms." ¶ 106. DLF also disclosed that the court granted its request to add Defendant Nelson and others to its fraud claims related to the Safety Audit Report. ¶ 107. As a result, on January 28, 2020, Beyond Meat's stock price fell $4.36 per share." ¶ 110.

## I.   LEGAL STANDARD

In assessing a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), a court must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiffs. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The Ninth Circuit has cautioned that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, at the pleading stage, a plaintiff "need only allege 'enough facts to state a claim for relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To state a claim pursuant to Section 10(b) of the Exchange Act, Plaintiffs must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the material misrepresentation or omission and the purchase or sale of a security; (4) reliance, (5) economic loss, and (6) loss causation. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016). Here, Defendants contest falsity, scienter and loss causation. Defendants' arguments fail on each count.

## II.   ARGUMENT

### A.   Defendants Had A Duty To Disclose Conflicting Facts About the DLF Litigation

Defendants' decision to speak to the merits of DLF's claims—something they were not required to do—triggered a duty to disclose all material information regarding the merits, including negative information. As the Ninth Circuit explained, "'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing

- 7 -                                        Case No. 2:20-cv-00963-MWF

adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 705–06 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

Here, Defendants did not merely disclose the DLF Litigation. Instead, they chose to quell investor concern over the risk of the litigation by falsely conveying a message that the DLF Litigation was without merit through their affirmative denials of the allegations and their statements that they believed the Company was justified in terminating the ESA with DLF, that the Company did not misappropriate trade secrets, and that they were not liable for fraud or negligent misrepresentation. ¶¶ 115, 119, 123, 128. All the while, Defendants knew of facts showing that DLF's allegations had merit and the risk to the Company was substantial.

The Ninth Circuit's decision in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016), is instructive. There, the defendant, CVB Financial Corporation ("CVB"), issued statements that: 1) listed troubled, non-performing or past-due loans, and 2) represented that it was not aware of any other loans for which known credit problems of a borrower would cause "serious doubts" as to the ability of such borrowers to comply with their loan repayment terms. *Id*. at 1203-1204. The plaintiffs alleged that the omission of the defendant's largest creditor, Garrett Group ("Garrett"), from the list of troubled loans, when CVB allegedly knew that Garrett was delinquent on its loan repayments, rendered CVB's "no serious doubts" statements misleading. *Id*. at 1208. The Ninth Circuit agreed, finding that the omission was misleading because CVB's statements assured investors that there was no basis for "serious doubts" about Garrett's loans, when in fact, CVB knew for at least two months that there was a basis to *doubt* Garrett's ability to repay. *Id*. at 1209.

Likewise, here, the purpose of Defendants' statements was to portray that there was no merit to the DLF Litigation, despite Defendants' knowledge of facts

- 8 -    Case No. 2:20-cv-00963-MWF

showing the opposite.[2]  These facts include:

- Beyond Meat was unhappy with the ESA because the Company felt the minimum purchase were excessive (¶¶ 75, 83);

- Beyond Meat began negotiating with CLW two years prior to the expiration of the ESA (¶¶ 75-77, 81).

- When DLF learned of Beyond Meat's negotiations with CLW it warned the Company that such negotiations were in breach of the ESA (¶ 78);

- Defendant Brown lied to DLF's CEO, Donald Goodman, representing that Beyond Meat would not move forward with CLW, when in fact, Company continued to negotiate with CLW to replace DLF (¶¶ 79-80);

- Beyond Meat was using a proprietary process created by DLF to mass-produce its products—a process that was "totally different" from what the Company had been doing before it entered into the ESA (¶ 60);

- Pursuant to the ESA, Beyond Meat could not disclose any confidential information received from DLF (including its Batch Making Protocols and layout, product flow, room design, and equipment selection needed to manufacture products) without prior written consent (¶ 53);

- DLF's replacement, CLW, had no experience mass-producing plant-based meats and needed Beyond Meat's help to "jump start" the process (¶ 82);

- Despite having no experience mass-producing plant-based products, Beyond Meat believed CLW "could be up and running in two to three weeks" (¶ 77);

---

[2]  Beyond Meat has continued to keep facts from investors by designating the majority of the evidence produced in the DLF Litigation as "confidential" or "highly confidential," over DLF's objections. Plaintiffs are confident that further facts supporting their claims exist and will be revealed through discovery.

