# EXHIBIT 2

LATHAM & WATKINS LLP
  Marvin S. Putnam (Bar No. 212839)
    *Marvin.Putnam@lw.com*
  Laura R. Washington (Bar No. 266775)
    *Laura.Washington@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone: +1.424.653.5500
Facsimile: +1.424.653.5501

Attorneys for Defendant-Cross-Complainant
Beyond Meat, Inc.

FILED
Superior Court of California
County of Los Angeles
08/11/2020
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ O. Chavez _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| DON LEE FARMS, a division of GOODMAN FOOD PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BEYOND MEAT, INC. d/b/a BEYOND MEAT; PROPORTION FOODS, LLC; MARK NELSON; JESSICA QUETSCH; ANTHONY MILLER; and DOES 1 through 10, inclusive, <br><br> Defendants. | Civil Case No.: BC662838 <br><br> Assigned to the Hon. Holly J. Fujie <br> Dept. 56 <br><br> **BEYOND MEAT, INC.'S FIRST AMENDED CROSS-COMPLAINT FOR:** <br><br> **(1) VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT (CIV. CODE SECTIONS 3426, *ET SEQ.*);** <br> **(2) BREACH OF CONTRACT – SUPPLY AGREEMENT;** <br> **(3) BREACH OF CONTRACT – NDA;** <br> **(4) NEGLIGENT SUPERVISION;** <br> **(5) FRAUD;** |
| BEYOND MEAT, INC., <br><br> Cross-Complainant, <br><br> v. <br><br> DON LEE FARMS, a division of GOODMAN FOOD PRODUCTS, INC.; GOODMAN FOOD PRODUCTS, INC.; DONALD GOODMAN; DANIEL GOODMAN; and BRANDON GOODMAN; <br><br> Cross-Defendants. | **(6) NEGLIGENT MISREPRESENTATION;** <br> **(7) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **(8) TRADEMARK INFRINGEMENT / FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(A));** <br> **(9) UNFAIR COMPETITION (LANHAM ACT, SECURITIES MANIPULATION, FDCA, CAL. FDCA); and** <br> **(10) CONVERSION** <br><br> **JURY TRIAL DEMANDED** |

Electronically Received 08/11/2020 03:22 PM

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 1 of 117

Cross-Complainant Beyond Meat, Inc. ("Beyond Meat" or "Cross-Complainant") alleges causes of action against Cross-Defendants Don Lee Farms, a division of Goodman Food Products, Inc. ("DLF"); Goodman Food Products, Inc. ("Goodman Foods"); Donald Goodman; Daniel Goodman; and Brandon Goodman (collectively, "Cross-Defendants"), as follows:

## **NATURE OF ACTION**

1.      Beyond Meat is an innovator in the food space.  It has led a groundbreaking effort to build meat directly from plants.  Unlike traditional vegan products, Beyond Meat's plant-based products are similar to the look, texture, and taste of animal meat.  Beyond Meat focuses on the core composition of animal muscle—namely amino acids, lipids, trace minerals and vitamins, and water, and uses biomedical science and technology to characterize each of these inputs, source them from non-animal, plant-based materials, and organize them against the architecture of animal meat.  This provides consumers with the taste, overall sensory experience, and nutritional benefits of animal meat, but with meat made directly from plants.  By perfecting building meat from plants, Beyond Meat believes it will make strong contributions to global human health, climate, natural resource, and animal welfare objectives.

2.      Developing these products did not come easy.  Beyond Meat's founder and team began working with several universities over a decade ago on a technology platform that resets the bonds in plant protein through a process of heating, cooling, and pressure to replicate the fibrous texture of animal muscle.  Beyond Meat built out a team of scientists, technicians, and state-of-the-art laboratories to create a portfolio of intellectual property that is captured in top selling products across the United States.  All told, the company has invested hundreds of millions of dollars on research, development, commercialization, market research, and sales, among other expenses, to develop, produce, and sell these groundbreaking products.  For example, Beyond Meat's products have been the top four selling plant-based meat items in grocery stores year-to-date, and have tested and launched with several of the world's largest quick serve restaurants.  These products and Beyond Meat's brand were well established prior to any relationship with DLF.  In addition, Beyond Meat produced, commercialized, and sold its flagship *Beyond Burger* prior to DLF having any role in that product's manufacturing.

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 2 of 117

3.     Conversely, DLF was founded by Donald Goodman in 1982 as a corndog and milkshake company.  The company later transitioned to meat production, primarily becoming an animal meat packer.  Despite its core business in animal meatpacking, in the 1990s, DLF tried to diversify with the release of a simple soy-based veggie patty.  The patty was not created using a plant-based formula like Beyond Meat's, and was not designed to replicate the look, feel, or taste of animal meat.  DLF's first attempt at diversification failed, and it discontinued manufacturing the 1990s' version of its veggie patty decades ago.  While DLF still produced some veggie patty products, DLF primarily focused on animal meatpacking.

4.     By 2014, Beyond Meat's proprietary plant-based products had been available to and consumed by the public for *years*.  That year, Beyond Meat and DLF began discussions about a potential contractual relationship, whereby Beyond Meat would provide raw materials to DLF to process, package, and deliver finished plant-based products for distribution.  Before DLF was provided access to Beyond Meat's proprietary raw materials and processes, it first agreed to keep them confidential.  After this agreement and subsequent discussions, the parties entered into a Supply Agreement (as amended, the "Supply Agreement"); DLF thus became Beyond Meat's co-manufacturer for some of its products.  There were, however, several products that DLF did not initially manufacture for Beyond Meat, including the *Beyond Burger*.[1]

5.     In and around March and April 2016, as Beyond Meat was expanding its product lines—several of which Beyond Meat had been producing without DLF—DLF induced Beyond Meat to move certain manufacturing operations to DLF's facility in Mansfield, Texas.  Well aware of Beyond Meat's production requirements, DLF promised that it could handle Beyond Meat's operations.  In doing so, DLF falsely represented that its Mansfield facility had appropriate health and safety controls; and that DLF had or would put in place the necessary infrastructure and qualified personnel to produce the quantity of Beyond Meat's products needed and meet Beyond Meat's quality standards.

---

[1] A co-manufacturer is a food manufacturing company that produces an existing company's product lines *pursuant to* that company's specifications and instructions.

3

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 3 of 117

6.      These misrepresentations were made to convince Beyond Meat that DLF should be its *exclusive* co-manufacturer and produce its products, many of which Beyond Meat had been manufacturing without DLF's assistance, including its renowned *Beyond Burger*.  DLF concealed its true intent, which was to learn Beyond Meat's proprietary process of how to manufacture and bind plant-based ingredients to look, taste, and feel like animal meat.  In essence, rather than trying to develop its own plant-based meat products with the substantial attendant cost, effort, and risk, DLF sought Beyond Meat's ideas, technology, know-how, and concepts.[2]

7.      Unaware of DLF's true intent, Beyond Meat agreed to amend the Supply Agreement and move certain operations to Mansfield.  Under the confidentiality protections of the parties' Supply Agreement and a separate Non-Disclosure Agreement ("NDA"), Beyond Meat disclosed proprietary information and trade secrets to DLF, including the basic manufacturing method on *how* to process and handle plant-based ingredients into a form that replicates animal meat.  Beyond Meat also provided detailed plans and schematics for the production lines designated for Beyond Meat's products at the Mansfield facility.  Beyond Meat, in fact, had its own team of engineers design the very production process that was used at DLF.

8.      The deficiencies at Mansfield, however, were later revealed.  To Beyond Meat's shock and dismay, DLF's facility could not produce the volume or quality of product Beyond Meat needed, requiring Beyond Meat to invest *millions* of unbudgeted dollars in upgrades and equipment purchases for the facility.  Despite DLF's numerous representations to the contrary, Mansfield was not remotely situated for Beyond Meat's needs, and DLF did not make the investment required to ensure its facility was operational in a way that meets basic food quality standards.  It was even unwilling to hire a competent workforce.

9.      In other words, DLF knew Beyond Meat's product demands, ignored them, and moved forward with the arrangement to move certain operations to Mansfield while knowing it

---

[2] While DLF learned from Beyond Meat how to *make* plant-based meat, Beyond Meat fortunately did not share with DLF the intellectual property relating to the taste and quality of its products (*i.e.*, the core formula that makes up its most successful offerings).

4

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 4 of 117

lacked the necessary infrastructure. But more troublingly, Beyond Meat later discovered through a sequence of quality and safety incidents that the Mansfield facility was woefully unsafe. Beyond Meat thus repeatedly notified DLF of food safety issues during production. Yet, DLF did nothing to remedy them. Beyond Meat became concerned that these issues reflected a broader pattern of insufficient controls and inadequate sanitation and requested that DLF immediately communicate a plan to remedy these serious ongoing problems.

10. Unfortunately, DLF could not do so. Then, Beyond Meat discovered dangerous pathogens (including *Salmonella* and *Listeria monocytogenes*) at DLF's Mansfield facility. Not only were pathogens found in products DLF manufactured for Beyond Meat, DLF had such poor controls in place that some of these contaminated products were not immediately sequestered and destroyed by DLF, but instead had to be caught by *Beyond Meat's* rigorous quality controls and safety testing. Some contaminated products had even made it into a food logistics center where they were set to be distributed to stores; but due to Beyond Meat's rigorous safety processes, it caught those products before they entered the stream of commerce. The unsanitary conditions at DLF's facility, and the inadequate controls and procedures maintained by DLF, violated the law, and constituted material breaches of the parties' Supply Agreement. As a result, Beyond Meat was forced to terminate the agreement in May 2017.

11. Instead of accepting responsibility and compensating Beyond Meat for the expensive unsaleable product DLF manufactured, DLF filed a baseless complaint against Beyond Meat inexplicably claiming Beyond Meat had somehow wrongfully terminated the Supply Agreement (despite the gross health hazards at DLF's facilities that DLF failed to remedy) and misappropriated *DLF's* "trade secrets" (despite DLF *never* having manufactured the products Beyond Meat had developed years before).

12. Then, without any apparent meaningful research and development ("R&D") investment of its own, DLF released—for the first time in the company's history—a plant-based, meat burger designed to replicate animal meat. In 2019, that concept was further adapted and called the *Better Than Beef Burger*, followed by the release of a plant-based ground beef substitute, called *Better Than Beef Crumble*. DLF and its parent-affiliate Goodman Foods even

5

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 5 of 117

attempted to trademark these products. But, as their very names highlight, DLF's products were designed to emulate and misappropriate products released and produced by Beyond Meat years earlier, including the *Beyond Burger* (released three years earlier) and *Beyond Beef Crumbles* (released five years earlier).

13. Although Beyond Meat never disclosed to DLF its secret plant-based formula (*i.e.*, its extrudate, protein and lipid matrix, pre-blends, and flavor systems), DLF misappropriated Beyond Meat's proprietary *manufacturing process* which carefully details how to *combine* such ingredients and create products that look, feel, bind, and taste like animal meat.

14. While DLF has ultimately failed to capture the taste and texture of Beyond Meat's scientifically designed plant-based meat, it has still profited off Beyond Meat's confidential and proprietary information. DLF's owner Donald Goodman recently proclaimed, "[i]nterest in our Organic Plant-Based Burger has just exploded." The alleged success of this product is due solely to the decades of R&D and substantial resources Beyond Meat invested in its ideas and trade secrets.

15. Indeed, not satisfied with merely stealing Beyond Meat's ideas and trade secrets, DLF (and Goodman Foods) brazenly leveraged Beyond Meat's *registered trademarks* to profit off Beyond Meat's competitive standing in the plant-based meat market. DLF's branding for its *Better Than Beef* plant-based products is akin to Beyond Meat's, and was designed to ensure consumer confusion and benefit from Beyond Meat's good name and standing.

16. In the midst of this misconduct, DLF's and the Goodmans' actions grew increasingly malicious. Shockingly, *after* misappropriating Beyond Meat's intellectual property, DLF initiated a public smear campaign against Beyond Meat—now its competitor. On April 29, 2019, DLF's owners Donald and Daniel Goodman leaked to the press (*Bloomberg News*) a confidential Beyond Meat site report regarding one of Beyond Meat's facilities and made false claims about that report in the hopes of both tarnishing Beyond Meat's May 2, 2019 groundbreaking initial public offering ("IPO") and manipulating its stock price. The disclosure was made *mere days* before the IPO, and the article was published *the following morning*. This unauthorized disclosure of confidential information was a blatant violation of the NDA, the

6

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 6 of 117

Supply Agreement, and the Court's protective order.  DLF and the Goodmans then spent months misleading Beyond Meat and the Court—*including in pleadings*—about whether DLF was Bloomberg News' source.  Only after expending significant resources, and following a motion to compel, did Beyond Meat finally uncover the truth:  the Goodmans were the source of the leak.

17.    Beyond Meat's First Amended Cross-Complaint seeks redress for DLF's, Goodman Foods', and the Goodmans' extraordinary misconduct and the substantial damage they caused.  Beyond Meat also seeks an injunction against the sale of DLF's plant-based products—including the *Better Than Beef Burger* and the *Better Than Beef Crumbles*—in light of the misappropriation of Beyond Meat's trade secrets and DLF's trademark infringing activities.

## THE PARTIES

18.    Cross-Complainant Beyond Meat is a Delaware corporation with its principal place of business in El Segundo, California.

19.    Cross-Defendant DLF is a California corporation with its principal place of business in Inglewood, California.

20.    Cross-Defendant Goodman Foods is a California corporation with its principal place of business in Inglewood, California.  Goodman Foods does business through DLF.

21.    Beyond Meat is informed and believes, and on that basis alleges, that Cross-Defendant Donald Goodman is an individual residing in Los Angeles County, California.

22.    Beyond Meat is informed and believes, and on that basis alleges, that Cross-Defendant Daniel Goodman is an individual residing in Los Angeles County, California.

23.    Beyond Meat is informed and believes, and on that basis alleges, that Cross-Defendant Brandon Goodman is an individual residing in Los Angeles County, California.

## JURISDICTION AND VENUE

24.    This Court has personal jurisdiction over Cross-Defendants because Cross-Defendants have conducted substantial business in California.  In addition, Cross-Defendants' residence in California is a separate basis for personal jurisdiction.

25.    The Superior Court of California for Los Angeles County is a court of general jurisdiction and therefore has subject matter jurisdiction over this action.

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 7 of 117

26. Venue is proper in this Court because: (1) the Supply Agreement contains a forum selection clause designating courts in the County of Los Angeles as having exclusive jurisdiction over disputes under the contract; (2) Cross-Defendants reside in and do business in the County of Los Angeles; and (3) the Supply Agreement was entered into, and the obligations thereunder were to be performed, at least in part, in this County.

**FACTS**

A. **Beyond Meat Develops Its Idea for Plant-Based Meat Products.**

27. Beyond Meat officially launched in 2009. Unlike traditional vegan products, Beyond Meat's products are novel—created to scientifically approximate the architecture and composition of animal muscle input by input, from materials harvested directly from plants. In other words, Beyond Meat's products are plant-based meats that reflect the look, texture, and taste of animal meat, thus offering a healthy and sustainable substitute for animal meat.

28. Beyond Meat's launch was made possible by years of R&D and scientific research with various universities, PhDs, and engineers from the biomedical and food industries, to understand the composition of animal meat in order to build that composition and architecture using plant-based ingredients. As a start-up, Beyond Meat raised and invested hundreds of millions of dollars to fund its novel concept, commercialize it, and market it. It also leased production facilities in Los Angeles, California and Columbia, Missouri as the bases of its years-long R&D process.

29. Beyond Meat developed an innovative and proprietary manufacturing process by which a plant-based protein raw "extrudate" (*i.e.*, a formula) transforms into a variety of finished products, each of which in turn has its own distinct manufacturing processes, carefully crafted protein and lipid "matrices," flavor systems, binding blends, and discrete ingredients.

30. These manufacturing processes were and are constantly improved by Beyond Meat's carefully curated, best-in-class R&D team. This team is continually innovating to create plant-based products that resemble—as closely as possible—meat products in texture, look, and taste. This has required a careful scientific-based approach to understand and replicate the

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 8 of 117

composition of animal muscle, by tracing amino acids, lipids, trace vitamins, minerals, and water, including the distribution of, characteristics therein, and relationship to, one another.

31.    Before Beyond Meat entered the market, veggie burgers generally were not intended to replicate animal meat.  For example, DLF had different veggie patties, such as the one depicted in **Figure A**.  This patty was consistent with other options on the market at the time.



**(Figure A)**

32.    In contrast, Beyond Meat introduced innovative plant-based products scientifically designed to replicate the look, feel, taste, and nutritional value of animal meat. **Figure B** shows an uncooked, raw *Beyond Burger*.  It bears a striking resemblance to a raw beef patty, yet is made using plant-based ingredients and a manufacturing process that resulted from decades of R&D.



**(Figure B)**

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 9 of 117

33.    **Figure C** is a photograph of Beyond Meat's cooked *Beyond Burger* patty, which shows that the burger, when cooked, appears nearly indistinguishable from an animal beef patty.



**(Figure C)**

34.    Similarly, Beyond Meat innovated and manufactures "crumbles"—primarily through its *Beyond Beef Crumbles* product line—that provide consumers with a plant-based version of cooked animal *ground beef* and can be used in foods like pasta, tacos, and stews.

35.    By early 2014, Beyond Meat was well established in the market, having won numerous innovation accolades, garnering front page coverage in *The New York Times* Sunday Review, and significant media coverage across major television networks.  Beyond Meat's initial lines included plant-based beef and chicken products, such as *Chicken Strips*, *Southwest Chicken Strips*, *Beyond Beef Beefy Crumbles*, and *Beyond Beef Feisty Crumbles*.  It also invested heavily in R&D and scaling of its "fresh" platform, which was designed to produce the equivalent of raw meat for placement in the meat aisle at supermarkets.  The flagship of this "fresh" platform was the *Beyond Burger*, to be followed by *Beyond Sausage* and *Beyond Beef*, all in "raw" form.

**B.    Beyond Meat and DLF Enter into the December 2014 Supply Agreement.**

36.    In late 2014, having already successfully produced, marketed, and sold several of its products, Beyond Meat began discussions with DLF's president and majority owner, Donald Goodman, about entering into a co-manufacturing relationship.

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT

EXHIBIT 2
Page 10 of 117

37.     Prior to commencing substantive negotiations and in order to protect its proprietary information, on September 12, 2014, Beyond Meat negotiated and entered into an NDA with DLF.  (Exhibit A (hereinafter, cited as "NDA").)  Among other things, the NDA provided that Beyond Meat's proprietary information would only be shared with DLF because of ongoing discussions regarding a potential co-manufacturing relationship.  It prohibited DLF from using "[Beyond Meat's] confidential information" or disclosing it "to any third party without prior written consent."  (NDA ¶ 3.1.)  Under the NDA, all information disclosed was and is "presumed to be confidential."  (*Id.*)

38.     Before its relationship with Beyond Meat, DLF had no experience creating plant-based meat products like those Beyond Meat offered, *i.e.*, meat created molecularly similar to animal meat, but built from plant-based ingredients.  Its experience was limited to the formation of conventional veggie patties.

39.     After conducting several trial production runs, Beyond Meat ultimately entered into a Supply Agreement with DLF on December 2, 2014.

40.     Under the Supply Agreement, the protections of the NDA continue to apply and protect Beyond Meat's confidential and proprietary information, including *after* any termination of the parties' contractual relationship.  (Exhibit B (hereinafter, cited as "Supply Agreement") at Ex. D, § 14.)

41.     The Supply Agreement granted Beyond Meat the right to enter DLF's facility upon notice to "inspect the manufacturing and packaging of all Products to determine if manufacturing and packaging are being performed" in compliance with the agreement and Beyond Meat's quality standards.[3]  (*Id.* § 1.14 (as amended).)

42.     Under the Supply Agreement, DLF became Beyond Meat's co-manufacturer for a discrete set of products, while Beyond Meat retained sole production rights for other non-delineated products.  DLF was required to "use reasonable efforts, consistent with such efforts it

---

[3] The agreement also contains an attorneys' fees provision, permitting the prevailing party in a lawsuit to obtain reimbursement of its attorneys' fees and costs.  (Supply Agreement § 6.13.)

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 11 of 117

uses with respect to other preferred customers, to fill all orders for Products submitted by" Beyond Meat.  (*Id.* § 1.1.)

43.    DLF further agreed and warranted that it would "comply with all applicable federal, state, and local laws, regulations, ordinances, and rules, including . . . those promulgated by the [FDA]."  It also warranted, represented, and guaranteed that all products manufactured and delivered to Beyond Meat would not be "adulterated or misbranded within the Federal Food, Drug, and Cosmetic Act (FDCA)," and would not be an article "which may not be introduced into interstate commerce under such Act."  (*Id.* § 2.1.)[4]  Beyond Meat relied on this warranty and DLF's accompanying verbal assurances that it would manufacture Beyond Meat products in accordance with applicable law and Beyond Meat's quality standards.

44.    Between December 2014 and June 2016, DLF manufactured certain Beyond Meat products at its facility in Inglewood, California, including the *Beast Burger*, *Beastly Sliders*, *Swedish Style Meatballs*, and *Italian Style Meatballs*.

45.    Concurrently, Beyond Meat continued innovating and manufacturing other products at its own facilities.

46.    One of these products was Beyond Meat's current flagship product:  the *Beyond Burger*.  As with Beyond Meat's other products, the *Beyond Burger* was the result of years of R&D.  Beyond Meat engaged a growing team of scientists and engineers from the biomedical and food industries to design and implement production lines—including selecting and customizing food-manufacturing equipment for higher volume production—to create the *Beyond Burger*.  Initially, Beyond Meat produced the *Beyond Burger* at its production facilities.  From its own production lines and through the work of its engineers, Beyond Meat developed a comprehensive set of production specifications (including specific equipment, process controls,

[4] A food product is "adulterated," in part, if it "bears or contains any poisonous or deleterious substance which may render it injurious to health," "consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food," or if it has been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. § 342(a).

12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 12 of 117

and layouts) that Beyond Meat could provide to a co-manufacturer in order to produce the product only after a bidding process and the co-manufacturer executed an NDA.

47. In May 2016, Beyond Meat launched the *Beyond Burger* for sale to the public at a Whole Foods located in Boulder, Colorado. Beyond Meat manufactured the *Beyond Burger* on a commercial scale at its own facility and continued to do so for several months.

**C.     DLF Induces Beyond Meat to Move Certain Operations to Mansfield, Texas.**

48. In or around February 2016, DLF suggested that its production of certain Beyond Meat products be moved to its facility in Mansfield, Texas. On information and belief, DLF believed that, if it could convince Beyond Meat that DLF should be its *exclusive* co-manufacturer and move certain of its production to Mansfield, Beyond Meat would provide—pursuant to the NDA and Supply Agreement—its production specifications to DLF and Beyond Meat would build out the infrastructure of the Mansfield facility to *DLF's* benefit. DLF thus would have proprietary production information for *all* of Beyond Meat's products and the environment in which to produce them.

49. In order to begin discussions about whether the Mansfield facility could realistically handle the production requirements for Beyond Meat's products, DLF received preliminary manufacturing process schematics and specifications for Beyond Meat's products, including the not-yet-released *Beyond Burger*. This information was shared under the terms of the NDA.

50. In and around March and April 2016, the parties began negotiations regarding the process for transferring certain manufacturing operations to Mansfield. During these discussions, DLF falsely represented that the Mansfield facility was sufficiently designed and constructed to support Beyond Meat's production demands and specifications. While DLF stated certain upgrades might be necessary to fully support production of Beyond Meat's products, DLF misrepresented that it could handle these upgrades, that the upgrades were minimal, and that DLF had the space, infrastructure, capacity, and personnel to handle Beyond Meat's production needs and adhere to its quality standards. It also misrepresented that it could appropriately and accurately develop a realistic production budget.