- Beyond Meat sent CLW design drawings to produce Beyond Meat products (something DLF alleges was subject the mutual confidentiality agreement under the ESA) (¶ 81);

- DLF's Batch Making Protocol for the Beyond Burger was found in ProPortion's files (CLW's "alter ego") (¶¶ 47, n.8, 89); and

- Beyond Meat failed to pay for products manufactured and delivered by DLF during the term of the ESA (¶ 105).[3]

These facts are sufficient to establish that Defendants' Class Period statements were misleading. Plaintiffs are not required—as Defendants insist—to plead that Defendants believed DLF would ultimately prevail in its litigation to establish that their statements were misleading. MTD at 12-15. Rather, Plaintiffs need only plead that Defendants "were on notice of facts" that give rise to liability. *See Lloyd*, 811 F.3d at 1209 (rejecting argument that plaintiffs needed to plead that CVB actually believed that Garrett was going to go bankrupt, holding instead, that allegations that CVB was on notice that Garrett may not be able to pay its loans was sufficient). Here too, Plaintiffs' allegations that Defendants were on notice of facts that showed DLF's claims had merit are sufficient.

Viewed in totality, the facts alleged conflicted with the impression created by Defendants' Class Period statements assuring investors that there was no basis to DLF's claims. Had Defendants disclosed the existence of these material facts, investors would have viewed the risks associated with the DLF Litigation differently. *See Sudunagunta v. NantKwest, Inc.*, No. CV1601947MWFJEMX, 2017 WL 8811116, at *7 (C.D. Cal. May 16, 2017) (M. Fitzgerald, J.) (had defendants

---

[3] DLF also alleges that Defendant Nelson and others altered the 2016 Safety Audit Report. Details regarding this report have been designated as "confidential." Nevertheless, DLF alleged in its Motion for Leave to File Third Amended Complaint, that DLF learned new facts regarding Beyond Meat's involvement in altering the report to support its existing claim for fraud and negligent misrepresentation. The motion was granted, indicating DLF had shown good cause for its amendment. ¶ 26.

disclosed  modifications to stock warrants, "reasonable investors would be expected to view the IPO with substantially more skepticism").

Defendants' attempt to discredit these facts as "unproven allegations" fails. MTD at 13-15. The facts alleged are based on Defendants' own emails (*e.g.*, ¶¶ 77-79); sworn testimony from Beyond Meat's former Vice President of Operations and Supply Chain (*e.g.*, ¶¶ 59-60, 81-82); and evidence produced in the DLF Litigation (*e.g.*, ¶¶ 54-58). This type of evidence is more than sufficiently reliable for pleading purposes. *See Lloyd*, 811 F.3d at 1208 (finding a report that was based on hearsay "sufficiently reliable, plausible, or coherent" because it was given by the COO, was specific in time, context and details and involved important communications from a CEO). Further, the evidence relied upon pre-dates Defendants' statements, establishing Defendants' knowledge of the facts at the time their statements were made. *See* ¶¶ 53, 60, 75-83, 89, 105.

**B.    Defendants Made Misleading Statements through Omissions**

**1.    Defendants' Denials Were Misleading**

Throughout the Class Period, Defendants repeatedly represented that "[w]e deny all of [DLF's] claims"—essentially dismissing them as meritless (¶¶ 119, 123, 128). Falsity is adequately alleged because Defendants' statements, measured against the omissions identified *supra* II.A., created the misleading impression that the DLF Litigation had no merit.[4] Omissions that "affirmatively create an impression of a state

---

[4] Defendants' citation to the Court's decision in *Kauffman v. Nat. Health Trends Corp.*, No. CV 19-163-MWF (JPRX), 2019 WL 7165921 (C.D. Cal. 2019) (M. Fitzgerald, J.), for the position that because Beyond Meat has not been found liable, their statements have not been rendered false, is misplaced. MTD at 15. In *Kauffman*, this Court held that there was no duty to disclose uncharged illegal conduct *without* allegations that there was a risk that the illegal activities would cause losses, especially since there was no current investigation into the activities or a finding of illegality. *Id*. at *5. Here, the DLF Litigation was ongoing at the time the Defendants made their positive statements and the allegations show that losses related to the litigation were "probable or more than remote." *Id. (citing In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. 2017)).