13

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 13 of 117

51.    As part of this charade, around March and April 2016, several DLF representatives—including the Goodmans (Donald, Daniel, *and* Brandon)—*repeatedly* (and *falsely*) made assurances to Beyond Meat representatives, including Ethan Brown, Mark Nelson, and Sergio Jimenez-Marquez, that DLF would be able to manufacture Beyond Meat products safely at Mansfield.  During negotiation of the agreement and calculation of the required capital spend, in particular, Donald Goodman vastly and purposely underrepresented the cost required to get the Mansfield facility up and running safely, as well as DLF's ability and willingness to manage and staff it.

52.    In addition, in or around March and April 2016, Donald and Daniel Goodman made statements to Beyond Meat's representatives reaffirming DLF's commitment to operate in good faith and protect Beyond Meat's trade secrets.

53.    At no point did the Goodmans (or anyone else at DLF) tell Beyond Meat that DLF intended to misappropriate Beyond Meat's manufacturing processes, and eventually release its own plant-based meat-substitute line using Beyond Meat's confidential and proprietary information.  Had Beyond Meat known the truth, it never would have agreed to move certain operations to DLF's facility in Mansfield, disclose to DLF's employees much of its manufacturing processes, and otherwise disclose its trade secrets.

54.    During the 2016 negotiations, relying on the confidentiality protections in the NDA and Supply Agreement, Beyond Meat provided DLF with proprietary information regarding the production processes for the Beyond Meat products that DLF was not currently manufacturing.  Before production commenced at Mansfield, DLF representatives and employees (including Donald Goodman, Brandon Goodman, and Felipe Gonzales) traveled to Beyond Meat's Los Angeles facility with clipboards and cell-phone cameras to study Beyond Meat's manufacturing processes, including for the *Beyond Burger*—which DLF was not then manufacturing.

55.    Ultimately, on April 11, 2016, the parties agreed to move the aforementioned operations to Mansfield and entered into the First Amendment to the Supply Agreement ("April 2016 Amendment," attached hereto as Exhibit C).  The April 2016 Amendment set forth the

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 14 of 117

parameters for the move.  Under the April 2016 Amendment, DLF became the exclusive co-manufacturer for Beyond Meat's products.  This included products that Beyond Meat had been manufacturing at its own facilities, such as the *Beyond Burger*.

56.     The April 2016 Amendment provided for Beyond Meat to purchase, deliver, and install several pieces of expensive equipment for production at Mansfield.  *Beyond Meat* selected the equipment after numerous trial production runs and extensive customization with various equipment vendors.  After selecting the appropriate equipment, *Beyond Meat* designed processes and equipment diagrams, and directed layouts to fit the equipment in the space provided at Mansfield.  DLF represented that Mansfield would be staffed with trained personnel capable of operating the equipment identified, purchased, and installed by Beyond Meat.

57.     Subsequently, DLF made several costly equipment requests over the next year.

58.     Under the agreement, Beyond Meat paid for certain infrastructure expenditures at DLF's facility.  DLF, however, misled Beyond Meat about the true cost of these expenditures, many of which had never been disclosed to Beyond Meat prior to entering the April 2016 Amendment.  In total, Beyond Meat invested over *$5.9 million* in equipment and infrastructure for the Mansfield facility, an amount that far exceeded the original budget.

59.     Contrary to DLF's statements including representations and warranties in the Supply Agreement, its facility did not have the ability to safely produce Beyond Meat's products.  Moreover, even with the significant additional expenditures Beyond Meat incurred, Beyond Meat proceeded in good faith in the hopes that DLF meant what it promised:  that it would be a good faith co-manufacturer.  Unfortunately, that was not the case.

**D.     DLF Receives Beyond Meat's Trade Secrets.**

60.     After the transfer of production to Mansfield, Beyond Meat R&D employees spent weeks conducting trial production runs at the facility.  These runs included teaching DLF how to create food batches to work with the larger commercial equipment at the facility.

61.     In fact, before production commenced at DLF, Beyond Meat performed testing on *each piece* of equipment (all of which it purchased for the Mansfield facility).  To conduct that testing, Beyond Meat representatives visited various equipment manufacturer facilities to ensure

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 15 of 117

that the equipment reflected and met Beyond Meat's specifications for production, which included factory acceptance tests.

62.    Beyond Meat also oversaw modifications to the equipment and the manufacturing process at the Mansfield facility prior to DLF's first production.

63.    Throughout the parties' relationship, Beyond Meat provided DLF with proprietary and confidential information, including, in particular, know-how regarding the processes of creating plant-based products that look, feel, bind, and taste like animal meat.  This included, at a minimum, ingredient formulations, binding systems, mixing processes, mixes and mixing times, sequences of ingredients, cooking temperatures, heating of essential ingredients, batch preparation steps, ingredient storage processes, and formula and product transportation requirements (collectively, the "Beyond Meat Trade Secrets").  These trade secrets are not otherwise known to the public.

64.    The Beyond Meat Trade Secrets disclosed to DLF did not consist of the *formula* that makes up the quality of Beyond Meat's plant-based products.  However, the Beyond Meat Trade Secrets included some of the important processes for *how* to manufacture plant-based ingredients allowing those ingredients to bind, feel, and taste like animal meat.  These Beyond Meat Trade Secrets were provided to DLF specifically and solely to manufacture Beyond Meat's products, including the *Beyond Burger* and *Beyond Beef Crumbles*.

65.    At all relevant times, Beyond Meat took extraordinary steps to protect its trade secrets, including requiring a signed NDA and additional confidentiality agreements with any third parties who observed Beyond Meat's production processes.

66.    On information and belief, DLF sought to use the April 2016 Amendment to learn the full scale of Beyond Meat's manufacturing processes and to receive, evaluate, and ultimately use the Beyond Meat Trade Secrets.  DLF's and the Goodmans' repeated false representations and assurances, and concealment of their true intentions, were designed to create the perception that DLF was a legitimate partner.  That perception, however, quickly dissipated due to DLF's own failings as a co-manufacturer, the inadequacy of its facility, and its inability to produce safe product.

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 16 of 117

**E.** **DLF Materially Breaches the Supply Agreement and Violates the FDCA and the California FDCA by Failing to Maintain a Safe Food Production Facility.**

67.     Shortly after transitioning production to Mansfield, problems arose with products manufactured by DLF.  Beyond Meat began discovering and receiving multiple customer reports of foreign objects found in finished Beyond Meat products that DLF manufactured, processed, and/or packed at Mansfield.

68.     This conduct violated the Supply Agreement.  It also violated the FDCA as well as California's Sherman Food Drug and Cosmetic Act ("California FDCA") which defines adulterated food as any food that "consists in whole or in part of any diseased, contaminated, filthy, putrid, or decomposed substance, or if it is otherwise unfit for food," or if it "contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it."  Cal. Hlth. & S. Code §§ 110560, 110545.[5]

69.     Despite these issues, Beyond Meat attempted to work with DLF as a good faith business partner to ensure its products were safely manufactured.  For example, Beyond Meat stationed its own employees at the Mansfield facility to oversee production runs.

70.     Food safety issues, however, were not the only problems that arose at the Mansfield facility.  Despite representing that the facility would be staffed by competent individuals who could operate large-scale commercial equipment, DLF never hired such personnel.  Instead, DLF hired unskilled individuals with absolutely no experience or training operating the expensive equipment purchased by Beyond Meat.

71.     On several occasions, Beyond Meat was required to send equipment technicians to Mansfield to repair equipment damaged by DLF.  Like the food safety issues plaguing the facility, the equipment problems caused by DLF became so frequent that Beyond Meat ultimately had to permanently station its own mechanic in Mansfield to avoid significant delays.

---

[5] DLF failed to maintain appropriate controls to ensure that food products from its Mansfield facility were manufactured, processed, packed, and/or held under conditions that do not render them "injurious to health," as required by the California FDCA.

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 17 of 117

72.    As issues at the Mansfield facility started to occur more frequently, Beyond Meat increased its vigilance and spent significant funds to ensure its customers were protected from the issues at DLF's facility.  Despite Beyond Meat's best efforts to work with DLF to safely manufacture its products, serious food and safety risks persisted.  Due to these unabated issues and DLF's inability to correct them, on April 12, 2017, Beyond Meat sent DLF a breach notice (attached hereto as Exhibit D), identifying multiple material breaches of the Supply Agreement.  In the breach notice, Beyond Meat expressed deep concerns about DLF's ability to manufacture its products safely, and requested that DLF implement a comprehensive and meaningful corrective action plan to remedy its breaches.

73.    Rather than heeding Beyond Meat's warnings and taking immediate corrective measures to address the deficiencies identified in the breach notice, DLF's response demonstrated an utter disregard for the serious health and safety concerns raised by Beyond Meat.  DLF brushed aside Beyond Meat's safety concerns as "isolated incidents" or "one-offs," and ignored them because they did not result in physical harm.  DLF's reckless indifference to its dangerous practices resulted in food safety issues continuing even *after* DLF received Beyond Meat's breach notice.

74.    Most notably, after DLF received Beyond Meat's breach notice, independent environmental sampling and testing confirmed that two lots of Beyond Meat products manufactured at DLF's Mansfield facility on April 24 and 25, 2017 were contaminated with *Salmonella*, a dangerous pathogen.  Separately, samples collected from Mansfield on April 26, 2017, were tested and the results indicated the presence of other dangerous microbiological pathogens including *Listeria monocytogenes*.  The products were caught by Beyond Meat, consistent with its safety protocols, before they could ever come to market.  Indeed, DLF's internal quality management procedures were so poor that contaminated product made it into one of the logistics centers that distributed finished Beyond Meat food products.  Because Beyond Meat employed such rigorous safety protocols, however, it tracked that product down and isolated it before it could ever entered the stream of commerce.

18

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 18 of 117

75. After receiving confirmation on or in early May 2017 of the presence of pathogens in Beyond Meat products manufactured by DLF, Beyond Meat demanded access to DLF's Mansfield facility and requested that an independent food safety scientist conduct additional pathogen testing on Friday, May 5, 2017. This request was made pursuant to Beyond Meat's rights under the Supply Agreement to inspect DLF's facility.

76. DLF *rejected* Beyond Meat's request to have an independent food safety scientist conduct sampling that Friday and only granted such access on *Monday, May 8, 2017*. DLF never provided any meaningful explanation for its refusal to permit Beyond Meat's independent food safety scientist to conduct testing on the requested date.

77. Beyond Meat later uncovered the reason for DLF's refusal: DLF used the weekend delay to conduct a "deep clean" of its facility in the hopes of eradicating all signs of *Salmonella* and *Listeria monocytogenes*. Over the course of May 5, 6, and 7, 2017, QVEST—a third party sanitation company—"deep cleaned" the entire Mansfield facility.

78. Astonishingly, the May 8, 2017 testing conducted at Beyond Meat's direction by an independent food safety scientist discovered that dangerous pathogens were *still present*, despite DLF's unprecedented and significant cleaning effort in anticipation of the inspection. Two samples taken from the Mansfield facility on May 8—from the "Fresh Mixer" and wood pallets—tested positive for *Salmonella*.

79. The fact that a deep clean designed to avoid a positive result on forthcoming pathogen testing did nothing to curb the presence of harmful pathogens in DLF's facility suggests that the extent of the pathogen contamination by DLF was even *more* severe than initial testing revealed. On information and belief, the real contamination was much larger, and DLF concealed its scope. Had Beyond Meat been able to conduct its pathogen testing on May 5, 2017, as requested, it would have been able to ascertain the full extent of the contamination.

80. The pathogen findings at DLF's Mansfield facility (including *Salmonella* and *Listeria monocytogenes*) confirmed that DLF caused products manufactured for Beyond Meat to be "adulterated" within the meaning of the FDCA and the California FDCA by preparing, packing, and/or holding such products under "insanitary conditions" whereby they "may have

19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 19 of 117

become contaminated with filth," or "may have been rendered injurious to health." This adulteration violated the FDCA and the California FDCA, and breached the Supply Agreement.

81.    The presence of dangerous pathogens at DLF's facility demonstrated that DLF was incapable of ensuring a safe environment for the production of Beyond Meat products. These sanitation and food safety problems resulted in numerous lots of Beyond Meat products manufactured by DLF to be unsaleable and were thus destroyed as unfit for human consumption.

82.    By early April 2017, nearly ***$500,000*** of Beyond Meat product manufactured by DLF was unsaleable due to foreign contamination issues.

**F.    DLF Fails to Remedy the Material Breaches and Files a Frivolous Lawsuit.**

83.    On May 23, 2017, after the contractual 30-day notice period expired and DLF had failed to remedy its material breaches of the Supply Agreement, Beyond Meat terminated the Supply Agreement by sending DLF a notice of termination. (Exhibit E.) In the notice, as required by the Supply Agreement, Beyond Meat requested DLF's "full cooperation to ensure an orderly transition of all manufacturing processes out of the Mansfield facility." (*Id.*) Beyond Meat also demanded access to the facility so that it could remove its valuable inventory, equipment, and other tangible personal property as soon as possible.

84.    DLF acceded to this request on May 24. But while DLF initially suggested it would cooperate with Beyond Meat's transition efforts, the very next day, DLF filed a complaint initiating this action. The complaint wrongly alleged that Beyond Meat's termination notice was invalid and constituted a breach of the Supply Agreement. Astonishingly, the complaint made *no mention* of the serious contamination and other health and safety issues at DLF's facility that led to Beyond Meat's termination.

85.    Only after filing the complaint did DLF provide Beyond Meat with access to the Mansfield facility to begin removal of its inventory, equipment, and other tangible personal property. Then, in early June 2017, while Beyond Meat was working diligently to retrieve its property, DLF abruptly revoked Beyond Meat's access to the facility and prevented it from removing all of its inventory, equipment, and other property.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

86.     To this day, some of Beyond Meat's expensive equipment remains in the Mansfield facility, and on information and belief is being used by DLF.  DLF thus continues to enjoy the millions of dollars that Beyond Meat invested in equipment and to modify DLF's facility so that it could successfully produce Beyond Meat's plant-based products.  Because Beyond Meat has been unable to recover its property, it has had to expend additional capital to procure replacement equipment for its manufacturing operations.

**G.     DLF Misappropriates the Beyond Meat Trade Secrets and Manufactures Plant-Based Meat Products.**

87.     After Beyond Meat terminated the Supply Agreement, DLF began to profit off the Beyond Meat Trade Secrets.  Although Beyond Meat never disclosed its proprietary information with respect to the creation of its extrudate—the key ingredient component of its products—it had provided DLF with the manufacturing processes for transforming plant-based ingredients into products that resemble animal meat.  DLF had no experience with this manufacturing process prior to its relationship with Beyond Meat.

88.     In February 2018—less than two years after Beyond Meat's *Beyond Burger* was released and less than a year after the Supply Agreement was terminated—DLF released its first ever plant-based meat burger concept.  It mainstreamed that concept later in September 2019, via a flagship product it now calls the *Better Than Beef Burger*.

89.     DLF's primary plant-based burger product—the *Better Than Beef Burger*— attempts to mimic Beyond Meat's *Beyond Burger*.

90.     Thereafter, DLF released its *Better Than Beef Crumble* product which is intended to mimic Beyond Meat's *Beyond Beef Crumble*.

91.     Beyond Meat is informed and believes that Donald Goodman made the decision for DLF to manufacture plant-based products and instructed DLF employees, including his sons Daniel and Brandon, to use Beyond Meat's confidential information and the Beyond Meat Trade Secrets to develop its *Better Than Beef* line of products.

92.     Beyond Meat is further informed and believes that Daniel Goodman designed DLF's *Better Than Beef Burger* and *Better Than Beef Crumble* products using Beyond Meat's

21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 21 of 117

confidential and proprietary information and the Beyond Meat Trade Secrets he and others at DLF learned during the course of DLF's relationship with Beyond Meat.

93. On information and belief, DLF used and is currently using the Beyond Meat Trade Secrets, including but not limited to ingredient formulations, binding systems, mixing processes, mixes and mixing times, sequences of ingredients, cooking temperatures, heating of essential ingredients, batch preparation steps, ingredient storage processes, and formula and product transportation requirements.  DLF is using those secrets to manufacture its *Better Than Beef Burger* and *Better Than Beef Crumbles*.[6]

94. Unlike Beyond Meat, who spent *years* and invested hundreds of millions of dollars developing the processes to replicate the composition of animal meat using solely plant-based ingredients, DLF had no comparable R&D department dedicated to studying the process of creating plant-based meat, and yet DLF was able to release products that resemble Beyond Meat's in terms of *look* in the same market space *less than two years* after the Supply Agreement was terminated.  In fact, DLF presented its plant-based burger raw to the consumer in the exact appearance of a *Beyond Burger*.

95. On information and belief, the Goodmans, on behalf of DLF, entered into the April 2016 Amendment with the intent and purpose of obtaining Beyond Meat's confidential and proprietary information and trade secrets.  As a result of this misappropriation, DLF is now a direct competitor of Beyond Meat.

**H.   DLF Uses Beyond Meat's Goodwill and Infringes Its Registered Trademarks.**

96. Since its inception in 2009, Beyond Meat has grown considerably, now having net revenues of $113,338,000 in the Second Fiscal Quarter of 2020.

97. Beyond Meat has offered several products in the United States in interstate commerce under the service mark BEYOND MEAT® since May 29, 2012.  It has also offered

---

[6] Although DLF has now created a plant-based line of products that resemble Beyond Meat's in terms of *look*, DLF has not been able to fully replicate the texture and taste of animal meat, having never received Beyond Meat's trade secrets for creation of its extrudate, the core component of Beyond Meat's products.  Instead, it roughly pieced together its own inferior plant-based mix and then used Beyond Meat's proprietary process for manufacturing plant-based meat in an attempt to profit off Beyond Meat's success.

22

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT

EXHIBIT 2
Page 22 of 117

products under the service mark BEYOND BEEF® since August 19, 2014.  In addition to customers in California, Beyond Meat sells its products under both marks to customers throughout the United States.  Beyond Meat's products can be found in more than 25,000 retail stores, and it has additionally partnered with several major retail fast-food restaurants and other restaurants around the country.

98.     Beyond Meat owns and uses U.S. Trademark Registration Nos. 4314689 and 4654352 in connection with plant-based meat-substitute food products including but not limited to Beyond Meat's *Beyond Burger*, *Beyond Beef*, and *Beyond Beef Crumble* products.

99.     Due to its lengthy and extensive marketing and use of these and its other marks over the past decade, Beyond Meat has a well-established presence, goodwill, and reputation in the animal-meat substitute industry for providing high quality plant-based products including burgers, sausages, beef "crumbles," and many other products.

100.     In order to raise recognition and to promote its brand, Beyond Meat has spent tens of millions of dollars promoting and advertising its products under the BEYOND MEAT® and BEYOND BEEF® marks.  As a result, BEYOND MEAT® and BEYOND BEEF® are recognized by the public, which has come to associate the marks as the source of plant-based products sold *by Beyond Meat*.  The public distinguishes Beyond Meat's products from those of other manufacturers on the basis of the BEYOND MEAT® and BEYOND BEEF® marks.

101.     DLF did not begin using the name *Better Than Beef* in the United States until September 2019.  Goodman Foods filed to register the mark "BETTER THAN BEEF" *for DLF's use* in connection with plant-based meat-substitute food products.  DLF has used the mark in interstate commerce on two products, the *Better Than Beef Burger* and *Better Than Beef Crumble*, which are akin to and compete directly with Beyond Meat's BEYOND MEAT® and BEYOND BEEF® line of products including the *Beyond Burger* and *Beyond Beef Crumbles*.

102.     DLF's *Better Than Beef* line uses the same descriptive concept as *Beyond Beef* or *Beyond Meat*—Beyond Meat's trademarks and branding.  Specifically, DLF's branding—like Beyond Meat's—suggests its plant-based food products exceed (or are superior to) animal meat.

23

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 23 of 117

In addition, the term "Crumble" is substantially similar to Beyond Meat's plant-based "Crumbles" and is meant to cause further consumer confusion.

103. As noted in **Figure A** above, prior to its relationship with Beyond Meat, DLF had developed a veggie patty that was a far cry from Beyond Meat's plant-based meat products.



104. The following is a comparison showing the parties' respective advertisements for their plant-based beef products, as depicted on their websites.

a. **Figure D** contains a screenshot of Beyond Meat's uncooked *Beyond Burger*, which was the result of years of R&D and substantial investment from Beyond Meat. Its raw (uncooked) appearance reflects a product that literally looks like an animal beef patty.



**(Figure D)**

24

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 24 of 117

b.      Conversely, **Figure E** demonstrates DLF's *Better Than Beef Burger* which was released *years* after Beyond Meat disclosed its trade secrets and DLF filed this retaliatory lawsuit.  This image reflects that DLF's branding strategy, like Beyond Meat's, is to market a plant-based burger that has the look of animal meat but that is *superior to* (*i.e.*, "beyond" or "better than") animal meat.  That strategy also incorporates the environmentally sustainable, vegan, and non-GMO attributes of the product, which Beyond Meat has long made central to its marketing efforts.



**(Figure E)**

b.      **Figure F** contains screenshots of Beyond Meat's *Beyond Beef Crumbles* and DLF's *Better Than Beef Crumble*, as depicted on the parties' respective websites.  Once again, these images demonstrate that DLF has leveraged Beyond Meat's branding concepts, including conceptualizing a type of "crumble" that is "better than" (or "beyond") the taste of ground beef.  The images even demonstrate similar food-staging photo techniques.

25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 25 of 117





**(Figure F)**

105. DLF's *Better Than Beef* products are also sold in the same markets and target the same customer base as Beyond Meat's *Beyond Meat* and *Beyond Beef* products.  For example, both Beyond Meat's and DLF's products have been sold in the following grocery stores:  Whole Foods, Publix, and Giant.

106. DLF acquired direct and constructive knowledge of Beyond Meat's marks through its contractual relationship with Beyond Meat and its familiarity with Beyond Meat's packaging and the qualities to identify on the packaging, such as non-GMO and vegan attributes.

107. DLF has even gone to great lengths to *advertise* its products in a manner that attempts to mimic Beyond Meat.  As just one example, reflected in **Figure G**, Beyond Meat

26

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 26 of 117

advertises its *Beyond Beef Crumbles* specifically for use in tacos and spaghetti. DLF markets its *Better Than Beef Crumble* in the same manner. DLF's marketing in this and other contexts shows how DLF is not only leveraging similar names (*i.e.*, "Crumble" versus "Crumbles"), but is also using Beyond Meat's advertising and branding approaches for its products.

**Tacos**





27

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

**Spaghetti**





**(Figure G)**

108.    More importantly, DLF's infringing activity has caused—and continues to cause—real and considerable consumer confusion.  A general search on popular online websites and platforms demonstrates as much.

a.    For example, **Figure H** demonstrates confusion caused by DLF's infringing activities.  The excerpted consumer "Tweet" in **Figure H** shows that in February 2019, a

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 28 of 117

consumer believed *DLF*—who sells its products at Costco—is the creator of the *Beyond Burger*, not Beyond Meat.



**(Figure H)**

b.    Furthermore, the excerpted consumer Instagram post in **Figure I**, dated January 7, 2020, like **Figure H**, mistakes a *Beyond Burger* for a *Better Than Beef Burger* (using a hashtag for the latter) from a restaurant called Nice Guys 100% Vegan which has only ever served the *Beyond Burger*, and never served the *Better Than Beef Burger*.



**(Figure I)**

c.    Because of the descriptive similarity to the *Beyond Beef* mark (*i.e.*, the fact that it represents plant-based meat that is "superior to" or "greater than" animal meat), many consumers

29

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 29 of 117

associated the "better than beef" phrase with Beyond Meat *before* DLF ever used it.  DLF knew that branding its products with this phrase would capitalize on Beyond Meat's existing customer base and create consumer confusion to its own benefit.

      d.     For example, the Tweet below in **Figure J** demonstrates a consumer using a "better than beef burger" hashtag, *over a year before* DLF released its *Better Than Beef Burger*. A&W has only ever sold the *Beyond Burger*—it has never sold DLF's *Better Than Beef Burger.*



**(Figure J)**

109.    There are *significant* additional examples of consumer confusion between the parties' products, which will inevitably continue as long as DLF is permitted to profit off the Beyond Meat Trade Secrets and infringe Beyond Meat's trademarks.