of affairs that differs in a material way from the one that actually exists" are actionable. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Lloyd*, 811 F.3d at 1209; *In re Apollo Grp., Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 910 (D. Ariz. 2005) (defendants' portrayal of the dismissal of a *qui tam* lawsuit was misleading because it conveyed the message that the lawsuit was without merit while defendants were in possession of information showing the opposite).[5]

Defendants' assertion that their denial statements are not actionable because they are literally true fails. *See* MTD at 11. "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991). "[L]iterally true" statements are actionable if they mislead investors due to the omission of material information. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017) (omissions of contrary fact actionable, even if statements are "not literally false"); *Lloyd*, 811 F.3d at 1209 (alleged statements were technically true, but still misleading). Here, Defendants' voluntary denials created a misleading impression that the DLF Litigation was meritless when contrary facts showed otherwise. Accordingly,

---

Defendants' additional authority fares no better. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (addressing the standard for pleading falsity of opinion statements, not omissions); *Curry v. Yelp, Inc.*, No. 14-cv-03547-JST, WL 7454137, at *7 (N.D. Cal. Nov. 24, 2015) (customer complaints showing that Yelp's site contained inauthentic reviews were not material because investors already knew that Yelp hosted inauthentic reviews); *Kovtun v. VIVUS, Inc.*, No. C 10-4957 PJH, 2012 WL 4477647, at *7 (N.D. Cal. Sept. 27, 2012) (incorrectly cited by Defendants at MTD 1, 13) (plaintiffs failed to allege what in the trial data showed that statements about a Phase III trial result were false when made). Lastly, *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1133-34 (S.D. Cal. 2018), is inapposite as it does not address the requirements for pleading falsity.

[5] While Defendants focus on whether Plaintiffs have proven that Defendants' statements were "objectively" and "subjectively" false, that discussion ignores Plaintiffs' claim that Defendants' statements were misleading not because of what they said, but because of what they did *not* say. *See Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) (a defendant must "desist from misleading investors by saying one thing and holding back another").

- 12 -                                          Case No. 2:20-cv-00963-MWF

Plaintiffs have sufficiently pled that Defendants' statements were misleading. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) ("Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact"); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("[O]nly if 'reasonable minds' could disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)").

### 2. Defendants' "Justification" Statements Were Misleading

Defendants also issued statements proclaiming their belief that the Company was innocent of all of DLF's claims. ¶¶ 115, 119, 123, 128. That these statements were phrased as opinions is of no moment. The Supreme Court has warned that "those magic words ["we believe," "we think"] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors." *Omnicare*, 575 U.S. at 193. The Ninth Circuit, analyzing *Omnicare*, noted:

> The Supreme Court explained that a reasonable investor 'expects not just that the issuer believes the opinion (however irrationally) but that it fairly aligns with the information in the issuer's possession at the time. Liability therefore attaches when 'a registration statement omits material facts about the issuer's inquiry into *or knowledge concerning* a statement of opinion' and 'those facts conflict with what a reasonable investor would take from the statement itself.

*City of Dearborn Heights*, 856 F.3d at 615 (internal citations omitted) (emphasis added).

Here, Defendants' failure to disclose the material facts set forth at *supra* II.A., rendered their statements materially misleading. Indeed, "the expression of an opinion may carry with it an implied assertion … that the speaker knows no facts which would preclude such an opinion.…" *Omnicare*, 575 U.S. at 191 (citation

- 13 -

omitted). These conflicting facts were known to Defendants at the time the statements were issued and call into question Defendants' basis for offering the opinions. *See City of Dearborn Heights*, 856 F. 3d at 616.[6] For example, a reasonable investor would question the basis for Defendants' opinion that they did not misappropriate DLF's trade secrets in light of the undisclosed facts that, among other things, Beyond Meat was relying on DLF's propriety process to mass-produce its products (¶¶ 55, 59); that Defendants provided shop drawings to CLW that enabled CLW to mass-produce its products (drawings that DLF claims were trade secrets) (¶ 81); and that DLF's Batch Making Protocol for the Company's flagship Beyond Burger was found in ProPortion's files (¶ 89). Similarly, a reasonable investor would question the basis for Defendants' opinion that the Company was justified in terminating the ESA with DLF in light of the conflicting facts suggesting that the termination was premeditated and due not to safety concerns as Defendants claim, but due to the contract minimums Beyond Meat agreed to but later found to be excessive. ¶¶ 71, 75, 83. Thus, the Complaint adequately pleads falsity with respect to Defendants' opinion statements.[7]