110.    By all accounts, DLF has profited from its infringing activities and its theft of the Beyond Meat Trade Secrets.

111.    It has released its plant-based line at large retail chains across the country, including Costco, Wal-Mart, and Kroger.  In a press release, DLF has claimed that it sold "more than a million Organic Plant-Based Burgers in less than sixty days, becoming the fastest growing product in its category."[7]  Donald Goodman was quoted in the same article stating:  "Interest in our Organic Plant-Based Burger has just exploded."  Moreover, Daniel Goodman told *Forbes* that DLF's plant-based products have become "a majority portion of the company's incremental sales, accounting for three-quarters of the total."[8]

---

[7] *See* Breakthrough Plant-Based Burger from Don Lee Farms SIZZLES with 1 Million Burgers Sold in Less Than 60 Days, *available at* https://www.businesswire.com/news/home/20180424005065/en/Breakthrough-Plant-Based-Burger-Don%C2%A0Lee-Farms-SIZZLES-1

[8] *See* Should Vegan Products Be Sold Alongside Meat and Dairy Items in Retail Stores?, *available at* https://www.forbes.com/sites/katrinafox/2018/05/07/should-vegan-products-be-sold-alongside-meat-and-dairy-items-in-retail-stores/#4d8bfa433204

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT

EXHIBIT 2
Page 30 of 117

112.    The only reason DLF's plant-based products are purportedly a "majority of the company's incremental sales" was and is because of DLF's use and misappropriation of Beyond Meat's intellectual property.

I.    **Donald and Daniel Goodman Double Down on Their Misconduct, Violate The NDA, and Attempt to Manipulate Beyond Meat's IPO and Stock.**

113.    Consistent with its trailblazing status in the plant-based meat industry, in 2019, Beyond Meat became the *first* plant-based meat brand to go public.  Its groundbreaking IPO on the NASDAQ trading exchange was accomplished on May 2, 2019—an event that was highly touted and widely celebrated.[9]

114.    With news of the looming IPO, the Goodmans engaged in a shocking and brazen attempt to interfere.  Their wrongful conduct violated several laws, as well as the Court's orders and the parties' NDA.

115.    The conduct started in the weeks running up to the IPO.  On March 8, 2019, DLF issued a false press release, which coincided with the last day of Expo West (a large food trade show).  The press release sought to tarnish Beyond Meat's reputation and success in unveiling several new products.  Among other things, it falsely claimed that DLF received "adulterated product" from Beyond Meat, and that DLF had been involved in the "development and launch of the Beyond Burger"—even though DLF had no role whatsoever in "develop[ing]" or "launch[ing]" the Beyond Burger.  In fact, DLF manufactured a *Beyond Burger* for the first time in September 2016, after the product was already being sold commercially.

116.    More significantly, DLF's press release falsely claimed that Beyond Meat was "currently" being sued for fraud.  In reality, the release was issued three days before the Second Amended Complaint was publicly filed by DLF whereby it alleged meritless fraud claims.

117.    Nevertheless, DLF and the Goodmans did not care about the truth.  The purpose of the press release was clear:  it was strategically positioned to coincide with the filing of DLF's

---

[9] *See* Beyond Meat Becomes First Vegan Meat Brand to IPO, *available at* https://www.livekindly.co/beyond-meat-set-to-become-first-vegan-meat-producer-to-launch-ipo

31

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2

frivolous fraud claim, and it was the initial step in DLF's crusade to illegally manipulate Beyond Meat's IPO and its stock price.

118.    Indeed, on April 29, 2019, *three days* before the IPO, Daniel Goodman, who was employed by DLF, blind copied ("bcc'd") his father Donald Goodman and emailed a *Bloomberg News* reporter a copy of a confidential site assessment report concerning Beyond Meat's manufacturing facility.  Daniel Goodman, in collaboration with Donald Goodman, misrepresented the nature of the report to smear Beyond Meat's reputation, falsely suggesting that Beyond Meat and its employees had improperly altered the report.  Nothing could be further from the truth.

119.    The Goodmans' conduct was an unconscionable breach of trust.  The site report was provided to DLF on February 22, 2016 under the strictest expectations of confidentiality, including the parties' NDA under which all such information is *presumed* confidential.  The report was also produced in the litigation and designated "Confidential" under the Court's protective order.

120.    The Goodmans (Daniel and Donald) utterly ignored these protections.  Their intentional disclosure led to the publication of a distorted article designed to influence the IPO.  In the early hours of May 3, 2019, the morning after the IPO, *Bloomberg News* published an article *quoting* from the confidential site assessment report.  What is worse, the article misleadingly stated that the report was "doctored,"[10] which was—and remains—highly (and contextually) inaccurate.  In particular, DLF's claim omitted key facts about the report's delivery and contents.  The misleading nature of the news article was solely due to the Goodmans' false statements and material omissions to *Bloomberg News*.

121.    Knowing they engaged in wrongful conduct, both DLF and the Goodmans spent months misleading Beyond Meat and the Court about the source of the disclosure.  Beyond Meat was left wondering how a confidential report shared under an NDA and that was subject to the

---

[10] *See* The Other Fake Meat:  Beyond Burger Clashes With Former Partner, *available at* https://www.bloomberg.com/news/articles/2019-05-03/the-other-fake-meat-beyond-burger-clashes-with-former-partner

32

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 32 of 117

Court's protective order had been leaked to the press on the eve of its long-awaited IPO.  It was only *after* Beyond Meat was forced to file a motion to compel DLF to produce communications with press organizations that the Goodmans were caught red-handed.

122.    It was clear why the Goodmans went to great lengths to cover up their conduct. They knew that disclosing false information in connection with an IPO was unlawful and even told the *Bloomberg News* reporter not to mention DLF as the source of the leak in an attempt to conceal their wrongful conduct.

123.    At no time, prior to disclosing the site assessment report, did Donald Goodman, Daniel Goodman, or anyone at DLF obtain written consent from Beyond Meat to disclose its confidential information, as required under Section 3.1 of the parties' NDA.

124.    On information and belief, DLF and the Goodmans have also shared Beyond Meat's confidential information—in violation of the NDA—with several other third parties, including press organizations.

125.    Section 14 of the NDA, as amended by Exhibit D to the Supply Agreement, provides that the "restrictions and obligations contained in this Agreement shall survive the termination of this Agreement."  (Ex. A.)  Thus, DLF was still under an obligation to refrain from disclosing Beyond Meat's confidential information at the time Daniel Goodman emailed a copy of the report to *Bloomberg News*.

126.    DLF's intentional and wrongful conduct has caused Beyond Meat harm.  Beyond Meat has been served with several derivative and shareholder class action lawsuits, whose claims (while frivolous) are in part based upon issues related to the confidential report and the false narrative surrounding that report that was advanced by Donald and Daniel Goodman.

**FIRST CAUSE OF ACTION**

**Violation of the California Uniform Trade Secrets Act ("CUTSA"),**

**Cal. Civ. Code §§ 3426.1-11**

**(Against DLF and Goodman Foods)**

127.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 126 above.

33

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 33 of 117

128.    Goodman Foods and DLF (the entity through which Goodman Foods primarily does its core business) has misappropriated—by acquisition, use, and unlawful disclosure—the Beyond Meat Trade Secrets and proprietary concepts and products in violation of California Civil Code § 3426 *et seq.*

129.    Beyond Meat invested substantial time, money, and other resources to develop its trade secrets and proprietary information.  The Beyond Meat Trade Secrets include but are not limited to ingredient formulations, binding systems, mixing processes, mixes and mixing times, sequences of ingredients, cooking temperatures, heating of essential ingredients, batch preparation steps, ingredient storage processes, and formula and product transportation requirements.[11]

130.    The proprietary business and product information of Beyond Meat's products, including but not limited to the *Beast Burger*, *Beastly Sliders*, *Beyond Burger* or "*Fresh Burger*," *Beyond Beef Crumbles*, *Homestyle Tenders*, *Italian Meatballs*, and *Grilled Chicken*, includes the Beyond Meat Trade Secrets, and in particular the processes for manufacturing them.  None of these trade secrets are or have ever been disclosed to the public.

131.    The Beyond Meat Trade Secrets are of significant value to Beyond Meat because they are not publicly known.  Yet, DLF (acting for itself and on behalf of Goodman Foods) acquired the Beyond Meat Trade Secrets in confidence and as a result of DLF's contractual and confidential relationship with Beyond Meat pursuant to the NDA and the Supply Agreement.

132.    The Beyond Meat Trade Secrets, however, were acquired by improper means including, *inter alia*, DLF's violation of its contractual obligations, and its fraudulent representations (and related concealment of material facts).  Whereby, in and around March and April 2016 and otherwise as described herein, DLF and the Goodmans misled Beyond Meat by representing:  (a) that DLF had the ability to (and would) manufacture Beyond Meat's products in a safe production environment with the correct infrastructure and competent personnel; and

---

[11] As discussed, these trade secrets do not include the core Beyond Meat food formula but the building blocks of how to combine the formula in a manufacturing process to create plant-based food products that look, feel, taste, and bind like animal meat.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2

(b) that DLF's true intent in entering into the Beyond Meat relationship was to engage as a good-faith co-manufacturer.

133.   Beyond Meat made reasonable efforts to keep the Beyond Meat Trade Secrets *secret* by, *inter alia*, repeatedly reinforcing the proprietary and secret nature of its products and know-how, requiring DLF to sign the NDA and Supply Agreement prior to disclosing the Beyond Meat Trade Secrets, marking documents as proprietary information, and requiring DLF-related visitors to Beyond Meat's locations to sign confidentiality agreements.

134.   Nevertheless, DLF (acting for itself and on behalf of Goodman Foods) has misappropriated, and is benefiting, using, and profiting from, the Beyond Meat Trade Secrets in breach of agreements, confidences, and the law.

135.   DLF (acting for itself and on behalf of Goodman Foods) has misappropriated Beyond Meat's Trade Secrets to launch its own new line of "plant-based meat-substitute products"—including the *Better Than Beef* line—which had never been produced, manufactured, conceived, or sold by DLF prior to its relationship with Beyond Meat.  In particular, this new line of products attempts to mimic Beyond Meat's extremely successful *Beyond Burger* and *Beyond Beef Crumbles*.

136.   During the course of DLF's business relationship with Beyond Meat, DLF manufactured both the *Beyond Burger* and *Beyond Beef Crumbles*.  In order to manufacture these products, DLF received, reviewed, and used the Beyond Meat Trade Secrets related to these products.  On information and belief, DLF is currently developing additional plant-based products that leverage the Beyond Meat Trade Secrets.

137.   On further information and belief, Donald and Daniel Goodman, in their capacities at DLF and Goodman Foods, were involved in the decision to manufacture the *Better Than Beef* plant-based products by misappropriating the Beyond Meat Trade Secrets.

138.   DLF (acting for itself and on behalf of Goodman Foods) has been unjustly enriched by its misappropriation of the Beyond Meat Trade Secrets and its use of them.

139.   Beyond Meat has suffered, and will continue to suffer, irreparable harm as a result of DLF's ongoing misappropriation of the Beyond Meat Trade Secrets.

35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 35 of 117

140. DLF's (acting for itself and on behalf of Goodman Foods) use and acquisition of the Beyond Meat Trade Secrets was a substantial factor in causing harm to Beyond Meat and causing DLF to be unjustly enriched.

141. Beyond Meat has suffered significant monetary damages resulting from the misappropriation of its trade secrets in an amount to be quantified at trial.

142. Moreover, Beyond Meat has suffered irreparable harm for which there is no adequate remedy at law and will continue to suffer irreparable harm unless this Court enjoins DLF from further misappropriating the Beyond Meat Trade Secrets. Accordingly, Beyond Meat is entitled to preliminary and permanent injunctive relief against DLF's and Goodman Foods' use of the Beyond Meat Trade Secrets to manufacture their own plant-based line of products, including the *Better than Beef* line.

143. Beyond Meat is further entitled to an award of exemplary damages and reasonable attorneys' fees because DLF's and Goodman Foods' misappropriation of the Beyond Meat Trade Secrets was willful, fraudulent, and malicious.

## SECOND CAUSE OF ACTION

### Breach of Supply Agreement

### (Against DLF)

144. Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 143 above.

145. In or about December 2014, Beyond Meat and DLF entered into the Supply Agreement, under which DLF agreed to manufacture, process, and package certain Beyond Meat food products. DLF agreed that it would do so in compliance with applicable laws and regulations, including state and federal laws intended to ensure food products introduced into commerce are safe for consumption.

146. Under the Product Warranty provision of the Supply Agreement, DLF also warranted, represented, and guaranteed to Beyond Meat that any products DLF manufactured would not be "adulterated or misbranded within the Federal Food, Drug, and Cosmetic Act [FDCA]."

36

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

147. DLF breached the Product Warranty provision of the Supply Agreement by its repeated failures to comply with applicable law, including the FDCA and the California FDCA.

148. Specifically, DLF, on more than one occasion, manufactured products for Beyond Meat that were "adulterated" as set forth in Section 402(a)(3) of the FDCA, in that they consisted "in whole or in part of any filthy, putrid, or decomposed substance," or were "unfit for food."

149. DLF also manufactured, processed, packed, and/or held Beyond Meat products under conditions that rendered them injurious to health, in violation of Sections 402(a)(1) and 402(a)(4) of the FDCA, as evidenced by the detection of serious pathogens at DLF's Mansfield, Texas facility (including *Salmonella* and *Listeria monocytogenes*), coupled with the presence of such pathogens in finished product manufactured by DLF. For the same reasons, DLF violated similar provisions of the California FDCA.

150. The positive test results for these pathogens at the Mansfield facility presented an immediate and material health and safety risk, requiring Beyond Meat to terminate the Supply Agreement. As such, DLF's lack of appropriate controls, insanitary conditions, and confirmed pathogenic contamination at its facility prevented it from performing its fundamental obligation under Section 1.1 of the Supply Agreement to fill all orders submitted by Beyond Meat. This is a separate, independent, and material breach by DLF of its contractual obligations.

151. The Supply Agreement also incorporates the parties' NDA pursuant to Section 6.2. By using and disclosing the Beyond Meat Trade Secrets without prior written consent as described herein, DLF further materially breached the Supply Agreement.

152. Separately, under the "Trademarks" provision of the Supply Agreement (Section 1.13), DLF acknowledged Beyond Meat's ownership of its trademarks and agreed that "[u]pon termination of this Agreement, [DLF] also agrees that it will immediately discontinue all use of the Trademarks."

153. DLF materially breached the Trademarks provision of the Supply Agreement by infringing Beyond Meat's trademarks by using a confusingly similar mark—the "*Better Than Beef*" mark—on substantially similar products, in nearly identical markets, and marketed to nearly identical customers. (*See infra*, ¶¶ 96 - 112.)

37

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 37 of 117

154.    Finally, by wrongly inducing Beyond Meat to build out the infrastructure at the Mansfield facility, and keeping and refusing to return Beyond Meat's equipment—purchased under the April 2016 Amendment—DLF further materially breached the Supply Agreement.

155.    By contrast, Beyond Meat performed all of its obligations, covenants and conditions under the Supply Agreement, except to the extent any such obligations, covenants or conditions were excused, prevented, or waived by DLF's acts or omissions.

156.    Beyond Meat has been damaged as a direct result of DLF's material breaches of the Supply Agreement as set forth herein, in an amount to be determined at trial.

157.    Beyond Meat has suffered irreparable harm for which there is no adequate remedy at law, and will continue to suffer irreparable harm unless this Court enjoins DLF's continued misconduct.  In addition to monetary damages, Beyond Meat is entitled to specific performance against DLF requiring DLF to cease using the Beyond Meat's Trade Secrets, Beyond Meat's trademarks, and other confidential information, and to return any and all equipment purchased by Beyond Meat.

158.    Beyond Meat is also entitled to recover its attorneys' fees and costs under the Supply Agreement.

### THIRD CAUSE OF ACTION

### Breach of the NDA

### (Against DLF)

159.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 158 above.

160.    On September 12, 2014, Beyond Meat and DLF entered into the NDA, under which DLF is prohibited from using any confidential information received by Beyond Meat, or disclosing that information to any third party without Beyond Meat's prior written consent.

161.    The Supply Agreement further provides that the obligation of confidentiality as described in the NDA shall "survive the termination of th[e Supply Agreement] for a period of three (3) years from the date of such termination."

38

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 38 of 117

162. Beyond Meat has performed all of its obligations, covenants, and conditions under the Supply Agreement and the NDA, except to the extent any such obligations, covenants or conditions have been excused, prevented, or waived by DLF's acts or omissions.

163. On February 22, 2016, Beyond Meat provided DLF with the site assessment report, which was strictly confidential under the parties' NDA. The site assessment report was also provided to DLF during discovery in this litigation with the document clearly designated as "Confidential."

164. Even though the Supply Agreement was terminated by Beyond Meat on May 23, 2017, under the terms of the NDA, DLF continued to be prohibited from disclosing Beyond Meat's confidential information, including the site assessment report, to any third party without Beyond Meat's prior written consent.

165. Despite this obligation, on April 29, 2019, Daniel Goodman—acting on behalf of DLF—emailed the confidential site assessment report to a reporter at *Bloomberg News*, blind copying his father Donald Goodman on the email. *Bloomberg News* is a third party to whom disclosure was prohibited without prior written consent.

166. This leak to the press was intended to, and did, coincide with Beyond Meat's May 2, 2019 IPO. The Goodmans and DLF *intended* to manipulate the IPO and the market for Beyond Meat's securities, in order to further DLF's fraudulent scheme to harm Beyond Meat and steal its trade secrets.

167. *Bloomberg News* published the contents of the report on May 3, 2019—one day after the IPO. After this publication, DLF misled Beyond Meat and the Court regarding the source of the leak. DLF falsely suggested for months that DLF and the Goodmans were not the source of the leak while knowing that Daniel Goodman provided the confidential site assessment report to *Bloomberg News*.

168. Neither DLF, Daniel Goodman, nor Donald Goodman ever sought or received Beyond Meat's prior written consent to disclose Beyond Meat's confidential information to *Bloomberg News*. Nor was such consent ever granted.

39

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 39 of 117

169.    As a result, DLF materially breached its obligations under the NDA by disclosing Beyond Meat's confidential information to a third party without prior written consent while the NDA was still in full effect.

170.    As a separate and independent ground for breach of the NDA, DLF materially breached its obligations to Beyond Meat by improperly and without authorization using and disclosing the Beyond Meat Trade Secrets to create DLF's own line of plant-based products.

171.    As a direct and proximate result of DLF's material breaches of the NDA, Beyond Meat has suffered and will continue to suffer monetary damages and reputational harm.

172.    In light of DLF's material breaches, Beyond Meat has suffered irreparable harm for which there is no adequate remedy at law.  Accordingly, in addition to damages, Beyond Meat is entitled to specific performance, including without limitation, an injunction precluding the continued use of the Beyond Meat Trade Secrets and other confidential information provided to DLF under the terms of the NDA.

## FOURTH CAUSE OF ACTION

### Negligent Supervision

### (Against DLF)

173.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 172 above.

174.    As noted above, on September 12, 2014, Beyond Meat and DLF entered into the NDA, under which DLF is prohibited from using any confidential information received by Beyond Meat or disclosing that information to any third party without prior written consent from Beyond Meat.

175.    Even though the Supply Agreement was terminated by Beyond Meat on May 23, 2017, under the terms of the parties' agreements, DLF continued to be prohibited from disclosing Beyond Meat's confidential information, including the site assessment report, to any third-party without Beyond Meat's prior written consent.

176.    As a signatory to the NDA and the Supply Agreement, and Beyond Meat's co-manufacturer, DLF owed Beyond Meat a duty of care in supervising the conduct of its

40

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 40 of 117

employees, representatives, agents, and contractors and in preventing them from behaving in a manner that was likely to result in clearly foreseeable injury to Beyond Meat, including by preventing DLF's employees, representatives, agents, and contractors from disclosing confidential information received from Beyond Meat to any third party without prior written consent, in violation of the NDA.

177.    At all relevant times, Daniel Goodman was employed by DLF, including as its Director of Development.  In that capacity, Daniel Goodman had direct access to Beyond Meat's confidential information.

178.    DLF had actual or constructive notice that Daniel Goodman created a particular risk to Beyond Meat of disclosure of its confidential information that required oversight.  It was foreseeable that DLF's failure to sufficiently supervise Daniel Goodman and ensure that appropriate controls were in place to prevent him from improperly using Beyond Meat's confidential information, or disclosing it to any third party without Beyond Meat's prior written consent, would cause Beyond Meat significant harm.

179.    As discussed herein, DLF breached its duty of care by, *inter alia*, failing to exercise sufficient oversight over Daniel Goodman's professional conduct, failing to ensure that appropriate controls were in place to prevent him from disclosing Beyond Meat's confidential information to any third party without prior written consent, and failing to supervise him to ensure that DLF fulfilled its obligations under the NDA.  Due to that failure of oversight, Daniel Goodman disclosed the site assessment report to *Bloomberg News*, misrepresented its contents, and lied about the disclosure, with the intent to interfere with Beyond Meat's IPO.

180.    DLF further breached its duty of care by failing to correct material misstatements and omissions that misled Beyond Meat and the Court regarding the source of the leak to *Bloomberg News*.

181.    As a direct and proximate result of DLF's negligent supervision, Beyond Meat has suffered and will continue to suffer monetary damages and reputational harm.

182.    Beyond Meat is also entitled to any and all equitable relief against DLF, including preliminary and permanent injunctive relief.

41

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 41 of 117

## FIFTH CAUSE OF ACTION

### Fraud (Fraudulent Inducement, False Promise, Concealment, and Intentional Misrepresentation)

**(Against DLF, Donald Goodman, Daniel Goodman, and Brandon Goodman)**

183.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 182 above.

184.    As specified herein, DLF and the Goodmans engaged in fraudulent acts with the intent to misappropriate Beyond Meat's intellectual property and destroy Beyond Meat's business.  These fraudulent acts include affirmative misrepresentations and related acts of concealment by Cross-Defendants.

185.    In or about April 2016, the parties entered into the April 2016 Amendment.  At and around that time and several weeks before in March 2016, the Goodmans (*specifically* Donald, Daniel, *and* Brandon Goodman) and other DLF representatives acting on their behalf made repeated representations to Beyond Meat representatives stating and indicating:  (a) that DLF would be able to manufacture Beyond Meat finished product safely in accordance with Beyond Meat's product standards at the Mansfield facility, that the facility was adequate for Beyond Meat's production needs, and that DLF had sufficient infrastructure and trained personnel, *and* (b) that DLF intended to be a good faith co-manufacturer.  These representations were confirmed in the agreements themselves (and in drafts of the agreements) and repeated verbally several times by DLF representatives.

186.    However, these representations were *false*.  First, DLF's Mansfield facility was *not* built safely and adequately to produce the products Beyond Meat required, revealed, *inter alia*, by the fact that the facility was structurally prone to material health hazards and that the facility had utterly insufficient infrastructure and incompetent personnel working there who could not run a manufacturing line of the size and type required.  Second, DLF never intended to be a good faith manufacturer, and instead engaged in fraudulent acts to receive, evaluate, and ultimately misappropriate the Beyond Meat Trade Secrets and infringe Beyond Meat's trademarks.

42

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 42 of 117

187.    DLF and the Goodmans (including Donald, Daniel, and Brandon) obtained the Beyond Meat Trade Secrets to use them to compete against Beyond Meat.  The brazen nature of DLF's conduct—shown in part by the release of its plant-based meat products the *Better Than Beef Burger*, and *Better Than Beef Crumble after* exiting its relationship with Beyond Meat— keenly demonstrates Cross-Defendants' fraudulent intent.

188.    DLF and the Goodmans also fraudulently *concealed* and failed to disclose several material facts which they had a duty to disclose.  There was a duty to disclose, because DLF and the Goodmans made the affirmative representations specified in paragraphs 48 through 66 above, which were incomplete and misleading given that DLF and the Goodmans were aware of the following additional facts which were known and accessible only to them and would have revealed the misleading nature of their scheme:

189.    First, DLF's Mansfield facility could not safely produce Beyond Meat's products (much less in accordance with Beyond Meat's established safety and product standards) and was not built structurally to do so; moreover, DLF retained immensely insufficient and untrained personnel who could not meet Beyond Meat's production needs.