### 3. Defendants' Risk Disclosures Were Misleading

Plaintiffs have also alleged that Defendants' risk disclosures were materially misleading statements. ¶¶ 116, 117, 120, 121, 125, 126, 129, 130. As Defendants have not challenged Plaintiffs' claims with respect to these statements (*see* MTD at 11, 15), Plaintiffs have sufficiently alleged that Defendants misleadingly portrayed

---

[6] *See also In re Obalon Therapeutics, Inc. Sec. Action*, No. 3:18-cv-0352-AJB-WVG, 2019 WL 4729461, at *7 (S.D. Cal. Sept 25, 2019) (the opinion statement "I think all of [the existing clients] committed," was actionable because it omitted that many clients did not reorder).

[7] Defendants' reliance on *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002), for the assertion that mounting a defense to a lawsuit is evidence of a defendant's belief in its innocence misinterprets *Gompper*. In *Gompper*, VISX was actively initiating suits in support of their patents. *Id*. at 896-97. The Ninth Circuit reasoned that from VISX's proactive actions a plausible inference could be drawn that the Company believed in the validity of its patents. *Id*. The same cannot be said when a company simply reacts to being sued.

the probable risk in the DLF Litigation as a mere possibility when they knew of facts that supported DLF's claims.[8]

### a.      Defendants' Risk Warnings Were Inadequate

Defendants wrongly claim that their risk disclosures allowed them to mislead the market. That is not the case. A risk disclosure is only sufficient when challenged statements include "enough cautionary language or risk disclosure"… that "reasonable minds" could not disagree that the challenged statements were not misleading. *In re Amylin Pharm. Inc., Sec. Litig.*, No. 01CV1455BTM(NLS), 2002 WL 31520051, at *8, *10 (S.D. Cal. Oct. 10, 2002). Defendants' purported "warning" about the DLF Litigation failed to "convey [the] substantive information" that was critical for investors to assess Beyond Meat's risk of liability. *See Immune Response*, 375 F. Supp. 2d at 1035. Plaintiffs have alleged in detail that the challenged statements were misleading because they omitted adverse, contradictory facts about the Company's risk in the DLF Litigation. *See* ¶¶ 75-81, 89, 105. The Ninth Circuit has found cautionary language insufficient in cases where, misstatements similarly omitted adverse facts. *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (where the purported cautionary language not only fails to cure, but contradicts the optimistic projections "the mix of information does not clearly preclude reasonable minds from differing on the question of whether they included misleading statements"); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882-83 (N.D. Cal. 2004) ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts").

Courts have also found cautionary language inadequate where, like here, defendants make positive statements concerning defendants' view of the merits of

---

[8] Defendants should not be permitted to raise new arguments with respect to these misleading statements on reply. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived.").

their legal position. *See Hoffman v. Avant! Corp.*, No. C-97-20698-RMW, 1997 U.S. Dist. LEXIS 21823, at *6 (N.D. Cal. Dec. 18, 1997). In *Hoffman*, the court found that even precise risk disclosures could not cure the alleged false statements because defendants' positive statements "substantially minimize[d] the[ir] impact." *Id.* Here, Defendants' nearly identical misleading statements similarly minimized their purported risk disclosures. Thus, Defendants' risk statements are likewise inadequate to insulate their misleading statements. Further, dismissal is unwarranted because whether the cautionary language is sufficient is a factual dispute. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 920 (N.D. Cal. 2012).[9]

### C.    Plaintiffs Allege a Strong Inference of Scienter

To allege scienter under the PSLRA, a complaint must "state with particularity all facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(a). The requisite state of mind must be a "departure from the standards of ordinary care that presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations omitted). However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. "The PSLRA calls for a 'strong inference,' not an outright confession or an airtight case." *In re Network Assocs., Inc., Sec. Litig.*, No. C 99-01729WHA, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000). "The Court should deny a motion to dismiss 'if a reasonable person would deem the inference of scienter cogent and at least as