190.    Second, DLF and the Goodmans never intended for DLF to be a good-faith co-manufacturer.  Instead, they misappropriated Beyond Meat's intellectual property to become its direct competitor.

191.    Like their affirmative misrepresentations, DLF's and the Goodmans' acts of concealment were materially misleading.  In particular, they failed to disclose that they intended to misappropriate the Beyond Meat Trade Secrets and infringe Beyond Meat's trademarks. DLF and the Goodmans had no reasonable grounds for concealing material facts from Beyond Meat. Indeed, the Goodmans knew, at a minimum, that DLF did not have the capacity to manufacture Beyond Meat's products safely and that DLF did not intend to be a good faith co-manufacturer. Those facts were material to Beyond Meat's decision to move certain of its operations to Mansfield.

192.    At the time of these representations and intentional acts of concealment, Beyond Meat was ignorant of their falsity, and that material facts were being withheld by DLF and the

43

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 43 of 117

Goodmans. Had Beyond Meat been aware, it would not have entered into the April 2016 Amendment, built out DLF's infrastructure at Mansfield, and provided direction to its employees on how to manufacture Beyond Meat's products. Beyond Meat most certainly would not have continued to provide confidential and proprietary information and trade secrets to DLF had it known DLF's and the Goodmans' true intentions.

193. Yet, in reasonable and justifiable reliance upon the representations and related omissions made by the Goodmans and DLF, Beyond Meat executed and performed under the April 2016 Amendment and continued to disclose substantial confidential and proprietary information and trade secrets to DLF.

194. As a proximate result of Beyond Meat being induced to enter into the April 2016 Amendment, and continue a co-manufacturing relationship with DLF, DLF and the Goodmans engaged in a fraudulent acts to misappropriate the Beyond Meat Trade Secrets. As a result of this scheme, Beyond Meat has suffered, continues to suffer, and is entitled to damages in an amount to be proven at trial.

195. DLF's and the Goodmans' conduct was intended to cause injury to Beyond Meat, subject Beyond Meat to cruel and unjust hardship in conscious disregard of Beyond Meat's rights, and otherwise cause Beyond Meat injury.

196. Their malicious intent is evidenced by their attempt to manipulate Beyond Meat's IPO and stock, their lies about doing so to this Court, and their other attempts to cover up their conduct. Their fraudulent conduct plainly amounts to malice, oppression, and fraud under Section 3294 of the California Civil Code, entitling Beyond Meat to punitive or exemplary damages in an amount sufficient to deter and punish DLF and the Goodmans.

197. Beyond Meat has suffered irreparable harm for which there is no adequate remedy at law due to DLF's and the Goodmans' fraudulent conduct, and will continue to suffer irreparable harm unless and until this Court enjoins DLF and the Goodmans. Accordingly, in addition to considerable damages, Beyond Meat is entitled to preliminary and permanent injunctive relief against DLF and the Goodmans.

44

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against DLF, Donald Goodman, Daniel Goodman, and Brandon Goodman)

198.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 197 above.

199.    In or about April 2016, Donald Goodman, Daniel Goodman, Brandon Goodman, and other DLF representatives acting on the Goodmans' and DLF's behalf, made repeated misrepresentations (as described in the Fifth Cause of Action) to Beyond Meat representatives stating and indicating:  (a) that DLF would be able to manufacture Beyond Meat finished product *safely* at the Mansfield facility and that the facility was adequate for Beyond Meat's production needs, and (b) that DLF intended to be a good faith co-manufacturer.  These representations were confirmed in the parties' agreements themselves and repeated verbally several times by DLF representatives (including the Goodmans).

200.    However, the representations were not true, and DLF and the Goodmans had no reasonable grounds for believing they were.  Indeed, DLF's Mansfield facility could not safely produce the products Beyond Meat required and did not remotely have the infrastructure or personnel for Beyond Meat's production needs.  Moreover, DLF never intended to be a good-faith co-manufacturer.  Instead, it engaged in fraudulent acts to receive, evaluate, and ultimately misappropriate the Beyond Meat Trade Secrets and infringe Beyond Meat's trademarks.

201.    At the time of these false representations, Beyond Meat was ignorant of their falsity, and that material facts were being withheld by DLF and the Goodmans.  Had Beyond Meat been aware, it would not have entered into the April 2016 Amendment and would not have continued to provide confidential information and trade secrets to DLF.

202.    Yet, in reasonable and justifiable reliance upon the representations and related omissions made by the Goodmans and DLF, Beyond Meat executed and performed under the April 2016 Amendment and continued to disclose substantial confidential and proprietary information and trade secrets to DLF.

45

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

203.    DLF's and the Goodmans' misrepresentations were intended to ensure Beyond Meat disclosed its trade secrets and moved certain operations to Mansfield.

204.    As a proximate result of Beyond Meat being induced to enter into the April 2016 Amendment, and otherwise continue a co-manufacturing relationship with DLF, DLF has misappropriated the Beyond Meat Trade Secrets.  Thus, Beyond Meat has suffered and is entitled to damages in an amount to be proven at trial.

205.    Beyond Meat has further suffered irreparable harm for which there is no adequate remedy at law.  Thus, Beyond Meat is entitled to preliminary and permanent injunctive relief.

### SEVENTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

### (Against DLF)

206.    Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 205 above.

207.    California law implies a covenant of good faith and fair dealing in all contracts between parties.  Thus, both the Supply Agreement and NDA entered into between DLF and Beyond Meat contain this covenant.

208.    DLF breached the implied covenant of good faith and fair dealing by engaging in fraudulent conduct to obtain and misappropriate Beyond Meat's confidential and proprietary information.

209.    Conversely, Beyond Meat performed all of its obligations, covenants, and conditions under the Supply Agreement and the NDA, except to the extent any such obligations, covenants or conditions were excused, prevented, or waived by DLF's acts or omissions.

210.    DLF additionally breached the implied covenant of good faith and fair dealing by using and disclosing Beyond Meat's confidential information, including the site assessment report, to a third party without prior written consent.  That action was taken with a deliberate intent to interfere with Beyond Meat's 2019 IPO and to manipulate Beyond Meat's stock price.  This conduct frustrated the purposes of the parties' contractual relationship and the trust Beyond Meat placed in DLF to protect its confidential information.

46

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 46 of 117

211. As a result of DLF's multiple breaches of the covenant of good faith and fair dealing, Beyond Meat has sustained damages to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Trademark Infringement/False Designation of Origin

### (15 U.S.C. § 1125 (a))

**(Against DLF and Goodman Foods)**

212. Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 211 above.

213. Beyond Meat is the sole and exclusive owner of the BEYOND MEAT® and BEYOND BEEF® trademarks used in connection with plant-based meat food products. Beyond Meat has caused its BEYOND MEAT® and BEYOND BEEF® products to be marketed, advertised, and promoted under the BEYOND MEAT® and BEYOND BEEF® trademarks.

214. As a result of this marketing, advertising, and promotion, the BEYOND MEAT® and BEYOND BEEF® trademarks have come to mean and are understood to signify Beyond Meat's products, and are one of the means by which those products are distinguished from the products of others in the same and in related fields.

215. On information and belief, Goodman Foods and DLF (on behalf of Goodman Foods) have registered and attempted to use a confusingly similar name—BETTER THAN BEEF—in interstate commerce in connection with DLF's sale of plant-based meat-substitute food products that neither originate from nor are authorized by Beyond Meat.

216. DLF's and Goodman Foods' use of such a confusingly similar name is likely to (and intended to) confuse, mislead, and deceive the public as to the origin of DLF's products, and/or cause the public to believe that Beyond Meat's BEYOND MEAT® or BEYOND BEEF® products and DLF's BETTER THAN BEEF products are in some way affiliated. This use thus constitutes a violation of the Lanham Act, including, but not limited to, 15 U.S.C. § 1125(a).

217. DLF's and Goodman Foods' mark is confusingly similar in appearance, sound, and/or meaning to Beyond Meat's federally registered marks, and is being used in connection with goods that are competitive with and similar to Beyond Meat's products.

47

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

218.   DLF's and Goodman Foods' use of the name BETTER THAN BEEF in connection with plant-based meat-substitute food products was intentional in that DLF knew that the name is confusingly similar to Beyond Meat's trademarks and that such use would deceive (and has deceived) the public and will cause (and has caused) actual customer confusion.

219.   DLF's and Goodman Foods' use of BETTER THAN BEEF in connection with plant-based meat-substitute food products constitutes infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1), and has caused substantial and irreparable injury to Beyond Meat's business reputation and goodwill.

220.   As a direct and proximate result of DLF's and Goodman Foods' trademark infringement, Beyond Meat is entitled to the equitable remedy of disgorgement of all revenues and/or profits wrongfully derived by DLF and Goodman Foods from their trademark infringement.

221.   These activities separately have caused and will cause irreparable harm to Beyond Meat for which Beyond Meat has no adequate remedy at law.  Specifically, Beyond Meat's BEYOND MEAT® and BEYOND BEEF® trademarks are unique and valuable property rights, and DLF's and Goodman Foods' infringement constitutes an interference with Beyond Meat's goodwill and customer relationships.  Thus, it will substantially harm Beyond Meat's reputation as a source of high quality food products.

222.   DLF's and Goodman Foods' wrongful conduct and the damages resulting to Beyond Meat are continuing.  Accordingly, Beyond Meat is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116(a).

## NINTH CAUSE OF ACTION

### Unfair Competition (Lanham Act, Securities Manipulation, FDCA, and Cal. FDCA)

### (Against DLF and Goodman Foods)

223.   Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 222 above.

48

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

224.    California's Unfair Competition Law ("UCL") defines unfair business competition to include *any* "unlawful, unfair or fraudulent" act or practice.  Cal. Bus. & Prof. Code § 17200, *et seq.*

225.    As detailed herein, DLF and Goodman Foods have engaged in numerous unlawful business acts and practices, including those that fall within the meaning of the UCL.  Such acts and practices include DLF's and Goodman Foods' infringement of Beyond Meat's BEYOND MEAT® and BEYOND BEEF® trademarks in violation of the Lanham Act (15 U.S.C. § 1125 (a)), as described in paragraphs 96-112.

226.    Moreover, DLF engaged in unlawful conduct when it tried to manipulate Beyond Meat's IPO and stock price in 2019 by disclosing to *Bloomberg News*—in violation of the parties' NDA and the Court's orders—a copy of the site assessment report and making misleading statements about the content and import of that report.

227.    Such conduct amounts, at a minimum, to multiple attempted violations of several federal and state securities laws that prohibit securities market manipulation, including without limitation, California Corporations Code Section 25400, *et seq.*

228.    Separately, DLF's conduct was unlawful under the FDCA and California FDCA.

229.    The FDCA prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated or misbranded," and "adulteration or misbranding of any food . . . in interstate commerce."  21 U.S.C. §§ 331(a)-(b).  A food is "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health," "consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food," or if it has been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  *Id*. § 342(a).

230.    The California FDCA further defines "adulterated" as any food that "consists in whole or in part of any diseased, contaminated, filthy, putrid, or decomposed substance, or if it is otherwise unfit for food," or if it "contains any poisonous or deleterious substance that may

49

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT

EXHIBIT 2
Page 49 of 117

render it injurious to health of man or any other animal that may consume it." Cal. Hlth. & S. §§ 110560, 110545.

231. DLF repeatedly manufactured food products for Beyond Meat that were "adulterated" within the meaning of both the FDCA and the California FDCA. Beyond Meat received multiple reports of foreign objects contained in finished product that DLF manufactured, processed, and/or packed. These items qualify as "filthy, putrid, or decomposed substance[s]" or substances that are "otherwise unfit for food," so their presence in Beyond Meat products causes such products to be adulterated in violation of both the FDCA and California FDCA.

232. Likewise, the *Salmonella* and *Listeria monocytogenes* pathogens found at DLF's facilities were dangerous pathogens to human health and qualify as a "poisonous or deleterious substance which may render [food product] injurious to health" under the FDCA and California FDCA. Accordingly, the presence of such pathogens in finished product manufactured, processed, and packaged at DLF's Mansfield facility causes such product to be "adulterated" in violation of the FDCA and the California FDCA.

233. DLF also prepared, packed, or held Beyond Meat's products under unsanitary conditions whereby such products may have become contaminated with filth and/or been rendered injurious to health. This is most clearly evidenced by the presence of pathogens in rooms of DLF's Mansfield facility in which Beyond Meat products were prepared, packed, or held. Beyond Meat also observed other unsanitary conditions at the facility, including live insects on food contact surfaces in the room in which Beyond Meat's fresh products were manufactured. These conditions rendered the Beyond Meat food products prepared, packed, or held therein to be adulterated, also in violation of the FDCA and the California FDCA.

234. DLF's business acts and practices are also unfair because the substantial harm suffered by Beyond Meat described herein outweighs any justification that DLF may assert for engaging in those acts and practices.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 50 of 117

235.   In addition, Beyond Meat could not have avoided the harm it suffered as a result of DLF's unfair acts and practices because DLF made every effort to obscure and conceal from Beyond Meat the existence and extent of its harmful acts and practices.

236.   DLF's business acts and practices were also fraudulent because a reasonable person would likely be deceived by DLF's material misrepresentations, omissions, and false promises, as described throughout this First Amended Cross-Complaint.

237.   DLF has thus engaged in business acts and practices that run afoul of the UCL. Through these business acts and practices, DLF has improperly obtained monies from Beyond Meat in the form of payments for fulfilled orders, infrastructure and equipment purchases, and other start-up costs.  DLF has also profited from selling products that misappropriate the Beyond Meat Trade Secrets and infringe Beyond Meat's trademarks.

238.   Beyond Meat requests this Court cause DLF to restore the money Beyond Meat has paid to DLF and issue an injunction barring DLF from continuing to engage in further acts of unfair competition, or otherwise exploiting Beyond Meat's confidential information.

239.   As a direct and proximate result of DLF's unlawful, fraudulent, and unfair business practices, Beyond Meat has suffered and will continue to suffer substantial damage in an amount to be proven at trial.  DLF must be required to disgorge and deliver to Beyond Meat all profits earned by DLF from its wrongful acts.  Moreover, Beyond Meat is entitled to recover restitution, including without limitation, all benefits DLF received as a result of its unlawful, fraudulent, and unfair business practices.

## TENTH CAUSE OF ACTION

### Conversion

### (Against DLF)

240.   Cross-Complainant repeats and incorporates by reference the allegations of paragraphs 1 through 239 above.

241.   Under Section 5 of the Supply Agreement, as amended, Beyond Meat owns certain tangible personal property that it has been unable to recover from the DLF Mansfield facility, including certain equipment purchased or leased by Beyond Meat and delivered to DLF.

51

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 51 of 117

242.    DLF has improperly asserted dominion and control over that property and has interfered with Beyond Meat's rights to recover this property.  In its May 23, 2017 termination notice, Beyond Meat requested access to the Mansfield facility so that it could remove its equipment.  This evidences Beyond Meat's clear intent to recover its property and its lack of consent to DLF's assertion of control over that property.

243.    Although DLF initially agreed to allow Beyond Meat access to recover its property, it later reversed course before Beyond Meat could complete the extraction effort.  Since then, DLF has retained possession of certain property belonging to Beyond Meat and continues to reap benefits from the use of such property.

244.    DLF's unlawful conversion of certain Beyond Meat property that remains at its Mansfield facility, and its continued exercise of dominion and control over that property, has directly and proximately caused, and continues to so cause, damages to Beyond Meat in an amount to be determined at trial.

245.    Specifically, Beyond Meat needed to procure new equipment in order to meet production demands.  Many of these costs would not have been incurred had Beyond Meat been allowed full, complete, and prompt access to the Mansfield facility to recover its remaining equipment for use in any ongoing manufacturing efforts.  In the meantime, Beyond Meat has suffered lost revenue in an amount to be determined at trial and reputational harm and loss of goodwill with respect to its customers.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Complainant Beyond Meat prays for judgment as follows:

1.    On the First Cause of Action:

    a.    For damages according to proof;

    b.    For exemplary damages in an amount sufficient to deter Cross-Defendants from further engaging in fraudulent and improper conduct;

    c.    For reasonable attorneys' fees and costs; and

    d.    For a preliminary and permanent injunction preventing DLF from

52

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED
CROSS-COMPLAINT
EXHIBIT 2
Page 52 of 117

further using or disseminating Beyond Meat's confidential and proprietary information and trade secrets, including in selling its own plant-based product lines.

2.    On the Second Cause of Action:

    a.    For damages against DLF in an amount to be determined at trial and sufficient to make Beyond Meat whole with respect to DLF's breaches of the Supply Agreement;

    b.    For specific performance; and

    c.    For attorneys' fees and costs, as provided in the Supply Agreement and permitted by law.

3.    On the Third Cause of Action:

    a.    For damages against DLF in an amount to be determined at trial and sufficient to make Beyond Meat whole with respect to DLF's breaches of the NDA;

    b.    For specific performance; and

    c.    For attorneys' fees and costs, as provided in the Supply Agreement and permitted by law.

4.    On the Fourth Cause of Action:

    a.    For damages against DLF in an amount to be determined at trial and sufficient to make Beyond Meat whole with respect to DLF's negligent supervision of Daniel Goodman; and

    b.    For a preliminary and permanent injunction.

5.    On the Fifth Cause of Action:

    a.    For compensatory damages according to proof;

    b.    For incidental and consequential damages, according to proof;

    c.    For punitive and exemplary damages; and

    d.    For a preliminary and permanent injunction.

6.    On the Sixth Cause of Action:

53

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT
EXHIBIT 2
Page 53 of 117

a.    For compensatory damages according to proof;

b.    For incidental and consequential damages, according to proof; and

c.    For a preliminary and permanent injunction.

7.    On the Seventh Cause of Action:

a.    For compensatory damage, according to proof;

b.    For incidental and consequential damages, according to proof;

c.    For specific performance; and

d.    For punitive and exemplary damages.

8.    On the Eighth Cause of Action:

a.    For general, special, actual and/or statutory damages, according to proof;

b.    For restitution and disgorgement of DLF's profits from the above-described activities;

c.    For the damages awarded to Beyond Meat for DLF's trademark infringement be trebled pursuant to 15 U.S.C. § 1117(b);

d.    For reasonable attorneys' fees and costs;

e.    For punitive and exemplary damages according to proof; and

f.    For a preliminary and permanent injunction preventing DLF from further infringing Beyond Meat's trademarks, including to prevent DLF from selling its infringing plant-based product line.

9.    On the Ninth Cause of Action:

a.    For such relief as may be permitted by law, including but not limited to restitution and disgorgement of monies received by DLF as a result of their misconduct alleged herein; and

b.    For a preliminary and permanent injunction.

10.   On the Tenth Cause of Action:

a.    For damages against DLF, in an amount to be determined at trial, equal to the value of the Beyond Meat property unlawfully

54

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 54 of 117

converted, or sufficient to make Beyond Meat whole with respect to DLF's unlawful conversion of such property.

11.   For prejudgment and post-judgment interest in the maximum amount provided by law; and

12.   For such other and further relief as the Court deems appropriate.

Dated:  August 11, 2020

Respectfully submitted,

LATHAM & WATKINS LLP


By: /s/ Marvin S. Putnam

Marvin S. Putnam
Laura R. Washington
10250 Constellation Blvd. Suite 1100
Los Angeles, California 90067
Telephone: + +1.424.653.5500
Facsimile:  +1.424.653.5501
Email: marvin.putnam@lw.com
Email: laura.washington@lw.com

*Attorneys for Cross-Complainant Beyond Meat, Inc. d/b/a Beyond Meat*

55

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2
Page 55 of 117

## **JURY DEMAND**

Cross-Complainant Beyond Meat, Inc. hereby demands a trial by jury on all issues so triable.

Dated:  August 11, 2020

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ Marvin S. Putnam
        Marvin S. Putnam
        Laura R. Washington
        10250 Constellation Blvd. Suite 1100
        Los Angeles, California 90067
        Telephone: + +1.424.653.5500
        Facsimile:  +1.424.653.5501
        Email: marvin.putnam@lw.com
        Email: laura.washington@lw.com

*Attorneys for Cross-Complainant Beyond Meat, Inc. d/b/a Beyond Meat*

56

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BEYOND MEAT'S FIRST AMENDED CROSS-COMPLAINT

EXHIBIT 2

# EXHIBIT A

EXHIBIT 2
Page 57 of 117



## Mutual Confidentiality Agreement

THIS MUTUAL CONFIDENTIALITY AGREEMENT ("Agreement") is made and entered into as of September 12, 2014, by and between Savage River, Inc., a Delaware corporation ("Savage River"), located at 1714 Commerce Court, Suite B Columbia, MO 65202; and Don Lee Farms, a division of Goodman Food Products, Inc. a California corporation ("Company"), located at 200 East Beach Ave, Inglewood, CA, 90302.

WHEREAS, the parties are mutually interested in evaluating the possibility of entering into a business relationship with each other; and accordingly the parties may disclose to each other certain information pertaining to their business that may be proprietary, confidential and, in some instances, trade secret information, which is highly commercially and competitively sensitive, that if disclosed or improperly used by the other party could be detrimental to the disclosing party. The parties acknowledge that their willingness to provide each other with such information or to enter into any future business relationship with each other is expressly contingent upon each party's agreement to treat such information in accordance with the terms of this Agreement.

NOW, THERFORE, in consideration of the disclosure(s) to be made by each party of such information, and other good and valuable consideration, the receipt and sufficiency of which is hereby mutually agreed and acknowledged, the parties agree as follows:

1.    Purpose. This Agreement is intended to set forth the understanding of the parties regarding the confidential treatment of certain non-public, proprietary, confidential and, in some instances, trade secret information, to be exchanged between the parties, and the resulting ownership of any enhancements, developments or modifications to any such proprietary, confidential and, in some instances, trade secret information disclosed hereunder. This Agreement shall not create any obligation on the part of either party to further discuss, negotiate or enter into any business relationship with the other party. It is hereby acknowledged by the parties to this Agreement, that the Company is in the business of researching, designing, creating, developing, manufacturing, selling and distributing various food products, and as such, has heretofore already researched, designed, created, developed, manufactured and/or sold other products similar to the products to be provided by Savage River hereunder and as identified on Exhibit B to this Agreement (collectively, the "Beyond Meat Products").

2.  Definitions. The terms defined in this Agreement shall have the meanings assigned to them as
set forth on Exhibit A which is attached to, Agreement and by this reference incorporated into and an integral part of, this Agreement.

1



3. Covenants.

3.1 Non-Disclosure. Recipient shall not disclose, without the prior written consent of the Disclosing Party any Confidential Information received from the Disclosing Party to any third party, except as required by law. Recipient shall maintain all Confidential Information received from the Disclosing Party in confidence and protect all such Confidential Information against unauthorized disclosure. Each party acknowledges and agrees that, in addition to any particular item that the Disclosing Party specifically indicates need to be treated as confidential, all information provided by the Disclosing Party to the Recipient shall be presumed to be Confidential Information.

3.2 Limited Disclosure. Each party shall maintain strict control over all Confidential Information received from the other party and shall strictly limit disclosure only to its Agents who need to know the Confidential Information for the purpose of evaluating the possible business relationship between the parties. Each party shall ensure that those Agents who are given access to any of the Confidential Information have been informed of the terms of this Agreement and have agreed to comply with all of its terms. Each party shall be responsible for any breach of this Agreement by its Agents.

3.3 Restrictions on Use. Company shall use Savage River Confidential Information and Know-How received from Savage River or Savage River Intellectual Property solely for the purpose of evaluating the possibility of entering into a business relationship with Savage River. Likewise, Savage River shall use Company Confidential Information and Know How received from Company or Company Intellectual Property solely for the purpose of evaluating the possibility of entering into a business relationship with Company. With respect to any New Company Intellectual Property developed solely by Company during the term of this Agreement, such New Company Intellectual Property shall be solely owned and may be used only by Company for its own purposes or for its financial or other gain or advantage. With respect to any New Savage River Intellectual Property developed solely by Savage River during the term of this Agreement, such New Savage River Intellectual Property shall be solely owned and may be used only by Savage River for its own purposes or for its financial or other gain or advantage.