---

[9] The mere fact that Defendants complied with Regulation S-K does not mean that the risk disclosures were adequate. To the contrary, Defendants' own cited-authority (*see* MTD at 16) states that "it is possible for securities fraud defendants to comply technically with SEC reporting requirements, such as § 229.103, and yet still be omitting information that is material and therefore should be disclosed." *City of Philadelphia v. Fleming Co., Inc.*, 264 F.3d 1245, 1267 (10th Cir. 2001).

compelling as any opposing inference one could draw from the fact alleged' in the complaint." *Sudunagunta*, 2017 WL 8811116, at *9 (citing *Tellabs*, 551 U.S. at 324). Under this standard, a "ties goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, No. CV072536PSGPLAX, 2014 WL 12585809, at *8 (C.D. Cal Aug. 4, 2014).

A complaint "must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). A defendant is reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary efforts." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (overruled in part, *City of Dearborn Heights*, 856 F.3d at 616). This is especially true "where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter." *Todd v. STARR Surgical Co.,* No. CV-14-05263-MWF-RZ, 2016 WL 6699284, at *13 (C.D. Cal. Apr. 12, 2016). Scienter can be established either through direct or circumstantial evidence. *See Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individualized allegations, scrutinized in isolation, meets that standard." *Reese*, 747 F.3d at 569. Here, the inference that Defendants committed fraud is as least as strong as the inference that they acted innocently.

### 1. The FAC Adequately Alleges Actual Knowledge or Recklessness

Plaintiffs have demonstrated that Defendants had access to and/or actual knowledge of contrary facts that showed that the claims asserted by DLF were not baseless. *See supra* II.A. Courts routinely find a strong inference of scienter where, as here, defendants omit materially negative information that they knew, or should have

known, rendering favorable statements misleading. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

Defendants incorrectly claim that Plaintiffs "offer not a single fact" and only "vague conclusions" to support scienter and again wrongly assert that Plaintiffs must show that Defendants knew that DLF would ultimately prevail on its claims. MTD at 18. However, Plaintiffs' allegations are based on Defendants' misrepresentations about the *risk* of liability, not the ultimate outcome. To that end, the FAC pleads a litany of facts showing that Defendants were aware of or had access to information that conflicted with Class Period statements that portrayed the DLF Litigation as meritless. *See Nursing Home Pension Fund*, 380 F.3d at 1230 (allegations that "contemporaneous reports or data, [are] available to the party, [and] contradict" the allegedly misleading statements are "the most direct way to show both that a statement was false when made and that the party making the statement knew it was false.").

For example, the FAC alleges that Defendant Brown: was actively involved in managing the Company's relationship with DLF (¶¶ 67-68, 79); knew that Company was testing and negotiating with CLW while it was under the ESA with DLF (¶¶ 75-76, 80-81); lied to DLF about the Company's continued negotiations with CLW (¶¶ 79-80); was notified that CLW could be up and running in two to three weeks despite it having no experience mass-producing plant-based products (¶ 77); was warned by DLF's CEO that DLF's lawyers considered the Company's negotiations with CLW to be in breach of the ESA (¶ 78); was told that the minimum required purchases under the ESA with DLF were excessive and was pressured about the issue (¶ 83); knew that CLW and ProPortion needed Beyond Meat's help to "jump start" their manufacturing processes (¶ 82); knew that the Company had access to DLF's proprietary information, including its Batch Making Protocols (¶¶ 53, 61-64); knew that Beyond Meat shared design drawings with CLW when the Company was still bound by the ESA with DLF (¶ 83); and knew that DLF's Batch Making Protocols

were found in ProPortion's files. When viewed together, these facts create a strong inference that Defendant Brown knew that DLF's claims were not baseless, and one that is cogent and at least as compelling as the opposite inference. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (instructing courts to "look to the complaint as a whole, not to each individual scienter allegation); *Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF VBKX, 2015 WL 1985562, at *11-12 (C.D. Cal. Feb. 27, 2015) (M. Fitzgerald, J.) ("viewed holistically" allegations that collectively combine to show defendants were aware of software issues, "sufficiently bolster the inference of scienter to survive the Motion to Dismiss").