3.4 Standard of Care. Each party shall use the same degree of care with respect to its obligations of confidentiality under this Agreement as it employs with its own information of a confidential nature, but in no event less than a reasonable standard of care.

3.5 Return or Destruction. All Confidential Information in tangible form, including, but not limited to, all notes, summaries, work papers, reports analyses, documents or other materials prepared by the Recipient using or containing Confidential Information received from the Disclosing Party, shall be, at the Disclosing Party's option, returned to the Disclosing Party or destroyed immediately upon the Disclosing Party's

2

DLF0053918

EXHIBIT 2
Page 59 of 117



request, including any versions stored in computer memories or other electronic media. An officer or other authorized representative of the Recipient shall certify to any such destruction.

3.6 Compelled Disclosure. In the event that the Recipient is requested or required by law or legal process to disclose any Confidential Information received from the Disclosing Party, it will provide the Disclosing Party with prompt notice of such request or requirement so that the Disclosing Party may consider seeking a protective order or other appropriate remedy. The Recipient shall use diligent efforts, at its expense, to limit any compelled disclosure, retain as much confidential treatment of the Confidential Information as is reasonably possible, allow the Disclosing Party to participate to the maximum extent permitted by law in any disclosure proceeding, and notify the Disclosing Party as soon as reasonably practicable of the items of Confidential Information so disclosed.

3.7 Existence of Agreement. Except as required by law or governmental regulation, neither party shall disclose, without the prior written consent of the other party: (i) the contents of this Agreement; (ii) the fact that the parties are evaluating the possibility of entering a business relationship; or (iii) the status of any such evaluation or possible business relationship.

3.8 Ownership of Confidential Information. Each party hereby acknowledges and agrees that the Confidential Information, including the Trade Secrets, Know How and Intellectual Property, of the Disclosing Party is the sole and exclusive property of such party and that no right or license is granted to the Recipient with respect to any of such Confidential Information. Recipient agrees to maintain all Confidential Information received from the Disclosing Party free from any legal or equitable claim of title or other encumbrance by it or any third party.

4. Warranties. Each party warrants that it has the right and authority to enter into this Agreement and to make any disclosure to be made hereunder, that no such disclosure shall violate any laws, regulations or rights of third parties, and that the terms of this Agreement are not inconsistent with any other agreements by which it is bound. Each party hereby acknowledges and agrees that, except to the extent as may be expressly set forth in a definitive written agreement executed as part of the business relationship between the parties, neither party has made any representations or warranties to the other party as to the accuracy or completeness of the Confidential Information, and that all Confidential Information is otherwise provided "as is". Neither party shall have any liability to the other party or its Agents resulting from the disclosure or use of the Confidential Information except to the extent expressly set forth herein or in any such definitive agreement between the parties.

3

DLF0053919

EXHIBIT 2
Page 60 of 117



5. Indemnification. Each party shall indemnify, defend and hold the other party and its Agents harmless from and against any and all third party actions, causes of action, claims, demands, proceedings, liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees, disbursements and other costs of litigation or other dispute resolution process) arising out of or related to the performance or breach by such party or its Agents of any of the terms of this Agreement.

6. Remedies. Each party hereby acknowledges that the Confidential Information, including the Trade Secrets, is of the character as to render the same unique, and therefore agrees that in the event of any breach of this Agreement by it, the other party could be irreparably and immediately harmed and may not be made whole by monetary damages alone. In the event of such a breach, and without prejudice to any rights and remedies otherwise available, such other party shall be entitled to seek equitable relief by way of injunction or decree of specific performance without the requirement of posting any bond.

7. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of California without regard to conflict of laws principles. Any action which is brought to enforce, interpret or to remedy any alleged breach of this Agreement shall be filed exclusively in any state of federal court located in Los Angeles county, California, and neither party shall object to the exercise of such court on any grounds, including without limitation, jurisdictional whether subject matter or personal.

8. Waiver. The failure or delay by a party in exercising any right, power or privilege under this Agreement shall not be deemed a waiver of such right power or privilege, nor shall any single or partial exercise thereof preclude any other further exercise of any right, power or privilege under this Agreement. No waiver of any term of this Agreement shall be binding unless made by means of a written instrument signed by a duly authorized representative of the party against whom enforcement of such waiver is sought.

9. Amendment; Binding Effect; Entire Agreement. This Agreement may not be amended, supplemented or otherwise modified except by a written instrument signed by a duly authorized representative of each party. The rights and obligations under this Agreement shall accrue to and be binding upon the successors and permitted assigns of the parties. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. No promises or understandings, either expressed or implied, exist between the parties with respect to the subject matter hereof unless contained in this Agreement. This Agreement supersedes all representations, warranties, commitments, offers, promises or contracts, of any kind of nature, whether oral or written, made prior to or contemporaneous with the execution of this Agreement with respect to the subject matter hereof.

4

DLF0053920

EXHIBIT 2
Page 61 of 117



10.     Notices. Any notice, consent, authorization or other communication required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, or be sent by facsimile or overnight express carrier with a confirmable means of delivery, or by certified mail, return receipt requested, postage prepaid, addressed in the case of each party to a duly authorized representative of such party at the address set forth at the beginning of this Agreement.

11.     Severability. Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

12.     Assignment. This Agreement may not be assigned by either party without the prior written consent of the other party, except that Company may assign this Agreement to any subsidiary or affiliate of Company without Savage River's consent.

13.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be original and all of which shall constitute one and the same instrument.

14.     Term. This Agreement shall continue in full force and effect until the parties conclude the evaluation contemplated hereunder by either entering into a business relationship or determining that such a relationship is inappropriate. The restrictions and obligations contained in this Agreement shall survive the termination of this Agreement for a period of three (3) years from the date of such termination unless the Confidential Information remains a trade secret under applicable law. For such trade secrets, the Recipient's obligations shall survive termination for as long as the Confidential Information remains a trade secret. For purposes of this Agreement, and without limitation to the foregoing, all (i) recipes, product specifications and formulations as provided and/or disclosed by Savage River; (ii) manufacturing processes and techniques as provided and/or disclosed by Company and (iii) marketing and distribution strategies of each Disclosing Party, are considered trade secrets.

Signatures on following page:

5



IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the sate first written above.

| Savage River, Inc. | Don Lee Farms |
|---|---|
| A Delaware corporation | A division of Goodman Food Products, Inc. |
| | a California corporation |

By: _____

Name: Donald Goodman

Its: President

By: _____

Name: ETHAN BROWN

Its: CEO

6

DLF0053922



## EXHIBIT A

Definitions. The terms defined in this Agreement shall have the following meanings as set forth below, which are by this reference incorporated into and an integral part of, this Agreement.

2.1 "Agents" shall mean a party's employees, officers, directors agents, advisors or contractors.

2.2 "Confidential Information" shall mean all information pertaining to a party's business, operations and activities, including, but not limited to, information concerning a party's customers, suppliers, products, services, product formulations, specifications and developments, product testing methods, results and data, packaging, packaging processes and procedures, apparatus, equipment, equipment designs, engineering drawings, manufacturing processes and procedures, production techniques, quality standards, distribution systems, research materials, marketing advertising and promotional plans and strategies, finances, books and records, computer software, and information technology, contracts, Know-How (as defined below), and other proprietary information or Trade Secrets (as also defined below), which is provided by a party to the other party, or any employee, officer, director agent, advisor, consultant or contractor of the other party, in any tangible or intangible form, including but not limited to, written and verbal communications, samples and computer and other electronic media. "Confidential Information" shall include notes, summaries, work papers, reports, analyses, documents and other materials prepared by the Recipient using or containing the the Disclosing Party's Confidential Information; provided however, shall not include information which (i) is or becomes publicly known and such public knowledge or disclosure is not the result of any act or failure to act on the part of the Recipient or its Agents, (ii) is, at the time of disclosure, already known to the Recipient, provided that the Recipient can demonstrate by written and dated material in the Recipient's possession that such information was known to and lawfully obtained by or learned by the Recipient prior to the time of disclosure, (iii) is information independently developed by the Recipient without the use of the Confidential information, or (iv) is information disclosed by a third party to the Recipient provided that such third party is not under a duty to keep such disclosed information confidential.

2.3 "Disclosing Party" shall mean the party disclosing Confidential Information to the other party.

2.4 "Savage River Know-How" shall mean any and all technical information presently available which is owned by Savage River and/or generated solely by Savage River during the term of this Agreement that relates to recipes, product specifications and

7

EXHIBIT 2
Page 64 of 117

DLF0053923



formulations of the Beyond Meat Products, and any modifications, enhancements or improvements to such recipes, product specifications and formulations of the Beyond Meat Products.

2.5 "Company Know-How" shall mean any and all technical information presently available which is owned by Company and/or generated solely by Company during the term of this Agreement that relates to processes, manufacturing processes, and any modifications, enhancements or improvements to such processes and/or manufacturing processes, and shall include, without limitation, all proprietary Company Intellectual Property regarding manufacturing data and any other Company Confidential Information relating to the manufacture or processing of any food products, including without limitation, the Beyond Meat Products.

2.6 "Recipient" shall mean the party receiving Confidential Information from the other party.

2.7 "Trade Secrets" shall mean business and technical information of either party, including, but not limited to, current and future customers, suppliers, products, services, Savage River Know-How, Company Know-How, formulations, processes, procedures, methods, systems, techniques, plans, compilations and other materials, that each party attempts to maintain in secret and that derive commercial value for each party from not being publicly known or readily ascertainable through independent development or reverse engineering.

2.8 "Company Intellectual Property" shall mean all ideas, expressions of ideas, concepts, discoveries, inventions, contributions, improvements, devices, technologies, designs, graphics, logos, images, renderings, trademarks, trade names, trade dress, service marks, names, slogans, words, copy and other creative material, computer software and information technology (including, but not limited to, any software codes, formulas, recipes, text, copy, associated files in whatever format and improvements thereto) which are either owned by Company as of the effective date of this Agreement or are created, designed, developed, discovered, and/or prepared solely by Company regarding a business relationship contemplated by this Agreement, including all proprietary rights in the foregoing, whether or not subject to patent, trademark of copyright protection.

2.9 "New Company Intellectual Property shall include any ideas, expression of ideas, concepts, discoveries, inventions, devices, technologies and designs which are improvements by Company of any Company Confidential Information, Company Know How, Company Intellectual Property or Trade Secrets disclosed to Savage River hereunder.

2.10 "Savage River Intellectual Property" shall mean all ideas, expressions of ideas, concepts, discoveries, inventions, contributions, improvements, devices, technologies, designs, graphics, logos, images, renderings, trademarks, trade names, trade dress,

8

DLF0053924

EXHIBIT 2
Page 65 of 117



service marks, names, slogans, words, copy and other creative material, computer software and information technology (including, but not limited to, any software codes, formulas, recipes, text, copy, associated files in whatever format and improvements thereto) which are either owned by Savage River as of the effective date of this Agreement or are created, designed, developed, discovered, and/or prepared solely by Savage River regarding a business relationship contemplated by this Agreement, including all proprietary rights in the foregoing, whether or not subject to patent, trademark of copyright protection.

2.11 "New Savage River Intellectual Property" shall include any ideas, expression of ideas, concepts, discoveries, inventions, devices, technologies and designs which are improvements by Savage River of any Savage River Confidential Information, Savage River Know How, Savage River Intellectual Property or Trade Secrets disclosed to Company hereunder.

*    *    *

9

DLF0053925

EXHIBIT 2
Page 66 of 117



EXHIBIT B

List of Beyond Meat Products:

Vegan Vegetable Protein Based Meat Analog Products consisting of:

Beef Crumbles

Sausage Crumbles

Burgers

Sliders

Meatballs

Chicken Strips

Chicken Poppers

Chicken Fingers

Veggie burgers

Sausage patties

Sausage links

Strips

Jerky

Soups, Chile

Burritos

Sandwiches

10

EXHIBIT 2
Page 67 of 117

DLF0053926

# EXHIBIT B



## EXCLUSIVE SUPPLY AGREEMENT

THIS EXCLUSIVE SUPPLY AGREEMENT (this "Agreement") is made and entered into as of December 2, 2014 ("Effective Date"), by and between Don Lee Farms, a division of Goodman Food Products, Inc., a California corporation ("Supplier") located at 200 East Beach Ave., Inglewood, CA, 90302, and Savage River, Inc., a Delaware corporation ("Buyer") located at 111 Main Street, El Segundo, CA 90245.

### RECITALS

A. The parties are mutually interested in entering into a business relationship with each other, after having previously entered into a Mutual Confidentiality Agreement (the "NDA"), which contained certain definitions which were incorporated therein and are incorporated herein as though fully set forth in this Agreement.

B. Supplier is in the business of researching, designing, creating, developing, testing, manufacturing, selling and distributing various food products. Buyer has developed certain food products as identified on **Exhibit A** to this Agreement (collectively, the "Beyond Meat Products").

C. Supplier and Buyer now wish to enter into this Agreement under which Supplier will design, test, manufacture and ship to Buyer on an exclusive requirements basis, the Beyond Meat Products and such other products as agreed to by the parties (each, a "Product" and collectively, the "Products").

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

**SECTION 1.**        **OBLIGATIONS OF SUPPLIER AND BUYER**

**1.1**    Supplier Obligations Generally. Supplier will sell to Buyer the Products defined in Recital C above according to the terms set forth in this Agreement and will use reasonable efforts, consistent with such efforts it uses with respect to other preferred customers, to fill all orders for Products submitted by Buyer. Supplier shall manufacture the Products in accordance with written specifications provided by Buyer as set forth on **Exhibit B**, which may be changed only by an amendment in writing signed by both Supplier and Buyer. Supplier's agreement to such amendment shall not be unreasonably withheld.

Division of Goodman Food Products, Inc.

1





**1.2. Buyer Obligations Generally.** Buyer shall purchase the Products from Supplier at the prices identified in **Exhibit C,** which prices are firm for the term of this Agreement, subject to freight and storage charges also identified in **Exhibit C.** During the term of this Agreement, Buyer shall purchase the minimum quantities of Products set forth on **Exhibit C** ("Minimum Required Purchases").



**1.3 Exclusive Contract.** Except as set forth below, Buyer shall purchase one hundred percent (100%) of its Products needs (otherwise referred to as all of Buyer's requirements therefor) from Supplier during the term of this Agreement, as renewed or extended from time to time in accordance with Section 3 below. Subject to the provisions of this Agreement, Buyer may not have the Products supplied by a supplier other than Supplier during the term of this Agreement, as renewed or extended. It is understood and agreed that this Agreement applies to all of the Products; unless (a) Buyer receives from Supplier written notice that Supplier is not able to supply such Products according to the specified delivery date, which written notice by Supplier shall be delivered to Buyer within ninety (90) days' of Supplier's receipt of written notice from Buyer of such order, specifying the quantity and date for delivery of such Products or (b) Supplier is unable to supply Product which meets the quality control standards set forth in the written specifications for that specific Product as set forth in Exhibit B. Notwithstanding anything set forth above, and provided Buyer has satisfied the Minimum Required Purchases set forth in **Exhibit B** of this Agreement, Buyer reserves the right to produce Products internally. Finally, since Buyer is agreeing to use Supplier as its exclusive external source of supply for the products, Supplier agrees that, Supplier will not manufacture or sell any vegan or vegetarian food products for any third party or under its own brand that contain the same list of ingredients and proportions of such ingredients as set forth on **Exhibit C** during the term of this Agreement, as renewed or extended, or any time thereafter.

**1.4 Ordering Products.** Buyer will submit orders to purchase Products to Supplier by the issuance of a written purchase order or similar document specifying the quantity, the model number (if available) of the Products to be purchased and the requested delivery date (the "Purchase Order"). Each order will be promptly accepted or rejected by Supplier. Buyer shall be required to order items as set forth on **Exhibit C.** Minimum quantity of each item is forty thousand (40,000) pounds per production run maximum 2 items, reference <u>Minimum Required Purchases</u> page.



2

EXHIBIT 2
Page 70 of 117



**1.5** **Terms of Order.** When a Purchase Order has been received by Supplier, it will constitute a firm and binding contract together with the terms of this Agreement. In the event of any inconsistency between the terms of any Purchase Order and this Agreement, the terms of this Agreement shall control such inconsistent terms.

**1.6** **Cancellation.** Purchase Orders received by Supplier under Paragraph 1.4 that have been accepted by Supplier cannot be cancelled except by written mutual consent of Supplier and Buyer; and Buyer shall be responsible for Supplier's cancellation changes.

**1.7** **Prices.** The prices for all Products sold by Supplier to Buyer hereunder will be F.O.B. Supplier's facility, and will include manufacturing, labor, overhead and thirty (30) days' storage charges. Prices will be at the prices set forth in this Agreement, which may be modified as also set forth below.

**1.8** **Payment Terms.** Payment of each invoice for Products ordered by Buyer will be made net thirty (30) days after shipment. If sales are made on "Open Account" by Supplier and Buyer does not pay in collectible funds according to payment terms, a late charge of 1 ½% of the unpaid amount will be added by Supplier for each 30 day period or any increment thereof that Buyer fails to pay the balance due according to terms.

**1.9** **Shipments/Pickups.** It is contemplated that Buyer will make their own arrangements for the pickup of all Products from Supplier's location. Supplier will promptly notify Buyer of any changes to shipment schedules that have previously been agreed to by Supplier and Buyer.

**1.10** **Method of Shipment.** Any special shipping instructions will be provided to Supplier by Buyer not later than the time that the related order is placed by Buyer; and any additional costs associated therewith shall be paid by Buyer. All Products shall be packed, marked, loaded and shipped in accordance with any specifications (if any) provided by Buyer, and the requirements of common carriers. Damage to any Product must be clearly noted on the Product's bill of lading at time of receipt of shipment of such damaged Product.



**1.11** **Title and Risk of Loss.** Title to, and possession of, the Products will pass to Buyer at the time that Supplier delivers the Products to the carrier for shipment. Buyer assumes and will bear the entire risk of loss and damage to the Products from any cause whatsoever while in transit and at all times thereafter, and no such loss or damage will relieve Buyer from its obligations under this Agreement. Buyer will notify Supplier and the insurance carrier of any such loss or damage.

Vendor Supply Agreement Production Inc.

3



**1.12    Defective Product.** Buyer shall be entitled to inspection of Product at time of a pre-shipment batch of Products manufactured. Supplier shall be responsible for the full cost of any finished goods inventory that is not salable because such finished goods inventory fails to meet the written Product specifications set forth in Exhibit B, or is (a) rejected by Buyer or its customers due to any failure to meet the written Product specifications set forth in Exhibit B, (b) is in breach of the Product Warranty set forth in Section 2.1, below or (c) is withheld or recalled due to food safety or mis-marking considerations which were caused solely as the result of any actions or failure to take any actions by Supplier.

**1.13    Trademarks.** Supplier acknowledges Buyer's ownership of the trademarks, distinctive markings and/or designs (hereinafter called "Trademarks"), which appear on the packaging materials and/or shipping containers for the Products and agrees not to use the Trademarks except as provided for in this Agreement. Supplier also agrees that its placing of the Trademarks on the packaging materials and/or shipping containers for the Products on behalf of Buyer does not constitute use of those Trademarks by Supplier. Supplier agrees to remove Buyer's Trademarks from any of the packaging materials and/or shipping containers that are unacceptable to Buyer or that remain in Supplier's possession or under its control upon termination of this Agreement so that such Product and/or packaging materials and/or shipping containers will not indicate in any way any association with Buyer when sold or otherwise disposed of by Supplier. Upon termination of this Agreement, Supplier also agrees that it will immediately discontinue all use of the Trademarks.

**1.14    Inspection.** Buyer shall have at all times during regular business hours when its Product is being manufactured and packaged, the right to enter Supplier's plant, upon notification to the manager of such plant, and inspect the manufacturing and packaging of all Products to determine if manufacturing and packaging are being performed in compliance with this Agreement and Buyer's quality standards.

**SECTION 2.**            **PRODUCT WARRANTY**

**2.1    Product Warranty.** Supplier agrees to comply with all applicable federal, state, and local laws, regulations, ordinances and rules, including, without limitation, those promulgated by the U.S. Food and Drug Administration, the U.S. Department of Agriculture, the U.S. Federal Trade Commission and the Environmental Protection Agency. Supplier warrants, represents and guarantees that all Products contained in each shipment or other delivery are: (a) not adulterated or misbranded within the Federal Food, Drug and Cosmetic Act, and not an article which may not be introduced into interstate commerce under such Act; (b) not adulterated or misbranded within



the terms of any state Pure Food or Net Weight Acts, or any other applicable federal, state, or local law, and not an article which cannot be legally transported or sold under the provisions of any federal, state, or local law; and (c) manufactured in accordance with the written product, packaging, labeling, quality and food safety specifications set forth in Exhibit B (collectively, the "Product Warranty"). In the event the Products are subjected to misuse, negligence, alteration, accident or repair by unauthorized personnel, or are otherwise tampered with after title pursuant to Section 1.11 above has passed to Buyer, Supplier's obligations under the foregoing warranty shall cease.

**2.2**    **Sole Remedy.** Subject to the conditions set forth in Section 2.1 above, with the exception of product liability claims brought by either Buyer's customers or customers of Buyer's customers, the sole and exclusive remedy for breach of any Product Warranty for any Product shall be the return of any nonconforming Product and either repayment of the purchase price thereof or replacement at the option of Supplier. All Products returned in connection with the Product Warranty may only be made with the prior authorization of Supplier, not to be unreasonably withheld.

**2.3**    **Disclaimer.** The warranties set forth above in this Section 2 are exclusive and in lieu of all other warranties. No other warranty, whether written or oral, is expressed or implied. Supplier expressly disclaims any warranties or merchantability or fitness for a particular purpose. In no event shall Supplier be liable for incidental, consequential, or special damages of any kind and however caused, including without limitation, loss of revenue or profit, loss of use of equipment or software, loss or interruption of business, loss of goodwill, cost of substitute equipment, facilities or services, or any claim of any customer for any such damages, even if Supplier has been advised of the possibility of such damages. The limitation of Supplier's liability provided for in the preceding sentence shall apply under all circumstances.

**SECTION 3.**        **TERM AND TERMINATION**

**3.1**    **Initial Term and Extensions.** This Agreement will become effective on the Effective Date set forth in the first paragraph and will, unless sooner terminated, (a) continue for an initial term of three (3) years, and thereafter (b) be automatically extended for one (1) additional periods of one (1) year each on the anniversary of the date of this Agreement unless written notice of termination is provided by one party to the other at least ninety (90) days prior to such anniversary date (with termination then being effective on such anniversary date).



**3.2** **Further Events of Termination** Either party may immediately terminate this Agreement by giving written notice to the other party if any of the following should occur: (a) bankruptcy, insolvency, or reorganization proceedings, or any other proceedings analogous in nature and effect, are instituted by or against the other party; (b) the other party is liquidated, whether voluntarily or involuntarily; (c) a receiver or trustee is appointed for all or substantially all of the property of the other party and not removed within thirty (30) days thereafter; or (d) the other party makes an assignment for the benefit of creditors.

**3.3** **Breach of Obligations.** If either party commits a material breach of any of its obligations under this Agreement and fails to cure said breach within thirty (30) days after receipt of written notice to do so by the other party, the other party may immediately terminate this Agreement by giving written notice thereof.

**3.4** **Consequences of Expiration or Termination.** Expiration or termination of this Agreement will have the following effects upon the rights and obligations of the parties hereunder:

**3.4.1** Except as expressly provided in this Section 3.4, all remaining obligations of Supplier to make deliveries of Products will cease upon the effective date of such expiration or termination.

**3.4.2** In the event of expiration pursuant to Section 3.1 or termination pursuant to Section 3.2 hereof orders accepted by Supplier during the term hereof will be completed as though expiration or termination had not occurred.