As explained above, Defendants' attempt to draw parallels to *Gompper* misses the mark. 298 F.3d at 893. The plaintiffs in *Gompper* alleged only one fact in support of scienter—that the defendants were aware that there was an outstanding claim against one of the company's core patents—and failed to show how awareness of that claim established that the defendants knew that the patent was invalid. *Id*. at 895-96. Here, Plaintiffs have not merely alleged that Defendants were aware of DLF's claims. The FAC pleads contemporaneous facts showing that DLF's claims were not baseless and that these facts were known to Defendants at the time they issued their misleading statements.

Defendants' reliance on *City of Philadelphia*, which has no precedential value, is similarly inapposite. At issue in *City of Philadelphia* was not the defendants' portrayal of the merits of pending litigation as here, but rather, the defendants' failure to disclose the existence of the litigation. 264 F.3d at 1253-54. The Tenth Circuit held that the plaintiffs could not establish a strong inference that defendants knew that the pending litigation was material, because they had offered *no* facts showing that the defendants knew of the underlying business practices at issue in the litigation, or the potential materiality of the litigation. *Id*. at 1264. Here, the FAC alleges that Defendant Brown was involved in the negotiation of the ESA, was involved in the Company's decision to negotiate with CLW while still under the ESA, and that

Defendant Brown lied to DLF regarding the continued negotiations with CLW. Further, unlike the litigation in *City of Philadelphia*, the DLF Litigation involves the Company's core business and the trade secrets concerning the Company's main products. It is unfathomable to suggest that the Individual Defendants did not know of the real risks associated with the DLF Litigation.

### 2.    Plaintiffs Have Alleged Scienter through Core Operations

A court can "impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company." *Reese*, 747 F.3d at 575. Under this theory, allegations regarding management's role "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," or "such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* at 575-76. Here, both scenarios apply.

Beyond Meat has only one business: manufacturing and selling plant-based meat products. ¶ 48. From December 12, 2014 through May 23, 2017, DLF was Beyond Meat's sole co-manufacturer. ¶ 55. It would be absurd for the Individual Defendants to be unaware of, or uninvolved with, the ***only entity responsible for producing 100% of its products,*** including the circumstances of its termination. Indeed, the FAC identifies facts showing that Defendants were directly involved with day-to-day management issues involving DLF, and issues relating to the manufacturing of the Company's products. *See* ¶¶ 67-68, 75, n.30, 77, 83. *See Roberti*, 2015 WL 1985562, at *11-12 (finding it "absurd" to suggest defendants were not aware of issued related to OSI's largest and most profitable division"); *Amylin Pharm.*, 2002 WL 31520051, at *8 (imputing knowledge of misstatements to officers where the misstatements related to the company's primary product); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005).

The core operations inference is also warranted because the Individual Defendants had access to contemporaneous information which indicated DLF's claims had merit and the Company's litigation risk was greater than it represented to investors, including: (1) the Company's financial statements, which would show accounts payable (*i.e.*, money owed) to DLF (*e.g.*, ¶ 118); (2) Company emails concerning the negotiations with CLW and the sharing of DLF's proprietary design drawings on how to set up a manufacturing facility (¶ 82); and (3) documents produced in the DLF Litigation, which show that DLF's Batch Making Protocols were discovered in ProPortion's files (¶ 89).[10] *See Oracle Corp.*, 380 F.3d at 1230 ("The most direct way to show both that a statement was false when made and the party making the statement knew that it was false via contemporaneous reports or data, available to the party, which contradict the statement."); *see also Roberti*, 2015 WL 1985562, at *13 (finding scienter through core operations where defendants had "actual access" to a database listing the problems encountered during development of the software defendants touted to the market in support of expected government contracts).