**3.4.3** In the event that Supplier terminates this Agreement prior to expiration of the term of this Agreement, including without limitation, due to Buyer's failure to meet the Minimum Purchases Required set forth in this Agreement or Buyer's breach of its obligations to purchase all of its Products requirements from Supplier and such termination is not for reason of material breach of this Agreement by Supplier, Buyer agrees as follows to: (a) pay Supplier a termination fee (the "Termination Fee"), which Buyer hereby acknowledges is not a penalty, rather it is an alternative means for Buyer to perform its obligations under the Agreement that partially compensates Supplier for the fact that Supplier has agreed to honor Buyer's purchase orders for Products, which has caused Supplier to not accept orders for other product manufacturing and upon which the prices charged Buyer hereunder is based in part. In the event Buyer fails to meet the Minimum Required Purchases as set forth in **Exhibit B** for any year, Buyer shall be responsible for paying a Termination Fee in the amount of twenty-five percent (25%) of the Processing Fee on

6

EXHIBIT 2
Page 74 of 117



the unfulfilled portion of the Minimum Required Purchases as also set forth in **Exhibit B** based on that year's average Processing Fee for all Products shipped. For example, if the Minimum Required Purchases is 5,000,000 pounds of all Products in year 1, and Buyer only orders and has shipped 4,000,000 pounds of all Products in year 1, and the average Processing Fee for that year 1 is eighty cents ($.80), then the Termination Fee shall be computed by multiplying 1,000,000 pounds by 25% by $.80 for a resulting amount of $1,000,000 x .25 x .80 = $200,000.00.

Buy also shall either use up or repurchase at Supplier's cost any authorized and unused raw materials used specifically by Supplier in the manufacture of the Products, as well as any packaging materials (in usable condition) that Supplier has in stock and that prior to such termination have been identified as being set aside for Products to be purchased by Buyer.

3.4.4   In the event that Buyer terminates this Agreement prior to expiration of the term of this Agreement, including without limitation, due to Supplier's failure to honor its exclusive supply commitment pursuant to the provisions of Section 1.3, above, and such termination is not for reason of material breach of this Agreement by Buyer, Supplier agrees to pay Buyer a termination fee (the "Buyer Termination Fee") which Supplier hereby acknowledges is not a penalty, rather it is an alternative means for Supplier to perform its obligations under the Agreement that partially compensates Buyer for the fact that Buyer has agreed to purchase Products exclusively from Supplier, which has caused Buyer to not pursue other sources of Product manufacturing. The Termination Fee shall be in the amount of twenty-five percent (25%) of the Processing Fee on the unfulfilled portion of the Minimum Required Purchases as also set forth in **Exhibit B** based on that year's average Processing Fee for all Products shipped. For example, if the Minimum Required Purchases is 5,000,000 pounds of all Products in year 1, and Buyer only orders and has shipped 4,000,000 pounds of all Products in year 1 before termination, and the average Processing Fee for that year 1 is eighty cents ($.80), then the Termination Fee shall be computed by multiplying 1,000,000 pounds by 25% by $.80 for a resulting amount of $1,000,000 x .25 x .80 = $200,000.00.

**SECTION 4.**          **FORCE MAJEURE**

No party will be liable in any manner, including without limitation any incidental, consequential or special damages of any kind, for failure to fulfill or delay in fulfilling all or any part of this Agreement which is due to any cause or circumstance beyond the control of such party, including without limitation acts of God, governmental orders, regulations or restrictions, war (whether declared or not), threat of war, warlike conditions, hostilities, sanctions, mobilization, blockage, embargo, detention, revolution, riot, looting, strike, lockout, plague or other epidemics, fire or flood.

A Division of Goodness Fong Products Inc.

7



## SECTION 5.          ADDITIONAL EQUIPMENT

Should additional equipment be required for processing any of the Products to be manufactured by Supplier for Buyer, Supplier will identify the equipment needed as set forth on Exhibit D and Buyer shall pay for (including but not limited to acquisition, installation, insurance, servicing and parts for continuous operation) and own all such equipment. Supplier will maintain the equipment with exception to parts and outside labor and have access to use the equipment for other production needs when the equipment is not in use. In the event the acquisition and use of any of the equipment to be purchased by Buyer hereunder in addition to and following the acquisition of any of the equipment identified on Exhibit D as of the Effective Date (the "Future Equipment") results in cost savings of the labor component of the pricing per pound of any Products manufactured and purchased hereunder, Supplier agrees to reduce the price per pound of such Products purchased hereunder in an amount equal to the amount of the actual cost savings realized from the Future Equipment purchased.

## SECTION 6.          MISCELLANEOUS

6.1     Nature of Relationship. Supplier and Buyer are and will remain independent business entities, not joint venture or partners. Nothing contained in this Agreement will be deemed or construed as constituting either party as an agent or legal representative of the other party for any purpose whatsoever, nor is either party granted any right or authority to assume or create any obligation or responsibility, express or implied, orally or in writing, on behalf of or in the name of the other party, or to bind the other party in any manner whatsoever.

6.2     Entire Agreement. This Agreement as well as the NDA constitute the entire agreement between the parties and wholly cancels, terminates and supersedes all previous negotiations, agreements and commitments, whether formal or informal, oral or written, with respect to the subject matter. The terms of the NDA, with the exceptions of Sections 3.3 and 14 which shall be modified as set forth in Exhibit D, shall remain in full force and effect as otherwise provided therein. In the event of any inconsistency between the terms of the NDA and this Agreement, the terms of this Agreement shall control such inconsistent terms.

6.3     Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of California without regard to conflict of laws principles. Any action which is brought to enforce, interpret or to remedy any alleged breach of this Agreement shall be filed .



exclusively in any state of federal court located in Los Angeles county, California, and neither party shall object to the exercise of such court on any grounds, including without limitation, jurisdictional whether subject matter or personal.

**6.4**     **Waiver.** The failure or delay by a party in exercising any right, power or privilege under this Agreement shall not be deemed a waiver of such right power or privilege, nor shall any single or partial exercise thereof preclude any other further exercise of any right, power or privilege under this Agreement. No waiver of any term of this Agreement shall be binding unless made by means of a written instrument signed by a duly authorized representative of the party against whom enforcement of such waiver is sought.

**6.5**     **Amendment; Binding Effect; Entire Agreement.** This Agreement may not be amended, supplemented or otherwise modified except by a written instrument signed by a duly authorized representative of each party. The rights and obligations under this Agreement shall accrue to and be binding upon the successors and permitted assigns of the parties. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. No promises or understandings, either expressed or implied, exist between the parties with respect to the subject matter hereof unless contained in this Agreement.

**6.6**     **Notices.** Any notice, consent, authorization or other communication required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, or be sent by facsimile or overnight express carrier with a confirmable means of delivery, or by certified mail, return receipt requested, postage prepaid, addressed in the case of each party to a duly authorized representative of such party at the address set forth at the beginning of this Agreement.

**6.7**     **Severability.** Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**6.8**     **Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other party, except that Supplier may assign this Agreement to any subsidiary or affiliate of Supplier without Savage River's consent.

**6.9**     **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be original and all of which shall constitute one and the same instrument.

9

EXHIBIT 2
Page 77 of 117

6.10    **Time.** Time is of the essence of this Agreement with respect to each and every provision of this Agreement in which time is a factor.

6.11    **Further Assurances.** Each of the parties agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Agreement.

6.12    **No Liability.** Supplier shall not be liable by reason of the termination or expiration of this Agreement to Buyer for compensation, reimbursement or damages on account of any loss of prospective profits on anticipated sales or on account of expenditures, investment, leases, or other commitments relating to the business or goodwill of Buyer. Buyer agrees to indemnify Supplier from all claims of its employees or representatives for similar compensation, reimbursement or damages.

6.13    **Attorney's Fees.** In the event that any party brings a suit against any other party for the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to obtain reimbursement from the non-prevailing party for all costs and expenses; including, without limitation, attorneys' fees and disbursements, incurred by the prevailing party.

*Signatures on following page:*

10

EXHIBIT 2
Page 78 of 117

IN WITNESS WHEREOF, the parties have executed this Agreement to as of the day and year first above written.

SUPPLIER:

Don Lee Farms, a division of
Goodman Food Products,
a California corporation

By: _____
       Donald Goodman

Title:    President

Date:    _____12/2/14_____

BUYER:

Savage River, Inc.,
a Delaware corporation

By: _____
       ETHAN BROWN

Title: [President]

Date:    _____11/26/2014_____

11

EXHIBIT 2
Page 79 of 117

**EXHIBIT A**

List of Beyond Meat Products:

Vegan Vegetable Protein Based Meat Analog Products consisting of:

Patties

Sliders

Meatballs

Chicken Poppers

Chicken Tenders

Other (as agreed to by both Buyer and Supplier)



**EXHIBIT B**

**PRODUCT SPECIFICATIONS**

**TO BE PROVIDED AND AGREED UPON BETWEEN BUYER AND SUPPLIER NO LATER THAN DECEMBER 9, 2014**

**TO BE PROVIDED BY BUYER**

13

**81**

EXHIBIT 2
Page 81 of 117



## EXHIBIT C

## PRICING AND PRODUCT PURCHASE MINIMUMS

Processing fee ("Processing Fee") for the Agreement

$.79 per pound for patties, sliders and meatballs

$.795 per pound for tenders and poppers (pre-marinated by Buyer)

The above Processing Fee prices do not include the following:

    (1) The price per pound for any liquid nitrogen used and
    (2) The cost of materials used, unless otherwise noted above.
    (3) Other than bulk pack

14



## MINIMUM REQUIRED PURCHASES

First year of Agreement – Four hundred Thousand (400,000) pounds of all Products shipped within first year.

Second and third years of Agreement – two million (2,000,000) pounds of all Products shipped per year.

For any year after the third full year of the Agreement, as mutually agreed in writing by the Parties, but in no event shall such year's Minimum Required Purchases be an amount less than 100% of the previous year's Minimum Required Purchases.

For purposes of calculating the aggregate pounds shipped during any year, that year shall run from the Effective Date, or the subsequent anniversary of the Effective Date through the 364th day thereafter. Each 365 day period shall constitute one year, and no overage or shortage of Products shipped within any one year shall be counted towards the Minimum Required Purchases for any other year.


Minimum orders shall be:

40,000 lb. for meatball items (spices pre-blended by Buyer by batch size) – 2 flavors total

40,000 lb. for patty/slider items (spices pre-blended by Buyer by batch size) – 2 flavors total

40,000 lb. for chicken tenders/poppers items (pre-marinated by Buyer) – 2 flavors total



# EXHIBIT D

## Revisions to Sections 3.3 and 14 of the NDA

Sections 3.3 and 14 of the NDA shall be revised to read as follows:

3.3  Restrictions on Use.  Company shall use Savage River Confidential Information and Know-How received from Savage River or Savage River Intellectual Property solely for the purpose of evaluating the possibility of entering into a business relationship with Savage River, as well for any purpose consistent with the goals and provisions of any resultant business relationship. Likewise, Savage River shall use Company Confidential Information and Know How received from Company or Company Intellectual Property solely for the purpose of evaluating the possibility of entering into a business relationship with Company, as well for any purpose consistent with the goals and provisions of any resultant business relationship. With respect to any New Company Intellectual Property developed solely by Company during the term of this Agreement or the subsequent Exclusive Supply Agreement dated as of October 31, 2014 ("Exclusive Supply Agreement"), such New Company Intellectual Property shall be solely owned and may be used only by Company for its own purposes or for its financial or other gain or advantage. With respect to any New Savage River Intellectual Property developed solely by Savage River during the term of this Agreement or the subsequent Exclusive Supply Agreement, such New Savage River Intellectual Property shall be solely owned and may be used only by Savage River for its own purposes or for its financial or other gain or advantage.

14.     Term.  This Agreement shall continue in full force and effect until the parties conclude the evaluation contemplated hereunder by either entering into a business relationship or determining that such a relationship is inappropriate. In the event the parties enter into a business relationship, this term of this Agreement shall terminate at the same time as the term of that Exclusive Supply Agreement between the parties which sets forth the parameters of their new business relationship. The restrictions and obligations contained in this Agreement shall survive the termination of this Agreement for a period of three (3) years from the date of such termination unless the Confidential Information remains a trade secret under applicable law. For such trade secrets, the Recipient's obligations shall survive termination for as long as the Confidential Information remains a trade secret. For purposes of this Agreement, and without limitation to the foregoing, all (i) recipes, product specifications and formulations as provided and/or disclosed by Savage River; (ii) manufacturing processes and techniques as provided and/or disclosed by Company and (iii) marketing and distribution strategies of each Disclosing Party, are considered trade secrets.

Confidential Greater Than Beef Products LLC, ...                                  16



## EXHIBIT E

### ADDITIONAL EQUIPMENT NEEDED

| PRODUCT | EQUIPMENT NEEDED | BUDGET COSTS |
| --- | --- | --- |
| Meatballs | Meatball forming head | $26,000 |
| Meatballs | Shuttle conveyor | $28,000 |

17

85

EXHIBIT 2
Page 85 of 117

# EXHIBIT C

## AMENDMENT TO
## EXCLUSIVE SUPPLY AGREEMENT

THIS AMENDMENT TO EXCLUSIVE SUPPLY AGREEMENT (this "Amendment") is made and entered into as of April 11, 2016, by and between Donna Lee Farms, a division of Goodman Food Products, Inc., a California corporation ("Supplier"), located at 200 East Beach Ave., Inglewood, CA 90302, and Savage River, Inc., a Delaware corporation ("Buyer"), located at 111 Main Street, El Segundo, CA 90245.

## RECITALS

A. The parties hereto have entered into a certain Exclusive Supply Agreement as of December 2, 2014 (the "Agreement").

B. The parties now wish to amend the Agreement as set forth below.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.      For purposes of the Agreement, the term "Start Date" shall mean the date that (a) all of the Additional Equipment set forth in Exhibit E is installed and operating and (b) the improvements set forth in Exhibit F are completed.

2.      Exhibits A, B, C and E to the Agreement are hereby amended in their entirety and replaced by Exhibits A, B, C and E to this Amendment, with the addition of new Exhibit F (Improvements and Additions), new Exhibit G (Pre-shipment Testing Requirements and Quality Standards) and new Exhibit H (External Agency Certifications).

3.      Section 1.2 of the Agreement is hereby amended in its entirety to read as follows:

1.2.    Buyer Obligations Generally. Buyer shall purchase the Products from Supplier identified in Exhibit C; provided, however, until the Start Date, the actual Products and the prices thereof shall be those presently being supplied and paid under the Agreement. From and after the Start Date, the Products and the prices thereof shall be as set forth in Exhibit C, which prices are firm for the term of this Agreement. From and after the Start Date and during the term of this Agreement, Buyer shall purchase the minimum quantities of Products set forth on Exhibit C ("Minimum Required Purchases"). Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed by the parties that Supplier has no obligation to furnish or supply any of the ingredients or packaging materials for the Products, all of which are to be furnished, supplied and delivered by Buyer at its sole cost and expense. Supplier's sole obligation is to process and package the Products solely with the ingredients and materials furnished, supplied and delivered by Buyer.

LA2480114.7
221655-10001

**87**

EXHIBIT 2
Page 87 of 117

4.    Section 1.3 of the Agreement is hereby amended to remove Buyer's right to produce Products internally except for pilot production activities. In the event that Buyer's production requirements exceed the physical footprint of Supplier's Mansfield, TX facility, Buyer shall give Supplier right of first refusal to expand the physical footprint of its facility at its own cost, in order to provide space to meet Buyer's production requirements.    Buyer and Supplier shall mutually agree to additional facility improvements and equipment requirements prior to commencement of facility expansion. Buyer would then be responsible for the purchase of any required equipment and reimbursement of facility infrastructure improvements in accordance with Section 5 of this agreement. In the event that supplier is unable or unwilling to increase or expand its factory footprint, then Buyer shall retain the right to produce such excess Products internally or with another external third-party manufacturer.

5.    Section 1.4 of the Agreement is hereby amended in its entirety to read as follows:

1.4    Ordering Products. Buyer will submit orders to purchase Products to Supplier by the issuance of a written purchase order or similar documents specifying the specific Product(s), the quantity, and the model number (if available) of the Product(s) to be purchased and the requested delivery date (the "Purchase Order"). Each order will be accepted or rejected by Supplier within three (3) business days of its receipt of the Purchase Order. Buyer shall order all Products in accordance with Exhibit C.

6.    Section 1.5 of the Agreement is hereby amended to provide that the Purchase Order constitutes a firm and binding contract when it has been accepted by Supplier.

7.    Section 1.8 of the Agreement is hereby amended in its entirety to read as follows:

1.8    Payment Terms. Payment of each invoice for Products ordered by Buyer shall be made the earlier of (a) net fourteen (14) days after shipment or (b) thirty (30) days after supplier notifies Buyer that the Products are ready for shipment, whichever occurs sooner. If sales are made on "Open Account" by Supplier and Buyer does not pay in collectible funds according to payment terms, a late charge of 1 ½% of the unpaid amount will be added by Supplier for each 30-day period or any increment thereof that Buyer fails to pay the balance due according to terms.

8.    Section 1.9 of the Agreement is hereby amended in its entirety to read as follows:

1.9    Shipments/Pickups. Buyer will make its own arrangements for the pickup of all Products from Supplier's location, at Buyer's sole cost and expense.

9.    Section 1.10 of the Agreement is hereby amended in its entirety to read as follows:

LA2480114.7
221655-10001

2

1.10 <u>Storage</u>. For any Product that is stored by Supplier for more than thirty (30) days, Buyer shall pay to Supplier an amount equal to $0.03 per pound for each thirty (30) days or portion thereof. Payments shall be made within ten (10) days after each thirty (30) day period. In addition to the foregoing, if any Product(s) are not picked up within six (6) months from the first day of storage, Supplier may dispose of such Product(s) without any obligation to liability to Buyer. Buyer shall reimburse Supplier for the costs of disposition.

10.     Section 1.12 of the Agreement is hereby amended to include the language as follows:

1.12 <u>Defective Product</u>. Buyer shall be entitled to inspection of Product at time of a pre-shipment batch of Products manufactured. Supplier shall be required to hold Product until Product has passed Buyer's Pre-shipment Testing Requirements and Quality Standards set forth in Exhibit G. Buyer will bear the cost and fees of all quality, certifications and other testing, including but not limited to costs incurred by Supplier in connection therewith (including but not limited to additional labor). Supplier shall be responsible for the full cost of any finished goods inventory that is not salable because such finished goods inventory fails to meet the written Product specifications set forth in Exhibit B, or is (a) rejected by Buyer or its customers due to any failure to meet written product specifications set forth in Exhibit B, (b) is in breach of the Product Warranty set forth in Section 2.1, below or (c) is withheld or recalled due to food safety or mis-marking considerations which were caused solely as the result of any actions or failure to take any actions by the Supplier.

11.     Section 1.14 Inspection of the Agreement is hereby amended to include the language as follows:

1.14 <u>Inspection</u>.   Buyer should have at all times during production or sanitation hours when its Product is being manufactured and packaged, the right to enter Supplier's plant, upon notification to the manager of such plant, and inspect the manufacturing and packaging of all Products to determine if manufacturing and packaging are being performed in compliance with this agreement and Buyers quality standards as specified in product specifications provided in Exhibit B and quality standards in Exhibit G.

12.     Section 1.15 External Agency Certifications is hereby added to the Agreement to include the language as follows:

1.15 <u>External Agency Certifications</u>. In as much as Buyer wishes to obtain various External Agency Certifications as described in Exhibit H (External Agency Certifications) for several of its Products, Buyer will bear all costs associated with Supplier preparing for, complying with and maintaining systems associated with the various certifying agency requirements. To this effect, Buyer agrees to reimburse Supplier for the addition of one or more Quality Assurance personnel hired by and compensated directly by Supplier at an annual cost of approximately $90,000 per year, charged back to Buyer for the specific purpose of administering the Buyer's quality

LA2480114.7
221855-10001

3

DocuSign Envelope ID: 8FD8060B-B649-465B-9159-A2054782F457

assurance, product traceability and inventory management programs at Supplier's premises. Buyer shall have the right to interface with and request information from said Quality Assurance personnel as required in order to conduct Buyer's aforementioned quality, product traceability and inventory management programs. Concurrent with the execution of this Agreement, Buyer shall pay to Supplier an advance of $90,000. It shall be Buyer's obligation to obtain the various External Agency Certifications. Buyer understands that Supplier makes no guarantee that any or all of the External Agency Certifications will or may be achievable and agrees that in the event that any or all of the External Agency Certifications are not achieved, that Buyer is still bound under the Minimum Required Purchases as outlined in Exhibit C of this contract. In the event that an External Agency Certification is deemed unachievable by Supplier (at its sole discretion) for a Product, due to complexity, business interference or for any other reason, Supplier agrees that Buyer may seek to manufacture that individual Product offering with an external third party, thus waiving its exclusive supply arrangement for that sole Product. Buyer understands that if such exclusivity is waived by Supplier for any single or combination of Products, that this in no way reduces the Buyer's Minimum Required Purchase commitment as outlined in Exhibit C.

13.    Section 2.1 of the Agreement is hereby amended to provide that, with respect to all raw materials and other items furnished by Buyer, Buyer shall have the same obligations and responsibilities that Supplier has under this Section 2.1.

14.    Section 3.1 of the Agreement is hereby amended in its entirety to read as follows:

3.1    Initial Term and Extensions. The term of the Agreement is hereby extended to end three (3) years after the Start Date, and thereafter be automatically extended for additional periods of one (1) year, with each year commencing on the anniversary of the Start Date unless written notice of termination is provided by one party to the other at least ninety (90) days prior to such anniversary date (with termination then being effective on such anniversary date).

15.    Section 3.3 of the Agreement is hereby amended to provide that a material breach by Buyer shall include, but not be limited to, the failure to pay any or all monies due to Supplier under this Agreement and the failure to furnish, supply and deliver all ingredients and materials provided for in Section 1.2.

16.    Section 3.4 of the Agreement is hereby amended in its entirety to read as follows:

3.4.    Consequences of Expiration or Termination. Expiration or termination of this Agreement will have the following effects upon the rights and obligations of the parties hereunder:

3.4.1 Except as expressly provided in Section 3.4.2, all remaining obligations of Supplier to make deliveries of Products will cease upon the effective date of such expiration or termination.

LA2480114.7
221655-10001

4

DocuSign Envelope ID: 8FD80808-B849-465B-9XX8-A2054782F457

3.4.2  In the event of expiration pursuant to Section 3.1, orders accepted by Supplier during the term hereof will be completed as though expiration had not occurred.

3.4.3  In the event that Supplier terminates this Agreement prior to expiration of the term of this Agreement pursuant to Section 3.3, In addition to any other rights and remedies to which Supplier is entitled, Buyer agrees to pay Supplier a termination fee (the "Termination Fee"), which Buyer hereby acknowledges is not a penalty but rather an alternative means for Buyer to perform its obligations under the Agreement, that partially compensates Supplier for the fact that Supplier has agreed to honor Buyer's purchase orders for Products, which has caused Supplier to not accept orders for other product manufacturing and upon which the prices charged Buyer hereunder is based in part. The Termination Fee shall be an amount equal to twenty-five percent (25%) of the Processing Fee on the unfulfilled portion of the Minimum Required Purchases for each of the remaining years of the term of the Agreement (or portion thereof) based on the weighted average Processing Fee for all Products purchased during the previous twelve (12) months.  For example, if the Agreement is terminated in the second year and the Products purchased was 4,000,000 pounds during that year, and the weighted average Processing Fee for the twelve (12) months prior thereto was eighty cents ($.80), then the Termination Fee shall be computed by multiplying 7,000,000 pounds by 25% by $.80 for a resulting amount of $1,400,000 (7,000,000 x .25 x .80 = $1,400,000).