### D.    The Complaint Adequately Pleads Loss Causation

To plead loss causation, Plaintiffs need only "demonstrate a causal connection between the deceptive acts that form the basis for the claim … and the injury suffered by the [Plaintiffs]." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). "[L]oss causation is a 'context dependent' inquiry as there are an 'infinite variety' of ways" to allege loss causation. *Mineworkers' Pension Scheme v.*

---

[10] Defendants also signed SOX Certification accompanying the Company's financial statements (*e.g.*, ¶ 118), which Defendants' incorrectly assert in *Zucco Partners, LLC,* that the Ninth Circuit has stated is not probative of scienter. *See* MTD. at 21. However, *Zucco* held that SOX Certifications are not sufficient "*without more*" to raise a strong inference of scienter. 552 F.3d at 1004 (emphasis added). Here, when Plaintiffs' scienter allegations are viewed holistically, the Individual Defendants' SOX Certifications affirming that the Company's financial statements were free of fraud adds to the strong inference of scienter. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707-08 (9th Cir. 2012).

*First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation omitted). Among the ways a plaintiff can plead loss causation is by showing that a corrective disclosure caused the stock price to decline. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).   "At the pleading stage, the plaintiff need only allege that the decline in the stock price was proximately caused by a revelation of fraudulent activity." *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV1602942SJOKSX, 2017 WL 2378369, at *18 (C.D. Cal. May 31, 2017). Plaintiffs have done exactly that.

The FAC specifically alleges that Beyond Meat's share price fell significantly after the truth—that Beyond Meat misrepresented the risk of liability in the DLF Litigation—became known when DLF issued the DLF Press Release announcing that the court held that DLF had proved the "probable validity" of part of its breach of contract claim (¶¶ 105-106; 110) and that it had sufficient facts with respect to its fraud claims to add Defendant Nelson, and other Beyond Meat officials, as named defendants. ¶ 107. These disclosures revealed that Defendants' prior misstatements, proclaiming their innocence and denying the claims (which had artificially inflated the Company's stock price), were misleading. Nothing more is needed to allege loss causation at this stage. *See Erickson v. Corinthian Colleges, Inc.*, No. CV137466GHKPJWX, 2015 WL 12732435, at *16 (C.D. Cal. Apr. 22, 2015) ("A plaintiff need only allege, not prove, loss causation to avoid dismissal."); *see also Gilead,* 536 F.3d at 1057 ("[s]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.").

### 1.    The DLF Press Release Is a Corrective Disclosure

A "corrective disclosure" is a disclosure that reveals the fraud, or at least some aspect of the fraud to the market. *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). However, "a corrective disclosure need not be a mirror-image disclosure—a direct admission that a previous statement is untrue; it must simply relate to the same subject matter as the alleged misrepresentation." *In re*

*Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 1549485, at *8 (N.D. Cal. May 1, 2017). Here, the DLF Press Release notified the market that DLF had proved the "probable validity" of part of its breach of contract claim. ¶ 131. This revelation indisputably concerns the same subject matter as the alleged prior misrepresentations—Defendants' misleading portrayal of the merits and risk posed by the DLF Litigation.

Defendants' primary argument is an impermissible "truth-on-the-market" defense, which is an affirmative defense to a securities fraud claim where "a defendant's failure to disclose material information may be excused where the information was made credibly available to the market by other sources." *Nguyen v. Radient Pharm. Corp.*, No. SA CV 11-0406 DOC, 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011). Defendants' argument that the DLF Press Release does not contain "new" information because the court in the DLF Litigation had issued the order three days earlier is without merit. MTD at 22-23. However, whether Defendants are absolved of their failure to disclose critical facts because investors could dig through other sources to attempt to piece together the truth three days earlier is an issue reserved for a jury. *See Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011).

Nevertheless, even if Defendants' argument was proper at this stage, it fails because the DLF Press Release did provide new information to the market. Courts have consistently recognized that disclosures presenting obscure, yet publicly accessible information to the market can be corrective. *See Norfolk City Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 697-98 (6th Cir. 2017) (rejecting argument that analysis based in part on publicly available data did not "convey new information" to the market because of the manner in which the information was first presented, and therefore the revelation "quite plausibly came as news to investors").[11]

---

[11] *See also Public Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (rejecting argument that an

- 23 -

Additionally, even though information may be theoretically discoverable, the market as a whole could not be presumed to be aware of information that was not published. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).[12]

Here, it is more than plausible, indeed it is likely, that the market did not learn of the information in the DLF Press Release prior to its publication. The ruling was issued on Friday, January 24, 2020 and the DLF Press Release was published the following Monday, January 27, 2020, the next market day. Defendants' suggestion that the information reached the market immediately assumes that investors were actively monitoring state court dockets or had access to specialized legal reporting outlets. More plausibly, the market became aware of the gravity of the decision when the DLF Press Release was released on a *national newswire*. Market trading activity supports this conclusion. Had the market already been aware of the court's decision, the stock price would not have declined in response to the DLF Press Release. ¶ 133.