17.    Section 5 of the Agreement is hereby amended in its entirety to read as follows:

Section 5.    Equipment and Improvements to Infrastructure.  The parties acknowledge that certain equipment has been installed, at Buyer's cost and expense, in Supplier's premises for the purpose of processing certain of the Products ("Original Equipment").  The parties agree that on or before May 15, 2016, Buyer shall, at its sole cost and expense, deliver to and install in Supplier's premises all of the equipment set forth in Exhibit E ("Additional Equipment").  For purposes of the Agreement, the Original Equipment and the Additional Equipment shall be referred to as the "Equipment".  In addition to paying for the Equipment and the installation thereof, Buyer shall also pay for insuring it at replacement cost. Buyer shall also be responsible for any and all parts and outside labor that Supplier reasonably deems are required in order for the Equipment to function properly. Supplier may, but shall not be obligated to, use its own employees to perform service on the Equipment.  Supplier has the authority to retain outside labor and purchase parts for the Equipment as it reasonably deems fit.  Buyer shall reimburse supplier for the cost thereof within ten (10) days after presented with a bill.

In connection with the installation of the Additional Equipment, Supplier may retain one or more consultants to assist in such installation.  Buyer shall reimburse Supplier for the cost of such consultants up to $500.00 per day (for a maximum of sixty (60) consulting days) plus travel expenses.  Such reimbursement shall be made within ten (10) days after Buyer receives a statement from Supplier.

LA2480114.7
221655-10001

5

Upon delivery of the Equipment, all of the Equipment (except for those items specifically purchased by Buyer as provided for in Exhibit E as amended from time to time) shall belong to and be owned by Supplier without any obligation to compensate Buyer. Supplier shall allow for buyer to file a UCC in the Supplier's domiciled state, identifying the Equipment located in Supplier's facility, which was purchased by and is reserved to Buyer. Any and all of the Equipment reserved to Buyer must be picked up by Buyer, at its sole cost and expense, within thirty (30) days of the termination; if not picked up within such thirty (30) day period, then Buyer shall immediately pay to Supplier the sum of $10,000.00, and if any of such Equipment is not picked up by Buyer within six (6) months of the termination, then such Equipment shall belong to and be owned by Supplier without any obligation to compensate Buyer; if Supplier elects to dispose of any such Equipment, the cost thereof shall be paid by Buyer. Upon the removal of Equipment by Buyer and/or the disposition of Equipment by Supplier, Buyer shall at its sole cost and expense restore Supplier's premises to the same condition as it was immediately prior to the installation of the Equipment. If Buyer does not so restore the premises within ten (10) days after removal or disposition, then Supplier may elect to restore the premises, in which event Buyer shall immediately reimburse Supplier for all costs and expenses associated therewith.

In order for Supplier to fulfill its obligations under this Agreement, it is necessary for Supplier to make certain improvements and additions to its premises. A description of such improvements and additions is set forth in Exhibit F attached hereto. As work progresses, and with Buyer's approval (which shall not unreasonably be withheld), Supplier may make changes that it deems reasonable. Although the parties estimate that the total cost thereof will be $1,089,600, the parties understand that such amount may differ. If the cost exceeds $1,089,600, Buyer shall pay the difference; if it is less than $1,089,600, Supplier shall reimburse such difference to Buyer. Supplier agrees to complete such improvements and additions within ninety (90) days after installation of the equipment provided for in Exhibit E. Concurrent with the execution of this Agreement, Buyer shall pay to Supplier the amount of $907,600, which covers the estimated cost of Phases 1 and 2 of Exhibit F. Prior to commencement of the Phase 3 work, Buyer shall pay to Supplier the amount of $182,000, which may be adjusted by Supplier.

[Signature Page Follows]

LA2480114.7
221655-10001

6

DocuSign Envelope ID: bf2e818a-0e36-c5fd...

IN WITNESS WHEREOF, the parties have executed this Amendment to as of the day and year first above written.

SUPPLIER:

Don Lee Farms, a division of
Goodman Food Products,
a California corporation

By: _____
Donald Goodman
Title: President

BUYER:

Savage River, Inc.,
a Delaware corporation

By: _____
Ethan Brown
Title: President

LA2480114.7
221655-10001

**93**

EXHIBIT 2
Page 93 of 117

## EXHIBIT A

List of Beyond Meat Products:

Vegan Vegetable Protein Based Meat Analog Products consisting of:

**SINGLE PROCESS ITEMS:**

"Chicken" Strips

"Beef" Crumbles

Raw ground "beef" loaf

Raw ground "beef" patties

Raw ground "beef" chub-packed

*DOUBLE PROCESS-STEP ITEMS:*

Beast Burgers

Beast Sliders

Meatballs

LA2480114.7
221655-10001

# EXHIBIT B

## PRODUCT SPECIFICATIONS

[TO BE FINALIZED AND MUTUALLY APPROVED BY BOTH BUYER AND SUPPLIER WITHIN 30 DAYS FOLLOWING COMMENCEMENT OF PRODUCTION OF THE PRODUCTS AT SUPPLIERS FACILITY]

LA2480114.7
221655-10001

**95**

EXHIBIT 2
Page 95 of 117

DocuSign Envelope ID: 8FD8060B-B649-465B-...-A2054782F457

## EXHIBIT C

PRICING

The prices paid by Buyer to Supplier for all Products ("Processing Fee") shall be as follows:

1. $0.79 per pound for single-step processing of raw materials, freezing and bulk packaging items of twenty (20) pounds or more. For example, "Chicken" strips, "Beef" crumble, and Raw ground "beef" patties.

2. $0.98 per pound for single-step processing of raw materials, freezing and retail packaging items that are less than twenty (20) pounds. For example, "Chicken" strips, "Beef" crumbles, Raw ground "beef" patties and Raw ground "beef" loaf.

3. $1.14 per pound when Buyer supplies hydrated raw material and Supplier cooks, freezes and retail packages into finished product that are less than thirty (30) pounds. For example, Cooked Beast Burger & Sliders, Meatballs and Breaded Chicken Tenders.

4. $1.49 per pound for processing raw materials, freezing and packaging into finished product on double process-step items. For example, Cooked Beast Burger & Sliders, Meatballs, Breaded Chicken Tenders.

5. There may not be more than two (2) processes in any one (1) package, in addition to freezing work-steps.

6. Each order must be for a minimum of 40,000 pounds.

7. Prices for Raw ground "Beef" chub-packed items shall be determined by Buyer and Supplier within thirty (30) days after the equipment is specified.

MINIMUM REQUIRED PURCHASES

First year of Agreement – four million (4,000,000) pounds of all Products purchased within first year.

Second year of Agreement – five million (5,000,000) pounds of all Products purchased within second year.

Third year of Agreement – six million (6,000,000) pounds of all Products purchased within third year.

For any year after the third full year of the Agreement, as mutually agreed in writing by the parties, but in no event shall such year's Minimum Required Purchases be an amount less than 100% of the previous year's Minimum Required Purchases.

LA2480114.7
221655-10001

For purposes of calculating the aggregate pounds purchased during any year, that year shall run from the Start Date, or the subsequent anniversary of the Start Date through the 364th day thereafter. Each 365-day period shall constitute one year, and no overage of Products shipped within any one year shall be counted towards the Minimum Required Purchases for any other year. In the event that Buyer does not purchase the Minimum Required Purchases for any year then, within ten (10) days after such year, Buyer shall pay to Supplier an amount equal to twenty-five percent (25%) of the Processing Fee of the unfilled portion of the Minimum Required Purchases for that year based upon the weighted average for all Products shipped during such year. For example, if the Minimum Required Purchases for that year is 5,000,000 pounds and Buyer purchased only 4,000,000 pounds at a weighted average of $0.80, then Buyer must pay to Supplier the sum of $200,000 (1,000,000 pounds multiplied by $0.80 by 25% = $200,000).

Each order must be for a minimum of 40,000 pounds.

LA2480114.7
221855-10001

11

EXHIBIT 2
Page 97 of 117

## EXHIBIT E

## EQUIPMENT

| PRODUCT | ESTIMATED INSTANTANEOUS LINE RATE (lbs/hr) | EXISTING AND PROPERTY OF DON LEE FARMS | EQUIPMENT | PURCHASE ($) | RENTAL ($/Mo.) | COMMENTS |
|---|---|---|---|---|---|---|
| **FROZEN (Phase 2)** | | | | | | |
| Beef Crumble | 3,900 | | | | | |
| Chicken Strips | 2,900 | | | | | |
| | | | Gaylord Tote Dumper (Combo Bin Dumper) | 20,000 | | Estimate to verify |
| | | | Lightning Mixer & Vessel for Marinade/Spices | 5,000 | | |
| | | YES | Cooking Steam Jacketed/Injected Paddle/Ribbon Mixer | | 3,280 | 72 mo lease to own purchase |
| | | | Floor Scale | * | | |
| | | | Buggie Dumper | 14,000 | | Estimate to verify |
| | | | Vibratory Dewatering Screen/Conveyor | 25,000 | | Estimate to verify |
| | | | Incline Belt Feeder (to Feed Freezer) | 25,000 | | Estimate to verify |
| | | | Storeveyor/Delivery Conveyor to Octofrost | 25,000 | | Estimate to verify |
| | | | IQF Freezer (Octofrost) | 450,000 | | |
| | | | Incline Conveyor to Scale | 50,000 | | Estimate to verify |
| | | | Stand-Up (Gusseted) Resealable Pouching Machine | | 9,000 | Rental estimate to verify. Need 95 bags/min to deliver 3900 lbs/hr @11oz, and 86 bags/min to deliver 2900 lbs/hr @9oz |
| | | | Washdown Scale (To supply Pouching Machine) | | 6,000 | New 5240L. Rental estimate to verify |
| | | | CEIA Metal Detector | 16,000 | | As currently used by DLF |
| | | | Top and Bottom Case Sealer SS InterTape | 18,000 | | As currently used by DLF |
| | | | **TOTALS EQUIPMENT FROZEN PRODUCTS** | **658,000** | **18,280** | |
| **FRESH BEEF (Phase 3)** | | | | | | |
| Patty | 2,000 | | | | | |
| | | | Gaylord Tote Dumper (Combo Bin Dumper) | 20,000 | | Estimate to verify. Format of crumble extrudate to verify. |
| | | | in-line Water Filter For Microbial Filtration | 1,000 | | 20 ppm |
| | | | Water Chiller | 15,000 | | Installed cost Batch Water Chiller, look into to Combine with Freon Cooling |
| | | | Mixer for Pasta | 25,000 | | Estimate to verify |
| | | | Mixer Buggie Dumper | 14,000 | | Estimate to verify |
| | | | Floor Scale | 10,000 | | Estimate to verify |
| | | | Load Cells for Mixer | 12,000 | | Including display |
| | | | Paddle/Ribbon Mixer | 20,000 | | DLF Estimate |
| | | | Vemag HP 20E | 148,600 | | From former Reiser Quote |
| | | | Inline Grinder | 33,700 | | From former Reiser Quote |
| | | YES | FM250 | * | | Patty & Slider Maker |
| | | | MMP 220 | * | | 78000 Loaf maker - For later |
| | | | Interleaver | 54,100 | | From former Reiser Quote |
| | | | Tray Depositor/Patty Stacker | 24,500 | | From former Reiser Quote |
| | | | Tray Sealer | | 15,000 | Estimate, we need 40-50 trays/min (preferably in one machine) for 2000 lbs/hr |
| | | YES | Compressor - for Tray Sealer | | | |
| | | | Water Chiller - for Tray Sealer | 15,000 | | Installed Cost Batch Water Chiller, look into to Combine with Freon Cooling |
| | | | "Mini-Bulk" Gas Tank System | | 1,400 | N2 & CO2 $700 each |
| | | YES | Gas Mixer | * | | |
| | | | Inkjet Printer to mount on Conveyor | 10,000 | | As currently used by DLF |
| | | | CEIA Metal Detector | 26,000 | | As currently used by DLF |
| | | | Top and Bottom Case Sealer SS InterTape | 18,000 | | As currently used by DLF |
| | | | **TOTALS EQUIPMENT FRESH BEEF** | **444,900** | **16,400** | |
| **FURTHER PROCESSING PRODUCTS (Phase 1)** | | | | | | HYDRATION AND COOLING ASSETS SAME AS FOR BEEF CRUMBLE |
| Beast Burger Sliders | 3,000 | | | | | |
| | | YES | Mixing, Patty Making, Cooking, Grilling, IQF | | | As currently done at DLF Inglewood factory |
| | | | Beast Burger Forming Plates Inventory 810215141 | | | Property of Beyond Meat currently at DLF Inglewood Factory |
| | | | Flow Wrapper | | 4,000 | |
| | | | Cartoner | | 7,950 | |
| Chicken Tenders/Poppers | 780 | | | | | |
| | | | Breader | 20,000 | | Used - Estimate |
| | | YES | Batterer | * | | |
| | | YES | Pre-dust Drum (Needs Repair) | * | | |
| | | YES | Fryer | * | | |
| | | YES | Scale & Bag Sealer | * | | |
| Meatballs | 700 | | | | | |
| | | YES | Meatball Extrusion Equipment | * | | |
| | | YES | Scale & Bag Sealer | * | | |
| | | | Shuttle Conveyor | * | | Property of Beyond Meat currently at DLF Inglewood Factory |
| | | | **TOTALS EQUIPMENT FURTHER PROCESSING PRODUCTS** | **20,000** | **11,950** | |
| | | | **TOTALS OF 3 CATEGORIES OF PRODUCT** | **1,122,900** | **46,630** | |

( 1 ) All equipment must withstand high pressure washing on a daily basis.

( 2 ) Buyer acknowledges that, from time to time Supplier will require additional equipment that it reasonably deems necessary in order to fulfill its obligations under this Agreement. Buyer agrees to deliver and install such equipment at its sole cost and expense.

LA2480114.7
221655-10001

EXHIBIT 2
Page 98 of 117

## EXHIBIT F

## IMPROVEMENTS AND ADDITIONS

| PRODUCT | ITEM | COST ($) | COMMENTS |
|---|---|---|---|
| **FROZEN (Phase 2)** | | | |
| Beef Crumble | | | |
| Chicken Strips | | | |
| | Ammonia Recirculator | 101,200 | |
| | Inner Cooler | 26,400 | |
| | Evapco PMC-889E Condenser | 132,000 | |
| | 3 Quantum HD Panels | 35,000 | |
| | Control | 28,000 | |
| | Ammonia Refrigeration System Install | 400,000 | |
| | Install - OctaFrost Mechanical, Moving Kettles, Blentech Mechanical & Electrical, Wall | 100,000 | |
| | Blentech Steam Install & Electrical OctoFrost | 25,000 | |
| | Upgrade/expansion to Fire Panel | 50,000 | |
| | Electrical Drops | 10,000 | |
| | TOTALS INFRASTRUCTURE/INSTALL FROZEN PRODUCTS | 907,600 | |
| **FRESH BEEF (Phase 3)** | | | |
| Patty | | | |
| | Blast Freezer Modifications | 80,000 | |
| | Room Refrigeration Package | 50,000 | |
| | Flooring Frozen & Fresh Area 2000 ft2 @ $10/ft2 | 10,000 | |
| | Freezer Door Repair/Replacement | 26,000 | |
| | Curtins & Wall Perforations | 5,000 | |
| | Various Electrical Installs & Lights | 5,000 | |
| | 1" Gas Flush Line to Fresh Beef Area | 6,000 | |
| | TOTALS INFRASTRUCTURE/INSTALL FRESH BEEF | 182,000 | |
| **FURTHER PROCESSING PRODUCTS (Phase 1)** | | | |
| Beast Burger & Sliders | N/A | | |
| Chicken Tenders/Poppers | Repair of Pre-dust Drum | | Discontinued |
| Meatballs | N/A | | |
| | TOTALS INFRASTRUCTURE/INSTALL FURTHER PROCESSING PRODUCTS | | |
| | TOTALS OF 3 CATEGORIES OF PRODUCT | 1,089,600 | |

\* This is an estimate. As per Section 5 of the Agreement, Buyer shall pay to Supplier an initial
payment of $907,600 for the commencement of Phases 1 & 2.

LA2480114.7
221665-10001

EXHIBIT 2
Page 99 of 117

## EXHIBIT G

### Pre-shipment Testing Requirements and Quality Standards

**Allergen/Sensitivities Information**

**Chicken-Free Strips (Breaded)**

| Allergen | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Soy | Present | Present | | |
| Wheat | Present | Present | | |
| Peanut | Absent | Undetectable | ELISA | * |
| Tree nut | Absent | Undetectable | ELISA | * |
| Fish | Absent | Undetectable | ELISA | * |
| Shellfish | Absent | Undetectable | ELISA | * |
| Milk | Absent | Undetectable | ELISA | * |
| Egg | Absent | Undetectable | ELISA | * |

**Chicken-Free Strips (Non-Breaded)**

| Allergen | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Soy | Present | Present | | |
| Wheat | Absent | Undetectable | ELISA | * |
| Peanut | Absent | Undetectable | ELISA | * |
| Tree nut | Absent | Undetectable | ELISA | * |
| Fish | Absent | Undetectable | ELISA | * |
| Shellfish | Absent | Undetectable | ELISA | * |
| Milk | Absent | Undetectable | ELISA | * |
| Egg | Absent | Undetectable | ELISA | * |
| Gluten | Absent | < 10 ppm | ELISA | * |

**Beef-free Crumbles, Burgers, Meatballs**

| Allergen | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Soy | Absent | Undetectable | ELISA | * |
| Wheat | Absent | Undetectable | ELISA | * |
| Peanut | Absent | Undetectable | ELISA | * |
| Tree nut | Absent | Undetectable | ELISA | * |
| Fish | Absent | Undetectable | ELISA | * |
| Shellfish | Absent | Undetectable | ELISA | * |
| Milk | Absent | Undetectable | ELISA | * |
| Egg | Absent | Undetectable | ELISA | * |
| Gluten | Absent | < 10 ppm | ELISA | * |

*For allergens run on the same line, allergen testing will be required for each production run; provided however, no testing is required when washdown occurs.

LA2480114.7
221655-10001

## EXHIBIT G

### Pre-shipment Testing Requirements and Quality Standards (Continued)

**Finished Product Microbiological Standards (ONLY FOR COOKED ITEMS).**

| Microorganism | Target | Upper Limit | Test Method | Test Frequency |
|---|---|---|---|---|
| Aerobic Plate Count | <10,000 cfu/g | <50,000 cfu/g | AOAC 990.12* | Every Lot** |
| Coliforms | <10 cfu/g | <100 cfu/g | AOAC 991.14* | Every Lot** |
| Salmonella | Negative | Negative/375 g | AOAC 2003.09* | Every Lot** |
| Listeria | Negative | Negative/25 g | AOAC RI #050903* | Every Lot** |
| E. coli O157:H7 | Negative | Negative/25 g | AOAC RI #031002* | Every Lot** |

\* Alternative method may be used with the prior approval of Beyond Meat

\*\* From washdown to washdown

**Finished Product Organoleptic Standards**

| Attribute | Target | Test Method | Test Frequency |
|---|---|---|---|
| Appearance | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |
| Texture | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |
| Flavor | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |
| Aroma | Will be specific to individual product – as approved by Supplier. | Sensory | Daily |

LA2480114.7
221655-10001

15

**101**

EXHIBIT 2
Page 101 of 117



## EXHIBIT H
### External Agency Certifications

| Non-GMO (Non-GMO Project/Food Chain Advisors) | | |
|---|---|---|
| **Beyond Meat Responsibilities** | **DLF Responsibilities** | **Audit Frequency & Certification Process** |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved<br>• Ensure all high-risk ingredients have non-GMO analysis documented and are using an approved lab.<br>• Perform internal audits and be able to show documented results and corrective actions.<br>• Have a traceability program and be able to demonstrate effectiveness.<br>• Ensure BYMT employees are properly trained.<br>• Document raw materials received at BYMT facility with supplier and lot code; show evidence that BYMT verifies incoming materials are not contaminated. | • Treat BYMT raw materials as you would an allergen program – keep segregated, don't store non-verified ingredients over BYMT ingredients<br>• Allow an annual audit of DLF facility<br>• Ensure BYMT products are properly labeled throughout the production process, including lot code<br>• Document raw materials (BYMT) received at DLF facility with supplier and lot code; show evidence that DLF verifies incoming materials are not contaminated<br>• Have a traceability program and be able to demonstrate effectiveness.<br>• Stated DLF monitoring, sampling, and testing procedures for BYMT products are actually being carried out.<br>• Ensure DLF employees are properly trained.<br>• Perform internal audits and be able to show documented results and corrective actions. | • Annual audit of BYMT Facility<br>• Annual Audit of DLF facility<br>• BYMT is in charge of certification process with the help of DLF cooperating with Non-GMO requirements and audits. |

| Kosher (Star-K) | | |
|---|---|---|
| **Beyond Meat Responsibilities** | **DLF Responsibilities** | **Audit Frequency & Certification Process** |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved<br>• Get all new equipment approved (new/used)<br>• Ensure all incoming raw materials are from approved suppliers and have Kosher symbol/Rabbi signature when necessary<br>• Keep Kosher certificates from suppliers up-to-date | • Notify BYMT of any new equipment to the production line (whether equip. is new or used)<br>• Allow Rabbi to watch production of BYMT products including an inspection of raw materials<br>• Allow Rabbi to review sanitation records<br>• Allow Rabbi to "Kosherize" equipment | • Rabbi will be present every production run<br>• Assist Rabbi while he is at DLF facility for production runs |

LA2480114.7
221655-10001

16

DocuSign Envelope ID: 8FD8060B-B849-465B-AF4B-A2054782F457

## EXHIBIT H
## External Agency Certifications (Continued)

| Gluten-Free (Gluten Free Certification Organization) | | |
|---|---|---|
| Beyond Meat Responsibilities | DLF Responsibilities | Audit Frequency & Certification Process |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved<br>• Get all new equipment approved (new/used)<br>• Test four lots of finished product/week for gluten<br>• All ingredients must be < 10 ppm gluten<br>• All finished product must be < 10 ppm gluten | • Notify BYMT of any new equipment to the production line (whether equip. is new or used)<br>• Swab any new equipment for gluten<br>• Maintain current allergen program to prevent contamination of non-allergen products with allergenic material.<br>• Any testing of ingredients and/or products must use an approved test method according to GFCO requirements.<br>• Only use GF symbol on certified products. | • Annual audit of BYMT Facility<br>• Annual Audit of DLF facility<br>• BYMT is in charge of certification process with the help of DLF cooperating with GFCO requirements and audits. |

| Vegan (Vegan Action) | | |
|---|---|---|
| Beyond Meat Responsibilities | DLF Responsibilities | Audit Frequency & Certification Process |
| • Get all ingredients approved<br>• Get all products approved<br>• Get all new suppliers approved | • Maintain current sanitation program and GMP's to ensure no contamination of Non-Vegan products with BYMT products and raw materials. | • BYMT is in charge of certification process with the help of DLF cooperating with Vegan Action requirements and audits (if applicable). |

*These requirements are based on the most up-to-date information provided to us by our certification groups and our current programs in place. These may be updated as each certification group requires.

# EXHIBIT D

EXHIBIT 2
Page 104 of 117

# COVINGTON

BEIJING   BRUSSELS   LONDON   LOS ANGELES
NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

**Mitchell A. Kamin**

Covington & Burling LLP
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
T  +1 424 332 4759
mkamin@cov.com

**By Electronic Mail and Federal Express**                    April 12, 2017

Donald Goodman
President
Don Lee Farms, A Division of Goodman Food Products, Inc.
200 E. Beach Avenue
Inglewood, CA 90302-3404

     RE:    Notice of Breach

Dear Mr. Goodman:

Reference is hereby made to that certain Exclusive Supply Agreement, dated December 2, 2014 and amended April 11, 2016 (as so amended, the "Supply Agreement"), between Savage River, Inc. ("Savage River") and Don Lee Farms, a division of Goodman Food Products, Inc. ("Don Lee Farms"). Terms used herein and not otherwise defined shall have the meanings given to them in the Supply Agreement.

Without waiving any contractual, legal, and/or equitable rights and/or remedies available to Savage River, all of which are hereby expressly reserved, this letter shall constitute notice pursuant to Section 3.3 of the Supply Agreement of numerous material breaches by Don Lee Farms of its obligations thereunder.