Defendants' argument that the DLF Press Release does not reveal falsity similarly fails because it incorrectly assumes that Plaintiff's allegations are premised upon an ultimate finding of liability in the DLF Litigation. Plaintiffs have clearly alleged that Defendants misrepresented the risk posed by the DLF Litigation.[13] The

---

article based on publicly available data was not new because data was "only available to a narrow segment of the public and not the public at large" and was "difficult to obtain").

[12] Even disclosures based on information that was previously widely disseminated can nonetheless be corrective if they provide "additional or more authoritative fraud-related information that deflated the stock price." *In re Apollo Grp., Inc. Sec. Litig.*, No. 08-16971, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010); *see also Gilead*, 536 F.3d at 1058 (finding a "later disclosure corrective when public initially 'failed to appreciate [the]significance' of negative information").

[13] Defendants' reliance on *BofI Holdings*, 302 F. Supp. 3d at 1128, and *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), is misplaced. MTD at 24. In those cases, the plaintiffs relied on the disclosures to establish the alleged conduct actually occurred. *See In re BofI Holdings*, 302 F. Supp. 3d at 1138-39 (relying on a complaint); *Loos*, 762 F.3d at 890 (relying on an announcement of an investigation; *see also Curry v. Yelp, Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) (same) (cited MTD at 24). Here, the DLF Press Release contains actual revelations about the risk of the DLF Litigation.

DLF Press Release revealed that Beyond Meat had failed to pay for product delivered by DLF—a probable breach of the ESA. ¶ 131. Accordingly, the DLF Press Release altered the market's risk calculus of the DLF Litigation by revealing facts for the first time that supports the validity of DLF's claims and the real risk of liability that Beyond Meat is facing, causing the decline in the Company's stock price. *See Metzler*, 540 F.3d at 1063 (finding loss causation exists where the market "learned of and reacted to [the] fraud").[14]

## III.   THE COMPLAINT STATES AN EXCHANGE ACT SECTION 20(a) CLAIM

Because the Complaint states a Section 10(b) claim, the Section 20(a) claim stands.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

Respectfully submitted,

DATED: August 31, 2020      **KAPLAN FOX & KILSHEIMER LLP**

By:  /s/ *Justin B. Farar*
     Justin B. Farar

Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 460
Los Angeles, CA 90025
Telephone: 310.614.7260
Email: *jfarar@kaplanfox.com*

---

[14] Plaintiffs have also adequately alleged loss causation by pleading that a materialization of Beyond Meat's litigation risk was realized when the court in the DLF Litigation held that it was probable that DLF would prevail on part of its breach of contract claim. In the Ninth Circuit, there is a materialization of the risk when "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of a security." *Nuveen Mun. High Income Opp. Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).  Here, Plaintiffs have alleged that Defendants concealed the risk that DLF's claims had merit by creating a misleading impression that the claims had no merit. The DLF Press Release revealed that the  risk had materialized causing the Company's stock to drop. ¶ 133.

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, California 94612
Telephone: 415.772.4700
Email: *lking@kaplanfox.com*
        *mchoi@kaplanfox.com*

*Counsel for Block Investments Corporation and Proposed Liaison Counsel for the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein (*pro hac vice* to be filed)
Stephanie M. Beige (*pro hac vice* to be filed)
Peter J. Harrington (*pro hac vice* to be filed)
10 East 40th Street
New York, NY 10016
Tel: (212) 779-1414
Fax: (212) 779-3218
Email:  *bernstein@bernlieb.com*
        *beige@bernlieb.com*
        *pharrington@bernlieb.com*

*Lead Counsel for Plaintiffs and the Proposed Class*

PLTFS' MEMO. OF LAW. IN OPPO. TO DEF'S MOTION TO DISMISS

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I HEREBY CERTIFY that, on August 31, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 31, 2020.

/s/ *Justin B. Farar*
Justin B. Farar