Specifically, we note that, pursuant to section 2.1 of the Supply Agreement, Don Lee Farms warrants, represents, and agrees that all products that it manufactures for Savage River are: (1) not adulterated or misbranded within the Federal Food, Drug, and Cosmetic Act (FDCA), and not articles which may not be introduced into interstate commerce under the FDCA; and (2) manufactured in accordance with the written product, packaging, labeling, quality, and food safety specifications set forth in Exhibit B to the December 2014 Agreement (the "Product Warranty").

Don Lee Farms is in material breach of the Supply Agreement, as set forth below:

1. Don Lee Farms has repeatedly manufactured products for Savage River that are adulterated as set forth in section 402(a)(3) of the FDCA, in that they consist "in whole or in part of any filthy, putrid, or decomposed substance," or are otherwise "unfit for food." Specifically, Savage River has received multiple reports of foreign objects in finished product that Don Lee Farms has manufactured, processed, and/or packed, as follows:

**105**

EXHIBIT 2
Page 105 of 117

**COVINGTON**

Donald Goodman
President
April 12, 2017
Page 2

    a.  On February 1, 2017 , Whole Foods Market reported finding a temperature stick, wrapped in a glove, inside a retail package of Beyond Burgers produced at Don Lee Farms.

    b.  On February 21, 2017 Savage River identified wood inside a bulk case of Beast Burgers.

    c.  On April 12, 2017, Savage River received a report from a customer who found a piece of parchment embedded in a Beyond Burger.

In addition to these egregious examples, Savage River is in the process of investigating additional customer claims regarding foreign materials found in its products, as manufactured, processed, and/or packed at Don Lee Farms.

2.  Don Lee Farms does not have appropriate controls in place to ensure that food products from its Mansfield, Texas facility are manufactured, processed, packed, and/or held under conditions that do not render them injurious to health. Specifically, your environmental monitoring program has identified *Listeria* spp. at various points throughout the facility environment. For example, *Listeria* spp. was identified on the floor of the Fresh Room in samples collected on January 20, 2017, and on the floor and in floor drains of the Fresh Room in samples collected on January 16, 2017. Savage River is awaiting additional information from Don Lee Farms in order to investigate and evaluate any follow up actions that Don Lee Farms has taken to address these, and other, findings.

FDA has repeatedly concluded that the presence of *Listeria* spp., including non-pathogenic strains, should be used as an indicator for the probable presence of *Listeria monocytogenes* in a processing environment. The finding of *Listeria* spp. demonstrates that conditions exist in your facility that could support the presence and growth of *Listeria monocytogenes* and indicates that your cleaning and sanitation practices are not adequate, which would cause products manufactured, processed, packed, or held in this facility to be adulterated under section 402(a)(4) of the FDCA.

Savage River further requests immediate access to the Mansfield, Texas facility for an independent third party analyst to perform environmental sampling for the presence of *Listeria* in the facility, as provided for under section 1.14 of the Supply Agreement.

3.  We are currently investigating reports that certain products that Don Lee Farms produced for Savage River may contain foods that are not identified on the product labels and are not included in our product specifications. This would cause such products to be misbranded under sections 403(a)(1) and 403(i) of the FDCA. For example, on April 5, 2017, Savage River, Inc. identified carrot slices—an ingredient used in products produced by Don Lee Farms but not used in Savage River, Inc. products—in its Beast Burger product. We will provide more information on additional investigations as soon as they are complete, but these reports provide further indication that your facility has not implemented appropriate controls to adequately protect against cross-contamination.

EXHIBIT 2
Page 106 of 117

**COVINGTON**

Donald Goodman
President
April 12, 2017
Page 3

4.  We understand that you do not intend to perform any temperature control in your Mansfield, Texas facility during the summer, when outside temperatures will cause the facility's internal temperature to rise significantly. FDA's current good manufacturing practice regulations for the manufacturing of human food require that all food manufacturing, processing, packing, and holding be conducted under such conditions and controls as are necessary to minimize the potential for the growth of microorganisms, allergen cross-contact, contamination of food, and deterioration of food. Given the anticipated temperatures in your Texas facility in the coming months, temperature control will be necessary to minimize the potential for the deterioration of food and the growth of microorganisms. The lack of temperature control will cause products produced in this facility to be adulterated under section 402(a)(4) of the FDCA.

Moreover, Don Lee Farms' failure to disclose the absence of, and need for, temperature control in order to ensure that the Mansfield facility could produce food safely prior to or during the parties' contract negotiations and budget setting process, and Don Lee Farms' subsequent claim that it had no obligation to do so, does not alleviate Don Lee Farms of its responsibility to fund and implement temperature control in the facility that it represented to Savage River was a facility capable of producing food safely. Quite the contrary — Don Lee Farms' material omissions and misrepresentations at the time the parties entered into their exclusive contract and established their operating relationship underscore Don Lee Farms' obligations and may expose it to additional damages.

5.  Don Lee Farms has communicated to Savage River that it does not intend to allow access to its Mansfield facility for inspection either by FDA or third party auditors for an evaluation of compliance with relevant FDA requirements. This refusal is a breach of section 1.14 of the Supply Agreement, under which Savage River has the right to enter the Mansfield facility and inspect the manufacturing and processing of Savage River products. Further, failure to allow FDA access to inspect a food facility is a prohibited act under section 301(f) of the FDCA. If Don Lee Farms continues to refuse access to its Mansfield facility for inspection for compliance with FDA requirements, Savage River will need to immediately transfer production of all product that requires a Certificate of Free Sale to another supplier.

Furthermore, Don Lee Farms has charged Savage River for "production minimums" that are not required by the Supply Agreement or any other agreement between the parties. Specifically, Don Lee Farms has purported to charge Savage River a "penalty" for Don Lee Farms failing to meet a *daily* production minimum of 20,000 pounds. As an initial matter, Don Lee Farms' failure to meet its desired daily production levels stems at least in part from Don Lee Farms' own use of inadequately trained personnel to operate manufacturing equipment. And in any event, the Supply Agreement does not impose any daily minimum on Savage River. Rather, Exhibit C of the April 11, 2016 Amendment establishes only two minimums that Savage River must meet — first, that each order must be 40,000 pounds, and second, that Savage River must satisfy annual order minimums of 4,000,000, 5,000,000, and 6,000,000 pounds in years 1, 2, and 3 of the agreement, respectively.

For clarity, Savage River does not agree to abide by a daily minimum requirement that does not exist in the Supply Agreement. In fact, we have consistently challenged Don Lee

EXHIBIT 2
Page 107 of 117

**COVINGTON**

Donald Goodman
President
April 12, 2017
Page 4

Farms' practice of charging on such daily production minimums. As such, any threats by Don Lee Farms to disrupt our business by ceasing production because of Savage River's purported failure to pay shall be considered an intention to breach on the part of Don Lee Farms and an intention to interfere with Savage River's contractual relationships, as any production stoppage would impair Savage River's ability to fulfill its obligations to retailers and other business partners. Savage River does not intend to pay any fees for daily production minimums for which Don Lee Farms has invoiced Savage River.

In addition, implicit in Don Lee Farms' obligation to fill all orders submitted by Savage River (*see* Section 1.1 of the Supply Agreement) is a requirement that Don Lee Farms hire personnel capable of operating the equipment necessary to produce Savage River's products. Savage River has, at its additional expense, made available to Don Lee Farms maintenance staff as a support function. This gesture does not relieve Don Lee Farms of its responsibility to effectively operate equipment and fulfill all orders submitted by Savage River. Please note that Savage River reserves the right to remove these resources at any time, and Don Lee Farms must ensure that such withdrawal does not impact its supply of products to Savage River. Don Lee Farms must, at all times provide competent, well-trained personnel to meet the requirements of the Supply Agreement without delays to production.

Throughout the parties' relationship, Savage River has fully met and even exceeded the obligations it owed to Don Lee Farms. For instance, after the parties negotiated a budget for making improvements at Don Lee Farms' Texas facility, the scope of the repairs far exceeded the agreed-upon estimate. Nonetheless, Savage River ultimately agreed to pay — and did pay — twice the estimated amount. By contrast, Don Lee Farms has repeatedly failed to honor its contractual obligations to provide products that comply with federal law and with Savage River's product specifications, as required by Sections 1.1 and 2.1 of the Supply Agreement.

Savage River demands that Don Lee Farms immediately comply with its obligations under the Supply Agreement. We expect Don Lee Farms to promptly implement a comprehensive and meaningful solution to remedy each of the material breaches outlined above. Under Section 3.3 of the Supply Agreement, you have thirty days from the date of receipt of this letter to cure said breaches. Following that 30-day period, Savage River will be entitled to terminate the Supply Agreement and will pursue any and all rights and remedies available to it. For the avoidance of doubt, this letter is without prejudice to any and all such rights and remedies.

Sincerely,

Mitchell A. Kamin
Counsel to Savage River, Inc.

**COVINGTON**

Donald Goodman
President
April 12, 2017
Page 5


cc:     Ethan Brown, President & CEO
        Savage River, Inc.
        111 Main Street
        El Segundo, CA 90245

        Harold Yu
        Orrick
        1000 Marsh Road
        Menlo Park, CA 94025

**109**

EXHIBIT 2
Page 109 of 117

# EXHIBIT E

EXHIBIT 2
Page 110 of 117

# COVINGTON

BEIJING  BRUSSELS  LONDON  LOS ANGELES
NEW YORK  SAN FRANCISCO  SEOUL
SHANGHAI  SILICON VALLEY  WASHINGTON

Mitchell A. Kamin

Covington & Burling LLP
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
T  +1 424 332 4759
mkamin@cov.com

**By Electronic Mail**                                    May 23, 2017

Gerald M. Chizever
Loeb & Loeb LLP
Counsel to Don Lee Farms, A Division of Goodman Food Products, Inc.
10100 Santa Monica Blvd, Suite 2200
Los Angeles, CA 90067

   RE:  Notice of Termination

Dear Mr. Chizever:

  This letter serves to notify you that, effective immediately, Savage River, Inc. ("Savage River") is hereby terminating the Exclusive Supply Agreement dated December 2, 2014 (as amended, the "Supply Agreement") by and between Savage River and Don Lee Farms, a division of Goodman Food Products, Inc. ("Don Lee Farms"), pursuant to Section 3.3 of the Supply Agreement, based on Don Lee Farms' failure to cure the repeated material breaches identified in Savage River's April 12, 2017 Notice of Breach ("Notice").[1]

  Don Lee Farms has repeatedly failed to demonstrate that it is capable of producing Savage River's products safely, in compliance with its contractual and regulatory obligations. Our concerns about Don Lee Farm's ability and willingness to take seriously its food safety obligations were compounded by our meeting yesterday.  We were shocked that you came to that meeting unprepared to discuss Savage River's very real health and safety concerns and without any ideas concerning a corrective action plan to address those problems.

  The very serious deficiencies in Don Lee Farms' manufacturing practices and processes, which we initially identified in the Notice, have unfortunately been confirmed in a variety of ways — most significantly, the finding of *Salmonella* at Don Lee Farms' facility, the recently detected presence of *Salmonella* in Savage River finished product manufactured by Don Lee

---

[1] The April 12 Notice of Breach also identified concerns related to the temperature control at the Don Lee Farms Mansfield facility.  Don Lee Farms subsequently sent a Notice of Breach to Savage River on April 26, 2017, asserting that Savage River has breached certain provisions of the Supply Agreement related to equipment and infrastructure upgrades for the purposes of temperature control.  We have separately responded to the April 26 Notice in our May 11, 2017 letter, and thus do not address Don Lee Farms' alleged breach claims here.

CONFIDENTIAL     **111**
**COE0077**    EXHIBIT 2 DLF0229481
Page 111 of 117

**COVINGTON**

Gerald M. Chizever
Loeb & Loeb LLP
May 23, 2017
Page 2

Farms, and a previous finding of *Listeria monocytogenes* at the facility. We note also that comprehensive third party environmental sampling conducted at Savage River's Missouri facility, from which Don Lee Farms receives certain ingredients for Savage River finished products, did *not* identify the presence of *Salmonella* (nor did Savage River's routine and regular environmental and product testing conducted at its facility). This means that Don Lee Farms is the only plausible source of the *Salmonella* contamination in Savage River's finished products.[2]

In light of these recent findings and the other adulteration incidents noted in our Notice — which confirm that the most recent pathogen findings are part of a much larger pattern and practice of inadequate control and poor sanitation at Don Lee Farms' facility — it is no longer tenable for Savage River to utilize Don Lee Farms to manufacture, process, and/or package its products. Indeed, Savage River believes it has an obligation to its customers, as well as a regulatory obligation, to exercise its contractual right to terminate, in order to ensure that the products Savage River distributes are safe. Moreover, because Savage River can no longer distribute product manufactured in the Mansfield facility due to the possibility of *Salmonella* contamination, and thus any production at the facility must immediately cease, Don Lee Farms is in material breach of its fundamental obligation to fill orders as required by Section 1.1 the Supply Agreement.

Without waiving any contractual, legal, and/or equitable rights and/or remedies available to Savage River, all of which are hereby expressly reserved, we also respond below to a number of assertions in your April 20 response to the Notice. As with yesterday's meeting, your response demonstrates Don Lee Farms' utter disregard for the serious health and safety concerns raised by Savage River, brushing aside these troubling examples as "isolated incidents" that did not result in any physical harm to any person, and focusing instead on Savage River's alleged unwillingness to pay for costly equipment and infrastructure upgrades that are several million dollars in excess of what the parties originally contemplated and that are not reasonably

---

[2] You continue to suggest without any support that the *Salmonella* in finished product could have been introduced by ingredients that Savage River provided to Don Lee Farms from its Missouri facility. This simply is not possible for reasons we've previously explained, including at yesterday's meeting. First, Savage River's manufacturing process for such ingredients includes a "kill step" that controls for any potential presence of pathogens in raw materials, and Savage River also has certificates of analysis for each raw material used in the relevant lots attesting to an absence of pathogens. Second, Savage River very recently conducted comprehensive environmental testing at its Missouri facility and did not identify the presence of *Salmonella*, as indicated in the reports we have shared with you, nor has Savage River ever identified pathogens within that facility or products manufactured at that facility. Third, the manufacturing process in the Don Lee Farms facility for one of the finished products that tested positive for *Salmonella* also includes a "kill step" that should control for any presence of pathogens in finished product. Fourth, Don Lee Farms processes raw chicken, a known source of *Salmonella*, in the same facility. Finally, environmental monitoring *did* identify *Salmonella* in the Don Lee Farms facility. Thus, the only plausible explanation for the contamination of Savage River finished product is that it occurred post-processing at the Don Lee Farms facility and is attributable solely to the fundamental lack of required food safety controls in that facility.

DLF0229482

**COVINGTON**

Gerald M. Chizever
Loeb & Loeb LLP
May 23, 2017
Page 3

necessary to manufacture Savage River's products. At yesterday's meeting, you again focused on Don Lee Farms' equipment demands first; Savage River's food safety concerns, including the recent positive *Salmonella* test results, weren't discussed at all until we raised the issue.

The most recent inspection results confirming *Salmonella* contamination at Don Lee Farms' facility clearly demonstrate that the many other incidents cited in our Notice are by no means isolated, but rather are further proof that the facility is simply unsuitable and unsafe for food production and wholly lacking in appropriate controls and procedures that are required to manufacture food safely.

Our concern is further amplified because Savage River *continues to regularly receive* reports of multiple foreign objects in finished Savage River products that Don Lee Farms has manufactured, processed, and/or packed. The following list identifies reports received since February 1, 2017 that Savage River has concluded are definitively linked to a lack of necessary controls at the Mansfield facility.

a. On February 1, 2017 , Whole Foods Market reported finding a temperature stick, wrapped in a glove, inside a retail package of Beyond Burgers produced at Don Lee Farms. In your April 20 response, you assert that Savage River employees are solely responsible for using and removing temperature sticks from Beyond Burgers and that Don Lee Farms was not involved in this situation at all. This is patently untrue. Don Lee Farms, not Savage River, places and removes temperature sticks from finished product, and thus the adulteration reported by Whole Foods is solely the fault of Don Lee Farms.

b. On February 21, 2017 Savage River identified wood inside a bulk case of Beast Burgers. Your response indicates that this was an isolated incident. However, Savage River has since received additional reports of wood in finished product that has clearly come from Don Lee Farms' facility and has also observed conditions in the facility that demonstrate a likelihood of such contamination to reoccur. For instance, on April 28, 2017, Savage River received a report that a customer found a piece of wood in a package of Beefy Crumbles that was manufactured and packaged by Don Lee Farms. More broadly, even if the February 21 incident *had been* an isolated one — which it is not — your letter's casual dismissal of the finding as a "one-off" suggests a broader disregard of Don Lee Farms' obligation to manufacture Savage River's products safely and in accordance with best practices.

c. On April 12, 2017, Savage River received a report from a customer who found a piece of parchment embedded in a Beyond Burger. In your April 20 response, you assert that Savage River supplied the parchment paper, and therefore that Don Lee Farms was not responsible for the presence of paper in the finished product. While you are correct that Savage River supplies parchment paper to Don Lee Farms, Savage River is in no way responsible for the presence of this parchment paper in finished product that Don Lee Farms manufactured, processed, and packaged. The parchment paper could have only become embedded in the finished product during the process of placing the finished

EXHIBIT 2
Page 113 of 117

PLF0229483

**COVINGTON**

Gerald M. Chizever
Loeb & Loeb LLP
May 23, 2017
Page 4

product into storage trays, a task for which Don Lee Farms is responsible.

d. On May 5, 2017, Savage River received a report that a customer found chunks of blue plastic in a package of Beefy Crumbles that was manufactured and packaged by Don Lee Farms.

e. On May 8, 2017, Savage River received a report from a food service customer that they found blue plastic embedded in Beyond Burger patties. This blue plastic is identical to the blue plastic sheets that Don Lee Farms uses in the Mansfield facility.

Savage River also explained in its Notice that Don Lee Farms lacks appropriate controls to ensure that food products from its Mansfield, Texas facility are manufactured, processed, packed, and/or held under conditions that do not render them injurious to health, noting multiple instances this year of the presence of *Listeria* spp. identified through the Don Lee Farms environmental monitoring program. The limited sampling Savage River was able to conduct on April 26 demonstrated continued issues related to pathogen control: one sample identified the presence of pathogenic *Listeria monocytogenes* on a zone 2 surface, and four additional samples identified the presence of *Listeria* spp. on zone 2 surfaces throughout the facility.

In addition to Savage River's many pathogen-related concerns, during recent visits to Don Lee Farms, Savage River has observed insanitary conditions that cause the Savage River products that Don Lee Farms manufactures, processes, packs, and holds to be adulterated under section 402(a)(4) of the FDCA. For example, on April 10, 2017, Savage River employees observed live insects on food contact surfaces in the "fresh room" of the Mansfield facility, immediately before production was to begin. On April 11, 2017, Savage River employees observed wood fragments of the same composition as those identified above on the surface of bags of finished Savage River product that were in process at the Mansfield facility. Coupled with the adulteration incidents cited earlier, the presence of *Listeria* spp. and *Listeria monocytogenes* in the facility, and the most recent test results confirming *Salmonella* contamination, these conditions make abundantly clear that Don Lee Farms is simply incapable of ensuring a safe environment for the production of Savage River products.

Under Section 3.3 of the Supply Agreement, Don Lee Farms had thirty days from the date of receipt of the Notice to cure its material breaches of the Supply Agreement. That 30-day cure period has now expired, and Savage River is hereby exercising its right to terminate based on Don Lee Farms' failure to cure. Moreover, in light of the presence of *Salmonella* at your facility and in finished product, and the danger of further contamination of Savage River's products, Don Lee Farms must immediately cease production of all Savage River products.

We expect Don Lee Farms' full cooperation to ensure an orderly transition of all manufacturing processes out of the Mansfield facility. Without limitation, we demand access to the facility on Thursday and Friday of this week (May 25-26), and on Saturday, June 3 and Sunday, June 4, in order to remove all Savage River equipment, raw materials, and other property in a timely manner. Please let us know by 5 p.m. Pacific Time tomorrow whether Don Lee Farms will provide access to its Mansfield facility at those dates and times.

CONFIDENTIAL

**114**
**COE0080**

EXHIBIT 2
DLF0229484
Page 114 of 117

**COVINGTON**

Gerald M. Chizever
Loeb & Loeb LLP
May 23, 2017
Page 5

In the event that Don Lee Farms does not agree to provide the requested access by close of business tomorrow, Savage River is prepared to file the enclosed complaint to recover its property promptly and to obtain relief in connection with Don Lee Farms' material breaches. In addition, Savage River expressly reserves the right to seek reimbursement of the over $2 million in infrastructure expenditures it has invested in the Mansfield facility, as well as the substantial start-up costs borne by Savage River in establishing its business relationship with Don Lee Farms.

Savage River reserves the right to pursue any and all rights and remedies available to it, whether at law, in equity, or under contract. For the avoidance of doubt, this letter is without prejudice to any and all such rights and remedies.

Sincerely,

Mitchell A. Kamin
Counsel to Savage River, Inc.

Enclosure

cc:    Ethan Brown, President & CEO
Savage River, Inc.
111 Main Street
El Segundo, CA 90245

Harold Yu
Orrick
1000 Marsh Road
Menlo Park, CA 94025

CONFIDENTIAL

EXHIBIT 2
DLF0229485

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Latham & Watkins LLP, 10250 Constellation Blvd., Suite 1100, Los Angeles, California, 90067. My email address is aimee.mandel@lw.com.

On **August 11, 2020**, I served the following document described as:

**BEYOND MEAT, INC.'S FIRST AMENDED CROSS-COMPLAINT FOR:**

**(1) VIOLATION OF CALIFORNIA  UNIFORM TRADE SECRETS ACT (CIV. CODE SECTIONS 3426, *ET SEQ.*);**
**(2) BREACH OF CONTRACT – SUPPLY AGREEMENT;**
**(3) BREACH OF CONTRACT – NDA;**
**(4) NEGLIGENT SUPERVISION;**
**(5) FRAUD;**
**(6) NEGLIGENT MISREPRESENTATION;**
**(7) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**
**(8) TRADEMARK INFRINGEMENT / FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(A));**
**(9) UNFAIR COMPETITION (LANHAM ACT, SECURITIES MANIPULATION, FDCA, CAL. FDCA); and**
**(10) CONVERSION**

by serving a true copy of the above-described document via electronic mail to the following parties:

| | |
|---|---|
| LOEB & LOEB LLP | LAPIDUS & LAPIDUS |
| Daniel A. Platt | Daniel C. Lapidus |
| dplatt@loeb.com | dan@lapiduslaw.com |
| Robert J. Catalano | Jim D. Bauch |
| rcatalano@loeb.com | jim@lapiduslaw.com |
| Safia Gray Hussain | 177 South Beverly Drive |
| sghussain@loeb.com | Beverly Hills, CA 90212 |
| 10100 Santa Monica Blvd., Suite 2200 | |
| Los Angeles, CA 90067 | *Attorneys for Defendant and Cross-Complainant* |
| | *ProPortion Foods, LLC* |
| *Attorneys for Plaintiff and Cross-Defendant* | |
| *Don Lee Farms, a division of* | |
| *Goodman Food Products, Inc.* | |

On **August 11, 2020**, I also caused the above-described document to be prepared to be transmitted by the United States Postal Service priority mail service on August 11, 2020 to the following party:

LAPIDUS & LAPIDUS
Daniel C. Lapidus
Jim D. Bauch
177 South Beverly Drive
Beverly Hills, CA 90212

*Attorneys for Defendant and Cross-Complainant ProPortion Foods, LLC*

116

PROOF OF SERVICE

EXHIBIT 2
Page 116 of 117

I declare that I am employed in the office of a member of the Bar of California, or permitted to practice before this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **August 11, 2020**, at Los Angeles, California.

_____
Aimee Mandel

117

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

PROOF OF SERVICE

EXHIBIT 2
Page 117 of 117